**EXHIBIT A**

**Filing Copy in Substantially Final Form**

SENIOR SECURED SUPER-PRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT

between

600 COMMONWEALTH PLACE, L.P.,

as the Lender,

and

SHUBH HOTELS PITTSBURGH, LLC,
as the Debtor

and

ATUL BISARIA,
as the Guarantor

Dated:

September 15, 2010

## SENIOR SECURED SUPER-PRIORITY DEBTOR-IN-POSSESSION
## CREDIT AGREEMENT

THIS SENIOR SECURED SUPER-PRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT, dated as of September 15, 2010, is entered into by and among SHUBH HOTELS PITTSBURGH, LLC ("Debtor"), ATUL BISARIA ("Guarantor"), and 600 COMMONWEALTH PLACE, L.P. ("Lender").

Preliminary Statement

The following recitals summarize the basis for, and are incorporated into, this Agreement:

A.    Debtor owns record title to the real property described in Exhibit "A", and the improvements thereon and related appurtenances, including without limitation the interior improvements at the Hotel including furniture, furnishings, fixtures, case goods, equipment, inventory and other personalty, and Debtor holds licenses and permits used in connection with the Hotel's operations, comprising an historic hotel with greater than 700 guest rooms, located at the entrance of Pointe Park in downtown Pittsburgh, Pennsylvania, operated under a franchise agreement with Hilton Hotels International and branded as the "Pittsburgh Hilton" (the "Hotel"). Debtor also owns. Debtor also operates certain concessions and facilities within the Hotel.

B.    On September 7, 2010 ("Petition Date"), Debtor commenced a Chapter 11 proceeding (No. 10-26337-JAD) ("Bankruptcy Case") by filing a voluntary petition for reorganization under 11 U.S.C. 101, *et seq*. (the "Bankruptcy Code"), with the United States Bankruptcy Court for Western District of Pennsylvania (the "Bankruptcy Court"). Debtor continues to operate its business and managing its property as debtor-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

C.    Prior to the Petition Date, Lender made unsecured working capital loans to Debtor in an aggregate outstanding principal amount, as of the Petition Date, of $4,500,000 ("Pre-petition Loans").

D.    Also prior to the Petition Date, Carbon Capital II Real Estate CDO 2005-I, Ltd. ("Carbon Capital") made a secured development and working capital loan in favor of Debtor in an aggregate principal amount of $49,600,000 ("Carbon Capital Loan"), including a cash collateral advance of $____ made on September 10, 2010 (the "Last CC Advance").

E.    In connection with the operations of its business following the Petition Date, Debtor was unable to obtain unsecured credit allowable as an administrative expense in the Bankruptcy Case. Debtor therefore requested secured post-petition financing from Lender, subject to Bankruptcy Court approval thereof. At Debtor's request, and subject to Bankruptcy Court approval, Lender agreed to provide Debtor with a senior secured, super-priority revolving

-2-

credit facility to Debtor of up to Three Million Dollars ($3,000,000) in the aggregate, upon the terms and conditions set forth herein, for the purpose of providing post-petition working capital support and financing for a Plan of Reorganization to be sponsored by Lender (as more fully described below, the "DIP Loan").

F.    Debtor has agreed to secure the DIP Loan and related Obligations by granting to DIP Lender a super-priority security interest in and lien upon all of its assets, real, and personal and mixed, and whether now existing or hereafter acquired, except for Excluded Property (as defined below).

G.    Guarantor owns 100% of the membership interests of Debtor, and has guaranteed payment of the Carbon Capital Loan. Guarantor has agreed to guaranty payment of the DIP Loan as well, and in addition, Guarantor has agreed to secure his guaranty by pledging to DIP Lender 100% of the Debtor's membership interests. Guarantor acknowledges that it will receive substantial direct and indirect benefits by reason of the making of the DIP Loan as provided in this Agreement.

NOW, THEREFORE, in consideration of the premises and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereto, intending legally to be bound, covenant and agree as follows:

SECTION I
INTRODUCTION

1.1    <u>DIP Loan Documents</u>.    This Agreement and the other Loan Documents supplement and are cumulative and in addition to the DIP Financing Order, but the provisions of the DIP Financing Order will govern and control over conflicting or inconsistent provisions in this Agreement or the other Loan Documents. Debtor acknowledges, ratifies, reaffirms, confirms, and agrees that it will be bound by and comply with all of the terms, covenants and conditions of the DIP Financing Order.

1.2    <u>No Novation</u>.    Neither this Agreement nor any Loan Documents nor the DIP Financing Order are intended to constitute, nor do they constitute or give rise to, any novation, cancellation or extinguishment of any of the Pre-Petition Loan or any Obligations of Debtor to Lender; it being the intention of the parties that the transactions provided for or contemplated herein shall be effectuated without any interruption in the continuity of the value and consideration received by Debtor as a result of the Pre-Petition Loan.

1.3    <u>Counsel</u>.    Debtor acknowledges that it is experienced in business and financial matters, and has had full opportunity to consult with counsel of its choosing in connection with the DIP Loan and the negotiation of this Agreement.

1.4    <u>Material Benefit</u>.    Debtor and Guarantor jointly and severally represent, warrant and acknowledge that each has received full and material benefit and valuable consideration as a

result of the DIP Loan and Lender's agreements as set forth in this Agreement and the Loan Documents, and as will be set forth in the  DIP Financing Orders,  which value is at least substantially equivalent to the obligations assumed by Debtor (and Guarantor, as applicable to him) under the Loan Documents.

1.5    Defined Terms.    Capitalized terms defined in the introductory recitals or elsewhere in this Agreement will have the meanings assigned to them at the place first defined. Other defined terms used in this Agreement or other Loan Documents shall have the following meanings:

Accounts.  All rights of Debtor to payment of money (i) for transient or other use and/or occupancy of accommodations or facilities at the Hotel, including without limitation any hotel guest rooms, other premises, concessions and facilities, or other property within or associated with the Hotel that has been or is to be sold, leased, licensed, assigned, or otherwise disposed of, (ii) for food, beverage, merchandise or services rendered or to be rendered, (iii) arising out of the use of a credit, debit or other charge card; (iv) all sums of money and other Proceeds due or becoming due in connection with any of the foregoing or otherwise in connection with the ownership, use, occupancy or other activities relating to the Hotel, and all notes, bills, drafts, acceptances, instruments, documents and other debts, obligations and liabilities, in whatever form, owing to Debtor with respect to the Hotel, all guarantees and security therefor, and Debtor's rights pertaining to and interest in such property; (v) all chattel paper; (vi) all amounts due from Guarantor or other Affiliates of Debtor; (vii) all insurance proceeds; (viii) all other rights and claims to the payment of money, under contracts or otherwise; (ix) and all other property constituting "accounts" as such term is defined in the UCC.  Accounts do not include Excluded Property.

Advances**.**  Defined in Section **.

Affiliate**.**  Any individual, trust, estate, partnership, limited liability company, corporation or any other incorporated or unincorporated organization that directly or indirectly, through one or more intermediaries, controls or is controlled by or is under common control with Debtor, or any member, officer, director, partner or shareholder of Debtor or any relative of any of the foregoing.  The term "control" means possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

Agreement.  This Senior Secured Super-Priority Debtor-in-Possession Credit Agreement, including the Exhibits hereto, as the same may be supplemented, amended or restated from time to time.

Applicable Law.  In respect of any Person, all provisions of constitutions, statutes, rules, regulations and orders of governmental bodies or regulatory agencies applicable to such Person, and all orders and decrees of all courts and arbitrators in proceedings or actions to which the Person in question is a party or by which it or its properties are bound.

-4-

Bankruptcy Case.  Defined in the recitals.

Bankruptcy Code.  Defined in the recitals.

Bankruptcy Court.  Defined in the recitals.

Bankruptcy Rules. The Federal Rules of Bankruptcy Procedure, as the same may from time to time be in effect and applicable to the Bankruptcy Case.

Budget.  The 13-week operating and cash flow budget for the Debtors, in form and content acceptable to the Lender, the initial version of which is attached hereto as Exhibit ** and which Debtor shall update on a weekly basis as provided for in Section**.

Business Day.  Any day of the year on which national banking institutions in New York, New York or Pittsburgh, Pennsylvania are open to the public for conducting business and are not required or authorized to close.

Carve-Out Expenses means (i) amounts payable pursuant to 28 U.S.C. § 1930 and (ii) allowed reasonable fees and expenses of attorneys, accountants, and other professionals retained in the Bankruptcy Cases pursuant to Sections 327, 328, 330, 331, and 1103 of the Bankruptcy Code, in each case (a) not exceeding the amounts set forth in the Budget, and (b) only as incurred prior to an Event of Default hereunder and not used for the purpose of investigating or prosecuting any claim against Lender or otherwise contesting any position asserted by Lender in the Bankruptcy Case.

Cash Collateral. Has the meaning given to such term in Section 363 of the Bankruptcy Code.

Cash Collateral Account. A deposit account or securities account in the name of Debtor pursuant to which (i) in the case of a deposit account, the applicable depositary bank agrees to comply with instructions from Lender directing the disposition or transfer of funds from time to time credited to such deposit account, without further consent of or direction from Debtor, Carbon Capital or any other Person, and (ii) in the case of a securities account, the applicable securities intermediary agrees to comply with entitlement orders originated by Lender, and all other requests or instructions from Lender regarding disposition, transfer, redemption and/or delivery of securities and other cash and property contained therein, without further consent or direction from Debtor, Carbon Capital or any other Person, in each case, pursuant to a deposit account control agreement or a securities account control agreement, as the case may be, in form and substance reasonably satisfactory to Lender.

Code.  The Internal Revenue Code of 1986 and the rules and regulations thereunder, collectively, as the same may from time to time be supplemented or amended and remain in effect.

<u>Collateral</u>.  All property and interests in property and proceeds thereof now owned or hereafter acquired by Debtor or Guarantor in or upon which a Lien is granted or purported to be granted pursuant to any Loan Document or the Orders, but excluding Excluded Property.

<u>Commitment Amount</u>. $3,000,000.

<u>Commitment Period</u>.  The period commencing on the Closing Date and ending on the Termination Date.

<u>Debtor</u>.  Defined in the introductory paragraph.

<u>Default</u>.  An event or condition the occurrence of which immediately is or, with a lapse of time or the giving of notice or both, becomes an Event of Default.

<u>DIP Financing Motion</u>.  The Debtor's application to the Bankruptcy Court seeking entry of the DIP Financing Orders, which shall be approved by Lender prior to the filing thereof.

<u>DIP Financing Orders</u>.  The orders of the Bankruptcy Court entered in the Bankruptcy Case after an interim and a final hearing under Bankruptcy Rule 4001(c)(2) or such other procedures as approved by the Bankruptcy Court which orders shall be satisfactory in form and substance to Lender, and from which no appeal or motion to reconsider has been timely filed, or if timely filed, such appeal or motion to reconsider has been dismissed or denied unless Lender waives such requirement), together with all extensions, modifications and amendments thereto, in form and substance satisfactory to Lender, which, among other matters but not by way of limitation, authorizes the Debtor to obtain credit, incur (or guaranty) Indebtedness, grant Liens under this Agreement and the other Loan Documents, as the case may be, and provides for the super-priority of the Lender's claims.

<u>DIP Loan</u>. The $3 million revolving credit facility provided for herein, which is the subject of the DIP Superpriority Claim in favor of DIP Lender.

<u>DIP Superpriority Claim</u>.  Has the meaning given in <u>Section 2.9(b)</u>.

<u>Draw Period</u>.  Defined in Section **.

<u>Effective Date</u>.  The first date on which the conditions set forth in Sections *** have been satisfied.

<u>Environmental Laws</u>. Any and all applicable federal, state and local environmental, health or safety statutes, laws, regulations, rules and ordinances (whether now existing or hereafter enacted or promulgated), and all applicable judicial, administrative and regulatory decrees, judgments and orders, including common law rulings and determinations, relating to injury to, or the protection of, real or personal property or human health or the environment, including, without limitation, all requirements pertaining to reporting, licensing, permitting,

-6-

investigation, remediation and removal of emissions, discharges, releases or threatened releases of Hazardous Materials into the environment or relating to the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of such Hazardous Materials.

ERISA.  The Employee Retirement Income Security Act of 1974 and the rules and regulations thereunder, collectively, as the same may from time to time be supplemented or amended and remain in effect.

ERISA Affiliate.  Any trade or business, whether or not incorporated, that is treated as a single employer with a Debtor under Section 414(b), (c), (m) or (o) of the Code and Section 4001(a)(14) of ERISA.

ERISA Event.  (a) Any "reportable event," as defined in Section 4043 of ERISA or the regulations issued thereunder, with respect to a Plan unless the 30-day notice requirement with respect to such event has been waived by the PBGC; (b) the adoption of any amendment to a Plan that would require the provision of security pursuant to Section 401(a)(29) of the Code or Section 307 of ERISA; (c) the existence with respect to any Plan of an "accumulated funding deficiency" (as defined in Section 412 of the Code or Section 302 of ERISA), whether or not waived; (d) the filing pursuant to Section 412(d) of the Code or Section 303(d) of ERISA of an application for a waiver of the minimum funding standard with respect to any Plan; (e) the incurrence of any liability under Title IV of ERISA with respect to the termination of any Plan or the withdrawal or partial withdrawal of any Debtor or any of its ERISA Affiliates from any Plan or Multiemployer Plan; (f) receipt by Debtor or any ERISA Affiliate from the PBGC or a plan administrator of any notice relating to the intention to terminate any Plan or Plans or to appoint a trustee to administer any Plan; (g) receipt by Debtor or any ERISA Affiliate of any notice concerning the imposition of Withdrawal Liability (as defined in Part I of Subtitle E of Title IV of ERISA) with respect to any Multiemployer Plan or a determination that a Multiemployer Plan is, or is expected to be, insolvent or in reorganization, within the meaning of Title IV of ERISA; (h) the occurrence of a "prohibited transaction" with respect to which Debtor is a "disqualified person" (within the meaning of Section 4975 of the Code) or with respect to which Debtor could otherwise be liable; and (i) any other event or condition with respect to a Plan or Multiemployer Plan that could reasonably be expected to result in liability of Debtor.

Equipment.  As defined in the UCC, and including all accessories, accessions, additions, attachments, improvements, substitutions and replacements.

Equity Option.  Defined in Section 2.**

Event of Default.  Defined in Section **.

Excluded Property.   All of Debtor's claims and causes of action for avoidance or transfers or liabilities, arising under the Bankruptcy Code and all proceeds arising from or relating thereto, and any Professional Retainer.

Final Budget**.**  Defined in Section **.

GAAP**.**  Generally accepted accounting principles, applied on a consistent basis, set forth in Opinions of the Accounting Principles Board of the American Institute of Certified Public Accountants and/or in statements of the Financial Accounting Standards Board which are applicable in the circumstances as of the date in question; and the requisite that such principles be applied on a consistent basis means that the accounting principles in a current period are comparable in all material respects to those applied in a preceding period, with any exceptions thereto noted.

Governmental Authority**.**  The United States of America, the Commonwealth of Pennsylvania, any political subdivision of any of them, and any court, agency, department, commission, board, bureau or instrumentality of any of them.

Guarantees. As applied to Guarantor, all guarantees, endorsements and other contingent or surety obligations with respect to DIP Loan or Carbon Capital Loan, or other obligations of any other Person (the "primary obligor"), whether or not reflected on the consolidated balance sheet of the Guarantor, including any obligation of the guarantor, direct or indirect, (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation or to purchase (or to advance or supply funds for the purchase of) any security for the payment thereof, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation of the payment thereof, (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation or (d) as an account party in respect of any letter of credit or letter of guaranty issued to support such Indebtedness or other obligation.

Hazardous Material.  Any substance (i) the presence of which requires or may hereafter require notification, investigation, removal or remediation under any Environmental Law; (ii) which is or becomes defined as a "hazardous waste", "hazardous material" or "hazardous substance" or "pollutant" or  "contaminant" under any present or future Environmental Law or amendments thereto including, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act (42 U.S.C. Section 9601 et seq.) and any applicable local statutes and the regulations promulgated thereunder; (iii) which is toxic, explosive, corrosive, flammable, infectious, radioactive, carcinogenic, mutagenic or otherwise hazardous and which is or becomes regulated pursuant to any Environmental Law by any governmental authority, agency, department, commission, board, agency or instrumentality of the United States, any state of the United States, or any political subdivision thereof; or (iv) without limitation, which contains gasoline, diesel fuel or other petroleum products, asbestos or polychlorinated biphenyls.

Indebtedness.  As applied to Debtor, without duplication, (i) all obligations for borrowed money and other extensions of credit, whether secured or unsecured, absolute or contingent, and whether or not evidenced by bonds, notes, debentures or other similar instruments, (ii) all obligations representing the deferred purchase price of property, other than accounts payable

arising in the ordinary course of business, (iii) all obligations secured by any Lien on property owned or acquired by Debtor, whether or not the obligations secured thereby shall have been assumed, (iv) that portion of all obligations arising under leases that is required to be capitalized on Debtor's balance sheet, (v) all Guarantees, (vi) all obligations, contingent or otherwise, with respect to the face amount of all letters of credit (whether or not drawn) and banker's acceptances issued for the account of or on behalf of Debtor, (vii) all obligations that are immediately due and payable out of the proceeds of or production from property now or hereafter owned or acquired by Debtor, (viii) obligations in respect of hedging, derivative and other contracts, and (ix) all other obligations which, in accordance with GAAP, would be included as a liability on Debtor's balance sheet, but excluding anything in the nature of capital stock, capital surplus and retained earnings.

Indemnified Party.  Defined in Section **.

Interest Rate.  Defined in Section *

Inventory.  As defined in the UCC.

Lien.  A security interest, mortgage, lien, charge, collaterally assigned interest or pledge, or other encumbrance in or on tangible or intangible property, whether such interest arises in equity or is based on common law, statute, or contract.

Loan Costs.  All expenditures and expenses which may be paid or incurred by or on behalf of Lender in connection with the documentation, modification, workout, payment, collection or enforcement of the DIP Loan or any of the Loan Documents, including without limitation, (i) the fees and costs of Lender's attorneys in connection with the documentation and closing of the DIP Loan and the due diligence review of Debtor's deliveries; and (ii) all applicable title, filing and recording fees and other closing costs.  During the term of the DIP Loan, Loan Costs payable by Debtor shall include: payments to remove or protect against liens; attorneys' fees and costs (including fees and costs of Lender's counsel); receivers' fees; engineers' fees; accountants' fees; consultants' fees (including intellectual property consultants); all costs and expenses incurred in connection with any of the foregoing; outlays for documentary and expert evidence; stenographers' charges; stamp taxes; publication costs; and costs (which may be estimates as to items to be expended after entry of an order or judgment) for procuring all such abstracts of title, title and UCC searches, and examination, title insurance policies, and similar data and assurances with respect to title as Lender may deem reasonably necessary either to prosecute any action or to evidence to bidders at any foreclosure sale a true condition of the title to, or the value of, the Collateral.

Loan Documents.  Collectively, the DIP Financing Order, this Agreement, the Note, the Mortgage, Security Agreement and Collateral Assignment of Leases, Rents and Profits, the UCC Financing Statements, the Lockbox Agreement, and other documents, agreements and instruments evidencing or securing the DIP Loan, including those specifically referred to in this Agreement, as they may be amended, supplemented or replaced in writing from time to time.

Material Adverse Effect. Means (a) a material adverse change in the business, operations, results of operations, assets, prospects, liabilities, or financial condition of Debtor, (b) a material impairment of Debtor's ability to perform its obligations under the Loan Documents to which it is a party or of the DIP Lender's ability to enforce the Obligations or realize upon the Collateral or Lender's Liens with respect to the Collateral; provided, that the following shall not be taken into account in determining whether there has been a Material Adverse Effect: (i) the commencement of the Bankruptcy Cases; and (ii) any effect, change, event, circumstance or condition arising out of or attributable to (1) general economic conditions not solely related to Debtor or (2) affecting the securities or credit markets not solely related to Debtor.

Maturity Date.  The earliest of (a) January 15, 2011, (b) the effective date of the Plan, (c) the dismissal or conversion of the Bankruptcy Case to a proceeding under Chapter 7 of the Bankruptcy Code, (d) the appointment of a Trustee or Examiner with expanded duties in the Bankruptcy Case, or (e) the Debtor's filing of any Plan of Reorganization in the Bankruptcy Case other than the Plan.

Multiemployer Plan. Any plan which is a Multiemployer Plan as defined in Section 4001(a)(3) of ERISA.

Note.  See Section ** hereof.

Note Record.  An internal record, including a computer record, maintained by Lender with respect to the outstanding principal and interest balance of the DIP Loan.

Obligations.  All liabilities, obligations, and indebtedness due or payable by the Debtor to the order of Lender, howsoever evidenced, created, incurred, acquired or owing, whether primary, secondary, direct, contingent, fixed or otherwise, including, without limitation, (a) all amounts due or becoming due to Lender in respect of the DIP Loan, and all amounts due or becoming due to Lender under the Loan Documents, and including principal, interest, contributions, taxes, insurance, loan charges, advance fees, commitment fees, release fees, lockbox fees, custodial fees, reasonable attorneys' and paralegals' fees and expenses and other fees or expenses incurred by Lender or advanced by Lender to or on behalf of Debtor or pursuant to any of the Loan Documents, and amounts payable to or for the benefit of Lender under any subrogation rights, indemnities or guaranties in connection with the DIP Loan, and (b) reasonable legal fees and expenses incurred by Lender in connection with the representation of the lender in the Bankruptcy Case, and (c) any extensions of credit by Lender to Debtor which arose or arise from (x) loans from the Lender to Debtor and (y) any claim of the Lender against the Debtor which arises after the filing of the Bankruptcy Case in connection with the Obligations or the Post-Petition Liabilities (as defined in the DIP Financing Order).

PBGC.  The Pension Benefit Guaranty Corporation or any entity succeeding to any or all of its functions under ERISA.

Pension Plan.  Any Plan which is an "employee pension benefit plan" (as defined in ERISA).

Person.  Natural persons, corporations, limited partnerships, general partnerships, joint stock companies, joint ventures, associations, companies, trusts, banks, trust companies, land trusts, business trusts, limited liability companies and limited liability limited partnerships, or other organizations, whether or not legal entities, and governments and agencies and political subdivisions thereof.

Petition Date.  Defined in the recitals.

Plan.  The Plan of Reorganization in the Bankruptcy Case to be filed by Debtor and sponsored by Lender, as described in the Letter Agreement attached as Exhibit ** attached hereto.

Post-Petition.  The time period beginning immediately upon the filing of the Bankruptcy Case.

Pre-Petition Permitted Liens.  Defined in Section ** .

Proceeds.  All proceeds of and all other profits, rentals and receipts, in whatever form, received or arising from any Collateral, including: whatever is received or acquired upon the sale, lease, exchange, assignment, licensing or other disposition of any Collateral; whatever is received, collected on or distributed on account of any Collateral; all rights arising out of any Collateral; all claims arising out of, and any insurance payable by reason of, the loss, nonconformity, interference with the use of, defects or infringement of rights in, or damage to or destruction of, any Collateral; any unearned premiums with respect to policies of insurance in respect of any Collateral; any condemnation or requisition payments with respect to any Collateral; all proceeds, judgments and collections resulting from any litigation, arbitration, mediation or other legal proceeding, and any other cash or property received by Debtor in connection therewith, including without limitation any settlement thereof; and all other property constituting "proceeds" as such term is defined in the UCC; in each case whether now existing or hereafter arising, but in each case excluding, nevertheless, all of the legal and other professional fees and expenses payable by the Debtor in connection with the generation of such Proceeds, including without limitation, all legal contingency fees and expenses so payable.  Proceeds shall exclude any Excluded Property.

Professional Retainer.  Any funds held by professionals employed or retained by the Debtor to represent Debtor.

Prohibited Transaction.  Any "prohibited transaction" within the meaning of Section 406 of ERISA or Section 4975 of the Code.

Reorganized Debtor.  Defined in Section **.

Request for Advance.  Defined in Section **.

Requirements.  All federal, state and local rules, regulations, ordinances, laws and statutes, and all hotel franchise or management contracts, other agreements, restrictions and covenants, which affect Debtor, the Hotel, or Debtor's business generally.

Security Documents.  The Mortgage, Security Agreement and Collateral Assignment of Lease and Rents made by Debtor in favor of DIP Lender to secure Obligations and dated the Closing Date, in each case as amended and/or restated and in effect from time to time, and any additional documents evidencing or perfecting DIP Lender's lien on the Collateral.

Subsidiary.  With respect to any Person, any corporation, association, joint stock company, business trust, partnership, limited liability company or other similar organization of which 50% or more of the ordinary voting power for the election of a majority of the members of the board of directors or other governing body of such entity is held or controlled by such Person or a Subsidiary of such Person; or any other such organization the management of which is directly or indirectly controlled by such Person or a Subsidiary of such Person through the exercise of voting power or otherwise; or any joint venture, whether incorporated or not, in which such Person has a 50% or greater ownership interest.

Taxes.  Sales taxes, occupancy taxes, payroll taxes, personal property taxes, excise taxes, intangibles taxes, real property taxes, and income taxes, and any assessments.

Termination Date.  The earlier of (i) the Maturity Date or (ii) the date on which an Event of Default occurs.

UCC.  The Uniform Commercial Code, as in effect from time to time in the applicable jurisdiction.

1.6  Rules of Interpretation.

(a)  All terms of an accounting or financial character used herein but not defined herein shall have the meanings assigned thereto by GAAP, as in effect from time to time.

(b)  Except as otherwise specifically provided herein, reference to any document or agreement shall include such document or agreement as amended, modified or supplemented and in effect from time to time in accordance with its terms and the terms of this Agreement.

(c)  The singular includes the plural and the plural includes the singular. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.

(d)     A reference to any Person includes its permitted successors and permitted assigns.

(e)     The words "include", "includes" and "including" are not limiting.

(f)     The words "herein", "hereof", "hereunder" and words of like import shall refer to this Agreement as a whole and not to any particular section or subdivision of this Agreement.

(g)     All terms not specifically defined herein or by GAAP that are defined in the Uniform Commercial Code as in effect in the State of New York, shall have the meanings assigned to them in such Uniform Commercial Code.

SECTION II
DEBTOR IN POSSESSION FINANCING

2.1     The DIP Loan.  On the date on which the DIP Financing Order becomes effective ("Effective Date"), Debtor is authorized to borrow, post-petition from Lender, the DIP Loan as provided in the DIP Financing Order and in this Agreement.  The DIP Loan may be advanced from time to time by Lender, and shall bear interest, and be secured, and be payable, on the terms and conditions set forth herein.

2.2     DIP Loan Availability.  In accordance with the DIP Financing Order, the DIP Loan amounts available for borrowing by Debtor shall be in the maximum aggregate principal amount of $3,000,000 (the "Commitment Amount").  Debtor may borrow, re-pay and re-borrow such principal on a revolving credit basis until the Termination Date, on the terms set forth herein.  Lender's commitment to make Advances shall automatically terminate immediately, on the Termination Date.

2.3     Requests for Advances.   All disbursements of principal under the DIP Loan are called "Advances" and the outstanding balance of all such Advances shall not exceed the Commitment Amount at any time. So long as there is no Default or Event of Default, Advances may be requested by Debtor and may be made upon the terms and conditions of the DIP Financing Order and this Agreement, from the Effective Date until no later than the Termination Date (the "Draw Period"). At least two Business Days prior to each requested Advance, Debtor will execute and supply Lender with a written request for Advance in a form approved by Lender (a "Request for Advance"). Each Request for Advance shall certify, among other things as may be required by Lender, (a) the purpose for the requested Advance, (b) the then outstanding principal balance under the DIP Loan, (c) that no Defaults or Events of Default exist, and (d) that the Request for Advance is in accordance and compliance with the Budget. Each Request for Advance shall constitute a reaffirmation by Debtor that (i) all representations and warranties made to Lender in the Loan Documents are true and will be true after giving effect to the requested Advance; (ii) all conditions to such Advance are fulfilled; and (iii) the use of Loan proceeds are and will be in accordance with the Budget and this Agreement.  In addition, Debtor

shall furnish Lender with documentation acceptable to Lender, and if required, the Bankruptcy Court, showing the date, amount, purpose and recipient of each Advance (or the proceeds of each Advance).

2.4    Advances.  Advances shall be made not more often than twice each calendar week and shall be in accordance with approved uses of funds relating to the Hotel as set forth in the Budget.  Lender shall not be required to make any Advances: (a) after the Draw Period, or (b) which exceed the amounts allocated pursuant to the Budget or (c) if a Default or Event of Default occurs.  The proceeds of each Advance shall be applied solely and exclusively to payment or to reimbursement to Debtor for payment of amounts that correlate to the Budget, and that are the subject of such Advance. Each Advance is and shall be deemed to be an advance, post-petition, of principal under the DIP Loan.

2.5    The Note.  The DIP Loan shall be evidenced by a single promissory note payable to the order of Lender in a principal amount equal to the Commitment Amount, dated as of the Effective Date (the "Note").  Debtor irrevocably authorizes Lender to make or cause to be made, at or about the time of any Advance or at the time of receipt of any payment of principal on the DIP Loan, an appropriate notation on its Note Record reflecting (as the case may be) the making of such Advance or the receipt of such payment.  The outstanding amount of the DIP Loan set forth on the Note Records shall be *prima facie* evidence of the principal amount thereof owing and unpaid to the Lender, but the failure to record, or any error in so recording, any such amount on the Note Record shall not limit or otherwise affect the obligations of the Debtor hereunder or under the Note to make payments of principal of or interest on the DIP Loan when due.

2.6    Interest ; Base Rate and Default Rate.

(a)    The principal amount of the DIP Loan that is outstanding from time to time prior to an Event of Default or the Termination Date will bear interest at a variable rate per annum equal to the Prime Rate as in effect from time to time, plus two percent (2%) per annum (the "Interest Rate").  As used herein, "Prime Rate" shall mean the rate of interest from time to time announced or published in *The Wall Street Journal* as the "prime rate", which rate is not necessarily the best or lowest rate then available from any particular lender to specific borrowers.]

(b)    The Interest Rate will be based on the Prime Rate as in effect on the first Business Day of each calendar quarter (i.e., the first Business Day of each January, April, July, and October).  Interest on the Loan shall be calculated on the basis of a fraction, the denominator of which is three hundred sixty (360) and the numerator of which is the actual number of days elapsed during which principal is outstanding.

(c)    Notwithstanding the rates of interest specified in above or elsewhere in any Loan Document, effective immediately upon the occurrence of any Event of Default and for as long as such Event of Default shall be continuing, and without further notice, motion or application to, hearing before, or order from the Bankruptcy Court, the principal balance of the

DIP Loan and all Obligations (including any Obligation that bears interest by reference to the rate applicable to any other Obligation) then due and payable, shall bear interest at a rate that is 4% per annum in excess of the Interest Rate in effect prior to an Event of Default ("Default Rate").

(d)     All agreements between the Debtor and Lender are hereby expressly limited so that in no contingency or event whatsoever, whether by reason of acceleration of maturity of the Obligations or otherwise, shall the amount paid or agreed to be paid to DIP Lender for the use or the forbearance of the Obligations exceed the maximum permissible under Applicable Law.  If, under or from any circumstances whatsoever, fulfillment of any provision of any of the Loan Documents at the time of performance of such provision shall be due, shall involve transcending the limit of such validity prescribed by applicable law, then the obligation to be fulfilled shall automatically be reduced to the limits of such validity, and if under or from circumstances whatsoever Lender should ever receive as interest an amount which would exceed the highest lawful rate, such amount which would be excessive interest shall be applied to the reduction of the principal balance of the Obligations and not to the payment of interest.  This provision shall control every other provision of all Loan Documents.

2.7     Fees.

(a)     Without limiting any of Lender's other rights hereunder or by law, if the DIP Loan or any portion thereof or any interest thereon or any other amount payable hereunder or under any other Loan Document is not paid within ten (10) days after its due date,  Debtor shall pay to Lender on demand a late payment charge equal to 5% of the amount of the payment due.

(b)     Debtor authorizes Lender to charge to its Note Record with any  interest, fees, charges, taxes and expenses provided for in this Agreement, the other Loan Documents or any other document executed or delivered in connection herewith or therewith.

2.8     Payments and Prepayments.

(a)      Interest accruing on the Loans shall be payable monthly in arrears on the first Business Day of each month and also upon the Termination Date.

(b)     The DIP Loan may be prepaid in part at any time, but may not be prepaid in whole, so that at least $1000 principal amount of the Obligations shall remain outstanding at all times, unless and until the Lender may, in its sole and absolute discretion, waive the Equity Option and consent to such full prepayment.

(c)     If at any time the total Advances outstanding from time to time exceed the Commitment Amount, Debtor shall immediately pay the amount of any such excess to Lender.

(d)     Upon Debtor's receipt of any Proceeds of the sale of any Collateral, Debtor shall immediately pay or cause to be paid to Lender an amount equal to 100% of such Proceeds to be applied against the DIP Loan.

(e)     All outstanding principal of the DIP Loan and all other Obligations shall be due and payable at once and in full upon the Termination Date.

2.9     <u>Method and Allocation of Payments</u>.

(a)     All payments by Debtor hereunder and under any of the other Loan Documents shall be made in lawful money of the United States in immediately available funds, and shall be deemed to have been made only when made in compliance with this Section. Without affecting any of the Debtor's obligations and liabilities for the DIP Loan, the Lender may at any time and in its sole discretion make an Advance to pay any Obligations, including interest and Loan Costs, then due and payable.  All such payments shall be made without set-off or counterclaim and free and clear of and without deduction for any Taxes, levies, imposts, duties, charges, fees, deductions, withholdings, compulsory loans, restrictions or conditions of any nature now or hereafter imposed or levied by any jurisdiction or any political subdivision thereof or taxing or other authority therein unless Debtor is compelled by law to make such deduction or withholding.  If any such obligation is imposed upon Debtor with respect to any amount payable by it hereunder or under any of the other Loan Documents, Debtor will pay to Lender such additional amount in U.S. Dollars as shall be necessary to enable Lender to receive the same net amount which Lender would have received on such due date had no such obligation been imposed upon Debtor. Debtor will deliver promptly to Lender certificates or other valid vouchers or other evidence of payment reasonably satisfactory to DIP Lender for all Taxes or other charges deducted from or paid with respect to payments made by Debtor hereunder or under other Loan Document.  Lender may, and Debtor hereby authorizes Lender to, debit the amount of any payment not made by such time to its Note Record.

(b)     All payments of principal of and interest in respect of the DIP Loan shall be made to Lender, at c/o _____, or at such other location as Lender may from time to time designate in writing.

(c)     If the Obligations shall have been declared immediately due and payable pursuant to Section 7.2, all funds received from or on behalf of Debtor (including as proceeds of Collateral) by Lender shall be applied in the following manner and order: (i) first, to the payment of any fees payable hereunder; (ii) second, to the payment of interest due on the DIP Loan; (iii) third, to the payment of the outstanding principal balance of the DIP Loan; and (iv) fourth, to the payment of any other Obligations payable by Debtor to Lender.

2.10     <u>Final Payment</u>. On the Termination Date, Lender shall be entitled to immediate indefeasible payment in full in cash of the entire outstanding balance of the DIP Loan, including unpaid interest and Loan Costs, without further application to or order of the Bankruptcy Court.

2.11    Cash Collateral Account**.**  Debtor will direct all obligors under any Accounts to make all payments directly to a Cash Collateral Account maintained with a commercial bank approved by Lender, pursuant to a Deposit Account Control Agreement in form and substance acceptable to Lender (the "Lockbox Agreement").  Prior to an Event of Default, Debtor shall be permitted to access the Cash Collateral Account for payment of working capital or other purposes in the Ordinary Course of Business. Lender agrees that it shall not issue any instructions exercising dominion over the Cash Collateral Account except following the occurrence and during the continuance of an Event of Default.  [?]

2.12    Super Priority Nature of Obligations and Lender's Liens.

(a)    Lender's Liens securing the Obligations and as to all Collateral shall prime and take priority over all other Liens and Claims (including but not limited to the Carbon Capital Loan and the Liens securing the same) against the Debtor to the full extent permitted or allowed under the Bankruptcy Code, which priority and priming shall be set forth in the DIP Financing Order and shall be subject, as to priority, only to the Carve-Out Expenses.

(b)    All Obligations shall constitute administrative expenses of Debtor in the Bankruptcy Case, with administrative super priority and senior secured status under Sections 364(c) and 364(d) of the Bankruptcy Code (the "DIP Superpriority Claim").  Such administrative claim shall have priority over all other costs, claims and expenses of the kinds specified in, or ordered pursuant to, Sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726 (to the extent permitted by law), 1113, 1114 or any other provision of the Bankruptcy Code or otherwise and shall at all times be senior to the rights of Carbon Capital, or Debtor, of Debtor's estate and any successor trustee or estate representative in the Bankruptcy Case or any subsequent proceeding or case under the Bankruptcy Code, subject, however, as to priority, only to Carve-Out Expenses.

(c)    Notwithstanding any conflicting or inconsistent provisions of this Agreement, the Debtor shall be permitted and obligated to repay to Carbon Capital the Last CC Advance, and such repayment shall be made not later than _____, 2010.

2.13    No Discharge; Survival of Claims.   Debtor agreed that (a) the Obligations hereunder shall not be discharged by the entry of an order confirming a plan of reorganization, compromise or arrangement in the Bankruptcy Case (notwithstanding the provisions of Section 1141(d)(4) of the Bankruptcy Code), unless such plan of reorganization is acceptable to the Lender in its reasonable discretion and provides for the full payment of the Obligations of Debtor under the Loan Documents upon consummation thereof and (b) (i) the superpriority administrative claim granted to Lender pursuant to the DIP Financing Order and described in Section 2.9 and the Liens granted to the Lender pursuant to the DIP Financing Order and described in Section 2.10 shall not be affected in any manner by the entry of an order confirming a plan of reorganization in the Bankruptcy Case.

3079347-3

2.14    Waiver of any Priming Rights.  On the Closing Date, and on behalf of itself  and its estate, and for so long as any Obligations shall be outstanding, Debtor hereby irrevocably waives any right (whether pursuant to Sections 364(c) or 364(d) of the Bankruptcy Code or otherwise) and agrees not to apply to the Bankruptcy Court seeking any right to grant or to confer any Lien of equal or greater priority than the Liens securing the Obligations.  Debtor shall not apply for or accept any financing secured by any Liens on any Collateral unless the same is expressly subordinated to Lender's Liens and Claims by an agreement acceptable to Lender and approved by the Bankruptcy Court.

2.15    DIP Loan to Survive Debtor's Bankruptcy.  The parties expressly acknowledge and agree that the DIP Loan and all of the Liens, rights, and obligations of the parties as provided for herein and in any of the other Loan Documents, are intended to and shall expressly survive and remain enforceable after the consummation of a Plan of Reorganization of Debtor and/or the dismissal or conversion of the Bankruptcy Case.

2.16    Taxes.   The parties acknowledge that, pursuant to the Bankruptcy Code, the DIP Loan and Loan Documents are exempt from documentary stamp and intangibles taxes [?]. If, however, any taxes or charges, including excise, documentary stamp taxes or intangibles taxes are determined to be due and payable on any other Loan Documents or with respect to the DIP Loan, Debtor shall be responsible for such payment, together with any penalties or late charges.

2.17    Equity Conversion Option.  In consideration of Lender's execution of this Agreement, and all advances under the DIP Loan, and for other value received by Guarantor, Guarantor grants to Lender or its Affiliate assignee the irrevocable right and option ("Equity Option"), exercisable in Lender's discretion at any time or from time to time up to and including the Termination Date, to convert all or any portion of the outstanding principal under the DIP Loan into member interests of the post-bankruptcy plan confirmation Debtor under the terms to be provided for in the Plan, which shall be acceptable to Lender in its sole and absolute discretion (assuming such confirmation occurs, "Reorganized Debtor").  Debtor will disclose in full the capital structure of Reorganized Debtor on Schedule 2.17 hereto, which Debtor will prepare and deliver to Lender at least 10 business days before the scheduled confirmation hearing on the Debtor's plan of reorganization under the Bankruptcy Code, and which will, subject to Lender's approval, be attached to and made a part of this Agreement.  Debtor represents and warrants that the information on Schedule 2.17 hereto will be true and correct. Debtor agrees reasonably to cooperate with Lender or its designated Affiliate in connection with Lender's exercise, if any, of the Equity Option, and Debtor (on behalf of itself and Reorganized Debtor) agrees to make adequate provision (that is reasonably acceptable to the Lender) for the Equity Option in any proposed plan of reorganization and disclosure statement, and to execute and deliver additional documents, and to issue membership certificates, and take such further action as may be reasonably required in order to consummate the Equity Option. Without limiting the generality of the foregoing, the exercise of the Equity Option may, at Lender's option, be made subject to the negotiation, execution and delivery of a shareholders' agreement among the Lender (or its designee that exercises the Equity Option), the Reorganized Debtor, and the other major shareholders of the Reorganized Debtor, covering such matters as protection

18

against future dilution, affiliated transactions, and an exit strategy for this investment (e.g., tag-along rights, etc.). The parties acknowledge that Lender has the option but not the obligation to exercise the Equity Option, and that, unless the Equity Option is exercised as confirmed in a notice of exercise signed by Lender, the DIP Loan remains due and payable in favor of Lender on the Termination Date, without and free and clear of any and all defenses, counterclaims, or rights of offset. If Lender exercises the Equity Option, all accrued and unpaid interest and Loan Costs under the DIP Loan shall be paid in full and not deemed a part of the purchase price for the Equity Option.


SECTION III
CONDITIONS OF DIP LOAN

3.1     Conditions Precedent to DIP Loan. This Agreement shall take effect upon, and the obligation of the Lender to make any Advances hereunder are subject to, the satisfaction of the following conditions precedent:

(a)     The Bankruptcy Court shall have issued the DIP Financing Order. The DIP Financing Order shall be a final order and shall be in full force and effect and shall not have been reversed, modified or amended, and no application seeking any change shall be filed or pending, nor shall there exist any violation thereof by Debtor. The DIP Financing Order shall, among other things, (i) approve the transactions contemplated hereby, (ii) grant Lender a super-priority perfected security interest in the Collateral, and (iii) grant the Liens referenced in Section IV, and (iv) modify the automatic stay to permit the creation and perfection of Lender's Liens.

(b)     Lender shall have received this Agreement, the Note, the Guaranty and the Pledge Agreement securing the Guaranty and encumbering all of the equity interests in Debtor, and other Loan Documents, and closing certificates, duly executed and delivered by Debtor and Guarantor, in form and substance satisfactory to Lender. In addition, Lender shall have received the following, all in form and substance satisfactory to Lender:

(i)     A certificate of Debtor's secretary with respect to resolutions of the Board of Directors authorizing the execution and delivery of the Loan Documents and identifying the officer(s) authorized to execute, deliver and take all other actions required under this Agreement, and providing specimen signatures of such officers.

(ii)     Debtor's Certificate of Organization and all amendments and supplements thereto, as filed in the office of the Secretary of State of its jurisdiction of organization, certified by said Secretary of State as being a true and correct copy thereof.

(iii)     Debtor's operating agreement, and all amendments and supplements thereto, certified by the Secretary as being a true and correct copy thereof.

3079347-3

(iv)    A certificate of the Secretary of State of Debtor's jurisdiction of organization as to legal existence and good standing.

(v)    A certificate of Debtor's chief financial officer or manager as to the accuracy of each such Debtor's representations and warranties and such other matters as the Lender may request.

(vi)    Such other documents, instruments, opinions and certificates and completion of such other matters, as Lender may reasonably deem necessary or appropriate.

3.2    <u>Litigation</u>.  No litigation, arbitration, proceeding or investigation shall be pending or threatened which questions the validity or legality of the transactions contemplated by any Loan Document or seeks a restraining order, injunction or damages in connection therewith, or which, in the reasonable judgment of the Lender, might adversely affect the transactions contemplated hereby or that might have a materially adverse affect on the assets, business or financial condition of Debtor or Lender.

3.3    <u>Recordings</u>.  All necessary filings and recordings against the Collateral shall have been completed and the Lender's liens on the Collateral shall have been perfected, as contemplated by the Security Documents.

3.4    <u>Consents</u>.  Debtor shall have received all consents and authorizations required pursuant to any material contracts with any other Person and shall have obtained all permits of, and effected all notices to and filings with, any governmental authority, in each case, as may be necessary in connection with the consummation of the transactions contemplated in any Loan Document.

3.5    <u>Conditions to Making Advances</u>. Without limiting the other terms and conditions set forth in this Agreement, Lender's agreement to make any Advance is subject to the following conditions precedent:

(a)    No Default or Event of Default shall exist at the date of such Advance;

(b)    All representations and warranties of Debtor in this Agreement and the other Loan Documents shall remain true and correct as if made on and as of the date of each Advance;

(c)    The Advance shall be provided for in the Budget, and the Debtor shall have achieved all performance milestones or benchmarks provided for in the Budget through the date of such requested Advance;

(d)    After the making of such Advance, the aggregate amount of Advances outstanding under the DIP Loan shall not exceed $3,000,000;

(e)     All of the instruments, documents and writing referred to in this Agreement or contemplated by this Agreement or any other Loan Document and all of the other requirements of or matters pertaining to the Loan in any way whatsoever, shall be in conformity to the requirements and provisions of this Agreement and reasonably satisfactory to Lender;

(f)     There shall have been no Material Adverse Change with respect to the Hotel or the Debtor from the date of entry of this Agreement to the date of such Advance;

3.6     <u>Conditions for the Benefit of Lender</u>.  The conditions set forth in this Section are for the exclusive benefit of Lender.  Lender may waive any of such conditions precedent in accordance with the terms of this Agreement.  If Lender makes an Advance notwithstanding the failure of Debtor to satisfy any of the above conditions, the Lender may nonetheless insist upon satisfaction of all such conditions before making any other Advance.  In no event whatsoever shall Lender have any obligation or liability to make any Advance as to which any condition precedent is not timely and fully satisfied.

3.7     <u>Fee and Expenses</u>.  There shall have been paid to Lender Loan Costs, including all fees and all reimbursements of costs or expenses (including attorneys fees and expenses), in each case due and payable under any Loan Document.

SECTION IV
COLLATERAL

4.1     <u>Grant and Confirmation of Security Interests</u>.   To secure the payment and performance of the DIP Loan and the other Obligations, for value received, Debtor unconditionally and irrevocably assigns, pledges and grants to Lender, and Debtor further confirms, reaffirms and acknowledges the granting to Lender under the DIP Financing Order, of continuing, valid and perfected security interests and liens, in, to, on and with respect to the following properties, rights, interests and assets of the Debtor, whether now owned or existing or hereafter acquired or arising (collectively, the "<u>Collateral</u>"):

(a)     all of the Debtor's goods and other personal property or fixtures, including, without limitation, (i) all Equipment, and (ii) all Inventory of Debtor;

(b)     all Accounts, and all money now or at any time in the possession or under the control of, or in transit to, the Lender or any bailee, agent or custodian of or for the Lender or the Debtor; and the Cash Collateral Account and Cash Collateral on deposit therein and all rights to receive payments therefrom;

(c)     the real property and improvements comprising the Hotel;

(d)     all books, records, writings, data bases, information and other property relating to, used or useful in connection with, or evidencing, embodying, incorporating or

referring to, any of the foregoing, provided that Lender's rights therein shall be limited to access thereto, upon reasonable notice and during business hours;

(e)    all of Debtor's insurance policies, including claims or rights to payment thereunder, to the extent they relate to any of the Collateral;

(f)    all permits and licenses held by Debtor with respect to the Hotel, and all of Debtor's other property and rights of every kind and description and interests therein, including any real property, leases and mixed property, wherever located,  and all other collateral and rights as established in the DIP Financing Order;

(g)    all products, offspring, rents, issues, profits, returns, income and other Proceeds of and from any and all of the foregoing Collateral, and to the extent not otherwise included, all payments under insurance (whether or not Lender is the loss payee thereof), or any indemnity, warranty or guaranty, payable by reason of loss or damage to or otherwise with respect to any of the foregoing Collateral); and

(h)    all of the equity interests in the Debtor, which shall be pledged to secure the Guaranty.

4.2    <u>Superpriority Liens</u>.  Debtor represents, warrants and confirms to Lender that, pursuant to the DIP Financing Order and Sections 364(c)(1) and (2) of the Bankruptcy Code, the Liens granted to Lender (a) have priority over all administrative expenses incurred in the Bankruptcy Case of the kind specified in Sections 503(b) or 507(b) of the Bankruptcy Code, and (b) constitute first priority Liens as to all Collateral, including without limitation the portion of the Collateral that is subject to prior valid perfected and duly enforceable pre-petition liens and security interests, as in effect and perfected in favor of Carbon Capital and other Parties prior to the Petition Date and as more fully itemized in <u>Schedule 4.2</u> attached hereto (the "<u>Pre-Petition Permitted Junior Liens</u>").  With respect to the portion of the Collateral subject to Pre-Petition Permitted Junior Liens, the Liens granted to Lender are senior in priority.

4.3    <u>Perfection</u>.  Debtor acknowledges that, pursuant to the DIP Financing Order, all of the Lender's Liens shall be deemed perfected without the necessity of filing any documents or other instruments otherwise required to be filed under applicable non-bankruptcy law for the perfection of security interests or liens.  Notwithstanding the foregoing, Debtor agrees, at its own expense, to execute, deliver and record the Mortgage and Assignment of Leases, in form and substance satisfactory to Lender, and to deliver the financing statements provided for by the UCC, together with any and all other instruments or documents and to take such other action as may be required to perfect and continue the perfection of Lender's security interests in the Collateral.  Debtor authorizes Lender to file and record any and all financing statements, assignments, and other documents required to perfect and continue the perfection of Lender's security interest in the Collateral.

4.4 <u>Continuing Security Interest</u>. This Agreement creates a continuing security interest in the Collateral and shall remain in full force and effect until payment in full of all of Obligations.

4.5 <u>Debtor Remains Liable</u>. Anything herein to the contrary notwithstanding, (a) the Debtor shall remain liable under the contracts and agreements included in the Collateral to the extent set forth therein, and shall perform all of its duties and obligations thereunder to the same extent as if this Agreement had not been executed; (b) the exercise by the Lender of any of its rights hereunder shall not release the Debtor from any of its duties or obligations under any such contracts or agreements included in the Collateral; and (c) the Lender shall not have any obligation or liability under any such contracts or agreements included in the Collateral by reason of this Agreement, nor shall the Lender be obligated to perform any of the obligations or duties of the Debtor thereunder or to take any action to collect or enforce any claim for payment assigned hereunder.

4.6 <u>Protection of Collateral</u>. Lender may at any time and from time to time take such actions as Lender reasonably deems necessary or appropriate to protect Lender's Liens and security interests in and to preserve the Collateral, including, without limitation, payment of any Taxes, Liens, or insurance premiums. All advances and costs, expenses, and charges which Lender may make, pay or incur for the protection of its security shall be included among the Obligations, shall be secured by all of the Collateral, shall be payable by Debtor to Lender upon demand, and shall bear interest at the highest rate allowable under Applicable Law.

4.7 <u>Cash Collateral</u>. Debtor agrees that the Hotel consists in part of a number of transient use rooms and related amenities available for sale or lease, and that all room rate revenues generated from the sale or lease of each room night (exclusive of food, beverage and other service-related revenues) constitutes Accounts and Collateral Proceeds under Section 552(b) of the Bankruptcy Code. Debtor intends for Lender to have a continuing Lien in all Post-Petition Account and Proceeds pursuant to Section 552(b) of the Bankruptcy Code. In connection therewith, Debtor acknowledges and agrees that the sale or lease of each hotel room night constitutes payment for the use and occupancy of Collateral and Proceeds of Collateral, and the cash collateral of Lender as that term is defined in Section 363(a) of the Bankruptcy Code.

## SECTION 5
## REPRESENTATIONS AND WARRANTIES

As a material inducement to Lender entering into this Agreement, Debtor represents and warrants to Lender as follows, which representations and warranties shall remain true throughout the term of the Loan:

5.1 <u>Accuracy of Recitals</u>. Each of the recitals to this Agreement is true and correct.

5.2    Existence and Ownership.  Debtor is a limited liability company duly formed, validly existing and in good standing under the laws of the State of ___, and is qualified to do business as a foreign corporation in good standing in all states in which it is required to be so qualified.

5.3    Authority and Enforceability.    Other than the DIP Financing Order, no registration with or approval or authorization of or any other action by, and no notice to or filing with, any Governmental Authority of any kind is required for the due execution and delivery of, or for the enforceability of, this Agreement or any of the other Loan Documents, or for the grant by Debtor of the security interests granted hereby, or for the perfection of or the exercise by Lender of its rights and remedies hereunder.   Debtor has full right, power and authority to execute, deliver and carry out the terms and provisions of this Agreement and the other Loan Documents, and every other document and instrument to be executed and delivered by Debtor pursuant to this Agreement or the DIP Financing Order.  Neither the Debtor's execution and delivery of this Agreement and the other Loan Documents, nor the performance or observance by the Debtor of the provisions of any of the foregoing, violates or will violate any existing provision in its Certificate of Organization or Operating Agreement, or any law applicable to it, or otherwise constitute a material default or violation under any existing material contract or other material obligation binding upon it or its properties.  The persons executing and delivering this Agreement and other documents on behalf of Debtor are duly authorized to so act on behalf of Debtor.   This Agreement, each other Loan Document, and every other document and instrument to be executed and delivered by Debtor, when executed and delivered, shall constitute the duly authorized, valid and legally binding obligation of the Debtor, enforceable in accordance with their respective terms.

5.4    Permits.  All necessary and required licenses, authorizations, registrations, permits, entitlements and approvals for the conduct of Debtor's business and operation of the Hotel have been obtained or will be obtained from all Governmental Authorities or other Persons, and such patents, licenses, permits and approvals shall at all times remain in full force and effect without modification or exception, subject, however, to such additions, modifications and/or replacements as may be required by Governmental Authorities or other Persons, and which are in form and substance reasonably satisfactory to Lender.

5.5    No Litigation.  There is no litigation, action, suit, or proceeding pending or threatened against Debtor or its shareholders before any Governmental Authority of which Debtor is aware and which are not reflected in disclosures made by Debtor in the Bankruptcy Case or which may reasonably be expected to have a Materially Adverse Affect.

3079347-3

5.6     Financial Information.    The financial data and operational reports heretofore delivered to Lender by Debtor are true and correct in all material respects.    No material adverse change has occurred in the financial condition or operations of Debtor reflected in the financial data heretofore delivered to Lender.    Other than as indicated by the financial statements, Debtor has no direct or contingent obligations or liabilities of a nature that would be required to be disclosed therein under GAAP which would be material to its financial position or condition.

5.7     Complete Disclosure.    To Debtor's knowledge, neither this Agreement nor any document, financial statement, credit information, certificate or statement provided to Lender by Debtor contains any untrue statement of material fact or omits to state a fact necessary to make any statements made herein or therein not misleading.

5.8     Brokerage Commissions.    No brokerage fees or commissions are payable in connection with the Loan by Debtor.

5.9     ERISA.    Debtor is not a party to any plan defined and regulated under ERISA, as amended, or Section 4975 of the Code.    None of the assets of Debtor are "plan assets" as defined in 29 C.F.R. Section  2509.75-2 or Section 2510.3-101.

5.10    Title.    Debtor has good and indefeasible fee simple title to the Hotel and all portions of the Collateral, free and clear of all liens, claims, assessments, encumbrances and rights of others other than the Pre-Petition Permitted Liens.    Debtor shall preserve such title to the Collateral and will forever warrant and defend the same and the validity and priority of the Liens granted to Lender against all other claims whatsoever.

5.11    Security Interest.    The Liens granted to Lender constitute valid, enforceable, and perfected first priority security interests in the Collateral.    All filings, registrations, recordings, and transfers necessary to create, preserve, and perfect the Lender's Lien in the Collateral granted by the Debtor to the Lender pursuant to this Agreement have been accomplished.

5.12    Payment of Taxes and Liens.    Debtor has timely paid all Taxes, and with the sole exception of amounts due in respect of the Carbon Capital Loan, all Pre-Petition Permitted Liens, and other charges in respect of the Collateral and the operation of its business or otherwise assessed against it.

5.13    Subsidiaries.    Debtor has no subsidiaries and is not a subsidiary of any other Person.

5.14    Loans to Related Parties.    As of the date hereof, Debtor has not made any loans or advances to Guarantor or any Affiliates and has not guaranteed any loans or advances for Guarantor or any Affiliates or any other Person.

5.15    Trade Names.    Except as set forth in Schedule 5.15, Debtor has not previously operated under another name or a trade name.

1

5.16   Regulation U.  Debtor is not engaged in the business of extending credit for the purpose of purchasing or carrying margin stock (within the meaning of Regulation U issued by the Board of Governors of the Federal Reserve System), and no proceeds of the Loan will be used to purchase or carry any margin stock or to extend credit to others for the purpose of purchasing or carrying any margin stock.

5.17   Accounts.  Each Account arises from a contract between the Debtor and its customer or from the bona fide sale or delivery of goods to and/or performance of services for its customer.

5.18   No Default.  No Default or Event of Default exists under this Agreement or any other Loan Document, nor will any Default begin to exist immediately after the execution and delivery hereof.

5.19   Location of Debtor's Offices.  The location and mailing address of each office of the Debtor and each location where the Debtor conducts business or has a post office box is set forth in Schedule 5.19.  The principal office of the Debtor is set forth in the provision for notices herein.

5.20   Reaffirmation of Representations.  The foregoing representations and warranties will be true and shall be deemed remade as of the date of each Advance under the DIP Loan.  All representations and warranties made herein or in any other Loan Document or in any certificate or other document delivered to Lender by or on behalf of Debtor pursuant to or in connection with this Agreement or any other Loan Document shall be deemed to have been relied upon by Lender, notwithstanding any investigation theretofore or thereafter made by or on behalf of Lender.  All such representations and warranties shall survive the making of each Advance hereunder and shall continue in full force and effect until such time as all Obligations have been paid in full.

SECTION 6
COVENANTS

So long as any portion of the Obligations remains outstanding, in addition to other covenants set forth in any Loan Document, Debtor covenants to and with Lender that:

6.1   Financial Statements.  Debtor shall keep proper and true and complete books of record and account and prepare financial statements in accordance with GAAP and shall cause to be furnished to Lender complete and accurate copies of (a) all debtor-in-possession reports immediately upon filing thereof with the Bankruptcy Court in the Bankruptcy Case, (b) all financial statements prepared by Debtor for any purpose, and (c) all such other financial information as Lender may request from time to time.

6.2   Equipment.  Debtor shall keep and maintain the Equipment in good operating condition and repair; make all necessary replacements thereof so that the value and operating

3079347-3

efficiency thereof shall at all times be maintained and preserved; promptly inform Lender of any additions or deletions from the Equipment; and prevent any such Equipment from becoming a fixture to real estate or an accession to other personal property.

6.3 <u>Taxes and Liens</u>. Debtor shall pay promptly when due all Taxes and Liens arising or accruing after the commencement of the Bankruptcy Case, including, without limitation, Taxes and Liens against any of the Collateral, and promptly discharge any Liens against the Collateral (other than the Pre-Petition Permitted Liens).

6.4 <u>Litigation</u>. Debtor shall give notice, as soon as possible under the circumstances, to Lender of any litigation affecting Debtor (and involving more than $25,000) whether or not the claim is considered by Debtor to be covered by insurance, and of the institution of any other suit or proceeding which might materially and adversely affect the operations, financial condition or business of Debtor or Lender's security interest or Lien in the Collateral.

6.5 <u>Material Agreements</u>. Debtor shall timely comply with all of its agreements and valid obligations, and shall not commit or permit to be committed any default under any obligations having an aggregate value in excess of $50,000, unless the same shall be contested in good faith by appropriate legal proceedings.

6.6 <u>Franchise and Requirements</u>. Debtor shall (a) preserve its limited liability company existence in good standing and will be and remain qualified to do business as a foreign corporation in good standing in all states in which it is required to be so qualified, and (b) maintain any franchise agreement as applicable to the Hotel and all material permits, licenses, patents, authorizations, registrations, approvals, and other similar matters necessary or appropriate for its business, and (c) comply in all material respects with all Requirements.

6.7 <u>Insurance</u>. Debtor shall maintain and pay for insurance in such amounts and covering the Collateral (including, without limitation, insurance o goods in transit) and such risks as is customary and prudent in the industry in which Debtor operates, and as provided in the DIP Financing Order. All such policies of insurance shall be in such forms and amounts as may be reasonably satisfactory to Lender. Each policy for property insurance shall show the Lender as loss payee. Each policy for liability insurance shall show the Lender as an additional insured. Each insurance policy shall provide that at least 30 days' prior written notice of alteration, cancellation or lapse shall be given to the Lender. Each insurance policy shall provide that no act or default of Debtor or any other Person shall affect the right of Lender to recover under such policy or policies of insurance in case of loss or damage. Debtor will provide Lender with evidence of such insurance, with a lender's loss-payable or additional insured, and non-cancellation endorsement, which otherwise shall be in form and substance acceptable to Lender. Debtor hereby irrevocably appoints Lender as Debtor's true and lawful attorney and agent-in-fact for the purpose of making, settling and adjusting claims under such policies of insurance, and endorsing the name of Debtor on any check, draft, instrument or other item of payment for the proceeds of such policies of insurance, solely as the foregoing relates to the Collateral. In the event Debtor, at any time or times hereafter, shall fail to obtain or maintain any of the policies of

insurance required above or to pay any premium relating thereto, then Lender, without waiving or releasing any obligation or Default by Debtor under any of the Loan Documents, may (but shall not be obligated to) at any time or times thereafter obtain and maintain such policies of insurance and pay such premiums and take any other action with respect thereto that Lender deems advisable. All sums so disbursed by Lender, including reasonable attorneys' fees, court costs, expenses and other charges relating thereto, shall be payable on demand by Debtor to Lender and shall be additional Obligations secured by the Collateral.

      6.8   <u>Bankruptcy Case and Plan</u>.  (a)Debtor shall send to Lender copies of each pleading or report heretofore or hereafter filed with the Bankruptcy Court concurrently with the filing thereof by Debtor, or within five days after the receipt thereof by Debtor, and, unless otherwise served on Lender, copies of any and all adversary proceeding complaints naming Debtor as a defendant, any motion or complaint for relief from stay in the Bankruptcy Case, any motion or application for (a) the appointment of an interim trustee, trustee or examiner in the Bankruptcy Case, (b) dismissal of the Bankruptcy Case, (c) conversion of the Bankruptcy Case from one under Chapter 11 to one under Chapter 7, (d) a change in venue of the Bankruptcy Case, or (e) any other relief.

      (b) Debtor shall execute the Definitive Agreements provided for in the Plan Letter of Intent attached as Exhibit** hereto within seventy two hours from the date hereof, and shall continuously remain in full compliance with all requirements of such Definitive Agreements, including but not limited to filing and prosecuting the Plan (and related Disclosure Statement) in accordance with the timeline and all other provisions of such Definitive Agreements.

      6.9   <u>Prohibited Acts</u>.  Debtor shall not, without Lender's prior written consent:

      (a)     dissolve, liquidate, merge into or consolidate with any Person or acquire any Person;

      (b)     make any investment other than in the ordinary course of business;

      (c)     engage in any other businesses other than those in which it is presently engaged or substantially alter its method of doing business;

      (d)     declare or pay dividends upon any of Debtor's equity or make any distributions of Debtor's property or assets or make any loans, advances and/or extensions of credit to any Person, except for trade credit granted to customers in the ordinary course of business;

      (e)     make any loans or other advances of money (other than salary and reasonable expense advances or reimbursements) to Guarantor, or officers, directors, Affiliates or stockholders of Debtor;

(f)     redeem, retire, purchase or otherwise acquire, directly or indirectly, any of Debtor's equity or make any change in Debtor's capital structure or in any of its business objectives, purposes and operations which might in any way adversely affect the repayment of the Obligations;

(g)     enter into, or be a party to, any transaction with any Affiliate, employee, officer, director or stockholder of Debtor, except in the ordinary course and pursuant to the reasonable requirements of Debtor's business and upon fair and reasonable terms which are fully disclosed to Lender and are no less favorable to Debtor than would obtain in a comparable arm's length transaction with a Person not an Affiliate, employee, officer, director or stockholder of Debtor;

(h)     enter into any transaction which materially and adversely affects the Collateral or Debtor's ability to repay the Obligations or permit or agree to any extension, compromise or settlement or make any change or modification of any kind or nature with respect to any Account;

(i)     guarantee or otherwise in any way become liable with respect to the obligations or liabilities of any Person except by endorsement of instruments or items of payment for deposit to the Lockbox or for delivery to Lender on account of the Obligations;

(j)     make deposits to or withdrawals from any deposit accounts for the benefit of any Affiliate;

(k)     except as otherwise expressly permitted herein or in the other Loan Documents, encumber, pledge, mortgage, grant a security interest in, suffer to exist any Lien upon (other than the Pre-Petition Permitted Liens), assign, sell, lease or otherwise dispose of or transfer (except for sale of Inventory in the ordinary course of business), whether by sale, merger, consolidation, liquidation, dissolution, or otherwise, the Hotel or any of Debtor's assets;

(l)     make any loans or other advances of money (other than salary) to officers, directors, stockholders, or Affiliates of Debtor (other than usual and customary travel advances in the ordinary course of business), or permit any increases in annual salary and all other direct and indirect remuneration to its officers  above the compensation levels paid to such persons as set forth in the attached Schedule 6.9 (l);

(m)     prepay prior to their respective presently existing maturities, any debts or liabilities of Debtor except the Note and the Obligations, to the extend allowed hereby;

(n)     seek to modify any provision of the DIP Financing Order;

(o)     default under, violate, or fail to comply in any respect with the requirements and provisions of the Definitive Agreements relating to the Plan.

3079347-3

6.10     <u>Performance of Agreements</u>.  Debtor shall duly and punctually perform, observe and comply with all of the terms, provisions, conditions, covenants and agreements on its part to be performed, observed and complied with hereunder and under the other Loan Documents, and Debtor will not suffer or permit any Default or Event of Default to exist under any of the foregoing.

6.11     <u>Further Assurances</u>.  Debtor shall duly execute and/or deliver (or cause to be duly executed and/or delivered) to Lender any instruments, documents, financing statements, waivers, consents or other writings which may be reasonably necessary to Lender to carry out the terms of this Agreement and any of the other Loan Documents, and to perfect its security interest in and facilitate the collection of the Collateral and the proceeds thereof.  Debtor shall perform or cause to be performed such acts as Lender may request to establish and maintain for Lender a valid and perfected security interest in and to the Collateral, free and clear of any Liens, other than Liens in favor of Lender, including, without limitation, so as to enable Lender to collect upon the Collateral comprised of the Accounts.

6.12     <u>Audit and Inspection by Lender</u>.  Debtor shall permit Lender, and any agents or representatives of Lender, at any reasonable time and from time to time, to inspect and make audits of any of the Collateral, to make inquiries of the account debtors under any Receivables, to examine and make copies of and abstracts from the records and books of account of and visit the properties of Debtor, and to discuss the affairs, finances and accounts of Debtor with any of its officers or accountants.

6.13     <u>Notice</u>**.**  Debtor shall cause its Chief Financial Officer, or in his absence, another officer designated by the Chief Financial Officer or President, to notify Lender in writing, within no more than 24 hours after Debtor or any of its officers or directors learns of any of the following: (a) the existence or occurrence of any Default or Event of Default under this Agreement or any of the other Loan Documents; or (b) if any representation or warranty made herein, or in any related instrument or writing, or any other certificate, report or statement provided to the Lender pursuant to the Loan Documents, shall not be or shall cease in any material respect to be true and complete; or (c) the institution of, or adverse determination in, any material litigation, arbitration or governmental proceeding involving the Debtor, and describing the nature thereof, what happened with respect thereto, and what steps are being taken by the Debtor with respect thereto.

6.14     <u>Indemnification</u>**.** Except to the extent arising from Lender's gross negligence or willful misconduct, Debtor shall protect, indemnify and defend Lender and its successors, assigns, participants and endorsees, and their respective officers, directors, employees and agents (each an "<u>Indemnified Party</u>**"**), against, and hold Lender and the other Indemnified Parties harmless of and from, any and all losses, liabilities, claims, damages, costs and expenses (including, but not limited to, reasonable attorneys' fees and court costs, whether incurred at the trial, appellate or administrative levels), which an Indemnified Party may suffer or incur, or to which an Indemnified Party may be subjected, by reason of, arising out of, or in connection with

6

(a) this Agreement and the other Loan Documents, including, without limitation, a breach of any certification, representation, warranty, or covenant of Debtor set forth in any of the Loan Documents, or (b) any of the transactions contemplated herein or in the other Loan Documents, or (c) protecting, modifying, administering, preserving, exercising or enforcing any of the rights of Lender under the Loan Documents.

Upon demand by an Indemnified Party, Debtor shall defend any action or proceeding brought against an Indemnified Party in connection with any of the foregoing or the Indemnified Party may elect to conduct its own defense at the reasonable expense of Debtor. In any event, Debtor shall reimburse the Indemnified Party in full for all costs reasonably incurred in investigating, preparing or defending against any action or proceeding, commenced or threatened, in connection with any of the foregoing matters, or incurred in settlement of any such action or proceeding (whether commenced or threatened).

The obligations of Debtor under this Section shall survive the closing of the Loan and the repayment thereof.

6.15    Stamp and Excise Taxes.  Debtor shall pay any and all taxes, charges, filing, registration and recording fees, excises and levies imposed upon Lender by reason of its interest in, or measured by amounts payable under, the Note, this Agreement, or any other Loan Document (other than income, franchise and doing business taxes), and shall pay all stamp taxes and other taxes required to be paid on the Note, this Agreement, or the other Loan Documents. If Debtor fails to make such payment within five days after notice thereof from Lender, Lender may (but shall not be obligated to) pay the amount due, and Debtor shall reimburse Lender on demand for all such Advances.  If Applicable Law prohibits Debtor from paying such taxes, charges, filing, registration and recording fees, excises, levies, stamp taxes or other taxes, then Lender may declare the Obligations then unpaid to be immediately due and payable.

6.16    Location.  Debtor shall keep all tangible Collateral which is personal property at the places therefor specified in Schedule 6.16, and, except for Inventory sold in the ordinary course of business, Debtor shall not transfer the Collateral from such premises without the prior written approval of Lender.

6.17    Lender's Expenses.  Debtor shall pay, on demand by Lender, all Loan Costs, provided that the DIP Financing Order shall govern the procedures regarding payment of attorneys' fees and expenses.

6.18    Estoppel Certificates.  Within ten (10) Business Days following a request by Lender, Debtor shall provide to Lender a duly acknowledged written statement confirming the amount outstanding under the Loan, the terms of payment and maturity date of the Note, the date to which interest has been paid and whether any offsets or defenses exist against the Note.  If any such offsets or defenses are alleged to exist, the nature thereof shall be set forth in detail.

7

6.19     Collateral Descriptions.  Upon request from Lender, from time to time, Debtor shall provide to Lender statements, schedules and certificates further identifying and describing the Collateral and such other reports in connection with the Collateral as Lender may reasonably request, all in reasonable detail.

6.20     Subordinated Obligations.  Debtor will not, directly or indirectly, (a) while any Obligations are outstanding hereunder or under any of the other Loan Documents, make or permit any payment to be made in respect of any indebtedness, liabilities or obligations, direct or contingent, to any Affiliate, which payments shall be and are hereby made subordinate to the payment of the Obligations, or (b) during the pendency of any Event of Default hereunder or under any of the other Loan Documents make or permit any payment to be made in respect of the indebtedness, liabilities or obligations, direct or contingent, which, by separate agreement are made subordinate to the payment of principal of the Obligations, or (c) make or permit the amendment, rescission or other modification of any of Debtor's subordinated obligations in such a manner as to affect adversely the priority of Lender's right to payment and collection or the lien priority of the Collateral.

## SECTION 7
## EVENTS OF DEFAULT/LENDER'S REMEDIES

7.1     Events of Default.  The occurrence of any one of the following events, and it remaining uncured after the expiration of any applicable notice and/or cure periods provided for in this Section 7.1 or Section 7.2, below)  shall constitute an event of default under this Agreement (an "Event of Default"):

(a)     Payment.  Debtor fails to pay the Obligations when due and payable or declared due and payable, or is in default of the payment of any portion of the Obligations;

(b)     Untrue Statements.  Any statement, report, financial statement, or certificate made or delivered by Debtor, or any of its officers, or employees, to Lender is not true and correct in any material respect;

(c)     Uninsured Damage.  There shall occur any material uninsured damage to or loss, theft, or destruction of any of the Collateral;

(d)     Representations and Warranties.  Any warranty, representation or other statement by or on behalf of Debtor contained in any of the Loan Documents or in any document furnished in compliance with or in reference thereto between Debtor and Lender is false or misleading in any material respect;

(e)     Breach of Covenants or Agreements.  Debtor shall violate, breach or default in the performance of any covenant or agreement on its part to be performed pursuant to any of the Loan Documents, including but not limited to any failure to maintain continuous

8

insurance coverage of the Collateral, and to comply in all respects with the timeline and other requirements of the Definitive Agreements relating to the Plan;

(f) <u>Injunction</u>. Debtor is enjoined, restrained or in any prevented or restricted by court order from conducting all or any material part of its business affairs;

(g) <u>Invalidity</u>. Any one of the Loan Documents shall terminate for any reason, or the validity, binding nature or enforceability of any of the Loan Documents shall be disputed by, or on behalf of, or in the right of, Debtor;

(h) <u>Budget or Cash Flow Shortfall; Material Adverse Change</u>. (i) Failure of Debtor to comply with the Budget or meet the projections set forth in the Budget, or (ii) failure of Debtor timely to satisfy any performance benchmark or milestone set forth in the Budget (as it may be modified from time to time in writing signed by Debtor and Lender), or (iii) any failure of the cash flow of Debtor's business plus the undisbursed portion of the maximum amount of the Loan to be at all times adequate, in Lender's reasonable judgment, to pay the necessary costs and expenses of operating Debtor's business; or there is a material adverse change in the business, prospects, assets, liabilities, or operations of the Debtor;

(i) <u>Change of Venue</u>**.** Any change of venue of the Bankruptcy Case;

(j) <u>Conversion to Chapter 7 or Appointment of Trustee or Dismissal</u>. Conversion of the Bankruptcy Case to a case under Chapter 7 of the Bankruptcy Code or dismissal of the Bankruptcy Case or appointment of an interim trustee, a trustee, or an examiner with any of the powers of a trustee in the Bankruptcy Case, or dismissal of the Bankruptcy Case;

(k) <u>Action based on Loan Documents</u>. The commencement by Debtor or any Affiliate or other Person of any legal action or claim of any type or nature whatsoever (whether now known or unknown) against Lender in connection with or arising hereunder or under any of the Loan Documents or any performance by Lender hereunder or thereunder, unless Debtor shall procure the dismissal thereof at no cost to Lender within 30 days after the same is asserted;

(l) <u>Termination of Business</u>. Debtor ceases to operate the Hotel for any reason, as now being operated;

(m) <u>Enforcement of Pre-Petition Permitted Junior Liens or Other Liens</u>**.** Any Pre-Petition Permitted Junior Lien shall become in default or any state of facts shall exist which permits any holder of a Pre-Petition Permitted Lien to exercise any rights as to the Collateral, or any  holder of a Pre-Petition Permitted Lien shall obtain relief from the automatic bankruptcy stay or otherwise assert rights to realize upon an interest in any of the Collateral, or the Bankruptcy Court shall enter an order modifying, annulling or terminating the automatic stay in favor of any creditor of Debtor (other than Lender) asserting a lien against the Collateral;

3079347-3

(n) <u>Violation of Order</u>.  Debtor shall fail to comply with any of the terms of the DIP Financing Order;

(o) <u>Expiration of Exclusivity Period</u>.  The exclusive period (including any extensions granted by the Bankruptcy Court) for Debtor to file a plan of reorganization in the Bankruptcy Case expires or terminates and a plan of reorganization is filed by any proponent other than Debtor;

(p) <u>Failure to File Plan or comply with Timeline</u>.  Debtor fails to file a disclosure statement and plan of reorganization (that Lender has approved in writing)  in the Bankruptcy Case within the timeline provided for in the Definitive Agreements relating to the Plan or the Bankruptcy Court  approves the disclosure statement for and solicitation of plan acceptances with respect to, any plan of reorganization for the Debtors that Lender has not approved in writing;  or

(q) <u>Material Adverse Change</u>.   If any material adverse change occurs with respect to the Hotel, or Debtor's business, affairs, financial condition or prospects.

7.2   <u>Remedies Upon Event of Default</u>.  If Debtor fails to cure an event or condition set forth in Section 7.1, above, within ten (10) days after Lender gives written notice thereof to Debtor, Debtor's counsel of record, the U.S. Trustee, and the Creditors' Committee counsel or chairman, so that the same becomes an Event of Default (other than an Event of Default under Section 7.1(c), (i), (j), (n), (p), or (q) as to which no notice or grace period shall apply), Lender shall have the following rights and remedies:

(a) <u>Payment</u>.   The right to declare, at the option of Lender and without demand, notice, or legal process of any kind, all of which are expressly waived by Debtor, all of the Obligations due and payable, in which event all of the Obligations shall immediately become due and payable;

(b) <u>Sale of Collateral</u>.  The right to proceed against and sell all or any portion of the Collateral in any order, until all of the Obligations are satisfied in full;

(c) <u>Collection from Account Debtors</u>.  The right to open Debtor's mail and collect any and all amounts due Debtor from account debtors, until all of the Obligations are satisfied in full;

(d) <u>Removal of Collateral</u>.   The right to (i) without judicial process and without any obligation to pay rent to Debtor, enter upon the premises of Debtor or any other place or places where the Collateral is located and kept, and remove the Collateral therefrom to the premises of Lender or any agent of Lender, for such time as Lender may desire, in order to effectively collect or liquidate the Collateral, and/or (ii) require Debtor to assemble the Collateral and make it available to Lender at a place to be designated by Lender, in its sole discretion;

10

(e)　Rights with Respect to Accounts.  Upon and after an Event of Default, Debtor irrevocably designates, makes, constitutes and appoints Lender as Debtor's true and lawful attorney and agent-in-fact, and Lender or Lender's agent may, with notice to Debtor, and at such time or times thereafter as Lender or said agent, in its sole discretion, may determine, in Debtor's or Lender's name: (i) demand payment of the Accounts; (ii) enforce payment of the Accounts, by legal proceedings or otherwise; (iii) exercise all of Debtor's rights and remedies with respect to the collection of the Accounts; (iv) settle, adjust, compromise, extend or renew the Accounts; (v) settle, adjust or compromise any legal proceedings brought to collect the Accounts; (vi) if permitted by Applicable Law, sell or assign the Accounts upon such terms, for such amount and at such time or times as Lender deems advisable; (vii) discharge and release the Accounts; (viii) prepare, file and sign Debtor's name on any Proof of Claim in the bankruptcy or similar document against any account debtor; (ix) prepare, file and sign Debtor's name on any notice or claim of lien, assignment or satisfaction of lien or similar document in connection with the Accounts; (x) endorse the name of Debtor upon any of the items of payment or proceeds and deposit the same to the account of Lender on account of the Obligations; (xi) endorse the name of Debtor upon any chattel paper, document, instrument, invoice, freight bill, bill of lading, or other document or agreement relating to Accounts and Inventory.

(f)　Procedures for Sale.  The right to sell or to otherwise dispose of all or any Collateral in its then condition, or after any further manufacturing or processing thereof, at public or private sale or sales, with such notice as may be required by law, in lots or in bulk, for cash or on credit, all as Lender, in its sole discretion, may deem advisable and such sales may be adjourned from time to time with or without notice.  Lender shall have the right to conduct such sales on Debtor's premises or elsewhere and shall have the right to use Debtor's premises without charge for such sales for such time or times as Lender may see fit.  Lender shall have the right to sell, lease or otherwise dispose of the Collateral, or any part thereof, for cash, credit, or any combination thereof, and Lender may purchase all or any part of the Collateral at public, or, if permitted by law and as provided in the UCC, private sale and, in lieu of actual payment of such purchase price, may set off the amount of such price against the Obligations.  Debtor agrees that ten (10) days' prior notice of any sale of Collateral shall be commercially reasonable and fair notice to it.  Lender may adjourn any sale from time to time, and no further publication or notice of an adjourned sale need be made, provided that notice of the date and time of the sale is given at the time of adjournment.

(g)　Right of Offset.  The right then, or at any time thereafter (in addition to any rights of offset available to Lender at common law or otherwise) to set off against, and to appropriate and apply toward the payment of the Obligations (in such order as Lender may elect in its sole discretion) whether or not such Obligations shall then have matured or be due and payable and whether or not the Lender has declared the Note and/or other Obligations to be in Default and immediately due, any and all sums and other property then held or owed by the Lender to or for the credit or account of Debtor.

(h)　Relief from Stay.  Lender may apply to the Bankruptcy Court for relief from the automatic stay to exercise its rights and remedies hereunder, under the Loan

11

Documents, or under Applicable Law, and Lender shall be entitled to the entry of an order terminating the automatic stay under Section 362 of the Bankruptcy Code on an expedited basis and a hearing on notice to Debtor, Debtor's counsel of record, and the Creditor's Committee, if any, and the U.S. Trustee in the Bankruptcy Case. At any such hearing, Lender shall be entitled to complete relief from the automatic stay for cause, and Debtor agrees that the occurrence of an Event of Default shall conclusively constitute cause.

(i)     Adversary Proceeding.  Lender may file an adversary proceeding in the Bankruptcy Case to enforce its rights and remedies under this Agreement and the other Loan Documents.

**7.3     Waivers.**  The acceptance by Lender at any time and from time to time of partial payments of the DIP Loan or performance of the Obligations shall not be deemed to be a waiver of any Event of Default then existing.  No waiver by Lender of any Event of Default shall be deemed to be a waiver of any other or subsequent Event of Default.  No delay or omission by Lender in exercising any right or remedy under the Loan Documents shall impair such right or remedy or be construed as a waiver or release thereof or an acquiescence therein, nor shall any single or partial exercise of any such right or remedy preclude other or further exercise thereof, or the exercise of any other right or remedy under the Loan Documents or otherwise; and Lender, upon the occurrence of an Event of Default under any of the Loan Documents, may proceed against Debtor at any time, under any agreement, in any order, and with any available remedy.  Debtor hereby expressly waives to the fullest extent legally possible any claim to require any lien marshalling or marshalling of assets

7.4     Cumulative Rights.  All rights and remedies available to Lender under the Loan Documents or otherwise shall be deemed concurrent and cumulative of and in addition to all other rights and remedies granted to Lender under any of the Loan Documents, at law or in equity, whether or not the DIP Loan is due and payable and whether or not Lender shall have instituted any suit for collection or other action in connection with the Loan Documents, and not alternative or exclusive remedies; and Lender may proceed with any number of remedies at the same time until all Obligations are satisfied in full.  In addition to any other rights and remedies contained in this Agreement and in all of the other Loan Documents, Lender shall have all of the rights and remedies of a secured party under the UCC or other Applicable Law, all of which rights and remedies shall be cumulative and non-exclusive.

SECTION 8
MISCELLANEOUS

8.1     Notices.  Any notice, report, demand, request or other instrument or communication authorized, required or desired to be given under this Agreement by any party shall be in writing and shall be deemed given if addressed to the party intended to receive the same, at the address of such party set forth below, and shall be sent by Federal Express or other nationally recognized courier, expenses prepaid or charged to the sender, or by telecopier (provided such telecopied material is also sent by certified mail, return receipt requested or

courier in the manner set forth herein) or by mail, postage prepaid. All such communications shall be deemed delivered when received; provided that telecopied messages shall not be effective unless such messages are also sent by mail or courier as set forth herein and; provided further, that mail sent via certified mail - return receipt requested, certified fee and normal postage prepaid, shall be deemed to have been received on the earlier of actual receipt thereof or the fourth day after the postmarked date indicated on the Receipt for Certified Mail. The addresses for the parties are set forth in <u>Schedule 8.1</u>. Any party may change the address to which any such notice, report, demand, request or other instrument or communication to such party is to be delivered or mailed, by giving written notice of such change to the other parties, but no such notice of change shall be effective unless and until received by such other parties.

8.2 <u>Entire Agreement</u>. This Agreement and the other Loan Documents, including the Exhibits and Schedules to them, is the entire agreement between the parties relating to the subject matter hereof.

8.3 <u>Time</u>. Time is of the essence as to all obligations of Debtor pursuant to this Agreement.

8.4 <u>Governing Law/Venue</u>**.** EXCEPT TO THE EXTENT FEDERAL LAW APPLIES AS PROVIDED IN THE PLAN CONFIRMATION ORDER, THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS (EXCEPT AS MAY BE EXPRESSLY PROVIDED THEREIN TO THE CONTRARY) SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF FLORIDA, EXCLUSIVE OF ITS CHOICE OF LAWS PRINCIPLES.

DEBTOR HEREBY CONSENTS TO THE JURISDICTION OF THE BANKRUPTCY COURT, AND IRREVOCABLY AGREES THAT, SUBJECT TO LENDER'S ELECTION, ALL ACTIONS OR PROCEEDINGS ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE OTHER LOAN DOCUMENTS SHALL BE LITIGATED IN THE BANKRUPTCY COURT, WHICH, PURSUANT TO THE PLAN CONFIRMATION ORDER, SPECIFICALLY HAS RETAINED JURISDICTION FOR SUCH PURPOSE. DEBTOR HEREBY WAIVES PERSONAL SERVICE OF ANY AND ALL PROCESS AND AGREES THAT ALL SUCH SERVICE OF PROCESS MAY BE MADE UPON DEBTOR BY CERTIFIED OR REGISTERED MAIL, RETURN RECEIPT REQUESTED, ADDRESSED TO DEBTOR, AT THE ADDRESS SET FORTH IN THIS AGREEMENT.

8.5 <u>Modification and Waiver</u>. No provision of this Agreement or any of the other Loan Documents shall be amended, waived or modified except by an instrument in writing signed by the parties against whom such amendment, waiver or modification is sought to be enforced, and, if required by the DIP Financing Order, approved by the Bankruptcy Court.

8.6 <u>Severability</u>. If any provision of this Agreement or any of the other Loan Documents is held to be illegal, invalid or unenforceable under present or future laws effective during the term thereof, such provision shall be fully severable, this Agreement and the other

Loan Documents shall be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part hereof or thereof, and the remaining provisions hereof or thereof shall remain in full force and effect.

8.7    Counterparts.  This Agreement may be executed in any number of counterparts, each of which, when executed and delivered, shall be an original, and such counterparts, when taken together, shall constitute one and the same instrument. Debtor agrees that any copy of this Agreement or any Loan Documents signed by the parties who are signatories, and transmitted by telecopier or otherwise for delivery to Lender shall be admissible in evidence as the original itself in any judicial, bankruptcy, administrative or alternative dispute resolution proceeding, whether or not the original is in existence or produced.  Once executed and delivered by the parties, execution and delivery of this Agreement and any other Loan Documents on or after the Effective Date shall be binding and enforceable on all parties hereto.

8.8    Assignability.  Debtor shall not assign this Agreement or any part of any Advance to be made hereunder without the prior written consent of Lender, which may be withheld in Lender's sole and absolute discretion.  The rights of Lender under this Agreement are assignable by Lender in whole or in part with the prior written consent of Debtor, which consent shall not be unreasonably withheld or delayed, provided that no consent of Debtor shall be required with respect to an assignment by Lender to an affiliate of Lender.  This Agreement is binding upon the successors and permitted assigns of Debtor, and shall inure to the benefit of Lender and its successors and assigns.

8.9    Waiver of Defaults.  Waiver by Lender of any breach or default by Debtor under any terms of this Agreement or any of the other Loan Documents shall not be deemed nor shall the same constitute a waiver of any subsequent breach or default on the part of Debtor.

8.10    No Third Party Beneficiaries.  This Agreement is an agreement only by and between Debtor and Lender.  Except as otherwise provided herein, no other person or party shall be a beneficiary hereof or have any rights hereunder, and no rights are conferred by this Agreement upon any other person or party, whether or not their name may be used or otherwise identified in this Agreement.

8.11    Limitation on Interest.  Debtor and Lender intend to comply at all times with applicable usury laws.  All agreements between Debtor and Lender, whether now existing or hereafter arising and whether written or oral, are hereby limited so that in no contingency, whether by reason of demand or acceleration of the maturity of the Loan or otherwise, shall the interest contracted for, charged, received, paid or agreed to be paid to Lender exceed the lesser of the Default Rate or the maximum amount permissible under Applicable Law.  Lender may, in determining the maximum rate in effect from time to time, take advantage of any law, rule or regulation in effect from time to time available to Lender which exempts Lender from any limit upon the rate of interest it may charge or grants to Lender the right to charge a higher rate of interest. If from any circumstance whatsoever, interest would otherwise be payable to Lender in excess of the maximum allowable rate, the interest payable to Lender shall be reduced to such

14

maximum rate; and if from any circumstance Lender shall ever receive anything of value deemed interest by Applicable Law in excess of the maximum rate, an amount equal to any excessive interest shall be applied to the reduction of the principal of Loan, and not to the payment of interest, or if such excessive interest exceeds the unpaid balance of principal of the Loan such excess shall be refunded to Debtor.

8.12 <u>Exculpation</u>. Lender and its directors, officers, employees, attorneys, agents and owners shall not incur any liability to Debtor (other than for its or their own acts or omissions amounting to gross negligence or willful misconduct ) for acts or omissions arising out of or related directly or indirectly to any of the Loan Documents; and Debtor hereby expressly waives, releases and discharges any and all claims and actions against Lender and its directors, officers, employees, attorneys, owners and agents (other than those attributable to its or their gross negligence or willful misconduct) arising out of or related directly or indirectly to any and all of the foregoing acts, omissions and circumstances. In no event shall Lender be liable for any punitive, consequential or indirect damages suffered by Debtor in connection with, arising out of, or in any way related to this Agreement or the other Loan Documents or the transactions contemplated and the relationship established by this Agreement and the other Loan Documents, and Debtor hereby waives any right to claim such damages.

8.13 <u>Section Headings; Number and Gender</u>. The section and other headings contained in this Agreement re for reference purposes only and shall not affect the meaning or interpretation of any provisions of this Agreement. All references in this Agreement to number and gender shall be deemed interchangeably to have a singular, plural, masculine, feminine or neuter meaning, as the sense of the context requires.

8.14 <u>Litigation</u>. If any legal action is brought for the enforcement of this Agreement, or because of an alleged dispute, breach, default, or misrepresentation in connection with any of the provisions of this Agreement, the successful or prevailing party or parties shall be entitled to recover reasonable attorney fees, paralegal fees and other costs incurred in that action or proceeding, in addition to any other relief to which it or they may be entitled. All references to attorneys' fees (or similar phrases) in this Agreement shall include attorneys' and paralegals' fees, costs and disbursements, whether suit be brought or not, and in any insolvency, bankruptcy, regulatory, administrative, investigative and appellate proceedings.

8.15 <u>Court Approval</u>. The Bankruptcy Court has approved this Agreement.

8.16 <u>Jury Trial Waiver</u>. DEBTOR AND LENDER HEREBY WAIVE THEIR RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS. DEBTOR AND LENDER ACKNOWLEDGE THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO A BUSINESS RELATIONSHIP, THAT EACH HAS RELIED ON THE WAIVER IN ENTERING INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS AND THAT EACH WILL CONTINUE TO RELY ON THE WAIVER IN THEIR RELATED FUTURE DEALINGS. DEBTOR AND LENDER

WARRANT AND REPRESENT THAT EACH HAS HAD THE OPPORTUNITY OF REVIEWING THIS JURY WAIVER WITH LEGAL COUNSEL, AND THAT EACH KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS.

[the remainder of this page is left blank intentionally]

16