# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

IN RE:

SHUBH HOTELS PITTSBURGH, LLC,

        Debtor.

_____

CARBON CAPITAL II REAL ESTATE CDO
2005-1 LTD., and BLACKROCK
FINANCIAL MANAGEMENT, INC., as sub-
special servicer to CARBON CAPITAL II
REAL ESTATE CDO 2005-1 LTD's special
servicer, MIDLAND LOAN SERVICES,
INC.,

        Movants,

    v.

SHUBH HOTELS PITTSBURGH, LLC,

        Respondent.

Bankruptcy Case No. 10-26337

Chapter 11

Judge Jeffery A. Deller

Document No. _____

Related to Document Nos._____

Hearing Date and Time:

Response Date and Time:

---

### EMERGENCY MOTION FOR AN ORDER APPOINTING A CHAPTER 11 TRUSTEE, ADDITIONALLY; MOTION TO TERMINATE EXCLUSIVITY PERIOD IN WHICH TO FILE A CHAPTER 11 PLAN; ADDITIONALLY, <u>MOTION TO VOID TRANSFER OF PROPERTY OF ESTATE</u>

Movants, Carbon Capital II Real Estate CDO 2005-1 Ltd. ("<u>Lender</u>"), and BlackRock

Financial Management, Inc. ("<u>BlackRock</u>", and with Lender, "<u>Movants</u>"), by and through their

undersigned counsel, Reed Smith LLP, file this motion ("<u>Motion</u>") for the appointment of a

chapter 11 trustee, pursuant to 11 U.S.C. § 1104(a), together with a motion seeking termination

of the exclusive period to file a chapter 11 plan pursuant to 11 U.S.C. § 1121(d).  Additionally,

US_ACTIVE-104691166.11-JSLOFGRE 10/25/10 3:46 PM

Movants seek to void the unauthorized transfer of property of the Debtor's estate. In support hereof, the Movants state as follows:

## I.       PROCEDURAL BACKGROUND

1.      The Debtor filed a voluntary petition under Chapter 11, Title 11 of the United States Code, 11 U.S.C. §101, *et seq*. ("Bankruptcy Code") on September 7, 2010 ("Petition Date").

2.      The Debtor is currently a debtor in possession pursuant to 11 U.S.C. §1107. As is set forth below, it is far from clear who is managing the debtor in possession.

3.      On September 8, 2010, Movants filed their Motion for Relief from Stay pursuant to which Movants requested relief from the automatic stay to foreclose on their interests in certain property (the "Collateral") that is subject to their security interests as evidenced by the Loan Documents.[1] The Motion for Relief from Stay, as supplemented, is incorporated herein by reference as if set forth at length. See Doc. Nos. 7, 109, 186, & 271.

4.      In their Motion for Relief from Stay, Movants assert that cause exists to lift the stay because the Debtor cannot adequately protect Lender's interests in the Collateral; and further, that the Debtor lacks equity in the Collateral and that the Collateral is not necessary for an effective reorganization. *See* Motion for Relief from Stay, ¶¶ 41 and 47-49.

5.      In support of these assertions, the Movants state that the Debtor cannot reorganize or provide adequate protection of the Lender's interests because, *inter alia*, the Rents are not property of the estate and Hilton terminated its Franchise License Agreement prior to the Petition Date. *See* id. at ¶¶ 44-47.

---

[1]      Capitalized terms not otherwise defined herein shall have the meaning given to them in the Motion for Relief from Stay.

6.     After the filing of the Motion for Relief from Stay, the Debtor filed an Expedited Motion for an Order Authorizing the Debtor to Use Cash Collateral or in the Alternative to Obtain Alternative Debtor in Possession Senior Lending Facility ("DIP Loan Motion", Doc. No. 13).  Dr. Kiran Patel is identified as the DIP Lender in the DIP Loan Motion.

7.     On September 14, 2010, the Debtor filed its Response to the Motion for Relief from Stay, wherein it asserted that "600 Commonwealth Place, L.P., or other entities controlled by Dr. Kiran Patel, M.D." (collectively, "Patel") would be the plan sponsor to assume the Loan with the Lender and ownership of the Hotel.  *See* Doc. No. 41.

8.     On September 21, 2010, the Debtor filed its Schedules and Statement of Financial Affairs [Doc. No. 75].

9.     On September 24, 2010 the Official Committee of Unsecured Creditors ("Committee") was appointed.

10.     The hearings on, *inter alia*, the Motion for Relief from Stay and the DIP Motion (collectively, "Pending Matters") were continued until October 7, 2010, to permit the Debtor, Patel, the Lender and the Committee to participate in discovery and formulate positions with respect to the Pending Matters.

11.     Various disputes arose over the failure of the Debtor and Patel to produce documents.  Further, some of the persons or entities from whom the Movants sought discovery were not able to be located and subpoenas were not able to be served.

12.     The Debtor, Patel, the Lender and the Committee have filed responses to the Pending Matters, albeit some of the responses may be modified pending the conclusion of the discovery.

13.     The hearing on the Pending Matters commenced on October 7, 2010, during which time the, William Sfamenos, the Debtor's controller ("Debtor's Controller"), and Mark Popovich, the Movants' expert, testified.

14.     On October 8, 2010, Eloisa Mascarenas ("Mascarenas"), Vice President of BlackRock Financial Management testified for more than seven hours.

15.     Additional witnesses, including the Debtor's current management company, PRISM Hotels & Resorts ("Prism"), were heard on October 12; additional witnesses are set to be heard thereafter, with respect to the Pending Matters.[2]

## II.     JURISDICTION AND VENUE

16.     This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157.  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicate for the relief sought in this Motion includes 11 U.S.C. §§ 362, 363(b), § 1104(a), and § 1121(d).

## III.     SUMMARY OF ARGUMENTS

### A.     APPOINTMENT OF CHAPTER 11 TRUSTEE

17.     In the event the Movants' Motion for Relief from Stay is not granted, a chapter 11 trustee should be appointed in this case because cause exists to appoint a trustee and because appointment of a trustee is in the best interests of creditors.

---

[2]     The Movants incorporate herein by reference their Motion for Relief from the Automatic Stay, including the supplements thereto, the transcript from September 15, 2010, and the Trial Transcripts from October 7, October 8, and October 12, 2010.

18.    Cause exists for the appointment of a chapter 11 trustee in this case because the Debtor's prepetition and postpetition actions have revealed gross mismanagement, incompetence, and deceitfulness in the handling of its affairs.  Such gross management, incompetence and dishonesty is evidenced by, *inter alia*, the following:  (i) the blatant disregard of creditor rights prepetition by the misuse of corporate revenues to pay insiders and non-corporate expenses;  (ii) the apparent sheer number of actual or potential conflicts of interest among the Debtor and Patel and other entities Patel directly or indirectly owns or controls;  (iii) the number and magnitude of the inter-company and insider transactions;  (iv) the commingling of affairs of the Debtor with affiliated companies/persons;  (v) Patel's attempt to circumvent the scrutiny of avoidance actions, by the filing of a plan which seeks to shelter all avoidance actions by having the reorganized Debtor take ownership of them free and clear of any claims;  (vi) the actual or attempted post-petition transfer of estate assets outside the ordinary course of business and without Bankruptcy Court approval;  and (vii) the acrimony among the Movants and the Debtor.

19.    Additionally, the foregoing facts support a finding that the Debtor is not and should not be trusted, is not capable of managing its affairs for the benefit of this estate, and the benefits to creditors of appointing a trustee greatly outweigh its costs.  Therefore, appointment of a chapter 11 trustee is also warranted because it is in the best interest of creditors.

### B.    TERMINATION OF EXCLUSIVITY TO FILE A PLAN

20.    Additionally, in the event exclusivity is not automatically terminated by the appointment of a trustee, cause exists to terminate the exclusivity period in which the Debtor may file a chapter 11 plan and to authorize the Movants to file a competing plan of reorganization.  The Debtor concedes that it is incapable of reorganizing without a transfer of its

equity interests and certain of its rights and claims to Patel pursuant to the Postpetition Transfer Agreement (as defined below). The Postpetition Transfer Agreement, however, is void or voidable. Therefore, by the Debtor's own admission, it cannot feasibly reorganize.

21. Finally, Patel is not a "white knight" for the creditors of the Debtor's estate, but was inextricably intertwined with the ownership and management of the Debtor on a prepetition basis with knowledge and/or participation in the mismanagement and abuses supporting Movants' request for appointment of a trustee. Consequently, even if the Postpetition Transfer Agreement were not void or voidable, a competing plan of reorganization providing the Debtor's creditors with a choice between doing business with Patel and his affiliates or with the Lender in its effort to secure new management and ownership is in the best interests of creditors.

### C. THE POSTPETITION TRANSFER AGREEMENT IS VOID OR VOIDABLE.

22. The Postpetition Transfer Agreement purports to (a) transfer all of the equity interests in the Debtor to Patel, (b) satisfy Patel's undocumented and disputed claims; and (c) release the estate's claims against Patel.

23. These purported transfers violate, *inter alia*, the automatic stay, the prohibition against using property of the estate outside the ordinary course of business without hearing and court approval, and the requirement that distributions on account of prepetition claims are to be made pursuant to a confirmed plan of reorganization and only to allowed claims. Further, it purports to modify the Lender's rights under the Loan Documents outside the procedural safeguards of the chapter 11 plan process.

**IV.    ADDITIONAL FACTS TO SUPPORT THE ARGUMENTS**

24.    The Lender asserts that cause exists to appoint a trustee because existing ownership has proven incapable of effectively managing the Hotel and related Collateral.

25.    Evidence of this ineffectiveness is found in, *inter alia*, the lack of full and fair disclosure made to the Court and to the creditors regarding the relationship between Patel and the Debtor and the ownership of equity interests in the Debtor, the complete disregard of the obligations and promises that the Debtor has made to the Lender under the Loan Documents, the utter disregard for the legitimate vendors, creditors and workers of Hotel, and by the gross mismanagement of the use of the Hotel revenues to pay for non-legitimate operating expenses – in spite of operating shortfalls.

**A.    Patel's Affiliations with the Hotel Property as Alleged Owner and Alleged Creditor**

26.    On September 27, 2010, the Debtor provided a copy of that certain September 21, 2010 Membership Interest Purchase Agreement which allegedly transfers to Pittsburgh Grand, LLC ("Grand"), a Florida limited liability company [as the] 100% of the equity interests in Debtor ("Postpetition Transfer Agreement").  A copy of the Postpetition Transfer Agreement is filed at Docket No. 182.

27.    Dr. Patel and Pittsburgh Grand, LLC are not listed as owning equity interests in the Debtor until October 6, 2010, when the Debtor filed an unsigned Amended Schedule of Equity Ownership, indicating the new ownership by Pittsburgh Grand LLC and Pittsburgh Grant Manager LLC, both of which are beneficially 100% owned by Patel [Doc. No. 194]

28.    The Postpetition Transfer Agreement purports to cause a change in control of the Debtor's ownership, without the Lender's consent, which consent is expressly required (*See* Loan Agreement, § 5.2.10) and without Court approval.

29.     The "consideration" exchanged to cause this unauthorized alleged postpetition transfer is summarized as follows:

    a.      a release at Closing by Patel of the Seller's guaranty of a DIP Loan for which no monies had been advanced at Closing;

    b.      a subordination of the alleged Patel Pre-petition loans, which alleged loans are not listed on the Debtor's 20 Largest Creditors or the Debtor's Schedules or Statement of Financial Affairs;

    c.      Patel's agreement to support a replacement for Hilton;[3] and

    d.      Patel's agreement to convert the DIP Loan (under which no monies have been advanced) into equity if a Debtor Chapter 11 Plan is approved.

(collectively, the "Purchase Price").

30.     Section 3.21 of the Postpetition Transfer Agreement baldly asserts that such consideration is reasonably equivalent value, stating:

    3.21    Reasonably Equivalent Value.  Sellers represent, acknowledge and agree that the Purchase Price represents substantial and reasonably equivalent new value for the transfers and agreements of the Sellers herein, and that this transaction is being made to afford the Company the opportunity to obtain a new franchise agreement and restructure its finances and affairs, and not with the purpose, intent or effect of hindering or delaying the Company's creditors.

31.     Finally, in the Postpetition Transfer Agreement, Debtor admits that the alleged transfer of equity from the beneficial ownership of Bisaria is a must if the Debtor is to have any chance at a reorganization.  Recital H in the agreement provides:

    Sellers are not able to provide further managerial and / or operational support to enable the Hotel to continue operating, or to support a plan of reorganization in the Bankruptcy Case, without significant equity participation and other assistance (including obtaining a replacement franchise for the Hotel) from and by the Buyer.

Postpetition Transfer Agreement, Recital H.

_____

[3] It is the Movants' understanding that Hilton will not issue a Hilton license to Patel.

32.     Following the unauthorized alleged postpetition transfer of estate property, on October 6, 2010, the Debtor filed a Disclosure Statement and Plan of Reorganization whereby claims of creditors would allegedly be paid over time, while all avoidance actions against insiders are either released or transferred to the Reorganized Debtor which is controlled by the insiders ("Patel Plan").

33.     The foregoing, as well as evidence propounded on October 7, October 8 and October 12, 2010 at the Trial on the Pending Matters, clearly reveals that the Debtor, Patel and related affiliates and insiders of Patel and the Debtor have been less than forthright about the numerous and significant transaction and transfers from the Debtor's assets and the Lender's collateral, that benefitted only insiders to the detriment of the Lender and all legitimate creditors of this Estate.

34.     For example, the Trial Testimony of the Debtor's Controller[4] includes a number of transactions that evidences that cause exists for the appointment of a Trustee.  Some of the highlights from the Controller's testimony include the following transactions which occurred over the last year:

> a.     The Debtor used Union Trust Funds to pay non-operational expenses;
>
> b.     Jai Lalwani controlled the use of funds at the Hotel;
>
> c.     Jai Lalwani was placed in control of funds of the Hotel by Patel;
>
> d.     Hundreds of thousands of dollars of Hotel revenues were used to pay personal American Express expenses of Jai Lalwani and other expenses not related to the operation of the Hotel;

---

[4]     See generally, Trial Transcript from October 7, 2010.

e. Patel's company - Tampa Hospitality and Hotel Management, LLC, - diverted thousands of dollars of Hotel revenue from the Cash Management System;

f. Lalwani directed the Debtor's Controller to make checks payable to the Debtor's Controller and then cash them and deliver the cash to Lalwani;

g. Disbursements were made from Hotel revenue to pay Black Diamond, Patel, K & P Partners, Bisaria, among others, when legitimate creditors of the Hotel were not being paid;

h. $197,000 was paid to Vani Lalwani, who was not a Hotel Employee, and who rendered no services to the Hotel;

i. Hotel revenues were used to pay Lalwani's personal driver;

j. More than $300,000 was paid to Patel, Black Diamond, Touch Heaven ("Pastor Amedia's Church"), and Bisaria, when the Hotel was experiencing cash flow shortages;

k. Checks were diverted from the Cash Management Accounts;

l. Budgets submitted by the Borrower and approved the Lender were not followed when cash was released from the Cash Management Account to the Debtor's operating accounts;

m. Patel has named Frank Amedia ("Amedia") as construction manager for the Hotel;

n. Amedia is the owner or principal of Touch Heaven Ministries, MAC Construction and TC Properties, all of which have received monies from the Hotel revenues; and

o. Equity distributions were made when there were operational shortfalls, no profits and defaults under the Loan Agreement.

35. Some of the highlights of the Mascarenas Trial testimony conducted on October 8, 2010, include:

a. Patel and Lalwani represented to the Lender that they were affiliated with:

- Tampa Hospitality and Hotel Management, LLC

- Black Diamond

- Fuel Group

- 600 Commonwealth Place, LP and 600 Commonwealth Place Management, LLC

b. K & P Partners is an affiliate of Patel.

c. The Lender never approved any loans to be made to the Debtor by Patel or Black Diamond:

- To the extent such alleged loans were made, they caused additional defaults under the Loan Agreements. *See* Loan Agreement, § 5.1.11. Financial Reporting.[5]

- To the extent such alleged loans were repaid, they caused additional defaults under the Loan Agreement.

- To the extent such alleged loans were repaid, they were made at times when legitimate creditors of the Debtor were not being timely paid, and deepened the insolvency of the Debtor.

- To the extent such alleged loans were repaid, they are transfers that are avoidable and must be recovered for the benefit of the Estate.

d. Tampa Hospitality and Hotel Management, LLC diverted Hotel revenue including more than $1 million in credit card receipts from the Lock-Box and Cash Management Account.

e. Payments made to Black Diamond, Patel, K & P Partners, Bisaria, and affiliates were not included on the approved 2010 Budget (Mascarenas Trial Exhibit D-25).

f. The Lender and the Debtor entered into the January 2010 Loan Amendment (Trial Exhibit A-E), wherein the Debtor agreed to cure enumerated defaults under the Loan Agreement and the Debtor failed to do so. During such time, the Debtor was making unauthorized payments to insiders including Black Diamond, Lalwani, Patel, Bisaria among others.

---

[5] To the extent the Borrower incurred an Extraordinary Expense not contemplated in the Borrower's Approved Annual Budget, Borrower is required to promptly deliver reasonably detailed explanation for the proposed Extraordinary Expense for Lender's approval. *See* Loan Agreement, § 5.1.11(d) & (e).

g.	Crescent Management advised Mascarenas that in the spring of 2010, it was directed to fly to Tampa by Patel and at such meeting Patel advised Crescent that Patel owned the Hotel and that Crescent had to take direction from Patel.

h.	The Lender and the Debtor entered into the July 23, 2010 Stipulated Order (Mascarenas Trial Exhibit 39), wherein the Debtor agreed to cure enumerated defaults under the Loan Agreement and the Debtor failed to cure the defaults.

36.	Patel's Plan is nothing more than a delay on paying creditors while trying to shield all of the insiders from avoidance actions and other possible lawsuits:

a.	All claims are to be paid over time from cash-flow;

b.	All insider contracts are to be assumed and cured; and

c.	All claims against insiders shall be revested in the Reorganized Debtor and the Debtor and Reorganized Debtor shall retain all Pre-Petition Causes of Action post-Confirmation.

37.	Hence, while the Patel Plan hinders payment to legitimate creditors, shields insiders from liability, and provides insiders with administrative claim status by using estate funds to "cure" insider "contracts," the Postpetition Transfer Agreement operates to legitimize the substantial alleged claims asserted against the estate in favor of Patel that are undocumented and suspect.  *See* Limited answers to discovery requests were supplied by Patel on October 3, 2010, a copy of which is filed at Docket No. 181 ("Patel Responses").

38.	While Patel characterizes the Debtor's prepetition obligations to him as alleged loans, the facts and circumstances surrounding the Debtor's obligations to Patel and the Debtor and Patel's failure to provide any explanation for these circumstances tend to establish that these alleged "loans" were intended to be treated as equity contributions.  The Patel Responses provides:

Response:	*Dr. Patel made, **what he understood to be**, a series of loans and received partial re-payment of these loans in regard to the Hotel commencing on July 23, 2009 through and including the petition*

*date. Dr. Patel's accounting records reflect wire transfers of loan disbursements and receipts in partial payment of interest or partial repayment of principal. Giving effect to all loan disbursements and receipts reflected in Dr. Patel's accounting records with respect to the subject loans, Dr. Patel claims a net loan balance due, as of the petition date, in the aggregate amount of $3,771,452 (excluding interest). The accounting records of the Hotel, as of the Petition Date, appear to reflect a loan balance due to Dr. Patel of $2,176,287.57. Based upon this discrepancy, Dr. Patel has engaged an independent forensic accountant to examine the transactions between him and the Debtor in an effort to determine the use of his loan proceeds and the extent of his pre-petition claims against the debtor.*

***

(emphasis added).

39.     These facts and circumstances include, but are not limited to:

    a.    Certain financial records of the Debtor identifying receipts of the funds from Patel as "contributions" and payments to Patel as "withdrawals."

    b.    No loan documents between Patel and the Debtor have been produced to the Lender.

    c.    The Controller testified that he was unaware of any loan agreements between Patel and the Debtor.

    d.    The Debtor's list of 20 Largest Creditors did not, <u>and still do not</u>, list Patel.

    e.    The Debtor's Schedules did not, <u>and still do not</u>, list Patel.

40.     All of the foregoing suggests that the Debtor treated and viewed the Patel's prepetition participation as equity rather than as a debt.

41.     Patel's response to Question 2, describing his claims against the Debtor's estate, coupled with additional facts and circumstances elicited by Movants through discovery, show that Patel's alleged claims against the Debtor arising from payments that Patel made to MAC Construction have questionable merit.

    <u>Response</u>:    *Pre-petition, at Debtor's request, **Dr. Patel engaged** MAC Construction ("MAC") as an asset manager and to perform the PIP required by Hilton. Dr. Patel advanced funds and is obligated to advance*

- 13 -

*further funds for this pre-petition work. The sums related to this work were advanced as a loan by Dr. Patel to the Debtor.* **Dr. Patel has advanced to MAC on behalf of the Debtor $452,566.32.** *MAC is owed $529,571.63.*

(emphasis added).

42.     The Debtor's Statement of Financial Affairs reveals that payments were made to MAC immediately by the Debtor, as opposed to Patel, before the Postpetition Transfer Agreement.  Additionally, the Statement of Financial Affairs show payments to another "asset manager," Black Diamond.

43.     According to the Statement of Financial Affairs, in the three months preceding the Petition Date, the Debtor paid more than $400,000 collectively to its "asset managers" (i.e. MAC and Black Diamond), to Patel-affiliate K & P Partners, and to American Express for insider credit card bills.  See Statement of Financial Affairs, Doc. No. 75 at page 72 of 88.  ("Patel Affiliate Payments").

44.     These Patel Affiliate Payments:  (a) were not authorized by the Lender;[6]  (b) are exclusive of any amounts that may have been paid to Patel;  (c) do not include amounts paid to Bisaria;  (d) do not include amounts paid to the Hotel Managers or to other "managers" or officers in charge of the management of the Hotel;  (e) do not include amounts that are not otherwise disclosed in the Statement of Financial Affairs; and  (f) were made at a time when other trade vendors and taxing authorities were not being paid.

---

[6]     See e.g. Loan Agreement, § 5.1.11 (requiring Lender approval for extraordinary expenses outside the Approved Annual Budget).

45.    Additionally, the Loan Documents require the Lender's prior written consent before entering into any such construction contract.[7]  Consequently, a construction contract entered into by Patel coupled with an alleged side agreement by the Debtor to repay Patel appears to be a back-door maneuver intended to defy the Debtor's contractual obligation to obtain Lender's approval of a material contract that has substantial implications for the Lender's Collateral.

46.    Patel's Response to Question 3 also identifies three more alleged claims, as follows:

> *Tampa Hospitality and Hotel Management, LLC, was a single purpose entity affiliate of Dr. Patel's that previously* **did business with the Debtor**. *Tampa Hospitality and Hotel Management, LLC does not currently have financial statements as that entity was administratively dissolved.  In addition to Tampa Hospitality and Hotel Management, LLC, Dr. Patel individually, made pre-petition unsecured loans to the Debtor, as did following affiliates of Dr. Patel: (i) K & P Partners, (ii) Global TPA, (iii) Beacon Health.*

(emphasis added).

47.    These additional alleged claims are:  (a) from entities not disclosed on the Debtor's Schedules as creditors; (b) for obligations not evidenced by any type of document produced to the Movants; (c) are in undisclosed amounts; and (d) are for undisclosed services and/or goods.  Moreover, Patel's Response is completely devoid of any detail regarding timing, nature, purpose, repayment terms, or status of these alleged "loans."

**B.    Patel's Affiliations with Jai Lalwani**

48.    Jai Lalwani is Dr. Patel's agent.  Through the admissions of the Debtor's Rule 30(b)(6) witness, the Debtor concedes that Mr. Lalwani's actions at the Hotel were taken on behalf of Dr. Patel:

> Q.    Who is Jai Lalwani?

---

[7]      See Loan Agreement, § 5.2.1(b).

A.  Consultant for Dr. Patel.

*       *       *

Q.  What is Jai Lalwani's job functions at the property?

A.  He doesn't have any.

Q.  He does not have any?

A.  No.

Q.  But I thought you said he works as a consultant?

A.  He has been a consultant for Dr. Patel during the renovation period, yes.

(See Deposition of Shubh Hotels Pittsburgh, LLC, dated September 29, 2010 ("Shubh Depo.") at p. 128:8-9; 185: 21-25; 186:1-15, excerpts attached hereto as **Exhibit A**).  The nature of Mr. Lalwani's relationship with Dr. Patel is documented in numerous e-mail communications wherein Mr. Lalwani refers to Dr. Patel as "boss," the "big man," and even "the Godfather."[8] Mr. Lalwani regularly updates Dr. Patel on conditions at the Hotel and informs him of when payments can be expected.[9]  The Trial Testimony of Ms. Mascarenas also supports the Lalwani / Patel connection.[10]

49.  In his capacity as "consultant," Mr. Lalwani was given supervisory control over the Controller and the Hotel's bank accounts.  See October 7 Trans. pp. 37-38; 41.  Through discovery, it is apparent that Mr. Lalwani's primary role, *inter alia*, was to protect Dr. Patel's equity investment.  See Mascarenas Trial Exhibits, D-10, D-15, D-16, D-17 (Fuel Investments

---

[8]     These emails are marked "confidential" and can be produced at the hearing on the Motion.

[9]     Additional evidence to support the Lalwani/Patel connection regarding projects other than this Property is evidenced in the production of documents by Patel that may be introduced at the hearing on the Motion.

[10]    See October 8 Tr. Transcript (Mascarenas).

was presented to the Lender as an entity in which Patel and Lalwani sought to acquire an interest in the Hotel in 2009.).

50. As the Trial Testimony of the Debtor's Controller has shown, Mr. Lalwani also used the revenues from the Hotel for his own personal use, with no regard to the welfare of the Hotel, the employees, or the Lender.

51. Although the Debtor contends that Mr. Lalwani no longer works at the Hotel, the e-mail communications produced during discovery prove otherwise.[11]  Mr. Lalwani was actively involved in seeking a replacement franchise for the Hotel.  He traveled to Atlanta, Georgia to meet with representatives of the InterContinental Hotels Group and communicated with Hyatt Hotels and Resorts.[12]  He also directed the actions of the Hotel's current manager, Prism Hotels & Resorts ("Prism"), and directed the disbursement of Hotel funds in September 2010. See Oct. 7 Tr. Transcript (Sfamenos).  Debtor's counsel continued to copy Mr. Lalwani on e-mails throughout the month of September, demonstrating Mr. Lalwani's continuing role in the oversight and management of the Hotel as it continued in bankruptcy.

52. In response to Question No. 6, Dr. Patel discloses two alleged loan transactions to entities in which Jai Lalwani has an interest.  There is no detail regarding the purpose, timing, nature, use or status of these alleged loans.

> Question 6:  Provide all documents related to and/or established a relationship between Dr. Patel and Jai Lalwani.

---

[11]     See October 7 Trans. at p. 53:
         THE COURT:  So are you representing to me Mr. Lalwani has no involvement with the hotel post-petition
                     in any fashion?
         MR. HARE:    That's correct, Your Honor.

[12]     See Shubh Depo. at pp. 138-143.

> Response: *Dr. Patel through his affiliate, K&P Partners, made a loan to Fuel Investments Clearwater, an entity in which Jai Lalwani has an interest.*
>
> *Dr. Patel made a loan to Fuel Investment Development in regard to a real estate project in downtown Tampa.*
>
> *Dr. Patel objects to the production of documents relating to these two transactions as overly broad, burdensome and irrelevant to this bankruptcy proceeding involving Shubh Hotels Pittsburgh, LLC.*

53. Moreover, while only the two alleged loan transactions are disclosed as the sole affiliations that Dr. Patel has with Jai Lalwani, Trial Testimony by the Debtor's Controller and Trial Exhibits show that Dr. Patel put Lalwani in "charge" of protecting Patel's money.

**C.    Patel's Affiliation With Black Diamond Hospitality.**

54. As the Trial Testimony has shown, many "un-budgeted" payments went to Black Diamond, for reasons that were unsubstantiated by the Debtor – other than Lalwani had directed them to be made.

55. In his response to Question No. 6, Dr. Patel denies any relationship he has with Black Diamond Hospitality.

> Response: *Dr. Patel is aware that Jai Lalwani has listed him as the Chairman of the Board of a company known as Black Diamond Hospitality. Dr. Patel is not the Chairman of the Board of this entity, nor has he authorized the use of his name in conjunction with this entity. Dr. Patel has no role with or financial or other interest in Black Diamond Hospitality, LLC.*

56. Contrary to Dr. Patel's denial of having any affiliation with Black Diamond Hospitality, Movants are in possession of documents stating that Patel and Lalwani represented to Lender in September 2009 that Patel was part of Black Diamond. See email of September 16, 2009 – Mascarenas Trial Exhibit D-8. The Debtor's account ledgers make no distinction

between Black Diamond and Dr. Patel because the Debtor's Controller considers them to be affiliates.  See Sfamenos Trial Exhibit B-11; see also October Trans. p. 83:14-16).[13]

57.    Black Diamond employees remain on the Hotel property and continue to collect payments for unknown reasons.  Vani Lalwani, an affiliate of Black Diamond and the sister of Jai Lalwani, apparently holds no position with the Hotel, but has received almost $200,000 in payments since July 2009.  See October Trans. p. [14]   Drew Funkhouser, Black Diamond's vice president, continues to operate at the Hotel as a "consultant of Dr. Patel.[15]

---

[13]    Q.    So, it's your understanding that there is an association between Kiran Patel and Black Diamond?

A.    Yes.

(October 7 Trans. p. 83:14-16).

[14]    Q.    And who is Vani Lalwani?

A.    To my understanding, that's Mr. Lalwani's sister.

Q.    And what job does she perform for the hotel?

A.    She does not perform any job that I know of for the hotel.

Q.    What services does she provide for the hotel?

A.    None that I know of.

(October 7 Trans., p. 94:25; 95: 1-5).

[15]    A.    … He's [Drew Funkouser] treated as a consultant of Dr. Patel's, but he's functioning in a very hands-on role with the property.

Q.    So he acts as a consultant to Dr. Patel for the property.

A.    Yes.

Q.    Does he work at the request of the general manager or the request of Dr. Patel?

A.    Both.

(Shubh Depo. pp. 184.)

58.    Further evidence will be produced at the hearing on the Motion showing Patel's and Amedia's involvement with Black Diamond.

**D.    Patel's Affiliation with Atul Bisaria**

59.    When asked for disclosure regarding Patel's affiliations with Bisaria, Dr. Patel responded that he has none.

> Question 7:    Please provide information on any and all relationships between Dr. Patel and Atul Basaria [sic].
>
> Response:    *Dr. Patel has no business relationships with Atul Basaria [sic]. The only transaction Dr. Patel has undertaken in regard to Mr. Basaria [sic] is the transaction to acquire the equity interests of Shubh Hotels, Pittsburgh, LLC.*

60.    This response, however, does not appear to make full and frank disclosure given that Dr. Patel, if taken at his word in his Responses to Questions 1 and 2, has allegedly made multi-million dollar unsecured "loans" to an entity beneficially owned by Bisaria when, at the same time, Patel claims not to have had any ownership interest in the Hotel.

**E.    Patel Affiliations with Frank Amedia**

61.    Dr. Patel's affiliation with Frank Amedia provides additional support for the proposition that management under Dr. Patel's ownership likely would not improve.

62.    In his response to Question No. 8, Dr. Patel states that he hired Frank Amedia and Mr. Amedia's construction company, MAC Construction, to complete work at the Hilton.   Dr. Patel, similar to his alleged prepetition "loans" to the Debtor, has no documentation in support of his arrangement with MAC Construction.

> Question 8:    Please provide information on any and all relationships between Dr. Patel and Frank Amedia.
>
> Response:    *Dr. Patel has hired Frank Amedia and his company, MAC Construction, for the benefit of the debtor, to perform certain asset management and construction work in conjunction with the hotel project in Pittsburgh.  Dr. Patel had agreed to pay the fees and costs charged by*

> *MAC Construction, with the understanding that these fees and costs would be paid back by the Hotel and that such advances would constitute a loan on behalf of the Hotel. Dr. Patel and Frank Amedia are in discussions with regard to other projects.*
>
> *There are no written documents in conjunction with a business relationship between Dr. Patel and Frank Amedia.*

63.     Again, it defies good business sense to enter into such substantial arrangements without documenting the terms and conditions governing the rights and obligations of the parties.

64.     Patel further states in the Patel Responses, that he has appointed Frank Amedia in the role of the chief operating officer. Upon information obtained by Movants, Movants will provide evidence that, *inter alia*, Mr. Amedia has been working with Lalwani at the Hotel since at least as early as June 1, 2010; and further, that payments in the amount of $20,000 to Touch of Heaven Ministries- the "church" where Frank Amedia is the "Pastor" were made at the direction of "Patel, Lalwani, and the Pittsburgh Hilton" at a time when the Debtor was experiencing significant cash flow shortages. *See* Mascarenas Trial Exhibit 32, at BlackRock0020291-0022929. *See also* Oct. 7 Tr. Transcript (Sfemanos).

65.     Documents also show that, in return for the $20,000 "donation," Debtor allegedly received more than $250,000 of sports drinks from Mr. Amedia that the Debtor then donated to the Boys Club, spending $29,000 to have the drinks "transported." On May 12, 2010, and contemporaneous with requesting the payment for the "shipping charges", Mr. Amedia thanks **Dr. Patel** and Jai Lalwani for the donation. *See* Mascarenas Trial Exhibit 32, at BlackRock0020292 (emphasis added).

66.     This purported donation was made at a time when the Debtor was delinquent with paying its operating expenses and was made in violation of the Debtor's budget approved by the Lender.

67.    These Patel Responses highlight the conflicts of interest, the commingled affairs, the complete lack of business judgment on the part of Patel in managing his own affairs with respect to the Hotel and those affiliated with the Hotel, and the complete disregard for the Lender's rights under the Loan Documents even on a postpetition basis.

### F.    Post-petition Management

68.    The Trial Record clearly shows that not only was the Hotel grossly mismanaged prepetition; such action continues postpetition.

69.    The Debtor's Schedules and Statement of Financial Affairs continue to be (a) inconsistent with the evidence offered at Trial, and (b) the Patel Responses.

70.    Prism testified that it was engaged by the Debtor to manage the Hotel operations in late August, 2010, yet (a) Prism did not have any role in the preparation of the Schedules or Statement of Financial Affairs; (b) is not listed as having a contract with the Debtor, (c) claims not to be able to file the Monthly Operating Report for the first month of the case, in spite of there being three operating budgets approved by the Court and only those payments on the budget should have been made.

71.    Upon information and belief, and contrary to the Debtor's Motion to Extend Period of Time to File First Monthly Operating Report [Dkt. No. 231], as of October 18, 2010, neither the Debtor nor Prism contacted Crescent management for the information set forth in the Motion to Extend, except as follows:  (a) on September 28, 2010, Crescent provided to the Debtor's Controller the August Income Statement;  (b) on October 4, 2010, the Debtor's Controller again requests August Income Statements; on the same date Crescent re-forwards September 28, 2010 transmittal, with copy of August Income Statement, to the Debtor's Controller;  (c) on October 14, 2010, Debtor's Controller requests back up/reconciliation of certain highlighted August account entries; and (d) on the same date, October 14, 2010, Crescent responds to Debtor's

Controller that it could work on compiling/providing the beginning of next week, but advises that many highlighted account entries had been carried over from beginning balances in place when Crescent took over management and that Crescent had requested but not received such back up from Shubh.

72.    Prism testified that it does not have operational control over the "construction" or "construction budget", and hence – under Patel's direction, Mr. Amedia is to be in charge of the construction and money at the Property.

73.    Upon information and belief, including the Amedia deposition transcript, Mr. Amedia should not be a fiduciary for creditors of this estate.

## V.    ARGUMENT

### A.    APPOINTMENT OF A CHAPTER 11 TRUSTEE

74.    Section 1104(a) of the Bankruptcy Code states in pertinent part:

(a)  At any time after the commencement of a the case but before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of a trustee---

(1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor;

(2) if such appointment is in the interest of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor; or

(3) if grounds exist to convert or dismiss the case under section 1112, but the court determines that the appointment of a trustee or an examiner is in the best interests of creditors and the estate.

11 U.S.C. § 1104(a).

75.     Although there is a strong presumption in Chapter 11 cases that the debtor-in-possession should be permitted to remain in control of the debtor corporation, In re Marvel Entertainment Group, Inc., 140 F.3d 463, 471 (3d Cir. 1998), where cause exists, it is nevertheless appropriate for the court to appoint a trustee in order to preserve the integrity of the bankruptcy process and to insure that the interests of creditors are served.  In re Intercat, Inc., 247 B.R. 911, 920 (Bankr. S.D. Ga. 2000) (citations omitted).

76.     For the reasons set forth herein there are two bases for the appointment of a chapter 11 trustee in this case.  First, "cause" exists under section 1104(a)(1) of the Bankruptcy Code. Second, appointment of a trustee pursuant to section 1104(a)(2) of the Bankruptcy Code is warranted because it is in the best interests of creditors.

### 1.     Cause Exists To Appoint A Chapter 11 Trustee.

77.     In determining whether cause exists to appoint a chapter 11 trustee because of fraud, deceit, gross mismanagement, and/or incompetence, courts have considered the following, additional, factors:

> a.     Materiality of the misconduct;
>
> b.     Evenhandedness or lack of same in dealings with insiders or affiliated entities vis-à-vis other creditors or customers;
>
> c.     The existence of pre-petition voidable preferences or fraudulent transfers;
>
> d.     Unwillingness or inability of management to pursue estate causes of action;
>
> e.     Conflicts of interest on the part of management interfering with its ability to fulfill fiduciary duties to the debtor;
>
> f.     Self-dealing by management or waste or squandering of corporate assets.

Intercat, 247 B.R. at 921.

78.     Courts have found "cause" for the appointment of a chapter 11 trustee to exist

where there a significant number of conflicts of interest between the debtor and its management.

Marvel, 140 F.3d at 472; see, e.g., In re SunCruz Casinos, LLC, 298 B.R. 821, 831 (Bankr. S.D.

Fla. 2003) ("cause" existed for the appointment of a Chapter 11 trustee based upon the sheer

number of conflicts of interest of the debtor's management, as holding multimillion dollar claims,

as the sole shareholder of a corporation which conducted business with the debtor, and as a

defendant in a substantial cause of action belonging to the debtor); In re L. S. Good & Co., 8

B.R. 312, 315 (Bankr. W. Va. 1980) (The magnitude of the number of inter-company

transactions places current management of the debtor in a position of having grave potential

conflicts of interest and the presumption arises that the current management of debtor will be

unable to make the impartial investigations and decisions demanded in evaluating and pursuing

inter-company claims on behalf of debtor); In re Oklahoma Refining Co., 838 F.2d 1133, 1136

(10th Cir. 1988) (The Court held that a history of transactions with affiliated companies could

constitute "cause" for the appointment of a trustee and held that once the court ruled that cause

existed under section 1104, it had no discretion but to appoint a trustee.).

79.     When determining whether "cause" exists for the appointment of a trustee, courts

should also consider any commingling of the Debtor's affairs with affiliated companies and

whether the current management lacks the discipline to institute fiscal and managerial controls

necessary for the reorganization.  In re La Sherene, Inc., 3 B.R. 169, 175 (Bankr. N.D. Ga.

1980).  In such instances, the appointment of a trustee may be appropriate irrespective of the

talents current management may bring to the case.  Id.

80.     In addition, courts have held that where there exists severe acrimony between the

creditors and the Debtor's management, cause exists for the appointment of a trustee.  See e.g.,

<u>Marvel</u>, 140 F.3d at 472; <u>see also</u>, <u>In re Plaza de Retiro, Inc.</u>, 417 B.R. 632, 641 (Bankr. D. N.M. 2009). In <u>Marvel</u>, the Court of Appeals for the Third Circuit held that the appointment of a trustee did not constitute an abuse of discretion when the Court found that severe acrimony between the debtor-in-possession and its creditors had risen to a level of "cause" necessitating such an appointment. <u>Id</u>. The facts revealed that it was not simply a matter of customary or reasonably-expected tension or friction between debtors and creditors, but acrimony that was driven by an inherent conflict of interest. <u>Id.</u> The conflict arose because the debtor-in-possession was controlled by interests which also occupied the status of creditors of the holding companies that owned the debtor-in-possession.

81. Where "cause" is determined to exist, the appointment of a Chapter 11 trustee is mandatory. <u>Oklahoma Refining Co.</u>, 838 F.2d at 1136.

82. In the present matter, it is beyond dispute that "cause" exists for the appointment of a chapter 11 trustee.

83. As described above, Patel is faced with a number of significant and irreconcilable conflicts of interest. Millions of dollars of what appear to be voidable pre-petition transfers to Patel controlled/owned entities are scheduled of record, and an investigation may very well uncover more. Wearing one of his many hats in this case, it is unreasonable to expect that the Patel-controlled Debtor would undertake any meaningful investigation or make an effort to recover such potentially significant assets of the Debtor's bankruptcy estate from Patel himself or one of his affiliated entities.

84. Pre-petition transactions aside, Patel and the multiple entities that he owns or controls pervade the Debtor's bankruptcy case on a daily basis, making it virtually impossible for

this Debtor to fulfill its fiduciary obligations without regard for the best interests of the equity ownership.

85.    As is evidenced by this Motion and the Pending Matters, there also exists irreconcilable acrimony between the Debtor and the Movants.  The Debtor's and Patel's blatant disregard for material terms of the Loan Agreement, the lack of disclosure in the Debtor's Schedules and Statement of Financial Affairs, as well as the Postpetition Transfer Agreement, among other events, provide a level of distrust and lack of confidence that constitutes cause for the appointment of a trustee as set forth in <u>Marvel</u>.  *See also* <u>In re Sharon Steel Corp.</u>, 86 B.R. 455 (Bankr. W.D. Pa. 1988), <u>subsequently</u> <u>aff'd</u>, 871 F.2d 1217 (3d Cir. 1989) (Appointment of trustee to manage Chapter 11 debtor under section 1104(a) is appropriate in light of management's self-dealing, transfer of significant assets to other companies under common control and away from reach of creditors, stripping debtor of cash, failure to cure operating losses after Chapter 11 filing, failure to pursue recovery of insider preferences and fraudulent conveyances, problem with fair allocation of operating costs among debtor and other companies under common control, and controlling officer's huge withdrawals from debtor at time of financial crisis).

86.    The evidence is clear that substantial estate causes of action for voidable preferential and/or fraudulent transfers against insiders exist, and that the Patel Plan exhibits the unwillingness or inability of current (or former) debtor in possession management to pursue those causes of action.

87.    Based upon the foregoing, the evidence introduced at trial, and responses to discovery requests, cause exists for the appointment of a chapter 11 trustee in this case because the Debtor's prepetition and postpetition  actions have revealed gross mismanagement,

incompetence, and deceitfulness in the handling of its affairs as evidenced by, *inter alia*:  (i) the blatant disregard of creditor rights prepetition by the misuse of corporate revenues to pay insiders and non-corporate expenses;  (ii) the apparent sheer number of actual or potential conflicts of interest among the Debtor and Patel and other entities he directly or indirectly owns or controls;  (iii) the number and magnitude of the inter-company and insider transactions;  (iv) the commingling of affairs of the Debtor with affiliated companies/persons;  (v) Patel's attempt to circumvent the scrutiny of avoidance actions, by the filing of a plan which seeks to shelter all avoidance actions by having the reorganized Debtor take ownership of them free and clear of any claims;  (vi) the actual or attempted post-petition transfer of estate assets outside the ordinary course of business and without Bankruptcy Court approval;  and (vii) the acrimony among the Movants and the Debtor.

88.    Therefore, Movants respectfully request that this Court authorize the appointment of chapter 11 trustee to administer the Debtor's chapter 11 bankruptcy case.

### 2.    Appointment Of A Chapter 11 Trustee Is In The Best Interest Of Creditors

89.    In determining whether the appointment of a trustee "is in the interests of creditors" under section 1104(a)(2), courts look to the practical realities and necessities of the case.  Sharon Steel, 86 B.R. at 458; In re Ridgemour Meyer Props., LLC, 413 B.R. 101, 112 (Bankr. S.D.N.Y 2008) (citations omitted).  Unlike section 1104(a)(1) of the Bankruptcy Code, section 1104(a)(2) does not require a finding of fault; the court may appoint a trustee even if no "cause" exists. Marvel, at 474.

90.    Among factors considered by the courts are (i) the trustworthiness of the debtor, (ii) the debtor in possession's past and present performance and the prospects of rehabilitation, (iii) the confidence – or lack thereof – of the business community and the creditors in present

management and (iv) the benefits derived by the appointment of a trustee measured against the cost of the appointment. Ridgemour, 413 B.R. at 112.

91.     In fact, some courts have found that a vote of no confidence by the collective creditor body is itself evidence that the appointment of a chapter 11 trustee is in the best interest of creditors. See e.g., In Matter of Burival, (Nos. 07-42271, 07-42273), 2009 WL 511134 (Bankr. D. Neb. 2009) (virtually all participating creditors supported motion to appoint trustee). Likewise, a filing of a motion to appoint a chapter 11 trustee within months of the petition date should not deter this Court from granting the relief sought herein. See e.g., In re Patman Drilling Intern., Inc., 2008 WL 724086 (Bankr. N.D. Tex. 2008) (trustee motion filed less than 3 ½ months after petition date was granted where numerous conflicts of interest and mismanagement was present).

92.     In the present matter, the Debtor's management has not proven to be trustworthy. The Movants do not trust the Debtor and the Patel-led management.

93.     The Patel Plan hinders payment to legitimate creditors, shields insiders from liability, and uses estate funds "cure" insider "contracts."

94.     Additionally, the practicalities of the Debtor's case further support the appointment of a chapter 11 trustee. The Movants submit that significant value can be derived for the entire creditor body but only if the Debtor's assets and operations are prudently and impartially controlled by an independent third party, pending a sale of substantially all of the assets or the confirmation of a chapter 11 plan that preserves the avoidance actions and causes of actions against insiders for the benefit of creditors.

95.     Based on the foregoing, the Movants submit that the immediate appointment of a trustee is both necessary and appropriate.

## B. TERMINATING EXCLUSIVITY IS IN THE BEST INTERESTS OF CREDITORS

96.    In the event the Court denies the requested appointment of a chapter 11 trustee such that the exclusivity period does not automatically terminate, cause nevertheless exists for terminating exclusivity under Section 1121(d) of the Bankruptcy Code for the Movants to file a competing plan or reorganization.

97.    Section 1121(d) of the Bankruptcy Code provides:

> Subject to paragraph 2, on request of a party in interest made within the respective periods specified in subsections (b) and (c) of this section and after notice and a hearing, the court may for cause reduce or increase the 120-day period or the 180-day period referred to in this section.

98.    Although "cause" is not defined by the Bankruptcy Code, the legislative history and reported case law interpreting section 1121(d) make it plain that "cause" is a flexible standard designed to balance the competing interests of debtors and their constituencies.  See H.R. Rep. No. 95-595, 1978 U.S.C.C.A.N. at 6191.

99.    In this case, cause exists to terminate exclusivity for at least three reasons, including (i) the acrimony between the Debtor and its principal lender, the Movants;  (ii) the Debtor's proposed plan impermissibly impairs the rights of creditors; and  (iii) the Debtor is incapable of submitting a confirmable plan of reorganization.

100.   The legislative history indicates that "cause" for terminating the exclusive period may include the recalcitrance of the creditors.  See H.R. Rep. No. 595, 1st Sess. 406 reprinted in 1978 U.S. Code Cong. & Ad. News 5787, 6362.  Support for this proposition can be found in cases where the exclusive period is reduced as a result of the acrimony between the key parties in the case.  See In re Texas Extrusion Corp., 68 B.R. 712, 725 (N.D. Tex. 1986).

101.  As detailed above, there is understandably acrimony between the Movants and the Debtor given the Debtor's complete disregard for its prepetition and postpetition obligations and promises contained in the Loan Documents and its misuse of revenues for the benefit of insiders.

102.  This Motion is a vote of no-confidence in the Debtor's ability or willingness to manage its affairs effectively and honestly.

103.  Additionally, the Debtor's proposed plan of reorganization impermissibly impairs the rights of creditors.  See Bank of America National Trust and Savings Assoc. v. 203 North LaSalle Street P'ship, 526 U.S. 434, 119 S. Ct. 1411 (1999) (holding that where current ownership intends to impair creditors under a chapter 11 plan and retain ownership of the Debtor following emergence from bankruptcy protection, subjecting the debtor to the market or allowing others to propose a competing plan is required.).

104.  In this case, the Debtor has placed the very insiders who received the voidable transfers in the position of determining (a) whether to sue themselves for fraud or preferential transfer; and (b) whether to provide their claims with administrative priority by assuming and curing alleged defaults under apparently undocumented "contracts".

105.  Finally, cause exists in this case because the Debtor cannot propose a confirmable plan of reorganization.

106.  The Debtor filed this case as a "Single Asset Real Estate Case". (See, Dkt. No. 1).

107.  Under section 362(d)(3), the Debtor in a Single Asset Real Estate Case is given 90 days within with to file a plan that has a reasonable possibility of being confirmed within a reasonable time.

108.  The Movants maintain that, based on the allegations contained in this Motion, the Debtor cannot file a plan that has a reasonable possibility of being confirmed within a reasonable

time.  In this case, by the Debtor's own admission, it has no reasonable opportunity for

reorganization when utilizing its prepetition ownership and management.  *See* Post Petition

Transfer Agreement.  Because the Postpetition Transfer Agreement is void and/or voidable under

the Bankruptcy Code, the Debtor cannot reorganize under the terms of its proposed Plan.

109.  The Debtor caused, or permitted, the transfer of all the membership interests in the

Debtor and in certain causes of actions owned by the estate and claims of the estate, to be done

pursuant to the Postpetition Transfer Agreement and without the consent of the Lender, which

consent is expressly required and without Court approval.

110.  For all of the foregoing reasons, Movants respectfully request that the Court

terminate the exclusive right of the Debtor to file a plan of reorganization such that Movants may

submit a competing plan of reorganization, giving the creditors of this estate the opportunity to

discontinue doing business with the Debtor in its current ownership and management structure.

### C.    THE POSTPETITION TRANSFER AGREEMENT MUST BE SET-ASIDE.

111.  The transfer of equity interests and estate causes of action contemplated in the

Postpetition Transfer Agreement violate several provisions of the Bankruptcy Code and as such

are void or voidable.

112.  The Postpetition Transfer Agreement purports to (a) transfer all of the equity

interests in the Debtor to Patel, (b) satisfy Patel's undocumented and disputed claims; and (c)

release the estate's claims against Patel.

113.  These purported transfers violate, *inter alia*, the automatic stay, the prohibition

against using property of the estate outside the ordinary course of business without hearing and

court approval, and the requirement that distributions on account of prepetition claims are to be

made pursuant to a confirmed plan of reorganization and only to allowed claims.  See

Fed.R.Bankr.P. 3021 (authorizing distributions under a Plan to creditors whose claims have been allowed <u>after</u> the plan has been confirmed).

114. The Postpetition Transfer Agreement violates the automatic stay. It provides for Patel to recover property from the estate on account of his alleged prepetition claim because it purports to satisfy Patel's alleged prepetition claims by providing Patel with a release of the estate's claims against Patel. *See* 11 U.S.C. § 362(a)(3) & (6). As such the transfers contemplated in the Postpetition Transfer Agreement are void.

115. The transfers of the Debtor's assets without Bankruptcy Court approval also violates of the Bankruptcy Code's prohibition against disposition of estate property outside the ordinary course of business and without notice, a hearing, and an order of court authorizing the transfer. *See* 11 U.S.C. § 363(b).

116. Moreover, these transfers were made in contravention of the rights of the Lender under the applicable Loan Documents and in complete disregard for the procedural safeguards and requirements of the plan confirmation process and the requirements of, *inter alia*, section 1123 and 1129 of the Bankruptcy Code.

117. For these reasons, the Movants ask that the Postpetition Transfer Agreement must be set aside or rendered void by this Court.

**<u>NEED FOR EMERGENCY RELIEF</u>**

118. It is imperative that an expedited hearing be held on the Motion to avoid the irreparable harm which would most assuredly result if these matters were adjudicated under the timeframes of the Court's regular docket.

119. Value of the Property will decline rapidly without effective and trustworthy management.

120.  Based upon the testimony heard by the Court in connection with the Motion for Relief from Stay, supports the Movants request for the appointment of a Trustee, additionally, termination of exclusivity, and voiding of the Post-petition Transfer, and further evidence is not needed.

121.  The Movants, therefore, are entitled to the immediate relief sought in this Motion.

122.  The request for an expedited hearing is caused by the events that preceded the Debtor's filing of Petition, and the Debtor's failure to rectify the gross mismanagement post-petition.  The Debtor continues to employ deception and underhandedness in its operations, and is not caused by any lack of diligence by the Movants or their counsel.

123.  Movants reserve their rights to assert additional support for the relief herein sought.


**WHEREFORE**, Movants, Carbon Capital II Real Estate CDO 2005-1 Ltd. ("Lender"), and BlackRock Financial Management, Inc. ("BlackRock"), pray (a) for the appointment of a chapter 11 trustee, pursuant to 11 U.S.C. § 1104(a); and (b) for the termination of the exclusive period to file a chapter 11 plan pursuant to 11 U.S.C. § 1121(d); and (c) to set aside or render void the Postpetition Transfer Agreement, and (d) for such other relief as this Court deems just and proper.


Dated:  October 25, 2010                    Respectfully submitted,


                                            /s/Robert P. Simons
                                            Robert P. Simons  (Pa. ID No. 48892)
                                            Amy M. Tonti  (Pa. I.D. No. 33468)
                                            Gregory L. Taddonio  (Pa. I.D. No. 88564)
                                            REED SMITH LLP
                                            225 Fifth Avenue

Pittsburgh, PA 15222-2716
Phone: (412) 288-3131
Fax:     (412) 288-3063
Email:  rsimons@reedsmith.com
Email:  atonti@reedsmith.com
Email:  gtaddonio@reedsmith.com

*Attorneys for Carbon Capital II Real Estate CDO
2005-1, Ltd. and BlackRock Financial Management,
Inc., as sub-special servicer to Carbon Capital II
Real Estate CDO 2005-1, Ltd.'s special servicer,
Midland Loan Services, Inc*