N

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

IN RE:                                  :
                                        :
SHUBH HOTELS PITTSBURGH, LLC,           :   Bankruptcy No. 10-26337JAD
                                        :
                                        :   Chapter 11
                                        :
            Debtor.                     :   Doc. No. **70**
                                        :

## MEMORANDUM OPINION[1]

The matter before the Court is Shubh Hotels Pittsburgh, LLC's motion to execute a Franchise Agreement with Wyndham Hotels and Resorts, LLC. This matter is a core proceeding over which this Court has jurisdiction pursuant to 28 U.S.C. §§ 157(b)(2)(M), 157(b)(2)(O), and 1334(b).

Shubh Hotels Pittsburgh, LLC (the "Debtor") is the current owner of a 713 room hotel located at or near Pittsburgh's Point State Park. The Debtor acquired the hotel, which is Pittsburgh's largest and arguably most recognizable given its location, in 2006. The hotel had operated as Hilton Hotel since the time of its construction in 1959 until September of 2010 when the Hilton company terminated the Debtor's franchise. Since the termination of the Hilton flag, the Debtor has operated its hotel as an independent hotel with no prominent flag.

By the motion, the Debtor wants to enter into a fifteen year franchise agreement with Wyndham Hotels and Resorts, LLC. By this non-ordinary course transaction, the Debtor will re-flag the hotel as a "Wyndham Grand," which is a quality full service hotel brand sponsored by Wyndham.

---

[1] This Memorandum Opinion constitutes the Court's findings of fact and conclusions of law pursuant to Fed.R.Bankr.P. 7052.

Section 363(b)(1) of the United States Bankruptcy Code provides that a debtor "may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Courts have held that in determining whether to authorize a debtor's use, sale or lease of property of the estate under Section 363(b)(1), the debtor-in-possession is required to show that a sound business purpose justifies the debtor's contemplated actions. In re Montgomery Ward Holding Corp., 242 B.R. 142, 153 (D. Del. 1999); see also In re Lionel Corp., 722 F.2d 1063, 1071 (2d Cir. 1983); In re Continental Air Lines, Inc., 780 F.2d 1223, 1226 (5th Cir. 1986); and In re Titusville Country Club, 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991). Courts have also held that a court should accept a debtor's business judgment, unless there is evidence of bad faith. In re: Grand Prix Associates, Inc., No. 09-16545DHS, 2009 WL 1850966, *5 (Bankr. D.N.J. June 26, 2009) (citing In re Sycom Enterprises, L.P., 310 B.R. 669, 675 (Bankr. D.N.J. 2004), In re Aerovox, Inc., 269 B.R. 74, 80 (Bankr. D. Mass. 2001) and In re Logical Software, Inc., 66 B.R. 683, 686 (Bankr. D. Mass. 1986)). Of course, when the debtor establishes a prima facie case supporting its contemplated transaction, an objector to the proposed transaction is also required to produce some evidence supporting its objection as mere argument or conclusory allegation is not enough. See Lionel, *supra*, at 1071.

The Wyndham transaction proposed by the Debtor is supported by the Official Committee of Unsecured Creditors. The Debtor's secured lender, Carbon Capital Real Estate II CDO-2005-1 Ltd. through its servicer Black Rock Financial Management, Inc. (collectively, the "Lender") has objected to the proposed franchise transaction. A fair reading of the Lender's objection is that the secured creditor contends that the Wyndham transaction has been proposed by the Debtor in bad faith and as a litigation tactic to stall the Lender's foreclosure efforts. The Lender also complains

that the Wyndham franchise should not be approved because the Lender (pursuant to its loan documents with the Debtor) has some sort of veto power over the re-flagging of the hotel. The Lender also contends that the hotel is better off as a Hilton franchise, as opposed to being re-flagged as a Wyndham Grand.

The record reflects that Dr. Kiran Patel directly or indirectly owns and controls the Debtor. While the documentation formally turning over control of the Debtor to Dr. Patel provides that he acquired his interest after the filing of this bankruptcy for little or no consideration, the record reflects that Dr. Patel had a fair amount of involvement with the Debtor in the year or so leading up to the Debtor's bankruptcy filing. In terms of bad faith, the Lender contends that the franchise motion is part of a scheme by Dr. Patel and his associates (including Mr. Jai Lalwani and Mr. Lalwani's companies known as Black Diamond Hospitality, Black Diamond Super Group and Fuel Group) to "kill" the Lender's interests.

The Court has previously noted that the Debtor's transactions with Dr. Patel and his affiliates "raise some eyebrows." The evidence introduced throughout these proceedings reflects that Dr. Patel and his associates appeared to control hotel operations prior to the Debtor's bankruptcy filing and thereafter as "one team." From time to time, Dr. Patel and his associates diverted hotel revenues away from the hotel (and the Lender's security interest) for their own benefit all the while trade vendors of the hotel remained unpaid. The diversion of funds also occurred all the while major construction and renovation projects remained uncompleted and protracted at the hotel (which, in turn, was one of the reasons why Hilton terminated the Debtor's flag). The record also includes evidence of the fact that hotel revenues were improperly diverted to other Patel/Lalwani projects in other parts of the country.

Dr. Patel, however, defended these transactions by claiming that he has been duped by Mr. Lalwani. But, the record reflects that Dr. Patel has not immediately disassociated himself from Mr. Lalwani. In fact, the record reflects that Mr. Lalwani was permitted to continue to interject himself into the Debtor's affairs post-petition as the hotel sought out a new flag. In addition, the record reflects that immediately after the bankruptcy filing, the Debtor remitted unauthorized post-petition payments to or for the benefit of Mr. Lalwani or his companies. The Debtor also remitted funds to Mr. Lalwani's "legal quarterback," Jonathan Kamin, Esq.[2]

All of the questionable transactions provided the Court with ample cause pursuant to 11 U.S.C. § 1104 to both appoint an examiner in this case to monitor the Debtor's receipts and disbursements and to terminate the Debtor's exclusive period to propose a plan of reorganization pursuant to 11 U.S.C. § 1121. Indeed, this Court did so by way of bench order on November 4, 2010, which was later memorialized by way of written Order dated November 8, 2010. But for the fact that this case has a very active Official Committee of Unsecured Creditors that is represented by competent legal counsel,[3] the Court may have appointed a trustee. Instead, the Court elected to exercise its discretion and defer inserting a trustee at this time. Notwithstanding the short shrift

---

[2] Attorney Kamin had entered his appearance in this bankruptcy case as "special counsel" for the Debtor. But, no formal application has ever been filed pursuant to 11 U.S.C. § 327. Nor has any affidavit of disinterestedness or disclosure of compensation been filed as required by 11 U.S.C. § 329 and Fed.R.Bankr.P. 2014, 2016 and 2017. The Court notes that the Office of the U.S. Trustee has been present at various hearings on this matter. The Court assumes that the Office of the U.S. Trustee, whose duties include monitoring a debtor's transactions with attorneys, is undertaking whatever investigation it deems appropriate with respect to the transactions that have come to light in these proceedings.

[3] See 11 U.S.C. § 1103(c).

given in the pleadings filed by the Debtor and Dr. Patel with respect to the questionable transactions, the Court cautions such parties that if any more shenanigans occur, the Court will appoint a trustee.

Now, does all of this background mean that the Wyndham transaction is a bad faith litigation tactic? The Court concludes that it is not.

The fact is Hilton terminated the Debtor's flag, which in-turn resulted in this bankruptcy case. By summarizing the events this way, the Court is not suggesting that Hilton's termination of the Debtor's franchise was wrong. That decision (either positively or negatively) is potentially left for another day. The record nonetheless, reflects that the Debtor, its officers and its agents have a significant amount of responsibility for the Debtor's state of affairs. No matter what has occurred, the undisputed record is that this hotel needs a new flag.

In determining whether the Debtor has exercised its sound business judgment in proposing the Wyndham franchise, the question is not whether the Court would rather have the hotel be a Hilton (or some other hotel franchise for that matter) or a Wyndham Grand. The question also is not whether the Court or any individual creditor (such as the Lender) would make a better business decision. Rather, the question is whether the Debtor, when it chose to enter into the Wyndham transaction, appropriately exercised its business judgment.

In reviewing the Debtor's exercise of its business judgment, the Court looks at whether the proposed transaction (1) represents a business decision, (2) is made with disinterestedness, (3) is made with due care, (4) is made in good faith, and (5) does not constitute an abuse of discretion or

waste of corporate assets. See e.g. In re Adelphia Communications Corp., No. 02-41729REG, 2004 WL 1634538, *2 (Bankr. S.D.N.Y. June 22, 2004).[4]

It is undisputed that the transaction proposed with Wyndham is a business decision- so the first factor is met. As to the second factor- disinterestedness- this element is met because there is no evidence that the Wyndham transaction constitutes any self-dealing with any insider of the Debtor. The third criterion- due care- appears to be challenged by the Lender. In this regard, the Lender complains that the Wyndham transaction is moving along with "light speed." The Lender also complains regarding: (a) the due diligence, or lack thereof, conducted by Wyndham, and (b) the fact the Dr. Patel never met face-to-face with Wyndham executives.

With respect to the speed of the transaction, it has not been at light speed. The Motion was filed on September 20th- more than a month ago. In fact, the delay occasioned by the intervening litigation has caused this transaction to be closely scrutinized not only by the Debtor's management, but also by the Official Committee of Unsecured Creditors, the U.S. Trustee, and all of the professionals involved in this case. Of course, the Court has scrutinized the transaction closely as well. It therefore appears that this transaction has had more than a sufficient amount of, and time for, deliberation.

With respect to due diligence, Wyndham's due diligence is irrelevant as there is no dispute that the transaction is an arm's length transaction in which Wyndham has proceeded in good faith.

---

[4] In the sale context, some courts examine (1) whether there is a sound business purpose for the sale; (2) whether the proposed sale price is fair; (3) whether the debtor has provided adequate and reasonable notice of the transaction; and (4) whether the buyer has acted in good faith. See Lionel, 722 F.2d at 1071. There is no dispute that notice of the proposed Wyndham transaction has been adequate. As to the remaining factors set forth in Lionel, they are subsumed in the five-part examination set forth above in the body of this Memorandum Opinion.

To the extent Wyndham's due diligence is relevant, the Court would note that Jeff Wagoner- the President of Wyndham Hotels and Resorts- was present at much of the trial of this matter and counsel of Wyndham was present throughout. If Wyndham's eyes were not open at the outset of these proceedings, they surely are now.[5]

As to the Debtor's deliberations, it also is not material that Dr. Patel never met Mr. Wagoner personally. The record reflects the Dr. Patel's surrogates undertook due diligence on his behalf, and both Dr. Patel and the Debtor are represented by sophisticated counsel. In addition, the Court is not convinced that Dr. Patel never met with Wyndham executives, as both Mr. Wagoner and Dr. Patel spent several days together in this Court's courtroom.

With respect to the fourth criterion- good faith- this Court has already determined above that the Wyndham transaction has not been proposed for an improper purpose. The transaction represents a good faith effort to re-flag the hotel.

As to the fifth criterion, this Court finds that the contemplated Wyndham transaction does not constitute an abuse of discretion or waste of corporate assets. Throughout the evidentiary hearing on this matter, the Debtor has highlighted the importance of re-flagging the hotel; that is, re-flagging is key to the Debtor recapturing of lost revenue and mitigating the concerns of existing reservation holders and employees regarding the long-term viability of the hotel. Specifically, the evidence shows that re-flagging the hotel as a Wyndham Grand will eliminate the continuing harm

---

[5] Mr. Wagoner also testified that Wyndham representatives visited the hotel, and as part of its due diligence inspected it, met with the hotel's manager, and obtained various financial information.

to the Debtor and this bankruptcy estate resulting from continued operation of the hotel as an "independent" unbranded guest lodging facility. In this regard, the evidence of record indicates:

      (i)     The Debtor has been without a national reservation system and has been deprived of 21% to 25% of its historic revenue for almost three months. That circumstance has significantly harmed the Debtor. A representative of Wyndham testified that it is prepared to immediately provide the hotel with access to its national reservation system once the Wyndham Franchise Agreement is authorized. The Debtor's witnesses testified that participation in the Wyndham national reservation system will enhance revenue and profitability.

      (ii)     A significant percentage of hotel revenue is derived from conference/convention business; and brand affiliation and resources play a large role in attracting that business. The absence of a national flag and the present uncertainty surrounding the Debtor's desire to a become a Wyndham Grand places the Debtor at a disadvantage to compete for the 2011 conference/convention business. Wyndham's representative testified at trial about Wyndham's extensive contacts with some of the largest corporations and organizations in both this market and nationally and further testified that it would immediately provide the Debtor with assistance from Wyndham's group sales team with respect to conference/convention business.

      (iii)     Since the termination of its former franchise agreement, the Debtor has gone without significant marketing campaigns. The absence of marketing traditionally provided by its franchisor has harmed the Debtor's business. Wyndham's representative has testified as to Wyndham's commitment to implement a marketing campaign for the hotel once the Wyndham Franchise Agreement is authorized.

      (iv)     Additional improvements to the hotel are needed. The Wyndham Franchise Agreement contains a list of property improvements and provides for a loan of up to $1,000,000 by Wyndham to the Debtor which would fund the agreed upon improvements to the hotel. Wyndham's representatives have also represented that Wyndham is prepared to make the improvement loan immediately available to the hotel, pursuant to the terms of the Franchise Agreement and related agreements, once same are approved and effectuated.

      (v)     Since the termination by its former franchisor, the Debtor has operated without: (i) the support of famous trademarks or copyrights, (ii) access to customer loyalty or referral programs, or (iii) centralized franchisor support functions such as a proprietary property management system, promotional programs, management and personnel training and/or operational standards, procedures and techniques. The lack of these privileges, which have been traditionally enjoyed by

the hotel through Hilton, have been and remain harmful to the Debtor's business. Wyndham has represented that it will provide all of these benefits to the hotel, as set forth in the Franchise Agreement, once the Wyndham Franchise Agreement is authorized.

(vi) The hotel is more valuable as a Wyndham Grand. The only appraisal and expert value testimony presented to the Court valued the hotel at $54 million as of September 7, 2010 and this appraisal further valued the hotel at $58 million as of December 31, 2010 **if** the property is franchised as a Wyndham Grand.

(vii) The absence of a national flag and present uncertainty surrounding approval of the Debtor's business judgment to become a Wyndham Grand is jeopardizing existing business and causing instability in the marketplace. The Debtor contends that concern about the viability of events already planned (or to be planned) and the drop off in group sales which has occurred while the hotel has operated as an independent hotel, is largely attributable to the lack of affiliation with a quality national brand. The evidence submitted by the Debtor supports the conclusion that approval of the Wyndham Franchise Agreement would restore confidence, stabilize and improve this situation.

(viii) Many of the Debtor's employees have expressed concern over the lack of a quality flag for the hotel. Association with one of the largest franchisors in the world would provide a level of comfort for over 300 employees of the Debtor and would help the Debtor retain key employees due to flag stability.

Based on the record before the Court, the preponderance of the evidence is that the Debtor's reorganization efforts and the estate are benefitted by the Debtor's election to enter into the Wyndham Franchise Agreement. The evidence and testimony presented throughout the evidentiary hearing on this matter demonstrates that Wyndham is "a reputable and experienced franchisor." Specifically, the Lender's expert admitted that Wyndham is not only "a reputable franchisor," but also that Wyndham has experience in flagging hotel properties in similar "size, scope, use and value" as the hotel property in question.[6] Based on this admission and the testimony presented by

---

[6]The evidence presented also included testimony to the effect that Wyndham has agreed to provide the Debtor with favorable pricing terms under its Franchise Agreement.

Wyndham and various experts before the Court, the Debtor's selection of Wyndham as a franchisor appears to be neither a waste of corporate assets nor an abuse of discretion.[7]

This Court must also reject the Lender's allegation that approval of the Wyndham Franchise Agreement would amount to a *sub rosa* or *de facto* plan of reorganization.

Where a transaction has the effect of dictating the terms of a prospective chapter 11 plan, it will constitute a prohibited *sub rosa* plan. See In re Capmark Fin. Group Inc., No. 09-13684CSS, 2010 WL 4313046, *38 (Bankr. D. Del. Nov. 1, 2010) (citing Official Comm. of Unsecured Creditors of Tower Auto. v. Debtors & Debtors in Possession (In re Tower Auto. Inc.), 241 F.R.D. 162, 168 (S.D.N.Y. 2006)). As articulated by the United States Court of Appeals for the Fifth Circuit, a transaction would amount to such a *sub rosa* plan of reorganization if it: 1) specifies the terms of any future reorganization plan; 2) restructures creditors' rights; and 3) requires that all parties release claims against the Debtor, its officers and directors, and its secured creditors. Official Comm. of Unsecured Creditors v. Cajun Elec. Power Coop. by & Through Mabey (In re Cajun Elec. Power Coop.), 119 F.3d 349, 354 (5th Cir. 1997) (citing Pension Benefit Guar. Corp. v. Braniff Airways, Inc. (In re Braniff Airways, Inc.), 700 F.2d 935, 940 (5th Cir. 1983)).

The contemplated Wyndham transaction does not appear to be a *sub rosa* plan. The Court reaches this conclusion because the Wyndham Franchise Agreement does not articulate terms for a plan of reorganization; nor does it require the Lender (or any other creditor) to vote in favor of any

---

[7]The Court is not suggesting or holding that the Lender has acted unreasonably, arbitrarily or capriciously in not approving Wyndham as a qualified franchisor. At trial, the Lender articulated a number of justifications as to why it preferred Hilton over Wyndham as the franchisor of the Debtor's hotel. Notwithstanding these justifications, the fact remains it is the Debtor's business judgment, and not the Lender's business judgment, that is at issue.

reorganization plan. Further, the terms of the Franchise Agreement do not dictate the priority scheme or dictate the timing and amount of money to be paid to creditors. Finally, adoption of the franchise would not require the Lender or other entities to release their claims against the Debtor, or the Debtor's officers or directors.

All that will be accomplished through the Wyndham transaction is the adoption of a franchise flag for the hotel. While it is true that this transaction affects the Debtor's reorganization, it is also true that many transactions are done in bankruptcy that affect a debtor's ability to reorganize. For example, as the Debtor correctly points out in its legal memoranda, prior to plan confirmation a debtor may change a marketing strategy, close unprofitable locations, open more desirable locations, reduce inventory, or enter into agreements with different vendors, franchisors or suppliers. The fact that a transaction affects a debtor's reorganization does not automatically convert the contemplated transaction into a *sub rosa* plan.[8] To hold otherwise would impede a

---

[8] The record reflects that the Debtor has a plan of reorganization on file. However, exclusivity has been terminated thus enabling competing plans to be filed by the Debtor's creditors. To the extent there is a concern that competing plans would be prejudiced by having the Wyndham Franchise Agreement approved (because a competing plan proponent may desire to subsequently reject the Franchise Agreement thereby giving rise to a large termination claim), the Debtor and Committee have successfully negotiated with Wyndham for the subordination of any termination claim that may be asserted by Wyndham in this bankruptcy case. Specifically, while the language of the Wyndham documents may differ to a degree, Counsel to the Debtor and Counsel to the Committee have represented to the Court that any termination claim that could be asserted by Wyndham shall be subordinate to any and all allowed unsecured claims in this case (including any allowed unsecured claim that may be asserted by the Lender). The Court understands this representation to mean that in essence any termination charges or debt asserted by Wyndham is subordinate to any and all priority claims and administrative expenses, and that the termination charges or debt of Wyndham (if any) would only be senior to both the interests of equity and creditor claims, if any, that are (under principles of equitable subordination) adjudicated to be subordinate. Thus, a competing plan proponent who seeks to place another flag on the hotel will not be faced with an additional multi-million dollar
(continued...)

debtor's ability to successfully reorganize, keep a bankrupt debtor in a constant state of limbo, and possibly negatively impact the going concern value of the bankruptcy estate. All of these consequences are exactly what the Bankruptcy Code is designed to avoid.

Lastly, the Lender complains that the Wyndham transaction violates the Lender's loan documents. This allegation may be true; however, bankruptcy causes certain provisions of a loan document to be suspended. This is one of those instances. All that Lender is entitled to here is adequate protection for the contemplated transaction. See 11 U.S.C. § 363(e). The evidence and testimony presented to date indicate that the Wyndham transaction does not harm the Lender's collateralized position. The record reflects that the Lender is owed approximately $50 million on its pre-petition claim,[9] and the collateral is presently worth $54 million.[10] Furthermore, there is no evidence indicating that the collateral is declining in value and the evidence of record suggests that re-branding the hotel as a Wyndham Grand would result in an increase in the value of the hotel to $58 million. Under these circumstances, the Court finds that the Lender is more than adequately protected by the equity cushion and by the fact that the Debtor has been agreeable to making periodic interest payments to the Lender.[11] See Doc. #13 *(Cash Collateral Motion)* para. 21(c).

---

[8](...continued)
administrative expense claim which could impede reorganization of the hotel assets and business.

[9]The Lender is also a post-petition lender. The record does not contain the exact amount of post-petition advances made by the Lender, if any. However, it is believed that such sums, if there are any that are due, are less than $2 million.

[10]The Lender's own internal documents suggest that the hotel is worth $56 million.

[11]The Court recognizes that the Lender contends that the Debtor's proposed plan of reorganization does not provide the Lender with the "indubitable equivalent" of its legal and
(continued...)

**WHEREFORE**, for the reasons stated above, the Court shall approve the Debtor's request for authority to execute the proposed Franchise Agreement with Wyndham Hotels and Resorts, LLC.

Dated: <u>November 23, 2010</u>     <u>   /s/ Jeffery A. Deller          </u>
**JEFFERY A. DELLER**
U.S. Bankruptcy Judge

---

[11](...continued)
equitable interests under its loan documents. The Court further recognizes that the Debtor's proposed plan seeks to re-write many of the other terms and conditions of the Debtor's loan documents. The Court does not address today whether the provisions of the Debtor's plan of reorganization provides, or fails to provide, the Lender with the indubitable equivalent of the Lender's interests. Rather, all that the Court is deciding today is that the Lender is adequately protected by the equity cushion that exists in the value of the hotel.

N
# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

**IN RE:**                                   :
                                             :
**SHUBH HOTELS PITTSBURGH, LLC,**   :    Bankruptcy No. 10-26337JAD
                                             :
                                             :    Chapter 11
                                             :
            **Debtor.**                      :    Doc. No. **70**
                                             :

## ORDER OF COURT

**AND NOW**, this **23rd** day of **November**, **2010**, for the reasons expressed in the accompanying *Memorandum Opinion*, the court hereby **ORDERS**, **ADJUDGES** and **DECREES** as follows:

1. The Debtor's request for authority to execute the proposed Franchise Agreement with Wyndham Hotels and Resorts, LLC is **GRANTED**.

2. To the extent there is a concern that competing plans could be prejudiced by having the Wyndham Franchise Agreement approved (because a competing plan proponent may desire to subsequently reject the Franchise Agreement thereby giving rise to a large termination claim), it is hereby **ORDERED** that any debt or obligation due Wyndham arising out of, or relating to termination or rejection of the Franchise Agreement is subordinated. Specifically, any termination claim, debt or other obligation that could be asserted by Wyndham arising out of or relating to termination at or before plan confirmation in this bankruptcy case shall be subordinate to any and all allowed unsecured claims in this case (including any allowed unsecured claim that may be asserted by the "Lender" as such term is defined in the Memorandum Opinion). Any such termination charges, debts or other

obligations that could be asserted by Wyndham as a result of such termination is also subordinate to any and all allowed priority claims and allowed administrative expenses, and that the termination charges or termination related debts or obligations that may become due to Wyndham (if any) will only be senior to both the interests of equity and creditor claims, if any, that are (under principles of equitable subordination) adjudicated to be subordinate by the Court.

3. Nothing in this Order or the Franchise Agreement should be deemed or construed to prevent a competing plan proponent from seeking the rejection and/or termination of the Wyndham Franchise Agreement at or before confirmation of a plan in this case.

4. To the extent any provisions of the Wyndham Franchise Agreement or related documents conflict with the terms of this Order, this Order shall control in all respects.

Dated: <u>November 23, 2010</u>　　　　　　　　　<u>　/s/ Jeffery A. Deller　　　　</u>
　　　　　　　　　　　　　　　　　　　　　　**JEFFERY A. DELLER**
　　　　　　　　　　　　　　　　　　　　　　U.S. Bankruptcy Judge