**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| In re | ) | Bankruptcy No. 10-26337-JAD |
| | ) | |
| **SHUBH HOTELS PITTSBURGH, LLC** | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | |

**FIRST AMENDED DISCLOSURE STATEMENT IN CONNECTION WITH  FIRST
AMENDED JOINT PLAN OF REORGANIZATION DATED DECEMBER 28, 2010**

Dated: December 28, 2010

<div style="margin-left:50%">

RUDOV & STEIN, P.C.
Counsel for the DEBTOR
David K. Rudov
100 First Avenue, Suite 500
Pittsburgh, PA 15222

-and-

Scott M. Hare, Esq.
The Frick Building Suite 1806
Pittsburgh, PA 15219

AND


BERGER SINGERMAN, P.A.
Counsel for Pittsburgh Grand LLC
James G. Gassenheimer, Esq.
Daniel Lampert, Esq.
Brian G. Rich, Esq.
200 South Biscayne Blvd. Suite 1000
Miami, FL 33131
Tel: 305-714-4383

</div>

**EACH OF THE PLAN PROPONENTS RESERVE THE RIGHT TO AMEND, SUPPLEMENT AND/OR WITHDRAW THIS DISCLOSURE STATEMENT AND THE PLAN AT OR BEFORE THE CONFIRMATION HEARING.**

## I. INTRODUCTION

Shubh Hotels Pittsburgh, LLC., which shall be referred to as the "Debtor", and Pittsburgh Grand, LLC (collectively with Debtor, the "Plan Proponents") have prepared this *First Amended Disclosure Statement in Connection with First Amended Joint Plan of Reorganization Dated December 28, 2010* (the "Disclosure Statement") in connection with the solicitation of acceptances or rejections of the *First Amended Joint Chapter 11 Plan Proposed by the Debtor and Pittsburgh Grand, LLC Dated December 28, 2010* (the "Amended Plan"), a copy of which accompanies this Disclosure Statement as **Exhibit "A"**[1]. Capitalized terms used herein have the meanings assigned to them in the Definitions section in the Amended Plan. Whenever the words "include," "includes" or "including" are used in this Disclosure Statement, they are deemed to be followed by the words "without limitation."

This Disclosure Statement is presented to certain holders of Claims against and Interests in the Debtor in accordance with the requirements of section 1125 of the United States Bankruptcy Code, 11 U.S.C. §§ 101-1330 (the "Code"). Section 1125 of the Code requires that a disclosure statement provide information sufficient to enable a hypothetical and reasonable investor, typical of the debtor's creditors and interest holders, to make an informed judgment whether to accept or reject a plan. This Disclosure Statement may not be relied upon for any purpose other than that described above.

---

[1] All documents referenced herein are available in pdf format at the following website (http://www.mediafire.com/shubh-plan) (the "Plan Website").

2

This Amended Disclosure Statement and the Amended Plan are an integral package, and they must be considered together for the reader to be adequately informed. This introduction is qualified in its entirety by the remaining portions of this Amended Disclosure Statement (including its Exhibits or Schedules), and this Amended Disclosure Statement in turn is qualified in its entirety by the Amended Plan. This Amended Disclosure Statement contains only a summary of the Amended Plan. You are strongly urged to review the Amended Plan, a copy of which is provided herewith, before casting a Ballot.

No representations concerning the Debtor (particularly as to the values of its property) are authorized other than as set forth in this Amended Disclosure Statement. You should not rely upon any representations or inducements made to secure your acceptance or rejection of the Amended Plan other than as contained in this Amended Disclosure Statement, and such additional representations and inducements should be reported to Debtor's counsel, who will in turn deliver such information to the proper authorities for such action as may be appropriate.

The information contained in this Amended Disclosure Statement, including any exhibits concerning the financial condition of the Debtor, has not been subjected to an audit or independent review except as expressly set forth herein. The Debtor has endeavored in good faith to be accurate in this Amended Disclosure Statement. Statements of the assets and liabilities of the Debtor as of the date of the commencement of the Chapter 11 Case are on file with the clerk of the Bankruptcy Court and may be inspected by interested parties during regular business hours.

The statements contained in this Amended Disclosure Statement are made as of the date of this Amended Disclosure Statement unless another time is specified. There is no guaranty that facts will not change after this Amended Disclosure Statement was filed; and it must be assumed that some facts will indeed change from that time until the hearing on the approval of the Amended Disclosure Statement (discussed below), and thereafter during the periods in which the Debtor makes payments under the Amended Plan.

This Amended Disclosure Statement was prepared in accordance with section 1125 of the Bankruptcy Code and not in accordance with federal or state securities laws or other applicable non-bankruptcy law. Entities holding or trading in or otherwise purchasing, selling or transferring claims against, interests in or securities of, the debtor should evaluate this disclosure statement only in light of the purpose for which it was prepared. This Amended Disclosure Statement has not been approved or disapproved by the Securities and Exchange Commission and the Securities and Exchange Commission has not passed upon the accuracy or adequacy of the statements contained herein. Nor may this Amended Disclosure Statement be construed to be advice on the tax, securities or other legal effects of the Amended Plan. You should, therefore, consult with your own legal, business, financial and tax advisors as to any such matters concerning the solicitation, the Amended Plan or the transactions contemplated thereby.

## II.  OVERVIEW OF CHAPTER 11

Chapter 11 comprises the chapter of the Code primarily used for business reorganization. Formulating a plan to restructure a debtor's finances forms a fundamental purpose of a case under chapter of the Code. Businesses also sometimes use chapter 11 as a means to conduct asset sales and other forms of liquidation. Whether the Debtor seeks to reorganize or liquidate, a chapter 11 plan sets forth and governs the treatment and rights creditors and interest holders will receive with respect to their claims against and equity interests in a debtor's bankruptcy estate.

3

The Code entitles only holders of impaired claims or equity interests who receive some distribution under a proposed plan to vote to accept or reject the plan. The Code conclusively presumes that holders of unimpaired claims or equity interests under a proposed plan have accepted the plan and need not vote on it. The Claims in Classes in 1, 2, 3, 4 and 5 of the Amended Plan are Impaired and thus may vote either to accept or reject the Amended Plan. The Debtor has enclosed a Ballot with this Amended Disclosure Statement to solicit the votes of the Creditors in Classes 1, 2, 3, 4 and 5. Those Creditors may vote on the Amended Plan by completing the enclosed Ballot and mailing it to the following address:

**upon the Counsel for the Debtor**

> RUDOV & STEIN, P.C.
> 100 First Avenue, Suite 500
> First & Market Building
> Pittsburgh, PA 15222
> (412) 281-7300 telephone

You should use the Ballot sent to you with this Amended Disclosure Statement to cast your vote for or against the Amended Plan. You may _not_ cast Ballots or vote orally or by facsimile. **For your Ballot to be considered by the Bankruptcy Court, it must be received at the above address by 5:00 p.m. (prevailing Eastern time) by the date fixed by the Bankruptcy Court on the accompanying scheduling order (the "Voting Deadline").** If you are a Creditor in Class 1, 2, 3, 4 or 5 and you did not receive a Ballot with this Disclosure Statement, please contact:

> David K. Rudov
> RUDOV & STEIN, P.C.
> Counsel for the DEBTOR
> 100 First Avenue, Suite 500

<div align="center">4</div>

Pittsburgh, PA 15222
(412) 281-7300 telephone

A ballot that does not indicate acceptance or rejection of a plan will not be considered. An impaired class of claims accepts a plan if at least 2/3 in amount and more than 1/2 in number of the allowed claims in the class that actually vote are cast in favor of the plan. A class of interests accepts a plan if at least 2/3 in amount of the allowed interests of such class that actually vote are cast in favor of the plan. Whether or not you vote, you will be bound by the terms and treatment set forth in the Amended Plan if the Bankruptcy Court confirms the Amended Plan. The Bankruptcy Court may disallow any vote accepting or rejecting the Amended Plan if the vote is not cast in good faith.

Once it is determined which impaired classes have accepted a plan, the bankruptcy court will determine whether the plan may be confirmed. For a plan to be confirmed, the Code requires, among other things, that the plan be proposed in **good faith** and comply with the other applicable provisions of chapter 11 of the Code, including a requirement that at least one class of impaired claims accept the plan, and that confirmation of the plan is not likely to be followed by the need for further financial reorganization. The bankruptcy court will confirm a plan only if it finds that all of the requirements enumerated in section 1129 of the Code have been met. The Debtor believes that the Amended Plan satisfies all of the requirements for confirmation.

One requirement for confirmation of a plan is called the "**best interests test**." Notwithstanding acceptance of the plan by each impaired class of claims, in order to confirm a plan, if even one member of an impaired class votes to reject the plan, the bankruptcy court must determine that the plan is in the best interests of each holder of a claim or interest in such class.

5

The best interests test requires that the bankruptcy court find that the plan provides to each member of such impaired class a recovery on account of the class member's claim or interest that has a value, as of the Effective Date of the Amended Plan (generally, 30 days after confirmation), at least equal to the value of the distribution that each such class member would have received if the debtor's assets were liquidated under chapter 7 of the Code on such date. Under the Chapter 7 liquidation analysis provided in this Disclosure Statement, all holders of claims within Classes 1, 2, 3, 4 and 5 (the impaired classes) will receive more under the Amended Plan than they would if the Debtor was liquidated and its most valuable asset, the Hotel at 600 Commonwealth Place, Pittsburgh, PA (the "Hotel"), was sold.

The Bankruptcy Code also requires that, in order to confirm a plan, the Court must find that confirmation of a plan is not likely to be followed by liquidation or the need for further financial reorganization of the Debtor ("**financial feasibility test**"). For a plan to meet this test, the Court must find that the Debtor's estate and the Reorganized Debtor possess the capital and should generate the other resources to meet their respective obligations under the Amended Plan. The Plan Proponents believe that following confirmation of the Amended Plan, the Reorganized Debtor will be able to fully perform all obligations under the Amended Plan without any need for liquidation or further financial reorganization. As shown by the financial projections attached as **Exhibit B** to the Disclosure Statement, the Hotel's projected cash flows, along with the Letters of Credit (as more fully described herein) more than adequately cover its payment obligations to the various classes under the Amended Plan.

The bankruptcy court may confirm a plan notwithstanding the plan's rejection by some impaired classes, if the bankruptcy court finds that at least one impaired class of claims (not including any acceptances by "insiders" as defined in section 101(31) of the Code) has accepted

6

the plan and that the plan satisfies certain additional conditions. This provision, found in section 1129(b) of the Code, is generally referred to as the "cramdown" provision. Pursuant thereto, the bankruptcy court may confirm a plan over the rejection by a class of secured claims if the plan is fair and equitable and satisfies one of the alternative requirements of section 1129(b)(2)(A) of the Code (otherwise known as "**cram down**"). Likewise, the bankruptcy court may confirm a plan over the rejection by a class of unsecured claims if the plan is fair and equitable and if the non-accepting claimants will receive the full value of their claims, or (even if the non-accepting claimants receive less than full value), if no class of junior priority will receive or retain anything on account of its pre-petition claims or interests.

**THESE ARE COMPLEX STATUTORY PROVISIONS, AND THE PRECEDING PARAGRAPHS ARE NOT INTENDED TO BE A COMPLETE SUMMARY OF THE LAW. IF YOU DO NOT UNDERSTAND THESE PROVISIONS, PLEASE CONSULT WITH YOUR ATTORNEY. THE PLAN PROPONENTS EXPECT THAT THEY MAY HAVE TO RELY UPON THE "CRAMDOWN" PROVISION OF SECTION 1129(b) OF THE CODE IN ORDER TO CONFIRM THE PLAN.**

## III. BACKGROUND OF THE DEBTOR AND EVENTS LEADING TO THE FILING OF THE BANKRUPTCY CASE

The Debtor owns and operates the largest hotel in the City of Pittsburgh (the "Hotel"), with more than 700 guest rooms and approximately 40,000 square feet of meeting space. Conrad Hilton built the Hotel as his first such property, and Hilton Hotels International ("Hilton") owned and operated the Hotel for more than 50 years. Hilton sold the Hotel to the Debtor on or about May 22, 2006. After the sale, the Hotel still maintained the Hilton flag through a franchise arrangement.

Toward the end of their ownership of the Hotel, Hilton stopped investing in the property, and allowed the Hotel to deteriorate substantially below their franchise standards. By the time of

7

the sale, the Hotel required a substantially expensive and elaborate renovation (including structural improvements to all of the Hotel rooms) to bring the Hotel up to Hilton brand standards. Hilton did not at all insist that the Hotel satisfy Hilton brand standards while it owned it, and Hilton preferred not to invest the capital to renovate the Hotel, so it sold the iconic Hotel to the Debtor for approximately twenty-eight million dollars ($28,000,000), far below the sixty five to seventy million dollar ($65-75,000,000) value the renovated Hotel would have commanded. The Debtor financed the acquisition of the Hotel, in part, from the predecessor in interest to the Debtor's present lender, Column Financial, Inc. ("CFI"), through an acquisition and construction loan of $49.6 million.

Carbon Capital II Real Estate CDO 2005-1 Ltd., a Cayman Islands exempted company ("Lender" or "Carbon Cayman") and its servicer, BlackRock Financial Management, Inc. ("BlackRock"), on behalf of investors, claims a first lien on, and security interest in, substantially all of the Debtor's real and personal assets. On September 15, 2010, Carbon Cayman filed a Proof of Claim (Claim No. 3-1), and on October 4, 2010, amended that Proof of Claim (Claim No. 3-2), both asserting a secured claim in the amount of $49,666,666.67 in principal plus interest, fees, costs, expenses and charges.

The Debtor is a Florida Limited Liability Company. The original members of the Debtor were affiliates of Atul Bisaria ("Bisaria"). On September 21, 2010, the members of the Debtor transferred one hundred percent (100%) of their membership interests so that Pittsburgh Grand LLC, a Florida limited liability company ("PG") owns 99% of the Debtor's equity and Pittsburgh Grand Manager, LLC, a Florida limited liability company ("PGM"), owns the remaining 1% and serves as the Debtor's Manager. Dr. Kiran Patel owns PG and PGM. Although BlackRock now alleges that it did not approve Dr. Patel's purchase of the Debtor's membership interests because

8

it now claims that Dr. Patel fails to qualify as an acceptable or capable owner, several internal documents confirm and substantiate the Debtor's position that BlackRock communicated its willingness to approve the transfer to Dr. Patel pre-petition. For example, in a BlackRock memorandum dated October 13, 2009, BlackRock's employee Eloisa Mascarenas, recommended the transfer of 89% of the Debtor's equity interest to an entity controlled by Dr. Patel.

Carbon Cayman has challenged the efficacy of the transfer. The Debtor and Dr. Patel submit that these unfounded challenges have no impact on the Amended Plan. As background information regarding the transfer, when the Debtor purchased the Hotel in the Fall of 2006 and began substantial renovations of the Hotel in 2007, including remodeling of guest rooms, common areas and the performance of other deferred maintenance and improvements, Bisaria approached Dr. Kiran Patel through a mutual acquaintance, Jai Lalwani, in order to discuss the Debtor's potential sale of the Hotel. During the discussions among Dr. Patel, Carbon Cayman/BlackRock, the Debtor and another investor group named The Related Group, Dr. Patel began and continued lending money to the Hotel to pay renovation costs and ensure the Hotel's survival. Dr. Patel and the Debtor made gentlemen's "hand shake" arrangements for these loans, and in response to Carbon Cayman's threat to dispute the loans, Dr. Patel hired a forensic accountant to determine the extent of his loans and how they were treated pre-petition. As of the date of this Amended Disclosure Statement, the Debtor has scheduled as undisputed Dr. Patel 's claim in the amount of $3,917,729.00.

BlackRock contends that the Debtor's bankruptcy resulted from mismanagement by parties engaged by the Debtor's former equity owner, Bisaria and by actions taken by Dr. Patel, which are disputed by the Plan Proponents. Because of Bisaria's equity transfer, Dr. Patel

9

presently holds one hundred percent (100%) of the membership interests in the Debtor.[2]  Mr. Bisaria has no role going forward with the Debtor's operations or the Amended Plan.  Although Jai Lalwani may have initially participated in the Debtor's managerial or financial decisions that concerned the Lender, such participation has ended and he will also have no ongoing role in the Hotel or the Reorganized Debtor after the effective date of the Amended Plan.  To replace Bisaria and Lalwani, the Debtor and Dr. Patel have engaged a new management team. A reputable and experienced management company, previously approved by BlacRock, Prism Hotels and Resorts, currently manages the Hotel.  Dr. Patel also appointed Frank Amedia, a highly experienced construction manager, to oversee the Property Improvement Plan ("PIP") construction.  On November 23, 2010, the Bankruptcy Court also approved the execution of a franchise  with Wyndham Hotels and Resorts  ("Wyndham") to brand the Hotel, formerly a Hilton, as an exclusive and valuable Wyndham Grand.  *See Memorandum Opinion*, Doc. No. 463.

## A.    <u>EVENTS LEADING TO THE FILING</u>[3]

Various circumstances led to the Debtor's decision to file a Chapter 11.  The principal factors relate to Bisaria's inability to continue the  construction and remodeling of the Hotel, events involving Hilton's termination of the Hotel franchise and Carbon Cayman's attempts to foreclose on the Hotel.   The Hilton franchise termination and Carbon Cayman foreclosure

---

[2]    The Commonwealth of Pennsylvania does provide that certain equity transfers of non-operating real estate entities can trigger a documentary stamp tax.  The Debtor verified that the sale of the membership interests in the Hotel does not trigger the Realty Transfer Tax with the Office of Chief Counsel for the PA Department of Revenue.  The Debtor will report its tax attributes for the short year ending with the equity transfer to Bisaria, and its tax attributes for the balance of 2010 to Dr. Patel.

[3]    Carbon Cayman asserted in its objection to the Original Disclosure Statement that the Disclosure Statement should include additional facts surrounding the events leading to the Chapter 11 filing.  While the Plan Proponents dispute much of Carbon Cayman's version of the facts, readers of this Disclosure Statement should read Section III, 7(B) in conjunction with this section of the Disclosure Statement.

processes proceeded in tandem. The Debtor has continuously kept the Carbon Cayman loan in payment good standing, so Carbon Cayman could only advance a foreclosure process based on a non-monetary default that the Debtor could not cure. The Hilton franchise termination process provided such an event.

That process began in August 2008, when Hilton sent Debtor a notice of default and termination letter due to an "Unacceptable" score for the Hotel's condition and alleged failure to comply with brand standards (the "First Hilton Default Notice"). The First Hilton Default Notice triggered Carbon Capital's threat to place the Debtor in non-monetary default and required the Debtor to invest substantial additional sums to improve the value of Carbon Cayman's collateral and seek to attain compliance with Hilton's requirements. The Debtor and Carbon Cayman negotiated a forbearance agreement in response to the First Hilton Default Notice, which required, *inter alia,* the Debtor to: (1) complete renovation of rooms by September 19, 2008; (2) deliver an updated Product Evaluation Improvement Plan Report by September 19, 2008; (3) complete renovation of 18 guestrooms by October 16, 2008; (4) complete renovation of 12 common area corridors by October 31, 2008; (5) complete renovation of two lobby restrooms by November 15, 2008; (6) complete renovation of the restaurant by November 15, 2008; (7) complete renovation of the meeting room expansion, lobby expansion, and construction of the indoor swimming pool by May 15, 2009; (8) satisfy all outstanding Mechanics Liens filed against the Hotel; and (9) reduce certain outstanding accounts payable to no more than $1MM.

On September 18, 2008, Hilton inspected the property and because of satisfactory progress in the construction, extended the construction deadline to April 1, 2009. On April 7, 2009, an inspection of the Hotel revealed the renovations of the guest rooms, corridors and

11

restaurant spaces were successfully completed and the Debtor was advancing construction on the meeting spaces and lobby. However, the Hotel's financial condition continued to deteriorate and by October of 2009 outstanding franchise fees had increased to $724,245 and the judgments and liens against the property exceeded three million five hundred dollars ($3,500,000). By about December 2009, Bisaria brought a new deal to the table under which a private equity company, HIG, offered to pay $67,000,000 for the Hotel if the construction was completed and the property could be transferred free and clear of liens. Based upon this proposal and a BlackRock restructuring proposal to approve Dr. Patel as the Hotel owner and reduce the mortgage loan to $45 million, Dr. Patel agreed to fund two million one hundred thousand dollars ($2,100,000) to pay down liens and negotiate a definitive amendment to the Carbon Cayman debt.

However, in early January, 2010, Hilton failed the Hotel in its quality inspection. Carbon Cayman, understanding that Hilton needed only two more similar failures within a 12 month period to terminate the Franchise Agreement, then declined to restructure and reduce the Loan and approve Dr. Patel as the Hotel owner, all as previously negotiated. Instead, they insisted upon a transaction resulting in that certain First Amendment to Loan Agreement (the "Amendment") dated as of January 14, 2010. Pursuant to the Amendment, Carbon Cayman made the Debtor: (1) pay a loan exit fee equal to $100,000 for each month and partial month after the Amendment closing date to the transfer closing date for any transfer of the property; (2) pay the greater of 20% of the net proceeds of any prepayment or $2,750,000 for any closing that occurred on or after the first anniversary of the Amendment; (3) pay the greater of 20% of the prepayment net proceeds, or $2,750,000, in conjunction with any refinancing of the Loan at any time after the Amendment; (4) pay $2,750,000 in connection with repayment of the Loan in full at any time after the Amendment, including the initial maturity date, or the extended maturity

12

date; and (6) pay $2 million into escrow to settle outstanding mechanics' and other liens at closing of the Amendment. The Amendment also required the Debtor to (7) complete the addition (expansion exterior) by December 1, 2010 as required by Hilton's PIP and Additional Build Out (expansion interior) by July 15, 2011, and (8) enter into a management agreement with Crescent Hotels & Resorts ("Crescent"). The Amendment followed (by less than 10 days) the Hotel's failure to pass Hilton's inspection for the first time in 2010.

In July 2010, Hilton, with Crescent's collaboration, conducted a surprise PIP inspection which the Debtor failed. Hilton notified the Debtor of this second "strike" within the 12 month period, and gave the Debtor notice of potential termination of the franchise if the Hotel failed an inspection on August 31, 2010. The Debtor and Dr. Patel made every effort to meet the inspection requirements, including making substantial additional expenditures to accelerate the construction schedules. However, Hilton failed the Hotel from the August 31, 2010 inspection, based on alleged paperwork and subjective defects. The Hotel's failure during the August 31, 2010 inspection greatly surprised the Debtor because the Hotel had carefully prepared for the inspection. Hilton principally supported the Hotel's failing score not upon defects in the Product Improvement Plan ("PIP") work, but upon a failure to obtain ministerial approvals from Hilton— *despite the fact that all PIP work had been completed to Hilton's required specifications and with Hilton approved materials.*

The Hotel's failure to pass the August 31, 2010 inspection did not at all surprise Hilton or Carbon Cayman. Within hours after the Hilton inspector announced the Hotel's failure at 5 p.m. on August 31, 2010, Hilton terminated the franchise agreement and shut down the Hotel's reservation system at 12:01 am on September 1, 2010, causing complete chaos at Hotel. The Debtor disputes the validity of Hilton's termination of the franchise agreement. However,

PT1 498847v3 12/28/10

Carbon Cayman exploited the franchise termination to declare the Debtor in default (even though the Debtor remained current on all monetary obligations to Carbon Cayman) and they filed their 85-page foreclosure action on the morning of September 3, 2010. The Debtor filed this Bankruptcy case immediately thereafter.

## B. POST-PETITION EVENTS

Describing this case as contentious from the start considerably understates the facts. The following summarizes the significant events that have occurred since the filing of the Bankruptcy Case:

### 1. CARBON CAYMAN'S MOTION FOR RELIEF FROM THE AUTOMATIC STAY AND MOTION TO APPOINT A CHAPTER 11 TRUSTEE

Carbon Cayman filed its Emergency Motion for Relief from the Automatic Stay (the "Stay Relief Motion") (Doc. No. 7), the day after this case commenced, on September 8, 2010, and Carbon Cayman continued to supplement that Motion until the Judge stayed further proceedings on it[4]. The Debtor and Dr. Patel vigorously opposed the Stay Relief Motion. The Debtor filed its Response on September 14, 2010 (Do. No. 41). Substantial discovery and multiple weeks of evidentiary hearings ensued on the Stay Relief Motion.

Carbon Cayman then filed its Emergency Motion to Appoint a Chapter 11 Trustee and to Terminate Exclusivity on October 25, 2010 (Doc. No. 312) . Again, the Debtor and Dr. Patel opposed these Carbon Cayman motions in their November 3, 2010 Response (Doc. No. 373).

On November 8, 2010, the Court entered its Order Staying the Stay Relief Litigation, terminating exclusivity and denying the Motion to Appoint a Chapter 11 Trustee. The Court did

---

[4] The Debtor filed its Response to the Lenders' Emergency Motion for Relief from Stay on September 14, 2010 (Doc. No. 41). Carbon Cayman filed a Supplement to its Emergency Motion for Relief from Stay on September 27, 2010. (Doc. No. 109). On October 6, 2010, Carbon Cayman filed a Second Supplement to their Emergency Motion for Relief from Stay. (Doc. No. 186).

PT1 498847v3 12/28/10

appear an Examiner to monitor and report on the Debtor's operations, but emphasized in the Order that the Debtor in Possession fully retained the ability to exercise its business judgment.

### 2. THE CREDITORS' COMMITTEE

On September 24, 2010, the Official Committee of Unsecured Creditors was formed (the "Committee"). On September 24, 2010 the Committee elected Leech Tishman Fuscaldo & Lampl, LLC as counsel. Since its formation, the Committee has actively engaged in all aspects of the case.

### 3. DIP FINANCING AND USE OF CASH COLLATERAL

The Debtor filed its Expedited Motion for an Order Authorizing it to Use Cash Collateral or in the Alternative to Obtain Alternative Debtor in Possession Senior Lending Facility on September 8, 2010 (Doc. No. 13). The Lenders filed their Response on September 14, 2010 objecting to the Debtor's Motion (Doc. No. 40).

On September 10, 2010, the Court continued the hearing on the Debtor's Expedited Motion for an Order Authorizing it to Use Cash Collateral or in the Alternative to Obtain Alternative Debtor in Possession Senior Lending Facility ("DIP Financing Motion") (Doc. No. 13) to September 15, 2010. The Court again continued the hearing on the DIP Financing Motion to September 29, 2010.

On November 9, 2010, the Debtor filed its *Amended and Expedited Motion for an Order Authorizing it to Enter into Alternative Debtor In Possession Senior Lending Facility* ("Amended DIP Financing Motion") (Doc. No. 402). On November 12, 2010, the Debtor filed a Supplement/Addendum to the DIP Financing Motion seeking to borrow up to $3 million from Dr. Kiran Patel (Doc. No. 418). After the hearing held on November 12, 2010, the Debtor and the Lenders agreed, and the Court granted interim approval for the Debtor to enter into a Debtor

15

In Possession senior lending facility with Carbon Cayman and BlackRock in an amount up to $1.35 million (the "DIP Loan") by entry of an Interim Financing Order dated November 12, 2010 (Do. No. 425).

On November 15, 2010, as a result of the hearing on November 12, the Court continued the final hearing on the Amended DIP Financing Motion until December 3, 2010 (Doc. No. 430). On December 3, 2010, the Court again continued the hearing on the Amended DIP Financing Motion to December 9, 2010 (Doc. No. 493). The Court entered a Final Order Approving Debtor in Possession Financing and Use of Cash Collateral on December 21, 2010 (Doc. No. 549).

### 4.    THE EXAMINER

As set forth above, the Bankruptcy Court has appointed an examiner in this case, Margaret M. Good. The Court authorized the Examiner to monitor the Hotel's cash receipts and disbursements, and not to provide management services or otherwise displace the Debtor's business judgment. A copy of the Examiner's Initial Report, dated December 2, 2010 (Doc. No. 487) is available on the Plan Website.

### 5.    THE EQUITABLE SUBORDINATION COMPLAINT

On November 3, 2010, Dr. Patel filed a complaint (the "Equitable Subordination Complaint") (Doc. No 1) pursuant to section 510 of the Bankruptcy Code against Carbon Cayman and BlackRock to equitably subordinate their entire claim to all other classes, including equity. The Equitable Subordination Complaint alleges in summary that Carbon Cayman/BlackRock misled Dr. Patel into investing millions of dollars into the improvement of the Hotel's value, by promising to restructure their loans and approve him as owner of the Hotel,

while intending to deny such restructure and approval and instead foreclose on the Hotel to expropriate the Dr. Patel's investments for their own exclusive benefit and the detriment of all other creditors. The Equitable Subordination Complaint recites the relationships among BlackRock and Hilton (BlackRock spun out from BlackStone, and BlackStone owns Hilton) and Crescent (the Hotel manager which communicated surreptitiously with BlackRock and scheduled the "surprise" Hilton inspection without notice to the Debtor), and alleges that they colluded to create an alleged incurable default (the termination of the Hotel Hilton franchise agreement) as the last element in BlackRock's "loan to own" scheme. The Equitable Subordination Complaint alleges that BlackRock also advanced its "loan to own" scheme by "scorched earth" litigation tactics, including its pattern of over litigating and seeking to prevail in litigation, including these bankruptcy proceedings, by outspending alone. BlackRock contests the Equitable Subordination Complaint and has counterclaimed against Dr. Patel as well in their *Answers and Affirmative Defenses to the Complaint, and Counterclaim,* dated December 6, 2010 (Doc. No. 8). Copies are available on the Plan Website. If the Equitable Subordination Complaint succeeds in full, then the Debtor may not have to pay Carbon Cayman's claim and a partial success may reduce Carbon Cayman's claim, in either case substantially benefitting junior creditors and the Debtor. There can be no assurance regarding the outcome of the Equitable Subordination Complaint.

### 6. THE DEBTOR'S APPLICATION TO ENTER INTO THE WYNDHAM FRANCHSIE

On or about September 20, 2010, the Debtor filed a motion for authority, among other matters, to execute a franchise agreement with Wyndham. (Doc. No. 70). Debtor filed this motion on an expedited basis because the Hotel flag contributes substantially to its reservations

PT1 498847v3 12/28/10

and cash flow, and Hilton's termination of its franchise (which the Debtor disputes) substantially damaged the Hotel's operations. There were several pleadings filed in support of the execution of a franchise agreement with Wyndham, including but not limited to the Committee's November 15, 2010 brief in support. (Doc. No. 433). Notwithstanding the Lender's objections to the Wyndham franchise (Doc. No. 434), the Court issued a Memorandum Opinion on November 23, 2010 approving the execution of the franchise agreement as a perfectly sound exercise of the Debtor's business judgment. (Doc. No. 463). A Copy is available on the Plan Website.

7.      **THE FILING OF THE DISCLOSURE STATEMENT AND PLAN**

On October 6, 2010, the Debtor and Pittsburgh Grand, LLC filed their Disclosure Statement (the "Original Disclosure Statement") and Plan of Reorganization. The Court held a hearing on approval of the Original Disclosure Statement on November 23, 2010. Objections were filed by Carbon Cayman (Doc. No. 445) on November 16, 2010. The Committee filed its Response (Doc. No. 444) and its requests for clarifications and/or other objections have been addressed in this Amended Disclosure Statement. Allegheny County and Hertz Gateway also filed objections to the Original Disclosure Statement which were resolved. As a result of the objections and discussions of objections among all the various parties, the Debtor prepared this Amended Disclosure Statement and the Amended Plan.

A.      **The Committee's Response:**

The Committee raised, among others, the following issues in its Response (Doc. No. 444) which the Plan Proponents have addressed as follows:

(1)    The Committee requested that the Debtor update the Original Disclosure Statement to reflect the Wyndham Transaction.  This Amended Disclosure Statement reflects the additional information related thereto.

(2)    The Committee requested the Debtor to provide additional disclosure about how the mechanics of the Letters of Credit operate, the establishment of a Creditor Trust as the beneficiary of the Letters of Credit, the status of the  DIP financing, and what happens when the Carbon Cayman loan matures. This Amended Disclosure Statement provides a detailed explanation of these issues in Section IV, B(2).

(3)    The Committee requested additional information regarding Avoidance Actions and how they will be prosecuted and proceeds applied.   The Amended Disclosure Statement lists certain potential avoidance  causes of action and at the request of the Committee and establishes under the Amended Plan a Creditors Trust[5], a mechanism for the pursuit of these claims and the allocation of recoveries under such claims.    To the extent avoidance actions generate net recoveries, these will accelerate the payment to the unsecured creditors under the Amended Plan.  See Section V, D.

(4)    The Committee requested more information about (a) which (if any) executory contracts the Debtor plans to reject, (b) cure costs for assumed contracts, (c) how the cure costs will be paid and (d) any rejection damages.  These issues are addressed in Section V, B.

(5)    The Committee requested further information regarding how property vests in the Reorganized Debtor and the Creditor Trust.   All property, except for the

---

[5]    The Creditors Trust will be drafted by counsel for the Committee.  It is envisioned that the Creditors Trust will address distribution to Classes  3 and 4.

Avoidance Actions, shall vest in the Reorganized Debtor. As discussed above, the net proceeds from avoidance actions shall benefit the general unsecured creditors and accelerate their payments under the Amended Plan.

(6)     The Committee requested more detailed information with respect to the secured claims, the priority claims and the Disputed Claims mechanics. This information has been provided in Sections IV and V.

(7)     The Committee requested further information on post-confirmation management and salaries. This information has been included in Section IV, B(2).

### B.     Carbon Cayman's Objection

Carbon Cayman's Objection to the Original Disclosure Statement claims that the Disclosure Statement materially misleads creditors in two general respects. First, they alleged that the Original Disclosure Statement mischaracterized the Debtor's Plan as a risk-free proposition paying all claims in full without regard to (a) risks of non-payment and (b) the present value of the Plan's deferred payments. Second, that the Disclosure Statement contained inaccurate statements concerning the events leading up to the chapter 11 filing and the course of events during the chapter 11 case. While the Plan Proponents disagree with Carbon Cayman's assertions, for purposes of resolution and full disclosure, this Amended Disclosure Statement includes Carbon Cayman's objections and the Plan Proponents' response. Interested parties should read this discussion in conjunction with the "Events Leading to the Filing of the Chapter 11" and "Risk Factors" Sections of this Amended Disclosure Statement.

PT1 498847v3 12/28/10

### C. Carbon Cayman Alleged that the Debtor's Plan Is Misleading Because It Does Not Account For the Present Value Of Certain Payments Under the Plan.

The Amended Plan proposes to pay all creditors the **full amount of their Allowed Claim with interest**. The Amended Plan provides for payments to creditors from the Hotel's cash flow, secured by up to $8 million in Letters of Credit posted by Pittsburgh Grand LLC. See the Section of this Disclosure Statement entitled "Description of Letters of Credit".

Carbon Cayman then argued that even modest adjustments in the Debtor's Financial Projections, and the allowance of substantial Disputed Claims , could reduce the cash flow payments to creditors substantially below 100 cents on the dollar. As set forth in this Amended Disclosure Statement, the Holders of Class 4 Claims will receive payment in full over time, plus interest. To the extent that the factors Carbon Cayman addresses, or other circumstances, prevent the creditors from receiving such full payment within 36 months (and the Letters of Credit do not satisfy the payment shortfall), the Amended Plan will simply continue paying creditor claims, with interest, until they are paid in full. The interest factor included in the creditor payments means that if the payment stream is discounted to present value at a discount rate higher than such interest rate, the discounted present value of the creditors' payments will be less than 100 cents on the dollar of claims. There can be no assurance that even if the Reorganized Debtor achieves the financial performance set forth in the Projections, that the Amended Plan will achieve full payment of all Allowed Claims within 36 months from the Effective Date. The Section of this Disclosure Statement entitled "Risk Factors" discusses these and other aspects of the Amended Plan.

PT1 498847v3 12/28/10

### D. Carbon Cayman alleged that the Original Disclosure Statement Contained Inaccurate or Incomplete Statements as Follows:

Carbon Cayman alleged that the Original Disclosure Statement omitted critical background information necessary for any creditor to review in contemplation of voting on the Plan, as follows:

(1) **Dr. Patel's Claim**. Dr. Patel has a substantial (almost $4 million) unsecured creditor claim against the bankruptcy estate. Carbon Cayman threatens to dispute this claim because no documentation supports it. Concededly, Debtor's original schedules omitted Dr. Patel's claim, the loans were undocumented, the balance sheet filed with the Debtor's September 2010 monthly operating report did not reflect the loans. However, the loans were reflected in the Debtors books of account, and the amended schedules do include Dr. Patel's claim in the amount of $3,917,729. Dr. Patel also asserts that he is entitled to interest on the loans at a rate that may be as high as 25%. Dr. Patel has hired a forensic accountant to review his financial transactions with the Debtor. Based upon the results of this review, the claim may be modified. Carbon Cayman asserts that Dr. Patel's claims should be treated as equity contributions or loans to Mr. Bisaria personally. Additionally, parties in interest may, it they deem it appropriate, object to Dr. Patel's claim. However, the Plan Proponents suggest that these allegations are meritless since under this Plan only, Dr. Patel will subordinate his claims to all other claims, except Carbon Cayman's equitably subordinated claim (if that Claim is in fact subordinated).

(2) **Carbon Cayman requested that this Amended Disclosure Statement disclose that Dr. Patel improved his position vis-à-vis other creditors by obtaining a post-petition transfer of 100% of the membership interests in the Debtor for no**

**alleged additional value.**    The post-petition transfer of the Debtor's equity interest has been fully disclosed in various pleadings and in this Amended Disclosure Statement.    Dr. Patel disputes Carbon Cayman's assertions that the equity transfer actually improved his position with respect to other creditors (in light of his agreement to subordinate the claim under the Amended Plan) or that the transfer was improper or has an impact on the case.

(3)    **Carbon Cayman asserted that the Original Disclosure Statement makes no reference to the improper use of Hotel funds.**    Carbon Cayman requested that this Amended Disclosure  Statement contain information related to Jai Lalwani's control over the Debtor's bank accounts during the past year.   The Events Leading to the Filing of the Bankruptcy Case in this Amended Disclosure Statement, and this discussion, contains the information requested by Carbon Cayman.    Specifically,  Carbon Cayman contends that Mr. Lalwani allegedly directed the Debtor's controller, William Sfamenos, to use the Debtor's revenues to pay personal expenses and other charges unrelated to Hotel operations. These expenses and other payments allegedly exceed $1,000,000.  Mr. Lalwani also allegedly diverted union dues withheld from wages to his companies, Black Diamond Hospitality, LLC and Black Diamond Hotel Supergroup LLC (together, "Black Diamond").   The Plan Proponents submit that Mr. Lalwani is no longer in control of any Debtor bank accounts and will have no role in Debtor's ongoing operations.   Additionally, any improper transfers for the benefit of Mr. Lalwani may be reviewed and possibly recovered as avoidable transfers.  These claims would be subject to assignment to the Creditors Trust and would be reviewed as to the viability of recovery on such claims.

(4)    **Carbon Cayman Requested that the Amended Disclosure Statement Contain Information Related to Dr. Patel's relationship with Jai Lalwani.**   Dr.

23

Patel has acknowledged that he had previously requested Mr. Lalwani to perform certain functions at the Hotel. Dr. Patel has also confirmed that Mr. Lalwani no longer has any authority or role in connection with the Hotel's operations, and that he will be terminating his other business relationships with Mr. Lalwani as soon as reasonably practical.

(5) **Carbon Cayman asserts that creditors should also be informed that Dr. Patel remains a business partner with Mr. Lalwani in at least four other transactions**. Dr. Patel has confirmed that all of his other relationships with Mr. Lalwani are being unwound.

(6) **Carbon Cayman alleges that the Original Disclosure Statement improperly suggests Lender "encouraged" Dr. Patel to make loans to the Hotel.** In connection with the proposed transaction with Carbon Cayman in the Fall of 2009 as described in the "Events Leading to the Bankruptcy Filing" Section of this Amended Disclosure Statement, Dr. Patel would become the controlling owner of the Hotel and assume the mortgage loan ("Patel Proposal"). Carbon Cayman asserts that the proposed term sheets for the Patel Proposal required more than $5 million in capital contributions ("Patel Required Equity Infusion"), and the Lender never considered or approved loans to the Debtor in connection with the Patel Proposal. In late 2009, Carbon Cayman alleges that Debtor advised that it no longer wanted to pursue the Patel Proposal because it had a better offer. The Lender and the Debtor then negotiated and executed the First Amendment of the Loan in January 2010. Carbon Cayman asserts that it only recently became unaware that Dr. Patel or his affiliates may have advanced money to the Debtor following the termination of Patel Proposal. Furthermore, Carbon Cayman asserts that its loan documents required its approval of any loans to the Debtor, which

24

approval was neither sought nor obtained. Dr. Patel disputes certain of these allegations as set forth more fully in the Equitable Subordination Complaint.

(7) **Carbon Cayman Alleges that the Original Disclosure Statement improperly states that Patel agreed to continuing lending money to the Debtor in November 2009 because "it was the only way to protect his existing loans."** Carbon Cayman disputes the suggestion that "after the Related/Patel deal died," Dr. Patel was forced to lend money for the Hotel to protect approximately $2,300,000 in advances he previously made to the property, and alleges that the Original Disclosure Statement ignores the fact that when the deal fell through in late November 2009, the Debtor repaid Dr. Patel for most of the sums he advanced. Specifically, the Hotel's controller kept a journal listing all funds transferred by and repaid to Dr. Patel. Carbon Cayman asserts that the Debtor's journal shows that through November 30, 2009, Dr. Patel made payments totaling $1,861,395 and also received payments totaling $1,652,275, leaving an alleged remaining balance of $209,120. Carbon Cayman then asserts that the Hotel had also issued Dr. Patel a check in the amount of $300,000 on or around November 10, 2009 (which apparently was reversed in December), and if that check were paid, Dr. Patel stood to receive $90,000 more than he invested into the Hotel. Dr. Patel disputes certain of these allegations.

(8) **Carbon Cayman alleges that the Original Disclosure Statement omits reference to material defaults under the Loan Documents**. Carbon Cayman alleges that the Original Disclosure Statement downplays the severity of certain defaults that existed under the Lender's loan documents prior to the Petition Date, including alleged flagrant and repeated violations of the cash management system established under the Loan Documents. Since July 2009, the Debtor's bank statements show that in excess of $3,400,000 was deposited directly into

25

the Hotel's operating accounts, in violation of the cash management system established under the Loan Documents. Carbon Cayman alleges that by circumventing the lockbox arrangement, the Debtor distributed Hotel revenues for innumerable unbudgeted expenses, including paying exorbitant asset management fees, equity distributions to insiders of the Debtor, and personal expenses which bore no relationship to the operation and management of the Hotel. Carbon Cayman further alleges that while this allegedly occurred, other creditors, including trade vendors and lien claimants, remained unpaid. Carbon Cayman asserts that the Debtor's expenditure of funds outside of the lockbox arrangement should affect creditors' judgment in evaluating the Amended Plan because Dr. Patel proposes to eliminate the lockbox arrangement. These disclosures are being made at the request of Carbon Cayman. The Plan Proponents dispute many or all of these allegations. Additionally, the Debtor has implemented new procedures to ensure full compliance with respect to Hotel revenues and payments, and the Court appointed the Examiner also for this purpose and function.

(9) **Carbon Cayman alleges that the Original Disclosure Statement suggests that the Hotel is now operated by management located within the city.** Prism Hotel Resorts ("Prism") is headquartered in Dallas Texas. Prism has been managing the Hotel since the end of August 2010. All employees on staff at the Hotel are Prism employees. Prism senior corporate management visits the Hotel several times per month. Prism ranks as one of the top hotel management companies in America. Prism manages hotels under various franchise agreements ("flags") including Hilton, Doubletree, Marriott, Radisson, Sheraton, Holiday Inn, Crowne Plaza and Wyndham. More information about Prism is available at www.prismhotels.com.

PT1 498847v3 12/28/10

(10)    **Carbon Cayman Alleges that the Original Disclosure Statement inaccurately asserts that Prism was "engaged by Blackrock to consult on this loan for a period over a year before the foreclosure was commenced."**    Carbon Cayman alleges that the testimony of David Martin, a Prism employee, shows this statement's inaccuracy. Carbon Cayman asserts that it did not engage Prism. Instead, Prism was asked as a courtesy to visit the property in August 2010 and it was not paid for its services.    The Plan Proponents contend that this is inaccurate and would refer parties to the factual allegations of the Equitable Subordination Complaint.

(11)    **Carbon Cayman Alleges that the Hotel failed its inspection for substantial and not "technical" reasons.**    Carbon Cayman alleges that the Original Disclosure Statement failed to describe the appropriate context under which Hilton terminated the franchise. They claim that the August 31, 2010 quality assurance inspection failure followed similar failures in April and July, 2010 (in July, they allege that Hotel scored only 45.95 out of 100). Accordingly, they claim the August 31, 2010 assessment represented the Debtor's third failure in six months.  The Plan Proponents dispute Carbon Cayman's view of the facts and would refer parties to the factual allegations as set forth in the Equitable Subordination Complaint.

(12)    **Carbon Cayman Alleges that the Related/Patel deal died because Bisaria refused to walk away from the project.**    Carbon Cayman disputes Dr. Patel's testimony that his proposed partnership fell through because Related did not want to share profits, liabilities, and ownership on a pro-rata basis.

PT1 498847v3 12/28/10

### E. Carbon Cayman Asserted That The Original Disclosure Statement Failed To Inform Creditors Of Material Risks To The Payment Of Their Claims

There are, in fact, many contingencies that could affect the payment stream contemplated under the Amended Plan. These contingencies include: (1) likelihood of complete success in resolving Disputed Unsecured Claims; (2) the likelihood that the Debtor will miss its Financial Projections; and (3) the maturity of the Class 1 Claim. The "Risk Factors" Section of this Amended Disclosure Statement discusses these and other factors. However, in general terms, the above factors could increase the amounts and the period of time required to make payments under the Amended Plan. Creditors will continue to receive interest at the prime rate during any such extended period, but the Letters of Credit only secure the first 3 years of the Amended Plan payments, so these factors could reduce the percentage of the creditors' payments that are secured by the Letters of Credit. Under the Plan, Dr. Patel will receive no distribution until all Allowed Claims have been paid in full, regardless of the period of time required to pay those Allowed Claims. There can be no assurance that even if the Reorganized Debtor achieves the financial performance set forth in the Projections, that the Amended Plan will achieve full payment of all Allowed Claims within 36 months from the Effective Date.

#### (1) Tax Consequences Of The Postpetition Equity Transfer

Carbon Cayman asserts that the transfer of the equity interest evidenced by the September 21, 2010 Membership Interest Purchase Agreement which transfers to Pittsburgh Grand 100% of the equity interests in Debtor (the "Postpetition Transfer Agreement") is voidable and has certain tax ramifications. The Plan Proponents dispute these allegations. Carbon Cayman asserts that the Postpetition Transfer Agreement caused a complete change in control of the Debtor for which there may be substantial tax consequence. Dr. Patel's counsel

28

conducted a telephonic discussion with the Office of Chief Counsel of the Pennsylvania Department of Revenue and discussed that under the circumstances of this case, the post-petition transfer did not trigger a taxable event.

## IV.   OVERVIEW OF THE PLAN

The Amended Plan of Reorganization  generally will allow Dr. Patel, as the owner of all the membership interests in the Debtor, to retain and continue to operate the Hotel after Amended Plan confirmation.  The Amended Plan provides for the payment over time of the full amount of all creditors' Allowed Claims[6], which is discussed in more detail throughout this Disclosure Statement.  The Amended Plan also contemplates that the Reorganized Debtor will perform under their financial obligations with Carbon Cayman.  The First Meeting of Creditors Notice issued on September 30, 2010 set a Bar Date for all creditors to file their Proofs of Claim documents by February 1, 2011 for all Creditors and March 7, 2011 for all Governmental Units.

## A.   ASSETS AND LIABILITIES

The Hotel forms the Debtor's principal asset.  As stated by the Bankruptcy Court in its *Memorandum Opinion* issued on November 23, 2010, the "record reflects that the [Hotel] is worth approximately $54 million" and the "Lender's own internal documents suggest that the hotel is worth $56 million."  Cushman & Wakefield, Inc. performed an appraisal of the Hotel and their September 27, 2010 report values the Hotel as $54 million as of September 7, 2010. The report also calculated the Hotel's prospective value upon assumption of the Wyndham Brand as $58 million  and the Hotel's prospective market value upon the completion of all expansion and renovations as $66 million.

---

[6]     As payments will be made over time, with interest, which will result in the payment of 100% of creditors' claims, the present value of said payments may be less than 100% if the payment stream is discounted to present value at a rate greater that the prime rate..  This will be discussed in more detail in this Disclosure Statement.

**B. SUMMARY OF PLAN'S TREATMENT OF CLAIMS AND INTERESTS**

The Amended Plan provides for the satisfaction or other treatment of Allowed Claims against, and Interests in the Debtor, as summarized below. Please note that the following summarizes only certain provisions of the Amended Plan, and the complete version of the Amended Plan is attached as Exhibit A hereto and enclosed with this Disclosure Statement, among other documents. You are urged to review the entire Amended Plan. To the extent that the Plan Terms vary from this Disclosure Statement, the Plan shall control.

**1. General Discussion Regarding Treatment of Claims and Certain Risk Factors**

There are risks associated with the Amended Plan and the payment to creditors it provides. With the addition of the Wyndham flag, the Reorganized Debtor projects that operations will stabilize and grow over the next three years. The payment schedules, however, presume the accuracy of the Debtor's forecasts of income, expenses and cash flow, and even minor variances in the assumptions contained in the Debtor's Financial Projections could substantially change the resulting payments and timing of payments. The Amended Plan provides that ultimately creditors will receive 100% of their Allowed Claim, plus interest; however, the Amended Plan's Letters of Credit will expire on the third anniversary of the Effective Date, whether or not all creditors have received such full payment by that time. After that point, Hotel revenues will be the only source of payment of Allowed Claims.

**2. The Letters of Credit.**

The Letters of Credit will be issued by an FDIC insured institution such as Wachovia,

BNY/Mellon or Wells Fargo.[7]  The Letters of Credit will be issued in favor of BlackRock and the Creditors Trust, as applicable.  Those entities will have the ability to draw on the Letters of Credit as set forth in the Plan.   The Letters of Credit offer substantial amelioration of the risks relating to payments during the first three years under the Amended Plan.  Upon the Effective Date of the Amended Plan, the Plan Proponents will post at least $2.05 million in Letters of Credit, consisting of $300,000 for payment of Lender's interest after exhaustion of the Interest Reserve, and $1.75 million as 85% of $2.05 million in the Hotel's projected cash flow for the first year of the Amended Plan term.  Prior to the first anniversary of the Effective Date, the Plan Proponents (supported by the personal guaranty of Dr. Patel solely as to of the procurement and placement of the Letters of Credit) will replenish (as needed because of draws in the first year) and increase the Letters of Credit to $3.3 million, consisting of $3 million naming the Creditor Trust as beneficiary, for the benefit of Allowed Claims in Classes 3 and 4 of this Amended Plan (which equals 85% of projected cash flow for the second year of the term of the Amended Plan after deducting the $800,000 payments to Carbon Cayman ($3.5 million)), and $300,000 for Carbon Cayman's interest payments (to secure that these payments will be made even in the few months in which the Hotel projects negative cash flow).  Prior to the second anniversary of the Effective Date, the Plan Proponents (supported by the personal guaranty of Dr. Patel solely as to of the procurement and placement of the Letters of Credit) will replenish (as needed because of draws in the second year) and increase the Letters of Credit to $4.2 million, consisting of $3.9

---

[7]    The Plan Proponents are not disclosing the Letters of Credit issuing bank at this time, in part, due to concern that BlackRock could pressure that bank not to issue such Letters of Credit.  The form of the Letters of Credit will be posted to the Plan Website within 10 days prior to the Confirmation Hearing and the delivery of the Letters of Credit to BlackRock and The Creditors Trust, respectively, will be a condition precedent to proceeding with Confirmation.  The Plan Proponents have provided counsel for the Committee information regarding a bank account that has available funds adequate to procure the first year Letters of Credit.

PT1 498847v3 12/28/10

million naming the Creditor Trust as beneficiary, for the benefit of Allowed Claims in Classes 3 and 4 of this Amended Plan [which equals 85% of projected cash flow for the second year of the term of the Amended Plan after deducting the $800,000 payments to Carbon Cayman ($4.55 million)], and $300,000 for Carbon Cayman's interest payments (to secure that these payments will be made even in the few months in which the Hotel projects negative cash flow).  However, the aggregate amount of the Letters of Credit so posted (including Letters of Credit posted after the Effective Date to replenish because of previous draws) will be $8 million.  For the avoidance of doubt, the maximum amount that may be drawn under Letters of Credit posted at any time during the term of this Amended Plan shall be $8 million, no additional Letters of Credit will be posted after the second anniversary of the Effective Date and all Letters of Credit will expire by the third anniversary of the Effective Date.

The Lender will receive the Letters of Credit allocated to it, and may draw on the due date for any scheduled $66,666.67 monthly interest payment under the mortgage Loan (after first exhausting the Interest Reserve), to keep the Loan in payment good standing at all times through the third anniversary of the Effective Date.  The Trustee for the Creditor Trust shall be authorized and directed to draw on the other Letters of Credit to the extent of the difference, if positive, between the 85% of the Hotel's projected net positive cash flow for any calendar quarter (reduced by cash flow allocated and payments made to Carbon Cayman under its Class 1 Claim) during the first three years of the Amended Plan's term, and the Hotel's actual net positive cash flow distributed to creditors in that calendar quarter  For example, assume that the Hotel's actual cash flow in the first quarter of the second year of the Amended Plan term (January-March, 2012) were ($300,000) (a $300,000 cash flow shortfall, typical of the winter slow season, and better than the $425,00 loss in the Projected Cash Flow), and $1,000,000 in the

32

second quarter of 2012 (down from the $1.3 million in the Projected Cash Flow). For the first quarter, both the projections and the actual results reflect a loss, so no Letters of Credit draws or Amended Plan distributions will be made. For the second quarter, Amended Plan payments would commence after the $300,000 first quarter deficit was recovered, so $500,000 of Cash Flow would be available for distribution under the Amended Plan (to Classes below Class 1). An additional $180,000 would drawn under the Letter of Credit for that quarter, because of the shortfall from the projected operating income (i.e, Classes below Class 1 should have expected the $800,000 of Projected Cash Flow would be available after the first quarter's $300,000 loss is repaid and Class 1 receives the first $200,000; 85% of $800,000 is $680,000 or $180,000 more than the $500,000 of actual Cash Flow available to them). The Hotel Cash Flow after recovering the first quarter loss would be allocated first $200,000 for the Carbon Cayman Class 1 Claim, then to pay the installments due for the first and second quarters of 2012 in respect of Class 2 Allowed Claims (and any remaining Disputed Claim Reserve for Class 2). The remaining Cash Flow, augmented by the $180,000 draws on the Letters of Credit, would be used to pay the installments due for the first and second quarters of 2012 in respect of Allowed Class 3 Claims (and any remaining Disputed Claim Reserve for Class 3), with the balance being distributed to pay Allowed Class 4 Claims (and the Disputed Claim Reserve for Class 4 Claims).

### 3.  Unclassified Claims

Subject to the allowance procedures and deadlines provided herein or as approved by the Court, on the Effective Date or as soon thereafter as is practicable, the holder of each Allowed Administrative Expense Claim shall receive on account of such Allowed Administrative Expense Claim and in full satisfaction, settlement, release and discharge of and in exchange for such Allowed Administrative Expense Claim, (a) Cash equal to the unpaid portion of such Allowed

33

Administrative Expense Claim or (b) such other treatment as to which the Debtor and the holder of such Allowed Administrative Expense Claim have agreed upon in writing. However, Allowed Administrative Expense Claims with respect to liabilities incurred by the Debtor in the ordinary course of business during the Chapter 11 Case shall be paid in the ordinary course of business in accordance with the terms and conditions of any agreement or course of dealing relating thereto.

The Debtor will pay the United States Trustee the appropriate sum required pursuant to 28 U.S.C. § 1930(a)(6) within ten days from the entry of an order confirming the Amended Plan for pre-confirmation periods and simultaneously provide to the United States Trustee an appropriate affidavit indicating the cash disbursements for the relevant period. In addition, the Debtor will pay the United States Trustee the appropriate sum required pursuant to 28 U.S.C. § 1930(a)(6) for post-confirmation periods within the time period set forth in 28 U.S.C. § 1930(a)(6), based upon post-confirmation disbursements made by the Debtor, until the earlier of the closing of these cases by the issuance of a final decree by the Bankruptcy Court, or upon the entry of an order by the Bankruptcy Court dismissing the Chapter 11 Case or converting the case to another chapter under the Bankruptcy Code, and the Debtor will provide to the United States Trustee upon the payment of each post-confirmation payment an appropriate affidavit indicating all the cash disbursements for the relevant period.

Each Professional in the Chapter 11 Case will file with the Bankruptcy Court its final fee application seeking final approval of all fees and expenses from the Petition Date through the Confirmation Date. As of the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date will terminate.

34

With respect to each Allowed Priority Tax Claim, at the sole option of the Debtor, the holder of an Allowed Priority Tax Claim shall be entitled to receive on account of such Allowed Priority Tax Claim, in full satisfaction, settlement, release and discharge of and in exchange for such Allowed Priority Tax Claim, (a) payment in full in Cash on the Effective Date (b) payment over 5 years from the date of assessment as allowed under the Bankruptcy Code; or (c) such other treatment agreed to by the holder of such Allowed Priority Tax Claim and the Debtor.

### 4.    Administrative Expense Claims

All claims entitled to administrative priority status under 11 U.S.C. Section 503(a)(2) shall be paid in full on the Effective Date of the Amended Plan, from capital contributed by the Plan Proponents. These claims consist primarily of professional fees incurred by the Debtor during the course of the Chapter 11 Case. It is estimated that these fees will be as follows:

| | |
|---|---|
| Debtor's Counsel | $705,000 |
| Committee Counsel | $342,000 |
| Examiner | $130,000 |
| Total | $1,177,000[8] |

This Class may also include the repayment of the DIP Loan estimated to be approximately $3.0 Million.

**Class 1** consists solely of Carbon Capital II Real Estate CDO 2005-1, Ltd., and BlackRock Financial Management, Inc., as sub-special servicer to Carbon Capital II Real Estate CDO 2005-1, Ltd.'s special servicer, Midland Loan Services, Inc. These entities have filed a Proof of Claim (Claim No. 3-2) amending an initial Claim, asserting a secured claim in the

---

[8]    These are estimates based upon the updated budget prepared with input from the Examiner and the Committee. These anticipate emergence from Chapter 11 in February 2011.

amount of $49,666,666.67 in principal plus interest, fees, costs, expenses and charges. As set forth in this Amended Disclosure Statement, Carbon Cayman has also provided certain DIP Financing which supports a Claim distinct from the Pre-Petition Claim, with said amount of DIP Financing to be paid on the Effective Date (this amount is estimated to be approximately $3.0 Million). In addition, Carbon Cayman has indicated that it will seek payment on the Effective Date of the Amended Plan in respect of (a) alleged default interest under its $49.6 million pre-petition loan, and (b) legal and other fees and expenses. Carbon Cayman has not asserted any particular amount for these elements of its claim, but the Debtor anticipates that Carbon Cayman will allege substantial claims for these items, running to millions of dollars. The Debtor expects to dispute Carbon Cayman's claim that these amounts should be paid in full upon confirmation of the Amended Plan, and as to the validity and amount of these claims, in whole or in substantial part. Please refer to the "Equitable Subordination Complaint" section of this Disclosure Statement for further information regarding pending disputes with Carbon Cayman.

Subject to the final resolution of the Equitable Subordination Complaint, the Reorganized Debtor will pay BlackRock's secured claim when due in accordance with its monetary terms, and with modifications as set forth on Exhibit A and summarized below

### SUMMARY OF BLACKROCK LOAN AGREEMENT REVISIONS

1.  Upon the occurrence of any default under the Loan Documents that can be cured by the payment of money, Debtor shall have a period of ten (10) days after notice in which to cure the same. Upon the occurrence of any default under the Loan Documents that cannot be cured by the payment of money, Debtor shall have a period of thirty (30) days after notice in which to cure the same.

2.  The Exit Fee shall be capped at $2.75 Million and the Debtor shall not be penalized upon an Event of Default by an obligation to pay an Exit Fee (above this amount) or similar charge.

36

3.  Upon the Effective Date of the Amended Plan, the Loan will be in good standing, free and clear of any defaults or Events of Default, including without limitation with respect to the termination of the Hilton franchise, the commencement of the Wyndham franchise, Prism as the Manager, and the equity ownership of the Debtor.

4.  Debtor shall, at the Effective Date, post a completion bond to insure that the Expansion Project will be timely completed, and Debtor's member, Pittsburgh Grand LLC, shall commit to pay the cost of completing such construction that is not funded from the Construction Reserve. Therefore, at the Effective Date, (a) the Cash Sweep shall terminate and the Lender shall release the Excess Cash Flow Reserve to Debtor at the Effective Date, (b) the Lender shall release the Construction Reserve to fund the first costs of completing the Expansion Project, (c) the Lender shall retain the Interest Reserve and use it to fund the first monthly payments coming due on the Loan after the Effective Date.

5.  These amendments shall not affect the Debtor's right to extend the maturity of the Loan in accordance with the terms of the Loan Documents.

6.  The Lender shall apply insurance and condemnation proceeds for damage or taking less than a total loss to the repair or restoration of the Hotel.

7.  Permitted Encumbrances shall include purchase money liens and leases used to acquire equipment and personal property for the Hotel, provided that the same only secure the assets acquired thereby and an amount not exceeding the acquisition price therefor.

Carbon Cayman will retain its liens on its collateral. The Reorganized Debtor will make monthly payments to Carbon Cayman of approximately $66,666.00 out of the Keybank Interest Reserve Account (approximately $557,000). When the Interest Reserve Account is depleted, Carbon Cayman will be paid monthly from the Hotel's cash proceeds, and will be the beneficiary of $300,000 letters of credit during the first 3 years of the Amended Plan to secure these interest payments. See "Letters of Credit", herein. As reflected in the projections attached as **Exhibit B** the projected cash flows of the Hotel as a Wyndham Grand are expected to be approximately $2 million in 2011, $4.2 million in 2012, and $5.4 million in 2013.

PT1 498847v3 12/28/10

If this claim is Allowed and not subject to subordination, upon maturity this claim shall be paid in full. If required, at the Confirmation Hearing, the Debtor will provide evidence and testimony regarding the ability to obtaining financing to pay the matured loan, based, *inter alia,* upon the value of the property.

As discussed in greater detail in the Amended Plan, the Reorganized Debtor will have several options that all treat Carbon Cayman's Allowed Claim fairly and equitably upon the loan's maturity date. The Reorganized Debtor will have the option to extend the length of payments for two years after the loan's maturity date in 2015. This right currently exists under the existing loan documents. The Reorganized Debtor may also pay the loan's balloon payment when the loan matures, through a payment or refinance. Lastly, the projections for the Hotel's cash flow, especially with it branded as a Wyndham Grand, more than support the Reorganized Debtor's ability to refinance Carbon Cayman's loan upon maturity and allow them to exit in the same manner provided by the pre-petition loan documents. To the extent that the aforementioned treatment in any way impairs Carbon Cayman under section 1129, the Amended Plan is still confirmable because it (a) does not discriminate unfairly and (b) provides fair and equitable treatment to Carbon Cayman. Under the terms of the Final DIP Financing Order, the Debtor will be obligated to repay the DIP Loan in full, plus interest. This amount may be $3.0 Million. Additionally, as set forth above, Carbon Cayman has reserved the right to seek payment on the Effective Date of attorneys' fees and default interest on the entire Loan. The Plan Proponents are unaware of the amount of attorneys' fees or default interest, but expect Carbon Cayman's claims will be very substantial, and that the Plan Proponents will contest these claims, pursuant to the Equitable Subordination Complaint and otherwise. If the Court rules in favor of Carbon Cayman on these issues, specifically on the default interest rate and attorneys'

38

fees, they may have a material impact on the payments due at Confirmation and may make the Plan not feasible. The Plan Proponents reserve the right to withdraw this Disclosure Statement and the Amended Plan.

Class 2 consists of all the Secured Claims, as listed below:

## SECURED CLAIMS - SCHEDULE D CLAIMS

| Creditor | Total Amount Owed | Arrearages | Type of Collateral Priority of Lien (1, 2, 3) | Disputed (D) Liquidated (L) Unliquidated (U) | Will Liens Be Retained Under the Amended Plan? (Y) or (N) |
|---|---|---|---|---|---|
| Central Pension Fund of Int. UOE | $114,293.00 | | Judgment lien on real estate | | Y |
| Comm Steel | $216,333.00 | | Judgment lien on real estate | D | Y |
| Commonwealth of PA – Department of Labor | $34,724.28 | | Judgment lien on real estate | | Y |
| Commonwealth of Pennsylvania – Department of Revenue | $14,716.47 | | Statutory Lien for Sales Tax (POC #48) | | Y |
| Commonwealth of Pennsylvania – Unemployment Compensation Tax | $35,253.69 | | | D | Y |
| Pittsburgh Building Owners Fund | $93,059.08 | | Judgment lien on real estate | | Y |
| PWSA | $57,546.49 | | Statutory water lien | | Y |
| Rush Air | $202,197.70 | | UCC on Personal Property | D | Y |
| SYSCO FOODS OF PITTSBURGH | $49,164 | | Judgment Lien | D | Y |
| US Foodservice | $97,942 | | Judgment lien on real estate (POC #11) | D | Y |
| PJ Dick Incorporated | $382,606 | | Mechanics Lien | D | Y |

39

| | | | | |
|---|---|---|---|---|
| Pittsburgh Building Owners Fund | $93,059.08 | | Judgment Lien | | |

These claims aggregate $1,390,892. However, it is anticipated that this total figure will be reduced through the claims objection process or negotiation. These creditors will be paid the full amount of their Allowed Claim in quarterly installments (4 payments per year) over a period of 36 months following the Effective Date (12 payments in total). The twelve payments will also be paid with interest from the Effective Date at the Prime Rate from the Hotel's Cash Flow, and secured by the retention of their existing liens encumbering the Hotel.

These claims are subject to review and objection. The Plan Proponents expect that these claims may be substantially reduced through the objection to claims process or negotiation. The creditors will retain their liens in full. Additionally, the quarterly payments to the claimants within Class 2 are not contingent upon payments being first made to Class 1.

**Class 3** consists of creditors asserting Unsecured Priority Claims, as listed below:

### *PRIORITY CLAIMS - SCHEDULE E CLAIMS*

| Creditor | Total Amount Alleged Owed |
|---|---|
| Carpenters Contribution Trust Account | $7,655.00 |
| Central Pension Fund of Intl UOE | $143,782.10 |
| HEREIU | $565,240.42 |
| Operating Engineers Local 95 | $1,104.82 |
| Opg Eng Local 95 Training Fund | $229.34 |
| Painters Dist 57 Local | $102,360.96 (Disputed) |

40

| Creditor | Total Amount Alleged Owed |
|---|---|
| Union 6 | |
| Painters Dist 57 Local Union 6 | $3,230.37 |
| Pittsburgh Building Owners Welfare | $51,281 |
| Plumbers Local 27 Combined Funds | $2,975.06 |
| Unite-HERE National Retirement | $184,046.95 |
| ACHD Air Pollution Control Fund | $375.00 |
| Allegheny County Liquor Tax | $2,848.02 |
| Allegheny County Occupancy Tax | $118,893.21 |
| Internal Revenue Service | $1,483.88 |
| PA Joint Board United | $24,914.58 |
| Pa Department of Revenue | $125,713.83 |
| USW Local 12-591 | $451.44 |
| City OF Pittsburgh, Dept of Finance | $3469.21 |
| Commonwealth of PA | $150,290 (Real amount $43,725 - see page 17 of Amended Schedules) |
| IRS | $3,496.28 (POC#32) |
| Pittsburgh Water & Sewer Authority | $57,476.03 |

These claims aggregate $1,551,310. However, it is anticipated that this total figure will be reduced through the claims objection process or negotiation These creditors will be paid the full amount of their Allowed Claim in quarterly installments (4 payments per year) over a period of 36 months following the Effective Date (12 payments in total). The twelve payments shall be

41

paid with interest from the Effective Date at the Prime Rate from the Hotel's Cash Flow, and secured in part by the Letters of Credit.

Class 4 consists of General Unsecured Claims. Based upon the Debtor's Amended Schedules the total amount of claims as listed is $14,604,230. However, this includes Dr. Patel's claim at $3.9 million and several significant claims which are subject to dispute. The primary claims subject to dispute are as follows:

The Debtor lists five (5) Disputed Unsecured Claims that aggregate approximately $7,022,375 and constitute approximately 70% of the filed and scheduled General Unsecured Class 4 Claims (other than Dr. Patel's claims, which the Plan will voluntarily subordinate upon its confirmation). These Disputed Unsecured Claims belong to Hilton in the amount $4,301,018 (the "Hilton Franchise Termination Fee"), Hilton in the amount of $484,124.19 (the Hilton Unpaid Royalty Claim), P.J. Dick Corporation in the amount of $1,264,466 (the "P.J. Dick Claim"), Rush Air in the amount of $267,931, and Crescent Management in the amount of $172,836. Proof of Claim Numbers 25 and 26 for C & M Installations ($216,000) and Contract Purchasing and Design ($316,000) are also disputed since all or part of these claims may be for goods and services provided to other Atul Bisaria owned hotels. The Debtor disputes the Hilton Franchise Termination Fee and the Hilton Unpaid Royalty Claim for several reasons, including certain of the allegations of the Equitable Subordination Complaint and the actions of Hilton and Crescent set forth in Section III,A, discussed above, which relate to Hilton. The Debtor disputes the P.J. Dick claim, which arose from performance of the construction at the Hotel, because of manifold and manifest defects, overcharges and failures of performance by P.J. Dick in connection with the construction. Additionally, the Debtor will assert claims against PJ Dick for, among other things, gross negligence, willful misconduct, deficient work. The damages include,

42

inter alia, increased costs of construction, materials, and professional fees to correct deficiencies, increased costs due to carry.

The Debtor disputes the Rush Air claim and continues to investigate this claim and quality of the climate control equipment and services provided by Rush Air. The Debtor disputes the Crescent claim because of their many breaches and failures to perform in connection with their management of the Hotel, as well as their improper activities regarding the "surprise" Hilton inspection and secret communications with Carbon Cayman.

Upon confirmation of the Amended Plan, Dr. Patel's claim of almost $4 million will be subordinated to all other creditors under the Amended Plan (except the equitably subordinated claim of Carbon Cayman, if applicable). The Amended Plan will, as required by the Bankruptcy Code, provide for the other disputed claims in Classes 2, 3 and 4 through the mechanism of the Disputed Claims Reserve. The Debtor will fully fund the Disputed Claims Reserve with a pro rata share of all payments otherwise distributable in respect of Allowed Claims in Classes 2, 3 and 4 of the Amended Plan. This Disputed Claim Reserve will bear interest at the same rate as which is being paid to the Class of Claims to which the Disputed Claims Reserve relates.. For instance, if the Allowed Claims in Class 2 were $1000 and the Disputed Claims in Class 2 were $500, and $150 were available for distribution under the Amended Plan to Class 2, then $100 would be distributed to the holders of Allowed Claims in Class 2 and $50 would be funded into the Disputed Claim Reserve for Class 2. If that $500 Disputed Class 2 Claim were then Allowed as a $250 Allowed Class 2 Claim, then the Disputed Claim Reserve for Class 2 would be distributed $25 to such $250 Allowed Class 2 Claim, and the remaining $25 to the other Allowed Class 2 Claims. Because the initial Disputed Claim Reserve for Class 4 Claims is expected to be much higher than the initial Allowed Class 4 Claims amount, the Disputed Claim Reserve for

43

Class 4 Claims will result in the deferral of payment of a substantial portion of the amounts otherwise distributable to Class 4 claims until such Disputed Class 4 Claims are resolved.

The unsecured, nonpriority creditors in Class 4 will receive the full amount of their Allowed Claims in quarterly installments (4 payments per year) until all Allowed Claims are paid in full. Since the total number of Allowed Claims within Class 4 will not be determined until the expiration of the claims bar date (Feb 1, 2011), the exact amount of time necessary to fully pay the claimants within this class is indeterminable at this time. The quarterly payments will be paid with interest from the Effective Date of the Amended Plan at the Prime Rate.

See the discussion of "Letters of Credit", above.

Class 5 - Subordinated Claims - Class 5 includes the Claims of Dr. Kiran Patel and entities controlled or owned by Dr. Kiran Patel in the approximate amount of $3.9 Million. Under the terms of this Plan only, the holder of Class 5 Claims has agreed to subordinate their Claims and not accept any payment while any amounts remain unpaid to Allowed Claims in Classes 2, 3 and 4.

Class 6 Equity Holders of Equity shall retain their interests under the Amended Plan

## C.  **MEANS OF IMPLEMENTING PLAN**

The Amended Plan contemplates certain payments at the Effective Date and thereafter for what is projected to be at least a 3 year term of the Amended Plan. On the Effective Date, the Plan Proponents will fund capital to the Reorganized Debtor consisting of (a) full payment of the Carbon Cayman DIP loan, and (b) administrative claims required to be paid on the Effective Date, projected at approximately $1.2 million. The Plan Proponents will also deliver a completion bond relating to the construction at the Hotel (assuring the completion of construction after the Carbon Cayman Construction Reserve is funded), and the initial Letters of

PT1 498847v3 12/28/10

Credit contemplated by the Amended Plan. These substantial capital commitments and their performance by the Plan Proponents provide and will provide tangible assurance to all creditors regarding the viability and feasibility of the Amended Plan.

With respect to the deferred Amended Plan payments, now that the Bankruptcy Court has approved the execution of a franchise agreement with Wyndham to flag the Hotel as a Wyndham Grand, the Debtor's ability to fund the claims payments from the Hotel's cash flow is further assured. The flag of a hotel, especially a hotel that caters to conferences and other organized events, has a direct and significant effect on its cash stream. Moreover, the Debtor obtained post-petition financing in the form of a DIP loan from Carbon Cayman to support the Hotel's operational needs until confirmation of a plan. The financial projections for the Hotel's cash flow during the next three years, attached as **Exhibit B, and the Letters of Credit,** provide more than reasonable assurances that the Hotel will originate sufficient profits to pay all the Classes according to the Amended Plan's terms.

1.  **Post-Confirmation Operations of the Debtor**

The Reorganized Debtor plans to operate the Hotel immediately after the Effective Date of the Amended Plan under substantially the same arrangements as in effect immediately prior to the Effective Date. Prism will continue to manage the Hotel under the terms of its management agreement with the Debtor, and Frank Amedia will provide executive oversight of Prism and Hotel operations and provide construction expertise on behalf of the Reorganized Debtor. Mr. Amedia's salary will be consistent with his present salary of approximately $180,000 per year. Mr. Amedia will receive typical medical benefits, room at the Hotel when he is in Pittsburgh and reimbursement of expenses, but no other "perks". Dr. Patel will not receive any salary from the Reorganized Debtor.

45

## 2. Confirmation Standards

For a plan to be confirmed, the Bankruptcy Code requires, among other things, that the plan be proposed in good faith and comply with the other applicable provisions of chapter 11 of the Bankruptcy Code, including a requirement that at least one class of impaired claims accept the Amended Plan, and that confirmation of the plan is not likely to be followed by the need for further financial reorganization. The Bankruptcy Court will confirm a plan only if it finds that all of the requirements enumerated in section 1129 of the Bankruptcy Code have been met. The Proponent believes that the Amended Plan satisfies all of the requirements for Confirmation.

## 3. Best Interests Test

A requirement for confirmation of a plan is called the "best interests test". Notwithstanding acceptance of the plan by each impaired class, in order to confirm a plan, the bankruptcy court must determine that the plan is in the best interests of each holder of a claim or interest in any such impaired class. Accordingly, if an impaired class does not unanimously accept the plan, the best interests test requires the bankruptcy court to find that the plan provides to each member of such impaired class a recovery on account of the class member's claim or interest that has a value, as of the effective date, at least equal to the value of the distribution that each such class member would have received if the debtor's assets were liquidated under Chapter 7 of the Bankruptcy Code on such date.

To estimate what members of each impaired class of unsecured creditors and equity interest holders would receive if a debtor were liquidated under Chapter 7, the bankruptcy court first determines the aggregate dollar amount that would be generated from the assets if the Chapter 11 case was converted to a Chapter 7 case under the Bankruptcy Code and the

46

Confirmation Date and the assets were liquidated by a trustee in bankruptcy (the "Liquidation Value" of such Assets). The Liquidation Value would consist of the net proceeds from the disposition of the assets and would be augmented by any cash held by the debtor.

The Liquidation Value of the debtor's assets available to general creditors would be reduced by the costs and expenses of the liquidation, as well as other administrative expenses of the Chapter 7 case. The costs of liquidation under Chapter 7 would include the compensation of a trustee or trustees, as well as counsel and other professionals retained by the trustee, disposition expenses, all unpaid expenses incurred by the debtor during its chapter 11 proceeding (such as compensation for attorneys and accountants) that are allowed in a Chapter 7 proceeding, and litigation costs and claims against the debtor arising from its business operations during the pendency of the Chapter 11 case and Chapter 7 liquidation proceedings. These costs, expenses and claims would be paid in full out of the debtor's liquidation proceeds before the balance would be made available to pay general unsecured claims or to make any distribution in respect of equity interests.

Once the percentage recoveries in liquidation of secured claimants, priority claimants, general unsecured creditors and equity security holders are ascertained, the value of the distribution available out of the Liquidation Value is compared with the value of the property offered to each of the classes of claims and interests under the plan to determine whether the plan is in the best interests of each class. The Plan Proponents believe that the Amended Plan satisfies this best interests test because the Debtor's assets will be liquidated under the terms of the Amended Plan and the distributions under the Amended Plan will provide at least the same recovery to holders of Allowed Claims against and Allowed Interests in the Debtor on account of such Allowed Claims and Allowed Interests as would distributions by a chapter 7 trustee.

47

# V.    ALTERNATIVES TO THE PLAN

Although this Disclosure Statement is intended to provide information to assist a Claim or Interest holder in determining whether to vote for or against the Amended Plan, a summary of the alternatives to confirmation of the Amended Plan may be helpful.

If the Amended Plan is not confirmed, the following alternatives are available: (a) confirmation of another Chapter 11 plan or a competing Plan (if one were to be filed); (b) conversion of the Chapter 11 Case to one under Chapter 7 of the Bankruptcy Code; (c) dismissal of the Chapter 11 Case leaving Creditors and Interest holders to pursue available non-bankruptcy remedies; or (d) granting Carbon Cayman stay relief which would result in likely foreclosure of the Debtor's property and no recovery for creditors. These alternatives to the Amended Plan are very limited and not likely to benefit creditors. Although the Debtor could theoretically file a new plan or a competing plan would be filed, the most likely result if the Amended Plan is not confirmed is that the Chapter 11 Case will be converted to Chapter 7 of the Bankruptcy Code. The Debtor believes that conversion of this Chapter 11 Case to Chapter 7 case would result in (i) significant delay in distributions to all creditors who would have received a distribution under the Amended Plan and (ii) diminished recoveries for certain classes of creditors. If the Chapter 11 Case is dismissed, creditors would be free to pursue non-bankruptcy remedies in their attempts to satisfy claims against the Debtor and Carbon Cayman would likely foreclose and eliminate any recovery to other Creditors. Additionally, the recoveries from Avoidance Actions would not be available for distribution to Class 4 Creditors.

## A.    OTHER MATTERS

The Debtor gives the option to both evaluate, designate  and pursue all avoidance actions to the Official Committee of Unsecured Creditors. After consultation with the Committee, the

48

parties have agreed that a Creditors Trust will be established and the Avoidance Actions (as defined in the Amended Plan) will be transferred to the Creditors Trust. The Creditors Trust will be formed and administered, and any professionals it engages will be compensated, by utilizing the proceeds of Avoidance Actions, and the Debtor (and Reorganized Debtor) shall not be responsible therefor. The proceeds from the Avoidance Actions will be paid for the benefit of Class 4 creditors and shall be treated as accelerated payments to them under the Amended Plan. The Trust will be prepared and filed prior to the Confirmation hearing. The Creditors Trust, at the direction of the Committee, shall disclose the name of the Trustee and the mechanics for the pursuit of these claims.

**B.** **EXECUTORY CONTRACTS**

All Executory Contracts and unexpired leases of the Debtor, not expressly assumed prior to the confirmation date, or at the confirmation date, shall be deemed rejected. Within 10 days prior to the confirmation hearing, the Debtor will file a Plan Supplement clearly listing the contracts to be assumed and the proposed cure amounts. The name of the contract party and the amount of the proposed cure and opportunity to object to the proposed cure amount will be set forth to allow the contract counter-parties the requisite notice. The cure amounts for assumed executory contracts and unexpired leases will be negotiated or be paid on the Effective Date of the Amended Plan. The Plan Proponents have attached as Exhibit E Schedule G from the Debtor's Amended Schedules indentifying the Debtor's list of Executory Contracts and Unexpired Leases. The most important of these Executory Contracts are the five Collective Bargaining Agreements ("CBA") for the vast majority of the hotel employees. The Debtor has been and remains committed to: i) honoring all existing CBA's and, ii) negotiating in good faith new CBAs for those agreements that have expired or are soon to expire.

## C.    OBJECTIONS TO CLAIMS

Pursuant to the Amended Plan, Debtor may object to any scheduled claim or Proof of Claim filed against the Debtor.  Such an objection shall preclude the consideration of any claims as "allowed" for the purposes of timely distribution in accordance with the Amended Plan.  However, Payment on account of the Disputed Claims of the pro rata amount shall be set aside in the Disputed Claim Reserve, until such Claim is allowed or disallowed.  The Debtor anticipates filing objections to claims of various creditors pursuant to the procedures and time-frame established in the post-Confirmation Order.

## D.    PRESERVATION OF ACTIONS AND CAUSES OF ACTIONS AND AVOIDANCE ACTIONS

From and after the Effective Date, to the extent not otherwise adjudicated or settled prior to or as a part of the Amended Plan, all rights pursuant to Chapter 5 of the Bankruptcy Code; including all  preference claims pursuant to section 547 of the Bankruptcy Code; all fraudulent transfer claims pursuant to section 544 or 548 of the Bankruptcy Code; and all claims recoverable under section 550 of the Bankruptcy Code; are hereby preserved,  and will be assigned to a Creditors Trust for the benefit of the Class 4 creditors.   A Trustee shall be appointed under the Creditor Trust (selected by the Committee), pursuant to directions from the Committee, to oversee the pursuit and recovery of these claims.   A non-exhaustive schedule of potential claims known to the Debtor is attached as **Exhibit C**.  The failure to include a potential claim on this schedule is not a waiver of the right to pursue such claim.   Prior to the Confirmation Hearing, the Trust document shall be prepared and approved by the Committee and filed with the Court.

Additionally, there are alleged Avoidance Actions against current and former insiders of the Debtor (collectively, the "Insider Avoidance Actions")  The Insider Avoidance Actions may represent a significant source of recovery for the Debtor's estate.    While these claims are strongly denied by the Debtor and Dr. Patel, these claims may include the following:

(a)    Dr. Patel allegedly received payments of more than $2,600,000 from the Debtor's bank accounts within the one-year period preceding the Petition Date.

(b)    Additionally, Carbon Cayman asserts that several claims exist against Dr. Patel for his role in the Hotel management due to the actions of , Jai Lalwani, who Carbon Cayman contends was or is Dr. Patel's agent.

(c)    Jai Lalwani and/or Black Diamond allegedly received payments of more than $727,000 from the Debtor's bank accounts since November 2009.

(d)    Carbon Cayman alleges that they  have discovered approximately $800,000 in cash withdrawals that were made from the Debtor's bank accounts during the 14-month period preceding the bankruptcy. The recipient of these funds has yet to be determined, but the magnitude of the payments warrants further investigation.

(e)    Carbon Cayman alleges that under the direction of Jai Lalwani, the Debtor paid the personal American Express charges of various individuals, but none of these charges have been shown to be related to Hotel business.  The bank records show that in excess of $527,000 was paid to American Express between July 1, 2009 through the Petition Date, but there is no evidence that the Debtor received reasonably equivalent value. Indeed, in one month alone, approximately $76,000 was paid to American Express by the Debtor.   The Debtor has been advised that goods fro the Hotel were purchased with some of these funds.

51

(f)     Atul Bisaria, the former equity holder of the Debtor and his wife, Mihu Bisaria, allegedly received payments in excess of $186,000 from the Debtor since July 2009. These payments were made when the Debtor was unable to satisfy other operating expenses, including but not limited to, a payment of $50,000 just days before the Petition Date.

(g)     Vani Lalwani, the sister of Jai Lalwani, allegedly received more than $197,000 in payments from the Debtor.

(h)     The Debtor's bank records also indicate that Harris Mathis ($45,000), Geebin Flores ($28,500), and Ademola Shittu ($14,200), each received payments from the Hotel in 2010. Although Mr. Mathis previously served as chief operating officer for the Debtor, there is no evidence to suggest these individuals provided any goods or services to the Debtor in exchange for the payments they received.

Any recovery by from the Avoidance Actions would be treated as accelerated payments to the Class 4 Creditors.

### E.  CONDITIONS PRECEDENT TO EFFECTIVENESS OF THE PLAN

The Amended Plan shall not become effective and the Effective Date shall not occur unless and until:

(a)     Ten days shall have passed from the Confirmation Date;

(b)     The Bankruptcy Court shall have entered the Confirmation Order in form and substance satisfactory to each of the Plan Proponents authorizing and directing the Debtor to take all actions necessary or appropriate to enter into, implement, and consummate the contracts, instruments, releases, indentures and other agreements or documents created, amended, supplemented, modified, or adopted in connection with the Amended Plan;

(c)     The Bankruptcy Court shall have approved the information contained in the Amended Disclosure Statement as adequate pursuant to section 1125 of the Bankruptcy Code;

(d)     No stay of the Confirmation Order shall be in effect at the time the other conditions set forth in this Section are satisfied, or, if permitted, waived;

(e) All documents, instruments and agreements, in form and substance satisfactory to each of the Plan Proponents, provided for under this Amended Plan or necessary to implement this Amended Plan shall have been executed and delivered by the parties thereto, unless such execution or delivery has been waived by the parties benefited thereby;

(f) The Amended Plan has not been withdrawn by either of the Plan Proponents, which right each of the Plan Proponents fully reserves through the date of Confirmation;

(g) A ruling by the Court determining the amount, if any, that Carbon Cayman is entitled to receive in connection with the consummation of the Amended Plan, in respect of its claims for default interest and recovery of attorneys' fees, on the entire Loan; and

(h) The posting of the Letters of Credit.

## VI. U.S. FEDERAL INCOME TAX CONSIDERATIONS

A summary description of certain U.S. federal income tax consequences of the Amended Plan is provided below. This description is for informational purposes only and is subject to significant uncertainties. Only the principal consequences of the Amended Plan for the Debtor and for the holders of Claims and Interests who are entitled to vote to confirm or reject the Amended Plan are described below. No opinion of counsel has been sought or obtained with respect to any tax consequences of the Amended Plan, and no tax opinion is being given in this Disclosure Statement. No rulings or determinations of the Internal Revenue Service ("IRS") or any other tax authorities have been obtained or sought with respect to the Amended Plan, and the description below is not binding upon the IRS or such other authorities.

The following discussion of U.S. federal income tax consequences is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), regulations promulgated and proposed thereunder and judicial decisions and administrative rulings and pronouncements of the IRS as in effect on the date hereof. Legislative, judicial or administrative changes or interpretations enacted or promulgated in the future could alter or modify the analyses and

53

conclusions set forth below.  It cannot be predicted at this time whether any tax legislation will be enacted or, if enacted, whether any tax law changes contained therein would affect the tax consequences to holders.  Any such changes or interpretations may be retroactive and could significantly affect the U.S. federal income tax consequences discussed below.

**THIS DISCUSSION DOES NOT ADDRESS FOREIGN, STATE OR LOCAL TAX CONSEQUENCES OF THE AMENDED PLAN, NOR DOES IT PURPORT TO ADDRESS THE U.S. FEDERAL TAX CONSEQUENCES OF THE AMENDED PLAN TO SPECIAL CLASSES OF TAXPAYERS. FURTHERMORE, ESTATE AND GIFT TAX ISSUES ARE NOT ADDRESSED AND TAX CONSEQUENCES RELATING TO THE ALTERNATIVE MINIMUM TAX ARE GENERALLY NOT DISCUSSED HEREIN.**

**NO REPRESENTATIONS ARE MADE REGARDING THE PARTICULAR TAX CONSEQUENCES OF THE AMENDED PLAN TO ANY HOLDER OF A CLAIM OR INTEREST. EACH HOLDER OF A CLAIM OR INTEREST IS STRONGLY URGED TO CONSULT ITS OWN TAX ADVISOR REGARDING THE U.S. FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE TRANSACTIONS DESCRIBED HEREIN AND IN THE AMENDED PLAN.**

Holders of Claims should generally recognize gain (or loss) to the extent the amount realized under the Amended Plan (generally the amount of Cash received) in respect of their Claims exceeds (or is exceeded by) their respective tax bases in their Claims.  The tax treatment of holders of Claims and the character and amount of income, gain or loss recognized as a consequence of the Amended Plan and the distributions provided for by the Amended Plan will depend upon, among other things, (a) the nature and origin of the Claim, (b) the manner in which a holder acquired a Claim, (c) the length of time a Claim has been held, (d) whether the Claim was acquired at a discount, (e) whether the holder has taken a bad debt deduction in the current or prior years, (f) whether the holder has previously included in income accrued but unpaid interest with respect to a Claim, (g) the method of tax accounting of a holder; and (h) whether a Claim is an installment obligation for U.S. federal income tax purposes.  **Therefore, holders of Claims should consult their own tax advisors for information that may be relevant to their particular situations and circumstances and the particular tax consequence to such holders**

PT1 498847v3 12/28/10

**as a result thereof.**

The tax treatment of a holder of a Claim that receives distributions in different taxable years is uncertain. If such a holder treats the transaction as closed in the taxable year it first receives (or is deemed to have received) a distribution of Cash and/or other property, it should recognize gain or loss for such tax year in an amount equal to the cash and the value of other property actually (and deemed) received in such tax year (other than that received in respect of accrued interest) with respect to its Claim (other than any portion of the Claim that is attributable to accrued interest) plus the estimated value of future distributions (if any) less its tax basis in its Claim (except to the extent its Claim is for accrued interest). A holder should then subsequently recognize additional income or loss when additional property distributions are actually received in an amount equal to the Cash and/or value of such other property (other than that received in respect of accrued interest) less the holder's allocable tax basis in its Claim with respect to such subsequent distribution. A holder may have to treat a portion of any such subsequent distribution as imputed interest recognizable as ordinary income in accordance with the holder's method of tax accounting. If instead the open transaction doctrine applies as a result of the value of the Subsequent Distributions that a holder may receive not being ascertainable on the Effective Date, such holder should not recognize gain (except to the extent the value of the Cash and/or other property already received exceeds such holder's adjusted tax basis in its Claim (other than any Claim for accrued interest)) or loss with respect to its Claim until it receives the final distribution thereon (which may not be until the Final Distribution Date). It is the position of the IRS that the open transaction doctrine applies only in rare and extraordinary cases. The Debtor believes that the open transaction doctrine should not apply and that holders may be entitled to take the position that on the Effective Date no value should be assigned to the right to receive any

55

Subsequent Distributions. **Creditors are urged to consult their own tax advisors regarding the application of the open transaction doctrine and how it may apply to their particular situations, whether any gain recognition may be deferred under the installment method, whether any loss may be disallowed or deferred under the related party rules and the tax treatment of amounts that certain Creditors may be treated as paying to other Creditors.**

Holders of Allowed Claims will be treated as receiving a payment of interest (in addition to any imputed interest as discussed in the preceding paragraph) includible in income in accordance with the holder's method of accounting for tax purposes, to the extent that any Cash and/or other property received pursuant to the Amended Plan is attributable to accrued but unpaid interest, if any, on such Allowed Claims. The extent to which the receipt of Cash and/or other property should be attributable to accrued but unpaid interest is unclear. The Amended Plan provides, and the Debtor intends to take the position, that such Cash and/or other property distributed pursuant to the Amended Plan will first be allocable to the principal amount of an Allowed Claim and then, to the extent necessary, to any accrued but unpaid interest thereon. Each holder should consult its own tax advisor regarding the determination of the amount of consideration received under the Amended Plan that is attributable to interest (if any) and whether any such interest may be considered to be foreign source income. A holder generally will be entitled to recognize a loss to the extent any accrued interest was previously included in its gross income and is not paid in full.

**Holders of Disputed Claims are urged to consult their own tax advisors regarding the taxation of their Disputed Claims.**

Certain payments, including the payments of Claims and Interests pursuant to the Amended Plan, are generally subject to information reporting by the payor to the IRS.

Moreover, such reportable payments are subject to backup withholding under certain circumstances. Under the backup withholding rules, a holder of a Claim may be subject to backup withholding at the applicable tax rate with respect to distributions or payments made pursuant to the Amended Plan, unless the holder: (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates this fact or (b) provides a correct taxpayer identification number and certifies under penalty of perjury as to the correctness of its taxpayer identification number and certain other tax matters. Backup withholding is not an additional tax. Rather, the U.S. federal income tax liability of those subject to backup withholding will be reduced by the amount of tax withheld. If withholding results in an overpayment of U.S. federal income taxes, a holder may obtain a refund of any excess amounts withheld under the backup withholding rules by timely filing the appropriate claim for refund with the IRS.

**THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES OF THE PLAN ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S INDIVIDUAL CIRCUMSTANCES. ACCORDINGLY, HOLDERS ARE URGED TO CONSULT WITH THEIR OWN TAX ADVISORS ABOUT THE U.S. FEDERAL, STATE, LOCAL AND FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.**

**CIRCULAR 230 DISCLAIMER: The IRS now requires written advice (including electronic communications) regarding one or more Federal (i.e., United States) tax issues to meet certain standards. Those standards involve a detailed and careful analysis of the facts and applicable law which we expect would be time consuming and costly. We have not made and have not been asked to make that type of analysis in connection with any advice given in this e-mail. As a result, we are required to advise you that any Federal tax advice rendered in this e-mail is not intended or written to be used and cannot be used for the purpose of avoiding penalties that may be imposed by the IRS.**

## VII.  ANALYSIS OF THE PLAN VS. LIQUIDATION ANALYSIS

All payments as provided for the in the Debtor' Amended Plan shall be financed by Debtor's cash on hand and capital to be advanced by the Plan Proponents, including from the Letters of Credit. As with any Plan, an alternative would be a conversion of the Chapter 11 case

to a Chapter 7 case and subsequent liquidation of the Debtor by a duly appointed or elected trustee. In the event of a liquidation under Chapter 7, the following is likely to occur:

(a)     An additional tier of administrative expenses entitled to priority over general unsecured claims under § 507(a)(1) of the Bankruptcy Code would be incurred. Such administrative expenses would include Trustee's commissions and fees to the trustee's accountants, attorneys and other professionals likely to be retained by said trustee for the purposes of liquidating the assets of the Debtor.

(b)     Further claims would be asserted against the Debtor with respect to such matters as income and other taxes associated with the sale of the assets, and the inability of the Debtor to fulfill outstanding, contractual commitments and other related claims.

(c)     A liquidation analysis is attached as **Exhibit D.**

Predicated upon the foregoing, it is management's opinion that the liquidation value of the Debtor would be insufficient to pay all classes of creditors holding Allowed Claims other than secured creditors.

## VIII.   <u>RISK FACTORS</u>

### 1.     <u>Failure to Satisfy Vote Requirement</u>

The Plan Proponents are seeking to receive votes in number and representing Claims in amount sufficient to enable the Bankruptcy Court to confirm the Amended Plan. If the Amended Plan does not receive sufficient votes for Confirmation pursuant to section 1129(a) of the Bankruptcy Code, then the Plan Proponents may and specifically reserve the right to seek to employ the "cram down" procedures set forth in section 1129(b) of the Bankruptcy Code.

PT1 498847v3 12/28/10

## 2.    The Amended Plan May Not Be Accepted or Confirmed

While the Plan Proponents believe the Amended Plan is confirmable under the standards set forth in section 1129 of the Bankruptcy Code, there can be no guarantee that the Bankruptcy Court will find the Amended Plan to be confirmable. Additionally, the Amended Plan as drafted requires acceptance by at least one of the impaired Classes.

If the conditions precedent to the Effective Date, as discussed in detail in this Amended Disclosure Statement and in the Amended Plan, have not been satisfied or waived, the Confirmation Order may not be entered, either of the Plan Proponents may withdraw the Plan and/or the Bankruptcy Court may vacate the Confirmation Order. **THERE CAN BE NO ASSURANCE THAT ALL OF THE VARIOUS CONDITIONS TO EFFECTIVENESS OF THE AMENDED PLAN WILL BE TIMELY SATISFIED OR WAIVED.** In the event that the conditions to effectiveness have not been timely satisfied or waived, the Amended Plan would be deemed null and void and the Plan Proponents may propose or solicit votes on an alternative plan that may not be as favorable to parties in interest as the Plan.

## 3.    Allowed Claims May Exceed Estimates

The timing and amount of projected distributions set forth in the Amended Plan and described in this Amended Disclosure Statement are based upon the Plan Proponents' good faith estimates and the Projections attached hereto, including projections of the amount of Amended Plan expenses that will be incurred and total amount of Claims in each Class that will ultimately be allowed. The actual amount of Amended Plan expenses could be greater than expected for a variety of reasons, including greater than anticipated administrative and litigation costs

PT1 498847v3 12/28/10

associated with resolving disputed Claims. Additionally, the actual amount of Allowed Claims in any Class could be materially greater than anticipated (based on, among other things, success in disputing Claims), which will impact the timing and amount of distributions to be made to Holders of Claims.

4.   **Either of the Plan Proponents may withdraw the Amended Plan**.   Carbon Cayman has asserted that Debtor must pay in full at the Effective Date its claims for default interest and attorneys' fees for the entire Loan.  The Debtor disputes these claims, and that such claims, even if they were allowed, must be paid on the Effective Date.  The Bankruptcy Court's ruling on these and other matters in connection with the Amended Plan's confirmation will substantially affect the amount of capital required to consummate the Amended Plan. Each of the Plan Proponents retains the right to withdraw the Amended Plan.

4.   <u>**The Debtor May Not Be Able To Perform Per Its Financial Projections**</u>

The distributions under the Amended Plan depend upon the Debtor's cash flow, and the Letters of Credit.  These are the exclusive sources for all Amended Plan distributions. The Debtor's Projections regarding such cash flow are attached an as Exhibit to this Disclosure Statement.  Those projections reflect assumptions and estimates that the Debtor believes to be reasonable, but the Debtor's actual results will vary from those projected and the differences may be material or substantial.  For instance, the projected results assume certain levels of revenues based on occupancy and room rates, and certain levels of expenses.  The revenue projections could be affected by positive or negative general economic conditions (or those affecting the Wyndham Grand franchise network or the hospitality industry in the Hotel's region).  The expense projections could be affected by unexpected liabilities.  Distributions under the Amended Plan also depend in substantial part upon the results of the Debtor's contest of

60

Disputed Claims because until the Debtor prevails in such disputes, funding to Allowed Claims will be affected by funding into Disputed Claims Reserves. The Amended Plan provides that the Debtor will continue to make payments under the Amended Plan until all Allowed Claims are paid in full with interest. However, the outcome of these uncertainties regarding the Projections and the Disputed Claims may substantially affect the timing of such payments. To the extent that payments are due under the Amended Plan after the third anniversary of its Effective Date, such payments will no longer be secured or benefitted by the Letters of Credit.

6. **The Present Value of Amended Plan distributions to Creditors may be less than 100%.** The Amended Plan requires the Debtor to continue distributions in respect of Allowed Claims until they are paid in full, with interest at the Prime Rate. This entails that if Creditors discount Amended Plan distributions to present value using a discount rate equal to the Prime Rate, such distributions will generate a present value of 100% of their Allowed Claims. However, if holders of Allowed Claims use a discount rate less than the Prime Rate, then their present value from distributions would be greater than 100%, or if they use a discount rate higher than the Prime Rate, then their present value would be less than 100%. Although Dr. Patel will also personally guaranty that the Plan Proponents will procure the up to $5.95 million of additional Letters of Credit the Amended Plan requires after the first $2.05 million are posted on the Effective Date, the Letters of Credit only secure that distributions in respect of Allowed Claims will be made to the extent of 85% of projected distributable Hotel cash flow during the first three years of the Plan. If the Hotel never generates positive cash flow, Allowed Claims would receive distributions only from draws on the Letters of Credit, and could receive substantially less than 100% of their claims.

PT1 498847v3 12/28/10

## IX.    CONFIRMATION BY CRAM DOWN

The Plan Proponents reserve the right, in the event that impaired classes reject the Amended Plan, to seek confirmation of the Amended Plan if the Court finds that the Amended Plan does not discriminate unfairly and is fair and equitable with respect to each dissenting class.

The Plan Proponents believe that confirmation of the Amended Plan is preferable to all other alternatives, and therefore urges all voting Creditors to **ACCEPT** the Amended Plan by completing and returning their Ballots so that they will be actually **RECEIVED** on or before the Voting Deadline.

Respectfully submitted,

Dated: December 28, 2010

Shubh Hotels Pittsburgh, LLC,
by its Manager, Pittsburgh Grand
Manager, LLC

By:    */s/ Frank Amedia*
Name: Frank Amedia
Its:    Manager

and

Pittsburgh Grand LLC

By: */s/ Frank Amedia*
Name: Frank Amedia
Its:    Authorized Signatory

AND

Counsel to Debtor:

Rudov & Stein, P.C.
100 First Avenue, Suite 500
First & Market Building
Pittsburgh, PA 15222
Telephone:  (412) 281-7300
Facsimile:  (412) 281-7305

PT1 498847v3 12/28/10

By:      */s/ David K. Rudov* _____
         David K. Rudov, Esquire
         drudov@rudovstein.com
         Pa. ID No. 35579

         and

         Scott M. Hare, Esquire
         1806 Frick Building
         437 Grant Street
         Pittsburgh, PA  15219
         Telephone:  (412) 338-8632
         Facsimile:  (412) 338-6611

By:      */s/ Scott M. Hare* _____
         Scott M. Hare, Esquire
         scott@scottlawpgh.com
         Pa. ID No. 63818

         AND

         Counsel to Pittsburgh Grand Manager, LLC and
         Pittsburgh Grand LLC:

         Fox Rothschild LLP
         625 Liberty Avenue, 29th Floor
         Pittsburgh, PA 15222-3115
         Telephone:  (412) 391-1334
         Facsimile:  (412) 391-6984

By:      */s/ John R. Gotaskie, Jr.* _____
         John R. Gotaskie, Jr., Esquire
         jgotaskie@foxrothschild.com
         Pa. ID No. 81143

         and

         BERGER SINGERMAN, P.A.
         200 South Biscayne Blvd., Suite 1000
         Miami, FL 33131
         Telephone:  (305) 714-4383
         Facsimile:  (305) 714-4340
         James D. Gassenheimer, Esquire
         (admitted *pro hac vice*)

Daniel Lampert, Esquire
(not admitted in PA)
Brian G. Rich, Esquire
(admitted *pro hac vice*)

PT1 498847v3 12/28/10