**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| In re:<br><br>SHUBH HOTELS PITTSBURGH, LLC,<br><br>Debtor. | Case No. 10-26337 JAD<br><br>Chapter 11 |

**DISCLOSURE STATEMENT TO ACCOMPANY CHAPTER 11 PLAN PROPOSED BY CARBON CAPITAL II REAL ESTATE CDO 2005-1 LTD AND BLACKROCK FINANCIAL MANAGEMENT, INC.
DATED DECEMBER 29, 2010**

**REED SMITH LLP**
Robert P. Simons, Esq.
Amy M. Tonti, Esq.
Gregory L. Taddonio, Esq.
Jeanne S. Lofgren, Esq.
225 Fifth Avenue, Suite 1200
Pittsburgh, PA 15222
Phone:  (412) 288-3131
Fax:     (412) 288-3063
Email:  rsimons@reedsmith.com
Email:  gtaddonio@reedsmith.com
Email:  jlofgren@reedsmith.com

*Counsel to Carbon Capital II Real Estate CDO
2005-1 Ltd And Blackrock Financial
Management, Inc.*

## IMPORTANT NOTICE

This Disclosure Statement[1] and its related documents are the only documents authorized by the Bankruptcy Court to be used in connection with the solicitation of votes to accept the Plan.  No representations have been authorized by the Bankruptcy Court concerning the Debtor, its business operations or the value of its assets, except as explicitly set forth in this Disclosure Statement.

Please refer to the Plan (or, where indicated, certain motions and orders filed with the Bankruptcy Court) for definitions of the capitalized terms used in this Disclosure Statement.

The Plan Proponent reserves the right to file an amended Plan and Disclosure Statement from time to time.

The Plan Proponent urges you to read this Disclosure Statement carefully for a discussion of voting instructions, recovery information, classifications of claims, the history of the Debtor and the Case, the Debtor's business and properties and a summary and analysis of the Plan.

The Plan and Disclosure Statement are not required to be prepared in accordance with federal or state securities laws or other applicable non-bankruptcy law.  The Disclosure Statement has been approved by the Bankruptcy Court as containing "adequate information;" however, such approval does not constitute an endorsement of the Plan or Disclosure Statement by the Bankruptcy Court.

The Disclosure Statement contains only a summary of the Plan.  This Disclosure Statement is not intended to replace a careful and detailed review of the Plan, but instead, is an aid and supplement to such review.  This Disclosure Statement is qualified in its entirety by reference to the Plan and the agreements and documents described therein.  If there is a conflict between this Disclosure Statement and the Plan, the provisions of the Plan will govern.  You are encouraged to review the full text of the Plan and to read carefully the entire Disclosure Statement, including all exhibits, before deciding how to vote with respect to the Plan.  The Disclosure Statement is also based upon information obtained from the Debtor's books and records.  The Plan Proponent makes no representations or warranties concerning the accuracy of the information obtained from these sources.

Except as otherwise indicated, the statements in this Disclosure Statement are made as of December 29, 2010 and the delivery of this Disclosure Statement will not, under any circumstances, imply that the information contained herein is correct at any time after December 29, 2010.  Any estimates of claims in this Disclosure Statement may vary from the final amounts of claims allowed by the Bankruptcy Court.

---

[1] Unless otherwise defined herein, capitalized terms shall have the meanings ascribed to them in the Plan (as defined below).

US_ACTIVE-105108638.10

**YOU SHOULD NOT CONSTRUE THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE.   YOU SHOULD, THEREFORE, CONSULT WITH YOUR OWN LEGAL, BUSINESS, FINANCIAL AND TAX ADVISORS AS TO ANY SUCH MATTERS IN CONNECTION WITH THE PLAN, THE SOLICITATION OF VOTES ON THE PLAN AND THE TRANSACTIONS CONTEMPLATED BY THE PLAN.**

**As to contested matters, adversary proceedings and other actions or threatened actions, this Disclosure Statement is not, and is in no event to be construed as, an admission or stipulation.**

US_ACTIVE-105108638.10

## TABLE OF CONTENTS

**Page**

ARTICLE I - INTRODUCTION .................................................................................1

1.1    Purpose of the Disclosure Statement ..................................................1

1.2    Voting on the Plan ...............................................................................2

1.3    Hearing on Final Approval of Disclosure Statement and Confirmation of the Plan ..............................................................................5

ARTICLE II - GENERAL INFORMATION ...........................................................7

2.1    Basis for the Plan ................................................................................7

2.2    Overview of Chapter 11 ......................................................................8

2.3    Description of the Debtor.....................................................................8

2.4    The Pre-Petition Involvement of Dr. Patel and Patel-Related Entities In The Debtor .........................................................................9

2.5    Events Leading to Chapter 11 Filing .................................................11

ARTICLE III - THE CHAPTER 11 CASE ...........................................................12

3.1    Commencement of the Chapter 11 Case and Related Relief..............12

3.2    Dr. Patel's Relationship with Lalwani. ..............................................15

3.3    Motion to Appoint a Trustee and Terminate Exclusivity. ..................17

3.4    Case Administration...........................................................................18

3.5    Compliance with the Bankruptcy Code, Bankruptcy Rules, Local Rules and United States Trustee Guidelines .......................................22

ARTICLE IV - SUMMARY AND OVERVIEW OF THE PLAN ..........................22

4.1    Summary.............................................................................................22

4.2    Classification and Treatment of Allowed Claims and Equity Interests.................30

ARTICLE V - MEANS OF IMPLEMENTATION OF THE PLAN ........................32

5.1    Source of Consideration for Plan Distributions.................................32

5.2    The Trust............................................................................................33

5.3    Effectuating the Sale. .........................................................................38

5.4    Transfer Taxes. ..................................................................................39

5.5    Corporate Action................................................................................40

5.6    Vesting of Assets in the Trust.............................................................40

5.7    Distributions.......................................................................................40

5.8    Subrogation Claims............................................................................40

US_ACTIVE-105108638.10

5.9    Cancellation of Notes, Instruments, Certificates and Other Documents. ..............40

5.10    Cancellation of Existing Securities and Agreements. ...........................................41

5.11    Release of Liens. ...................................................................................................41

5.12    Books and Records. ...............................................................................................41

5.13    Closing of Case by Charitable Gift. ......................................................................42

5.14    Labor Organizations and Labor Agreements. .......................................................42

ARTICLE VI - PROCEDURES FOR DISPUTED CLAIM ......................................................42

6.1    Objections to Claims. .............................................................................................42

6.2    No Distribution Pending Allowance. ......................................................................42

6.3    Reserve on Account of Disputed Claims. ...............................................................42

6.4    Resolution of Disputed Claims. ..............................................................................43

6.5    Estimation. ..............................................................................................................43

6.6    Distributions to Holders of Allowed Claims Upon Disallowance of Disputed Claims. ......................................................................................................44

ARTICLE VII - TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES .......................................................................................................................44

7.1    Rejection of Executory Contracts and Unexpired Leases. .....................................44

7.2    Assumption of Executory Contracts and Unexpired Leases. ..................................45

ARTICLE VIII - CONDITIONS PRECEDENT TO EFFECTIVENESS OF THE PLAN ..........48

8.1    Conditions Precedent to Confirmation Date ...........................................................48

8.2    Conditions Precedent to Effective Date ..................................................................48

8.3    Waiver of Conditions Precedent .............................................................................49

8.4    Effect of Nonoccurrence of Conditions to Effective Date ......................................49

ARTICLE IX - EFFECT OF CONFIRMATION ....................................................................49

9.1    Vesting of Assets. ...................................................................................................49

9.2    Binding Effect. ........................................................................................................49

9.3    Discharge of Claims and Termination of Equity Interests. .....................................49

9.4    Discharge of the Debtor. .........................................................................................50

9.5    Full Release of Senior Secured Lender, BlackRock, and Midland ..........................50

9.6    Exculpation. ............................................................................................................51

9.7    Preservation of Rights of Action. ...........................................................................51

9.8    Injunction. ...............................................................................................................52

9.9    Purchaser Not a Successor. .....................................................................................53

US_ACTIVE-105108638.10

ARTICLE X - RETENTION OF JURISDICTION ..................................................................53

10.1    Jurisdiction by the Bankruptcy Court. ...............................................53

ARTICLE XI - CRAMDOWN RESERVATION ...................................................................54

11.1    Nonconsensual Confirmation.............................................................54

ARTICLE XII - MISCELLANEOUS PROVISIONS ...........................................................55

12.1    Disposition of the Creditors Committee. ............................................55

12.2    Disposition of the Examiner. ..............................................................55

12.3    Substantial Consummation. ................................................................55

12.4    Payment of Statutory Fees. ................................................................55

12.5    Modification of the Plan. ...................................................................55

12.6    Revocation or Withdrawal of Plan.....................................................55

12.7    Courts of Competent Jurisdiction. .....................................................56

12.8    Severability. .......................................................................................56

12.9    Governing Law. ..................................................................................56

12.10   Successors and Assigns.......................................................................56

12.11   Time. ..................................................................................................56

ARTICLE XIII - UNITED STATES FEDERAL INCOME TAX CONSIDERATIONS ...........57

13.1    Introduction ........................................................................................57

13.2    Certain Material United States Federal Income Tax Consequences to
        Holders of Claims ..............................................................................58

ARTICLE XIV - ALTERNATIVES TO THE PLAN..............................................................60

14.1    Other Chapter 11 Plans. ....................................................................60

14.2    Liquidation under Chapter 7 of the Bankruptcy Code.........................60

14.3    Dismissal of the Chapter 11 Case. .....................................................60

ARTICLE XV - CONFIRMATION REQUIREMENTS ..........................................................61

15.1    Acceptances Necessary to Confirm the Plan. .....................................61

15.2    Best Interests of Creditors..................................................................61

15.3    Feasibility...........................................................................................62

15.4    Confirmation of the Plan. ...................................................................62

ARTICLE XVI - CERTAIN RISK FACTORS TO BE CONSIDERED ...................................63

16.1    Parties in Interest May Object to the Plan Proponent's Classification of
        Claims. ...............................................................................................63

16.2    The Plan Proponent May Not Be Able to Secure Confirmation of the Plan. ........63

US_ACTIVE-105108638.10

16.3    The Plan Proponent May Object to the Amount or Classification of Your
Claim........................................................................................................64

16.4    The Sale to the Purchaser May Not Be Approved as Proposed...........................64

ARTICLE XVII - WHERE YOU CAN OBTAIN MORE INFORMATION .............................64

ARTICLE XVIII - CONCLUSION AND RECOMMENDATION............................................65

US_ACTIVE-105108638.10

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

In re:

SHUBH HOTELS PITTSBURGH, LLC,

                    Debtor.

Case No. 10-26337 JAD

Chapter 11

## ARTICLE I - INTRODUCTION

### 1.1    Purpose of the Disclosure Statement

Carbon Capital II Real Estate CDO 2005-1, Ltd. (the "Senior Secured Lender") by and through BlackRock Financial Management, Inc., as sub-special servicer to Carbon Capital II Real Estate CDO 2005-1, Ltd.'s special servicer, Midland Loan Services, Inc, (collectively, the "Plan Proponent") prepared this Disclosure Statement in connection with the Chapter 11 Plan Proposed by the Senior Secured Lender Dated December 29, 2010 (the "Plan"), filed in the Bankruptcy Case of Shubh Hotels Pittsburgh, LLC (the "Debtor") under title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code"), currently pending in the United States Bankruptcy Court for the Western District of Pennsylvania (the "Bankruptcy Court"). The purpose of the Disclosure Statement is to provide you information of a kind and in sufficient detail that would enable a hypothetical reasonable investor, typical of holders of Claims and Interests of the Classes being solicited to make an informed decision, whether to vote to accept or reject the Plan.

A copy of the Plan (with exhibits) is attached hereto and incorporated herein by reference as Exhibit A. Unless otherwise specifically noted, all capitalized terms utilized herein shall have the meaning ascribed to such terms as set forth in the Plan.

To further assist you in your consideration of the Plan, a copy of the Liquidation Analysis is attached hereto and incorporated herein by reference as Exhibit B. The Liquidation Analysis allows you to compare the proposed restructuring in the Plan to what a liquidation of the Debtor's assets might yield.

You should read this Disclosure Statement, the Plan, and the documents and exhibits attached thereto in their entirety before voting on the Plan. No statements or information concerning the Debtor or any other entity described in this Disclosure Statement or the Plan, particularly, but not limited to, the Debtor's financial results, assets or liabilities are authorized by the Plan Proponent other than as set forth in this Disclosure Statement or exhibits hereto.

The financial information set forth in this Disclosure Statement was largely compiled from the Debtor's records and has not been audited by independent certified public accountants, nor has it necessarily been prepared in accordance with generally accepted accounting principles, except as specifically set forth herein. Furthermore, the Plan Proponent has previously questioned the accuracy of same of the Debtor's financial information. **For these reasons, and**

**as a result of the complexity of the financial affairs of the Debtor, the Plan Proponent does not represent or warrant that the information set forth in this Disclosure Statement is without any inaccuracy.**  To the extent possible, however, the information has been prepared from the Debtor's financial books and records, and every reasonable effort has been made by the Plan Proponent to ensure that all information in this Disclosure Statement has been fairly presented.

### 1.2    Voting on the Plan

Each holder of a Claim or Equity Interest of a Class under the Plan will receive this Disclosure Statement, the Plan and a ballot ("Ballot") for accepting or rejecting the Plan.  Any holder of a Claim or Equity Interest whose legal, contractual or equitable rights are altered, modified or changed by the proposed treatment under the Plan is considered "Impaired" and therefore eligible to vote unless the holder is deemed to reject the Plan.  Each holder of a Claim or Equity Interest of a Class that is deemed to accept or reject the Plan will not be eligible to vote on the Plan.  You should review this Disclosure Statement and the Plan before submitting a Ballot to confirm whether you are entitled to vote.  Only eligible votes will be counted for Plan confirmation purposes.

---

**Which Classes of Claims are Entitled to Vote on the Plan?**

- Classes of Claims and Equity Interests are entitled to vote on the Plan as follows:

  - Claims in Classes 1(A), 1(B) and 2 are Unimpaired, are deemed to have accepted the Plan, and are not entitled to vote on the Plan

  - Claims in Classes 3 and 4 are Impaired and entitled to vote on the Plan (each a "Voting Class" and together the "Voting Classes")

  - Claims in Class 5 and Equity Interests in Class 6 will receive no distribution under the Plan, are deemed to have rejected the Plan, and are not entitled to vote on the Plan

---

For a summary description of the Classes of Claims and Equity Interests and their respective treatment under the Plan, see Article IV below.

Pursuant to the Bankruptcy Code, the Plan will be deemed accepted by an Impaired Class of Claims if the Plan Proponent receives votes accepting the Plan representing at least:

- two-thirds (2/3) of the total dollar amount of the Allowed Claims in the Class that cast a vote; and

- more than one-half (1/2) of the total number of Allowed Claims in the Class that cast a vote.

All properly completed Ballots *actually received* by the Plan Proponent no later than [_____] [___], **2011 at 5:00 p.m. (EST)** (the "Voting Deadline") will be counted in

- 2 -

US_ACTIVE-105108638.10

determining whether each Impaired Class entitled to vote on the Plan has accepted the Plan.  All Ballots must be delivered to and received by the Plan Proponent by the Voting Deadline.  Any Ballots received after the Voting Deadline will not be counted.

---

**Voting on the Plan**

***When does the Ballot need to be received?***  The deadline for the receipt by the Plan Proponent of properly completed Ballots is [_____] [____], 2011 at 5:00 p.m. (EST).

***Which Classes may vote?***  Persons may vote to accept or reject the Plan only with respect to Allowed Claims that belong to a Class that is Impaired under the Plan and is not deemed to have accepted or rejected the Plan.  **These are Classes 3 and 4.**

***How do I vote on the Plan?***  For a vote to be counted, the Plan Proponent must *actually receive* an original signed copy of the Ballot delivered with this Disclosure Statement.  <u>You may not submit votes by facsimile</u>.

***Who should I contact if I have questions or need a Ballot?***  You may contact the Plan Proponent at the addresses or phone numbers listed below.

---

This Disclosure Statement and the Plan are the only materials that you should use in determining how to vote on the Plan.  The Plan Proponent believes that approval of the Plan provides the greatest return to holders of Claims in the Voting Classes.

---

## Voting Recommendations

The Plan Proponent believes that the Plan presents the best opportunity for holders of Claims to maximize their respective recoveries.  **The Plan Proponent encourages holders of Claims to vote to <u>*ACCEPT*</u> the Plan.**

---

The Ballots have been specifically designed for the purpose of soliciting votes on the Plan from each Class entitled to vote.  For this reason, in voting on the Plan, please use only the Ballot sent to you with this Disclosure Statement.  If you hold Claims in more than one Class, you must use a separate Ballot for voting with respect to each Class of Claims that you hold.  If you believe you have received the incorrect form of Ballot, you need another Ballot or you have any questions concerning the form of Ballot, please contact the Plan Proponent in advance of the Voting Deadline.

Please complete and sign your Ballot and return it to the Plan Proponent at the following address:

US_ACTIVE-105108638.10

> By mail or overnight delivery:
>
> ReedSmith LLP
> Attn: Robert P. Simons, Esquire
> 225 Fifth Avenue, 12th Floor
> Pittsburgh, PA  15222
> Tel:  (412) 288.3131

The Plan Proponent will prepare and file with the Bankruptcy Court a certification of the results of the voting on the Plan on a Class-by-Class basis.

Additional copies of the Ballots, this Disclosure Statement and the Plan are available upon request made to the Plan Proponent.  Please contact the Plan Proponent at the address and telephone number listed above with any questions relating to voting on the Plan.

---

**Your Vote is Important**

Your vote on the Plan is important because:

- Under the Bankruptcy Code, a chapter 11 plan can only be confirmed if certain majorities in dollar amount and number of claims (as described above) of each voting class under the plan vote to accept the plan, unless the "cram down" provisions of the Bankruptcy Code are used.

- Under the Bankruptcy Code, only the votes of those holders of claims or interests who actually submit votes on a plan are counted in determining whether the specified majority of votes in favor of the plan have been received.

- If you are eligible to vote with respect to a Claim and do not deliver a properly completed Ballot relating to that Claim by the Voting Deadline, you will be deemed to have abstained from voting with respect to that Claim and your eligibility to vote with respect to that Claim will not be considered in determining the number and dollar amount of Ballots needed to make up the specified majority of that Claim's Class for the purpose of approving the Plan.

---

All pleadings and other documents referred to in this Disclosure Statement as being on file with the Bankruptcy Court are available for inspection and review during normal business hours at the Office of the Clerk of the United States Bankruptcy Court for the Western District of Pennsylvania, 5414 U.S. Steel Tower, 600 Grant Street, Pittsburgh, PA 15219; telephone (412) 644-2700, or on-line at the Bankruptcy Court's website:  http://www.pawb.uscourts.gov (PACER-CM/ECF account required for on-line viewing of documents).

THIS DISCLOSURE STATEMENT CONTAINS SUMMARIES OF CERTAIN PROVISIONS OF THE PLAN AND OTHER DOCUMENTS RELATING TO THE PLAN. WHILE THE PLAN PROPONENT SUBMITS THAT THOSE SUMMARIES PROVIDE ADEQUATE INFORMATION WITH RESPECT TO THE DOCUMENTS SUMMARIZED,

US_ACTIVE-105108638.10

THESE SUMMARIES ARE QUALIFIED BY THE COMPLETE TEXT OF SUCH DOCUMENTS. IF ANY INCONSISTENCIES EXIST BETWEEN THE TERMS AND PROVISIONS OF THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR OTHER DOCUMENTS DESCRIBED HEREIN, THE TERMS AND PROVISIONS OF THE PLAN AND OTHER DOCUMENTS ARE CONTROLLING. EACH HOLDER OF AN IMPAIRED CLAIM SHOULD REVIEW THE ENTIRE PLAN AND ALL RELATED DOCUMENTS AND SEEK THE ADVICE OF ITS OWN COUNSEL BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. ANY CHANGES TO THESE DOCUMENTS WILL BE DESCRIBED AT THE HEARING ON THE CONFIRMATION OF THE PLAN.

THIS DISCLOSURE STATEMENT MAY NOT BE RELIED UPON BY ANY PERSON OR ENTITY FOR ANY PURPOSE OTHER THAN BY HOLDERS OF IMPAIRED CLAIMS OR INTERESTS ENTITLED TO VOTE ON THE PLAN IN DETERMINING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN. NOTHING CONTAINED IN THIS DISCLOSURE STATEMENT WILL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY, OR BE DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE PLAN ON HOLDERS OF CLAIMS OR EQUITY INTERESTS.

EXCEPT TO THE EXTENT OTHERWISE SPECIFICALLY NOTED HEREIN, THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS GENERALLY INTENDED TO DESCRIBE FACTS AND CIRCUMSTANCES ONLY AS OF DECEMBER 29, 2010 AND NEITHER THE DELIVERY OF THIS DISCLOSURE STATEMENT NOR THE CONFIRMATION OF THE PLAN WILL CREATE ANY IMPLICATION, UNDER ANY CIRCUMSTANCES, THAT THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS CORRECT AT ANY TIME AFTER DECEMBER 29, 2010 OR THAT THE PLAN PROPONENT WILL BE UNDER ANY OBLIGATION TO UPDATE SUCH INFORMATION IN THE FUTURE.

THE PLAN PROPONENT SUBMITS THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTEREST OF EVERY CREDITOR AND RECOMMENDS THAT YOU VOTE TO ACCEPT THE PLAN.

### 1.3    Hearing on Final Approval of Disclosure Statement and Confirmation of the Plan

The Bankruptcy Court by order dated [_____] [__], 2011 approved the Disclosure Statement and form Ballots ("Disclosure Statement Order"), and in accordance with the Disclosure Statement Order will hold a hearing on confirmation of the Plan (the "Confirmation Hearing") at the following time and place:

| Confirmation Hearing |
|---|
| **Date and Time:** Commencing at [____:00 _.m.] (prevailing EST), on [_____] [__], 2011 |
| **Place:** United States Bankruptcy Court for the Western District of Pennsylvania (Pittsburgh |

US_ACTIVE-105108638.10

| Division), Courtroom D, 54th Floor, US Steel Tower, 600 Grant Street, Pittsburgh, Pennsylvania 15219 |
|---|
| **Judge:** Jeffrey A. Deller, United States Bankruptcy Judge, Western District of Pennsylvania (Pittsburgh Division) |

At the Confirmation Hearing, the Plan Proponent will seek an order confirming the Plan. At the Confirmation Hearing, the Bankruptcy Court will:

- Determine whether sufficient majorities in number and dollar amount, as applicable, from each Voting Class have delivered properly executed votes accepting the Plan to approve the Plan;

- Hear and determine objections, if any, to the Plan and to confirmation of the Plan that have not been previously disposed of;

- Determine whether the Plan meets the confirmation requirements of the Bankruptcy Code; and

- Determine whether to confirm the Plan and authorize and approve the transaction contemplated by the Plan.

**Any objection to confirmation of the Plan must be in writing, filed with the Bankruptcy Court and served so as to be actually received on or before [_____] [__], 2011 at 5:00 p.m. (EST) by the following persons:**

- Counsel for the Plan Proponent:  Robert P. Simons, Esquire, Reed Smith LLP, 225 Fifth Avenue, Pittsburgh, Pennsylvania 15222

- The Office of the United States Trustee for the Western District of Pennsylvania, Liberty Center, Suite 970, Pittsburgh, Pennsylvania 15222, Attn:  Norma Hildenbrand, Esquire.

US_ACTIVE-105108638.10

## ARTICLE II - GENERAL INFORMATION

### 2.1    Basis for the Plan

Upon filing a petition for chapter 11 bankruptcy relief, a debtor is given an exclusive period of time, typically known as the "exclusivity period," to file and solicit support for its plan of reorganization.  During the exclusivity period, no other creditor or party in interest may file a competing plan.  The exclusivity period initially lasts for 120 days, but in most cases, it can be extended for up to 18 months following the Petition Date.

The Bankruptcy Court terminated the Debtor's exclusivity period on November 4, 2010 after finding that several transactions involving the Debtor's current equity holder, Dr. Kiran Patel, and his agents (including Jai Lalwani, Frank Amedia, and Jonathan Kamin) placed these individuals into a conflict situation with the Debtor.  The Bankruptcy Court later found that Dr. Patel and his agents used Hotel assets for their own benefit while other creditors remained unpaid:

> From time to time, Dr. Patel and his associates diverted hotel revenues away from the hotel (and the Lender's security interest) for their own benefit all the while trade vendors of the hotel remained unpaid.  The diversion of funds also occurred while major construction and renovation projects remained uncompleted and protracted at the hotel (which, in turn, was one of the reasons why Hilton terminated the Debtor's [franchise]).  The record also includes evidence of the fact that hotel revenues were improperly diverted to other Patel/Lalwani projects in other parts of the country.

Order of Court, p. 3, November 23, 2010, Document No. 463.[2]  Because the Debtor engaged in a series of questionable transactions, including but not limited to, unauthorized postpetition payments to or for the benefit of Messrs. Lalwani and Kamin, the Court also determined that ample cause existed to appoint an examiner to monitor the Debtor's receipts and disbursements. Id. at p. 4.

The Bankruptcy Court's Order allows the Plan Proponent to file its own Plan.  As discussed further herein, the Plan Proponent proposes to sell the Hotel to the highest bidder, and then distribute the proceeds to creditors.  The Plan features an initial offer which assures a minimum distribution to creditors that may increase if higher bids are received.  The Plan seeks to accomplish the goals to which parties aspire in any reorganization case.  It provides for a distribution to creditors based on the value of the Debtor's assets.  It provides funding for the completion of long-stalled construction at the Hotel.  It also ensures continued employment for the Hotel's employees under the supervision of competent, responsible, and accountable management.  More importantly, the Plan provides creditors with a choice.  They can cast their lot with Dr. Patel and his affiliates (whom the Bankruptcy Court has previously determined to

---

[2]    The funds diverted from the Hotel prior to the Petition Date exceed $1,000,000.

US_ACTIVE-105108638.10

have engaged in questionable conduct), or they can seek a change that will result in distributions for the benefit of creditors on the Effective Date of the Plan.

## 2.2    Overview of Chapter 11

Chapter 11 is the primary business reorganization chapter of the Bankruptcy Code. Under chapter 11 of the Bankruptcy Code, a debtor is authorized to reorganize its business and affairs for itself, its creditors and its equity interest holders.  Alternatively, a creditor can, as here, propose a plan to reorganize the business itself.  In addition to permitting the rehabilitation of a debtor, another goal of chapter 11 is to promote equality of treatment for similarly situated creditors and similarly situated equity interest holders with respect to distributions of the value of a debtor's assets.

The commencement of a chapter 11 case creates a bankruptcy estate that is comprised of all of the legal and equitable interests of a debtor as of the Petition Date of the chapter 11 case. The Bankruptcy Code provides that a debtor may continue to operate its business and affairs and remain in possession of its property as a "debtor-in-possession."

The consummation of a plan of reorganization is the fundamental objective of a chapter 11 reorganization case.  A plan of reorganization sets forth the means for restructuring a debtor's business and satisfying claims against and interests in a debtor.  Confirmation of a plan of reorganization by a bankruptcy court binds the debtor, any person acquiring property under the plan, and any creditor or equity interest holder of a debtor.  Pursuant to section 1123(b)(4) of the Bankruptcy Code, a plan of reorganization may provide for the sale of all or substantially all of the property of the debtor's bankruptcy estate and the distribution of the proceeds of such sale among holders of claims or interests.  Furthermore, section 1129(a)(11) of the Bankruptcy Code explicitly states that a plan of reorganization may provide for the liquidation of the debtor.

Certain holders of claims against and interests in a debtor are permitted to vote to accept or reject the plan.  Prior to soliciting acceptances of the proposed plan, however, section 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding the plan.   The Plan Proponent is submitting this Disclosure Statement to holders of claims against and equity interests in the Debtor to satisfy the requirements of section 1125 of the Bankruptcy Code.

## 2.3    Description of the Debtor

Shubh Hotels Pittsburgh, LLC is a Florida limited liability company that owns the largest hotel in the City of Pittsburgh, containing over 700 guest rooms and approximately 40,000 square feet of convention/meeting space.  The Hotel was originally built by Hilton Hotels International or its predecessor in approximately 1959, and it continued to operate as a Hilton franchise for approximately 50 years.   The Debtor claims to employ approximately 300 individuals.  Most of the Debtor's hourly workforce (approximately 2/3 of the total employees) are members of Unite Here Local 57.

In 2006, the Debtor acquired the Hotel from Hilton and embarked on an expansion project to renovate the Hotel's rooms, increase conference room space, install an indoor pool,

- 8 -

and create a spa.  At the time of the acquisition, the Debtor's equity was largely owned or controlled by Atul Bisaria ("Bisaria").  The Debtor financed the purchase of the Hotel and the related expansion project costs through one or more loans issued by the Senior Secured Lender's assignor.  The loans were secured by liens on substantially all of the Debtor's assets, including the revenues derived from the Hotel operations as well as the real property upon which the Hotel is situated.  The loan documents provided a deadline of March 31, 2008 by which the Debtor was to complete the expansion project.

When the Debtor failed to timely complete the expansion project in 2008, the Senior Secured Lender discovered that judgments and liens in excess of $4,000,000 had been filed against the Hotel on behalf of unpaid contractors, suppliers, and laborers.  In addition, Hilton issued a notice of default in August 2008 which threatened to terminate the Hilton franchise due to the Hotel's condition and its failure to satisfy the Hilton brand standards.  The Senior Secured Lender entered into a forbearance arrangement with the Debtor providing the Debtor with time to satisfy the judgments and extending the time to complete the expansion project to May 15, 2009.

The Debtor again missed the deadline for timely completing the expansion, and in June 2009, the general contractor for the project walked off the construction site.  Once again, the Debtor had incurred over a million dollars in judgments and liens against the Hotel related to unpaid contractors, suppliers, and laborers.

### 2.4    The Pre-Petition Involvement of Dr. Patel and Patel-Related Entities In The Debtor

Dr. Kiran Patel and Jai Lalwani ("Lalwani") first became involved with the Hotel in July 2009.  Previously, Dr. Patel and Lalwani were partners in at least two real estate projects in Florida.  In one of the projects, a proposed development near the convention center in Tampa, Florida (the "Tampa Project"), Dr. Patel provided a $3,000,000 loan and a personal guaranty for an additional $5,000,000 loan held by the State Bank of Texas.  By February 2009, State Bank of Texas initiated foreclosure proceedings against the Tampa Project and Dr. Patel stood to lose $8,000,000.  Lalwani suggested to Dr. Patel that he could recoup any losses sustained in the Tampa Project by investing in the Hotel.

On or about July 11, 2009, Lalwani executed an Asset Purchase Agreement, a Loan Agreement, and a Purchase Money Loan Note reflecting a sale of Bisaria's equity interests in the Debtor for a purchase price of $2,570,000.  Dr. Patel, either directly or indirectly through Lalwani, funded $570,000 to Bisaria for the purpose of consummating the July 11, 2009 transaction.  Lalwani claims to have taken delivery of the Debtor's membership interests at that time, and it is believed that an assignment or pledge of those membership interests was likewise given to Dr. Patel.  Dr. Patel testified that he was told "[y]ou will get stock anytime you want. We'll do whatever is necessary."

### (a)  Dr. Patel and His Investors Seek to Acquire the Hotel.

In the fall of 2009, the Senior Secured Lender approved a proposed transaction whereby Dr. Patel and an entity known as The Related Group (together, the "Patel Group") would become owners of the Hotel and assume the secured loan ("Patel Proposal").  As the proposed term

US_ACTIVE-105108638.10

sheets confirm, the Patel Proposal contemplated capital contributions from the Patel Group in excess of $5,000,000 ("Patel Group Required Equity Infusion").  The contributions were not portrayed by the Debtor, Dr. Patel, or the Patel Group as loans.  Dr. Patel indicated that the disagreements within the Patel Group regarding profit and loss allocations prevented the transaction from occurring.  The Senior Secured Lender was told that the deal did not occur because the Debtor obtained a better offer to sell the Hotel, but no such deal ever materialized.

### (b) Dr. Patel and Lalwani Gain Control Over Hotel Revenues.

While the Patel Group negotiations were ongoing, the Debtor's bank accounts were frozen due to a garnishment initiated by an employee welfare fund holding a judgment in excess of $1,000,000.  To circumvent the garnishment, Dr. Patel created Tampa Hospitality and Hotel Management LLC ("Tampa Hospitality").  On September 1, 2009, Bisaria executed a power of attorney giving Tampa Hospitality authority to operate and manage the Hotel.  Lalwani executed the power of attorney on behalf of Tampa Hospitality.  Thereafter, Tampa Hospitality established certain bank accounts wherein more than $1,000,000 in Hotel revenues were deposited.  The Hotel's controller, William Sfamenos ("Sfamenos"), testified that the Tampa Hospitality accounts were under the control of Lalwani.

Mr. Sfamenos testified that once the garnishment was resolved, Lalwani continued to exercise control over Hotel funds, even when access to the Debtor's original bank accounts was restored.  Lalwani, acting as Dr. Patel's agent, decided which vendors could be paid and the amounts of the payments.  He also directed Sfamenos to make payments to, among others, himself and his companies, Black Diamond Hospitality LLC and Black Diamond Hotel Supergroup LLC (together, "Black Diamond"), his sister, Vani Lalwani, and Dr. Patel.  In violation of the loan documents, Lalwani also ordered Hotel revenues to be diverted away from the lockbox account into bank accounts he could control.

### (c) Dr. Patel Claims to Make Several Advances.

Dr. Patel claims to have made a series of advances which he now characterizes as "loans" to the Debtor.  The Senior Secured Lender believes that to the extent they occurred, these advances were either equity contributions or loans to Bisaria.  Dr. Patel has produced no promissory notes, loan agreements, or other instruments to support his claims because the transactions were admittedly undocumented.  Dr. Patel testified, however, that his alleged loans carry an interest rate "as high as 25 percent" or more.

### (d) Modification of Loan Documents.

In the absence of the restructuring contemplated under the Patel Proposal, and to afford the Debtor another opportunity to complete the expansion and meet its financial obligations, the Senior Secured Lender and the Debtor agreed to the terms of a first amendment to the loan documents in January 2010.  Under the amendment, the interest rate for the loan was reduced and the maturity date was extended by five years.  In exchange, the Debtor agreed to make an equity contribution of $2,100,000 (the "Equity Funding") to satisfy lien creditors of the Hotel. Bisaria represented that he would obtain the necessary funds by selling certain property in India.

US_ACTIVE-105108638.10

Bisaria failed to disclose to the Senior Secured Lender that Dr. Patel might be the actual source of the Equity Funding.

The Equity Funding was funneled through an escrow account held by the law firm of Goldberg, Kamin & Garvin. Jonathan Kamin, an attorney with the firm, represented the Debtor, Dr. Patel, and Lalwani at various times. Although the purpose of the Equity Funding was to satisfy certain vendor claims of the Hotel, it has now been established that approximately one-fourth of the funds were used for other purposes. This includes a payment of $500,000 to a real estate advisory firm which performed no services to the Hotel.

### (e) Construction Management.

In an effort to resume construction activity at the Hotel, the Debtor appears to have entered into three separate contracts for the provision of construction management services. The first contract was an independent contractor agreement between the Debtor and Black Diamond, Lalwani's company. It was not provided to the Senior Secured Lender until July 2010. Under the alleged contract, Black Diamond claims the right to receive payments totaling $960,000, irrespective of whether any services are actually performed for the Hotel.

The Hotel also entered into construction management contracts with two affiliates of Black Diamond: Hasick Construction Group, Inc. and MAC Construction, LLC, owned by Frank Amedia. Hasick agreed to provide construction management services in exchange for payments aggregating to $200,000. A subsequent contract from MAC Construction proposes to do the same work for $150,000. Bank records show that MAC Constructions received payments substantially in excess $475,000. Amedia also serves as a pastor for Touch Heaven Ministries in Florida. In May 2010, Touch Heaven received a $20,000 donation from the Debtor. The Hotel's controller testified that the Debtor had never previously made a charitable donation in excess of $250. Only the Hasick contract was authorized under the loan document or included in the Debtor's approved budget.

### 2.5    Events Leading to Chapter 11 Filing

Prior to the Petition Date, and as outlined above, the Debtor defaulted on its loan to the Senior Secured Lender on several occasions. In addition to its failure to timely complete the expansion project and to pay its contractors, suppliers, and laborers, the Debtor also flagrantly and repeatedly violated its obligations under the cash management system established under the Loan Documents.

Throughout 2010, the Debtor was consistently unable to satisfy Hilton quality assurance standards. Hilton conducted inspections at the Hotel three times during the year (in April, July, and September), and in each instance, the Debtor received a failing grade. After the Debtor registered its third failure in six months, Hilton terminated the Hilton Franchise Agreement by letter dated September 1, 2010. The termination left the Hotel without a flag and access to a central reservation system. Termination of the Hilton Franchise Agreement also constituted an event of default under the Loan Documents, prompting the Senior Secured Lender to declare an event of default and accelerate the full amount of the indebtedness due and owing to the Senior Secured Lender (consisting of principal in the amount of $49,600,000, plus interest at the default

US_ACTIVE-105108638.10

rate provided in the Loan Documents, and Lender's fees and costs, including attorney fees and costs).

On September 3, 2010, the Senior Secured Lender filed a *Complaint in Mortgage Foreclosure* in the Court of Common Pleas of Allegheny County to foreclose on its interests in the Hotel and filed an *Emergency Motion to Appoint a Receiver for the Hotel*. On September 7, 2010, the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the Bankruptcy Court.

## ARTICLE III- THE CHAPTER 11 CASE

### 3.1    Commencement of the Chapter 11 Case and Related Relief

On September 7, 2010 (the "Petition Date"), the Debtor filed its petition for relief under chapter 11 of the Bankruptcy Code.

(a)    Continuation of Business; Stay of Litigation and Collection Efforts

Subsequent to the Petition Date, the Debtor continues to operate as a debtor-in-possession subject to the supervision of the Bankruptcy Court and a court-appointed examiner (as described below). The Debtor is authorized to operate its business in the ordinary course, with transactions outside the ordinary course of business requiring Bankruptcy Court approval. An immediate effect of the filing of the Debtor's bankruptcy petition was the imposition of the automatic stay under the Bankruptcy Code, which, with limited exceptions, enjoins the commencement or continuation of all collection efforts by creditors, the enforcement of liens against property of the Debtor, and the continuation of litigation against the Debtor. The automatic stay remains in effect, unless modified by the Bankruptcy Court, until consummation of a chapter 11 plan.

(b)    Major Events Following Commencement of the Chapter 11 Case

(i)    *Senior Secured Lender's Motion for Relief from Stay.*

On September 8, 2010, the Senior Secured Lender filed its Motion for Relief From Stay (as amended and supplemented, the "Stay Motion") seeking to foreclose on its interests in the Hotel because, among other things, the Debtor's actions (through mismanagement and loss of the franchise) had impaired the Senior Secured Lender's collateral. The Stay Motion also claimed that the Debtor was unable to timely file a confirmable chapter 11 plan of reorganization.

The Bankruptcy Court conducted an evidentiary hearing on the Stay Motion which spanned several days and included testimony from nine witnesses. The Bankruptcy Court elected to stay a determination on the Stay Motion pending the appointment of an examiner and the termination of exclusivity. The Bankruptcy Court expressed a desire for the parties to focus on reorganizing the underlying business prior to sorting out the various claims in litigation.

(ii)    *Debtor's Motion to Approve Wyndham Franchise Agreement.*

Following the loss of the Hilton franchise on September 1, 2010, the Debtor and Dr. Patel's representatives engaged in an abbreviated search for a replacement flag. Within six (6)

US_ACTIVE-105108638.10

days, a letter of intent was negotiated with Wyndham Hotels & Resorts, LLC to be the new flag for the Hotel.  Pursuant to internal communications, the Debtor moved with haste to block any effort by Hilton or any other franchisor from making a competing offer.

On September 20, 2010, the Debtor filed its *Expedited Application for Approval Authorizing Debtor To Execute Franchise Agreement With Wyndham Hotels and Resorts, LLC Pursuant to Letter of Intent Dated September 14, 2010 and to Pay Transaction and Franchise Fees In Connection Therewith* (The "Wyndham Franchise Motion") (Docket No. 70).  By Order of Court dated November 23, 2010, the Bankruptcy Court approved the Wyndham Franchise Motion.

(iii)    *Alleged Transfer of Equity in the Debtor.*

On or around September 21, 2010, and without the required approval from its Senior Secured Lender, the Debtor's sole members claim to have transferred 100% of their membership interests in the Debtor to Pittsburgh Grand, LLC and Pittsburgh Grand Manager, LLC, entities that are 100% beneficially owned by Dr. Patel, pursuant to that certain Membership Interest Purchase Agreement (the "Post-Petition Equity Transfer") (See Docket No. 194).  Dr. Patel testified that he did not provide any new consideration in exchange for the Post-Petition Equity Transfer.  The Post-Petition Equity Transfer caused a change in control of the Debtor that constituted an incurable postpetition event of default under the Senior Secured Lender's Loan Documents and violated the Debtor's Operating Agreement.  According to the Debtor's Operating Agreement, the Post-Petition Equity Transfer rendered the Debtor's sole members unable to participate in and manage the affairs of the Debtor.  In certain communications, Lalwani also claims the Post-Petition Equity Transfer is ineffective without his consent since he allegedly controls some of the membership interests in the Debtor.

(iv)    *Postpetition Revelations.*

Evidence collected during the trial on the Stay Motion has shed light on numerous instances of mismanagement by the Debtor involving, among other things, the misuse of Hotel revenue to satisfy the personal expenses of Dr. Patel and his agents while legitimate creditors remained unpaid.  The Senior Secured Lender was unaware of this misconduct at the time it occurred, and it might not have discovered these improprieties had it not pursued discovery in furtherance of the Stay Motion.  All of the disbursements identified above occurred during a time when the Debtor claimed it lacked sufficient revenues to timely pay its creditors.

This misconduct includes, *inter alia*, the following:

(A)    *Misappropriation of Employee Dues*.    Pending the resolution of an intra-union dispute, the Debtor was holding the union dues of most of its hourly employees in an escrow account.  These dues represented amounts withheld from employee paychecks.  Both Dr. Patel and Lalwani received payments from this account.  In May 2010, Lalwani directed the Hotel to transfer $64,000 to his company, Black Diamond.  In September 2010, an additional $150,000 was transferred from the account to the Kamin escrow account.  The following day, Kamin wired $90,000

- 13 -

to Dr. Patel, $12,500 to Black Diamond.  Kamin has allegedly returned the remaining $50,000 to the Debtor.

(B)   *Payments to Individuals Who Performed No Services to the Hotel.*  Sfamwani testified that Lalwani directed him to issue payments from the Debtor's bank accounts to various individuals who neither employees of the Hotel, nor did they render any services.  These included the following payments:  (i) $197,000 to Lalwani's sister, Vani Lalwani; (ii) $45,000 to Harris Mathis, the Debtor's former chief operating officer; (iii) $28,500 to Geebin Flores, believed to be the owner of a clothing store in Miami, Florida; (iv) $20,000 to Touch Heaven Ministries, an entity owned by Dr. Patel's asset manager, Frank Amedia; and (iv) $14,200 to Ademola Shittu, Lalwani's personal driver.

(C)   *Violation of the Cash Management Provisions of the Loan Documents.*   At the direction of Lalwani, it is estimated that at least $3,500,000 in Hotel revenue was deposited directly into the Debtor's bank accounts in circumvention of the cash management protections.[3]  This enabled the Debtor to make, without detection, unbudgeted payments and equity distributions to Dr. Patel, Lalwani, Bisaria, their affiliates, and other individuals or entities who provided no goods or services to the Hotel.  While this occurred, other creditors, including trade vendors and lien claimants, remained unpaid.

(D)   *Payment of Personal Charges on American Express.*  Since July 2009, the Hotel paid in excess of $549,000 to satisfy American Express charges which Sfamenos claimed to be unrelated to Hotel business.  An examination of the charges reveals that many payments were for personal expenses, including travel to Las Vegas and India.  The Hotel revenues also paid for numerous charges incurred at gentlemen's clubs in Pittsburgh, Las Vegas, and Hollywood, Florida, as well as for escort services.

(E)   *Cash Withdrawals from the Hotel.*  Sfamenos also testified that he was directed to provide cash withdrawals from the Hotel's accounts directly to Lalwani.  This occurred on several occasions, with an average withdrawal of $3,200 each time.  In an October 2009 e-mail, Sfamenos warned Lalwani that there was insufficient cash to satisfy his

---

[3]       Because the Debtor borrowed funds specifically for renovation and expansion of the Hotel, the loan documents required the Debtor to deposit all Hotel revenues into a lockbox account during the construction period. Funds from the lockbox were transferred to a cash management account and applied to Hotel expenses pursuant to a "waterfall" established under the loan documents.  After reserving for taxes, insurance, and debt service payments, remaining funds were paid to the Debtor in accordance with anticipated monthly expenditures identified in its approved budget.

US_ACTIVE-105108638.10

demand because Lalwani had "drained the vault" by spending the funds in a Pittsburgh-area gentlemen's club.

>(F)     *Transfer of Funds Between the Debtor's Affiliates*.  Bisaria owns another hotel in Nebraska through an entity called Shubh Hotels Lincoln, LLC ("Shubh Lincoln").  Bank records show that the escrow account at the Kamin Firm was used to disguise transfers between the Debtor and Shubh Lincoln.  In particular, the Debtor wired $135,000 to the Kamin Firm on December 18, 2009.  On the same day, the Kamin Firm wired $134,576 to Shubh Lincoln.  On December 23, 2009, Shubh Lincoln wired $134,576 to the Debtor in what Lalwani described as a "loan repayment."

>(G)     *Unapproved Transfers*.  On August 26, 2010, the Debtor hired Prism Hotels & Resorts ("Prism") to replace Crescent Hotels & Resorts ("Crescent") as the new property manager for the Hotel, and it continues to serve in that capacity to this day.  Under Prism's watch, the Debtor continued to make  payments from Hotel revenue to insiders of the Debtor which were not approved on the budget, including the following: (a) a $50,000 payment to Bisaria's wife, Mihu Bisaria (August 27); (b) a $50,000 payment to Black Diamond (August 27); (c) a $150,000 payment to Goldberg, Kamin & Garvin from the union dues account (September 2); (d) a $25,000 payment to Black Diamond from the union dues account (September 2); and (e) a $50,000 payment to Black Diamond from an account established by Prism.  These payments were made at the direction of Lalwani, who copied Prism's employee with his requests.  Prism was also hired to perform work on other hotel properties targeted by Dr. Patel and Lalwani for investment.

The Debtor and Dr. Patel have failed to explain or even address most of the misconduct described above.  Indeed, the Bankruptcy Court noted that these parties gave "short shrift" to the questionable transactions, prompting it to warn the Debtor and Dr. Patel that a trustee will be appointed if further shenanigans occur.  November 23, 2010 Order, p. 5.

### 3.2     Dr. Patel's Relationship with Lalwani.

To properly evaluate the distinction between the Debtor's Plan and the Plan of the Plan Proponent, it is important for creditors to understand the nature of Dr. Patel's relationship with Lalwani.  Lalwani's fingerprints appear on virtually every questionable transaction involving the misuse of Hotel funds.  It also appears that Dr. Patel knew, or should have known that Lalwani was diverting substantial amounts of funds from the Hotel because Lalwani provided him with frequent updates or copied him on numerous e-mails discussing the transfer of Hotel assets.

Publicly, Dr. Patel attempted to distance himself from Lalwani, but privately, Dr. Patel frequently communicates with Lalwani and relies upon him to provide information and strategy related to the Hotel, as well as with their other business dealings.  The following summarizes the

US_ACTIVE-105108638.10

evidence produced to date in the Bankruptcy Case regarding the nature and extent of Dr. Patel's relationship with Lalwani.

(a)  Lalwani Represents Dr. Patel's Interests at the Hotel

Since July 2009, Lalwani served as Dr. Patel's agent at the Hotel.  Dr. Patel testified that "Jai has been on the ground, for right or wrong, has been representing me, telling me he'll be protecting my interest."  Dr. Patel was also aware that Lalwani held himself out to others as Dr. Patel's agent.  In fact, the Hotel's controller understood Lalwani's role to be the "buffer" between the Hotel and Dr. Patel.

While acting as Dr. Patel's agent, Lalwani continued to exercise control over the Debtor's bank accounts to make payments for the benefit of himself and Dr. Patel.  Copies of e-mail communications demonstrate that Dr. Patel was aware that Lalwani was using Hotel funds for these purposes.  In particular, Dr. Patel knew that Lalwani was paying himself large management fees, was using Hotel revenues to fund the acquisition of other hotel properties, and directed funds to State Bank of Texas for the purpose of reducing Dr. Patel's personal liability on the Tampa project.  Communications from State Bank of Texas indicate that they were promised cash flow from the Hotel to satisfy the obligations Dr. Patel and Lalwani owed on the Tampa Project.

(b)  The Debtor and Dr. Patel Conceal Lalwani's Postpetition Involvement with the Hotel.

When allegations of wrongdoing by Lalwani first surfaced, the Debtor and Dr. Patel represented to the Bankruptcy Court that Lalwani's ties to the Hotel had been severed.  Debtor's counsel unequivocally denied that Lalwani had any involvement with the Hotel after the Petition Date.  However, e-mail communications demonstrate that not only was Lalwani intimately involved in establishing the Hotel's litigation strategy in the Bankruptcy Case, he assumed the leading role during a two-week span while Dr. Patel was traveling in India.  All communications between Dr. Patel and his attorney were funneled through Lalwani during that time.  The Debtor's counsel also continued to communicate with Lalwani after the Petition Date.

In sworn testimony before the Bankruptcy Court, Dr. Patel also denied that he had any affiliation or relationship with Lalwani's company, Black Diamond.  He indicated "[a]s broad as you want to take it, take it from me that I have no association with it."  His counsel likewise denied that Dr. Patel had any dealings with Black Diamond.  Despite this, the evidence shows that Dr. Patel wired nearly $200,000 to Black Diamond between September 16-27, 2010.

The Bankruptcy Court rejected the representations of Dr. Patel and the Debtor when it made the following findings:

> "the record reflects that Mr. Lalwani was permitted to continue to interject himself into the Debtor's affairs post-petition as the hotel sought out a new flag.  In addition, the record reflects that immediately after the bankruptcy filing, the Debtor remitted unauthorized post-petition payments to or for the benefit of Mr. Lalwani or his companies.  The Debtor also remitted funds to Mr. Lalwani's "legal quarterback," Jonathan Kamin."

- 16 -

November 23, 2010 Order, p. 4.

      (c)      <u>Dr. Patel Has Not Severed Ties with Lalwani.</u>

      In light of the evidence presented, the Bankruptcy Court found it significant that "Dr. Patel has not immediately disassociated himself from Mr. Lalwani." <u>Id</u>. After it was revealed that Lalwani improperly used hundreds of thousands of dollars of Hotel funds, Dr. Patel's support did not waiver. Rather, Dr. Patel reiterated that he and Lalwani were "one team," and as recently as October 1, 2010, Dr. Patel instructed Lalwani to "do what is best for the [former] Hilton [hotel]." Dr. Patel sought Lalwani's assistance to complete a sworn statement in the Bankruptcy Case, and the pair appear to have engaged in extensive conversations on October 27, 2010, the day before Dr. Patel was scheduled to testify before the Bankruptcy Court.

      Moreover, Dr. Patel continues to partner with Lalwani despite the protests of those closest to him. Dr. Patel acknowledged that he refused the advice of his wife and brother, both of whom told him to stay away from Lalwani. Dr. Patel also ignored information supplied by the Hotel's former property manager, Crescent, which suggested that Lalwani has a record of nefarious activities. Dr. Patel did not bother to read the allegations leveled against Lalwani, and instead sent them directly to Lalwani. In turn, Lalwani terminated Crescent as the property manager.

      (d)      <u>Neither Dr. Patel Nor the Debtor Have Pursued Any Actions Against Lalwani.</u>

      The strong connection between the Debtor, Dr. Patel, and Lalwani is best demonstrated by the fact that no proceedings have been commenced by the Estate to recover any of the misused funds. While there appears to be no dispute that Lalwani improperly diverted funds for personal gain, Dr. Patel has focused his litigation efforts against the Senior Secured Lender instead of pursuing those who appear to have defrauded the Debtor's estate. The Debtor's counsel likewise represented that he would not pursue claims against Dr. Patel and his affiliates, but would defer such action to the Committee. As of the end of December, no such actions have been filed.

### 3.3    <u>Motion to Appoint a Trustee and Terminate Exclusivity.</u>

      Based upon the evidence uncovered above, the Senior Secured Lender filed a *Motion for the Appointment of a Chapter 11 Trustee or in the Alternative Termination of the Exclusive Period to File a Chapter 11 Plan* (the "<u>Trustee Motion</u>") (Docket No. 312) on October 25, 2010. By Order dated November 4, 2010, the Court terminated the Debtor's exclusive right to file a plan of reorganization, and on November 12, 2010, the Court appointed Margaret M. Good to serve as an examiner of the Debtor, pursuant to section 1104 of the Bankruptcy Code. (Docket No. 419). The Bankruptcy Court concluded that "the questionable transactions" provided ample cause to appoint an examiner to monitor the Debtor's receipts and disbursements and to terminate the Debtor's exclusive period. Order dated November 23, 2010, p. 4. It subsequently noted that but for the involvement of the Committee, the Bankruptcy Court may have appointed a trustee. <u>Id</u>. The Court further warned the Debtor and Dr. Patel that if "any more shenanigans occur, the Court will appoint a trustee." <u>Id</u>. at p. 5.

US_ACTIVE-105108638.10

### 3.4    Case Administration

#### (a)    Retention of Professionals by Shubh Hotels Pittsburgh

The Bankruptcy Court authorized the retention of David K. Rudov and Scott M. Hare as bankruptcy counsel to the Debtor (Docket No. 399).  The Debtor also represented to the Court on several occasions that it was being represented by Jonathan Kamin, who was described in several of the Debtor's e-mails to be "lead counsel."  Despite assurances that an application would be forthcoming, no such pleading has been filed, nor has Mr. Kamin made any disclosures as required under Fed.R.Bankr.P. 2014 regarding his disinterestedness or the source of his compensation.  In an order dated November 23, 2010, the Bankruptcy Court indicated its assumption that the Office of the United States Trustee, a component of the United States Department of Justice, would pursue whatever investigation it deems appropriate with respect to Mr. Kamin's involvement in these proceedings.

#### (b)    Use of Cash Collateral and Post-petition DIP Advances

On September 8, 2010, the Debtor filed its *Expedited Motion to Use Cash Collateral or Obtain Alternative Debtor In Possession Senior Lending Facility* (Docket No. 13) (collectively, the "Cash Collateral Motion").  The Cash Collateral Motion, in pertinent part, requested authority for the Debtor to utilize cash and proceeds of accounts, inventory, and Hotel revenues subject to liens of the Senior Secured Lender and to incur additional debt in the form of a postpetition loan.  By a series of bridge orders (collectively, the "Bridge Orders"), the Debtor and the Senior Secured Lender agreed to certain limited uses of Cash Collateral since the Petition Date.  On December 21, 2010, the Bankruptcy Court entered its *Final Order Approving Debtor In Possession Financing And Use of Cash Collateral* authorizing, *inter alia*, the Debtor to obtain certain Post-petition DIP Advances from the Senior Secured Lender in accordance with the terms and conditions set forth therein (the "Post-petition DIP Advance Order") (Docket No. 546).  Pursuant to the Post-petition DIP Advance Order, the Senior Secured Lender was granted, among other forms of adequate protection, replacement liens, and other consideration.

The Post-petition DIP Advance Order also provided the Committee and other parties in interest with a period of time to investigate, and, if necessary, to challenge the amount and extent of the Senior Secured Lender's Claims as well as the validity of their Liens (the "Challenge Period").

#### (c)    Appointment of the Official Committee of Unsecured Creditors

On September 24, 2010, the Office of the United States Trustee filed its Notice of Appointment of Committee of Unsecured Creditors, which was amended on October 20, 2010, and appointed eight (8) members to serve on a committee and to represent the interests of all general unsecured creditors of the Debtor.  The eight (8) members are:  (i) Clean Textile Systems, Inc., Chairperson; (ii) Pennsylvania Joint Board; (iii) RKB Electric & Supply, Inc., (iv) HEREIU Welfare Fund; (v) P.J. Dick Incorporated, (vi) Crescent Hotels & Resorts LLC,  (vii) Central Pension Fund of I.U.O.E.; and (viii) Rush Air.  The Bankruptcy Court approved the retention of Leech Tishman Fiscaldo & Lampl as bankruptcy counsel to the Committee (Docket No. 297).

- 18 -

      (d)     Claims Bar Dates

The Bankruptcy Court established December 31, 2010 as the final date for creditors (other than governmental entities) to file proofs of claims against the Debtor.  The final date for governmental entities to file proofs of claims against the Debtor is March 7, 2011 (collectively, the "Bar Dates").  Pursuant to Bankruptcy Rule 3003(c)(2), any creditor:  (a) whose Claim (i) was not scheduled by the Debtor or (ii) was scheduled as disputed, contingent or unliquidated, and (b) who failed to file a proof of claim on or before the applicable Bar Date, will not be treated as a Creditor with respect to that Claim for purposes of voting on the Plan or receiving a distribution under the Plan.  Counsel to the Debtor served notice of the Bar Dates on all known creditors on December 9, 2010 (Docket No. 508).

A deadline for filing Administrative Claims has not been established as of the date of this Disclosure Statement.  The Debtor has requested (through the Plan) that the Bankruptcy Court establish the date that is 45 days after the entry of the Post-Confirmation Order and Notice as the Administrative Claim Bar Date.

      (e)     Schedules and Statement of Financial Affairs

On September 21, 2010, the Debtor filed its Schedules of Assets and Liabilities and Statement of Financial Affairs (Docket No. 75).  Due to numerous inaccuracies and omissions, the Schedules of Assets and Liabilities and Statement of Financial Affairs were subsequently amended on November 18, 2010 (Docket No. 453).  The Debtor also filed an Amended List of Equity Holders on October 6, 2010 to reflect the unauthorized Post-Petition Equity Transfer. (Docket No. 194)

      (f)     The Debtor's Plan of Reorganization

On October 6, 2010, Dr. Patel and the Debtor filed their *Disclosure Statement To Accompany Plan Dated October 6, 2010* (the "Debtor's Disclosure Statement") (Docket No. 188) and *Joint Chapter 11 Plan Proposed By The Debtor and Pittsburgh Grand LLC Dated October 6, 2010* (the "Debtor's Plan") (Docket No. 189).  The Debtor's Plan proposes payments to creditors over time, backed by letters of credit issued by certain unidentified financial institutions.  The Debtor's Plan provides no mechanism by which the reorganized Debtor can pursue claims against Dr. Patel, the Patel-Related Entities, or others for certain fraudulent or other avoidable transfers which occurred before or after the Petition Date.  Because the right to pursue such claims will re-vest in the Debtor, it is unlikely that anyone will purse such claims, thereby eliminating a source of recovery for creditors under the Debtor's Plan.

Numerous objections were filed to the Debtor's Disclosure Statement.  A hearing on the Debtor's Disclosure Statement was held on November 23, 2010, at which time the Debtor agreed that substantial amendments to the Debtor's Disclosure Statement and Plan were required.  The amended Debtor's Disclosure Statement and amended Debtor's Plan are due to be filed on or before December 29, 2010.

US_ACTIVE-105108638.10

      (g)    <u>Assumption or Rejection of Certain Executory Contracts and Unexpired Leases</u>

The Debtor has not moved to assume or reject any of its Executory Contracts or Unexpired Leases.

      (h)    <u>Patel Adversary</u>

On November 3, 2010, Dr. Patel commenced the Patel Adversary seeking to equitably subordinate the claims of the Senior Secured Lender to those of Dr. Patel, as well as requesting damages for tortious interference. On December 6, 2010, the Senior Secured Lender filed an answer and asserted several counterclaims against Dr. Patel, including a request to disallow Dr. Patel's claims against the Debtor or in the alternative, to subordinate such claims as equity. The Senior Secured Lender also seeks damages from Dr. Patel for intentional misrepresentation, concealment, and tortious interference. These claims remain pending before the Bankruptcy Court. If either side is successful in their equitable subordination claims it will alter the distribution that may be available to creditors.

      (i)    <u>Anticipated Post-Petition Litigation</u>

Through discovery conducted since the Petition Date, the Plan Proponent has determined that the Estate possesses certain causes of actions that should yield additional value to the holders of Class 4 General Unsecured Claims. These actions include preference actions, fraudulent transfer actions, and subordination of certain alleged claims against the Estate.

In its Order dated November 23, 2010, the Bankruptcy Court found that Dr. Patel directly or indirectly owns and controls the Debtor, acquired his controlling interest in the Debtor for little or no consideration, and had a fair amount of involvement with the Debtor in the year or so leading up the Debtor's bankruptcy filing. The Bankruptcy Court also noted that the Debtor's transactions with Dr. Patel and his affiliates and associate (including Mr. Jai Lalwani, Black Diamond and Fuel Group) "raised some eyebrows" and reflects that Dr. Patel and his associates appeared to control hotel operations prior to the Debtor's bankruptcy filing. The Court also found that these persons or entities diverted substantial hotel revenues from appropriate and authorized expenses in payment of personal and unbudgeted items.

Based upon the foregoing, Dr. Patel and his associates are insiders of the Debtor and, as a result, the Estate possesses the right to recover certain transfers made to or for their benefit in the one-year preceding the Petition Date. Such actions may include, but are not limited to, the following:

      1.    Dr. Patel received payments of more than $2,600,000 from the Debtor's bank accounts within the one-year period preceding the Petition Date. Although these transfers are alleged to be repayments for alleged loans advanced to the Debtor, Dr. Patel acknowledges that the loans were unsecured and undocumented. The Senior Secured Lender contends that any advances made by Dr. Patel were either capital contributions or loans to Bisaria for purposes of investing in the Hotel, rendering any payments

- 20 -

he might have received as voidable transfers. Because Dr. Patel may have also received payments for advances that are unrelated to Hotel business, the estate also holds potential fraudulent transfer claims against Dr. Patel. The Debtor may also hold claims exist against Dr. Patel for his role in the Hotel's management due to the actions of his agent, Lalwani.

3.    Lalwani and/or Black Diamond received payments of more than $727,000 from the Debtor's bank accounts since November 2009. Testimony from Sfamenos indicates that additional cash withdrawals of more than $16,000 were paid to Lalwani from the Debtor's funds without proof that such funds were necessary for Hotel operations.

4.    The Senior Secured Lender has discovered approximately $800,000 in cash withdrawals that were made from the Debtor's bank accounts during the 14-month period preceding the Petition Date. The recipient(s) of these funds have yet to be determined, but the magnitude of the payments warrants further investigation.

5.    Under Lalwani's direction, the Debtor paid the personal American Express charges of various individuals, but these charges have not been shown to be related to Hotel business. No support for these charges was provided to because the Debtor considered the payments to be management distributions. Bank records show that in excess of $527,000 was paid to American Express between July 1, 2009 through the Petition Date, but there is no evidence that the Debtor received reasonably equivalent value in return. Indeed, in one month alone, approximately $76,000 was paid to American Express by the Debtor.

6.    Since December 2009, the Kamin Firm received payments of $578,000 from the Debtor. This includes at least $317,000 paid in the 90-day period prior to the Petition Date. It also appears that the Kamin Firm was performing work for Dr. Patel and Lalwani on projects which are unrelated to the Hotel.

7.    Atul Bisaria, the former equity holder of the Debtor and his wife, Mihu Bisaria, received payments in excess of $186,000 from the Debtor since July 2009. These payments, including a $50,000 transfer made just prior to the Petition Date, were made when the Debtor was unable to satisfy other operating expenses.

8.    As noted above, Vani Lalwani ($197,000), Harris Mathis ($45,000), Geebin Flores ($28,500), and Ademola Shittu ($14,200), each received payments from the Hotel, but none of them provided any goods or services to the Debtor in exchange for the payments received.

US_ACTIVE-105108638.10

Under the Lender's Plan, the proceeds from these avoidance actions would be distributed to the Trust for the benefit of holders of Allowed Class 4 General Unsecured Claims.

While the avoidance actions operate to increase distributions on account of Allowed Class 4 Claims, actions to subordinate certain alleged claims against the Estate operate to reduce the number and amount of claims entitled to receive a distribution from the Trust, thereby increasing the overall percentage distribution to holders of Allowed Class 4 Claims. Determinations by the Bankruptcy Court in the Patel Adversary therefore may have an impact on these distributions.  For example, the Lender's Plan, unlike the Debtor's Plan, classifies the millions of dollars in alleged "claims" asserted by Dr. Patel and Patel-Related Entities as Class 5 Subordinated Claims that are junior in priority to Class 4 Claims; and therefore, if Lender is successful in the Patel Adversary, these claims, even if substantiated, will receive no distribution under the Plan.  The Debtor scheduled Dr. Patel as having an alleged unsecured claim in the amount of $3,917,729 with interest accruing at a prepetition rate of up to 25%.  If the claims of Dr. Patel are not subordinated in the Patel Adversary, the distribution available to holders of Allowed Class 4 Claims may be reduced to the extent any portion of the claims of the Patel-Related Entities are Allowed.

### 3.5    Compliance with the Bankruptcy Code, Bankruptcy Rules, Local Rules and United States Trustee Guidelines

On November 3, 2010, the United States Trustee conducted a meeting of creditors pursuant to section 341 of the Bankruptcy Code.  Authorized representatives of the Debtor attended the meeting.  The Debtor also filed its monthly operating reports for September, October, and November, but certain bank reconciliations were not provided with those reports. To the best of the Plan Proponent's knowledge, the Debtor has paid all statutory quarterly fees as required by the Office of the United States Trustee.

### ARTICLE IV - SUMMARY AND OVERVIEW OF THE PLAN

### 4.1    Summary

If the Plan is confirmed, the Purchaser will acquire substantially all of the Debtor's assets.  The Purchaser's bid represents the initial offer for the Debtor's assets.  Provided that the Purchaser is the Senior Secured Lender or its designee, the Sale consideration will include, at a minimum, the following:

(a)    Senior Secured Lender's credit bid (in an amount to be determined during the Sale) of up to the outstanding balance due under the Post-Petition DIP Advances and the Pre-Petition Senior Secured Loan.  The balances due under the Post-Petition DIP Advances and the Pre-Petition Senior Secured Loan consist of the principal balance of approximately $49,600,000 and $3,000,000 (assuming the Post-Petition DIP Advances are fully funded), respectively, plus additional advances, interest at the default rate, attorneys' fees, costs and other expenses.

(b)    Senior Secured Lender's funding $2,140,718 for construction completion in addition to the funds in the Construction Reserve Account.

- 22 -

(c)    Senior Secured Lender's Cash payment of $3,726,505 to be distributed as follows:

1.    First, in payment of Allowed Class 2 Secured Claims on the Effective Date until paid in full;

2.    Second, in payment of Allowed Administrative Expense Claims on the Effective Date until paid in full;

3.    Third, in payment of Allowed Class 3 Priority Claims on the Effective Date until paid in full;

4.    Fourth, in payment of Allowed Priority Tax Claims until paid in full; and

5.    Fifth, the balance, if any, contributed to the Trust for the benefit of holders of Allowed Class 4 Claims and distributable in accordance with the terms of the Trust Agreement (until paid in full).

(d)    Senior Secured Lender's carve-out of $1,000,000 from distribution on account of its Pre-Petition Senior Secured Loan to be contributed to the Trust in Cash on the Effective Date for the benefit of holders of Allowed Class 4 Claims and distributable in accordance with the terms of the Trust Agreement.

The Plan is estimated to provide for payment in full of all Allowed Claims other than Class 4 General Unsecured Claims, Class 5 Subordinated Unsecured Claims, Class 6 Equity Interests, and Claims of Insiders.  The holders of Class 5 Subordinated Unsecured Claims and the holders of Equity Interests likely will not receive any distributions under the Plan.  The Claims of Insiders are Disputed Claims.  All Equity Interests will be cancelled without further action by the Debtor on the termination date of the Transition Agreement.

The Plan Proponent submits that the Plan provides the best option for the holders of Allowed Claims to maximize their recoveries.

The following table provides a summary of the classification and treatment under the Plan of Claims and Equity Interests.  The summary is qualified in its entirety by the more detailed information in the Plan and this Disclosure Statement.  The total amount of the Claims reflects the Plan Proponent's current estimate, based upon the Debtor's Schedules, books and records; the Proofs of Claim filed on the Claims Register; and the informed opinion of the Plan Proponent's professionals of the likely amount of certain objectionable claims after resolution by settlement or litigation.  Reference should be made to the entire Disclosure Statement and to the Plan for a complete description of the classification and treatment of Claims and Equity Interests.

- 23 -

US_ACTIVE-105108638.10

| **Unclassified** | **Unimpaired** |
|---|---|
| **Administrative Expense Claims** | |
| **A.  Administrative Expense Claims, including Allowed Cure Claims, but excluding Compensation and Reimbursement Claims** | **A.**  Unless otherwise agreed to by the holder of an Allowed Administrative Expense Claim and the Purchaser, or as otherwise expressly provided for in the Plan, each holder of an Allowed Administrative Expense Claim will receive in full and final satisfaction of its Administrative Expense Claim an amount of Cash equal to the amount of such Allowed Administrative Expense Claim either:  (a) in the ordinary course following the Effective Date, or (b) if the Administrative Expense Claim is not Allowed as of the Effective Date, within thirty (30) days after the date on which an order Allowing such Administrative Expense Claim becomes a Final Order, or as soon as reasonably practicable thereafter; provided however, that Allowed Administrative Expense Claims representing post-petition liabilities incurred by the Debtor in the ordinary course of business which are not materially past due (of which the Debtor submits there are none) shall be paid in accordance with the terms and conditions of the particular transactions relating to such liabilities and any related agreements.  Receipt of the amount of the Allowed Administrative Expense Claim by a holder of such Claim as provided for in the Plan shall constitute full satisfaction, settlement, release, extinguishment, and discharge of such Allowed Administrative Expense Claim as of the date paid. |
| **B. Compensation and Reimbursement Claims, Exclusive of Lender Professional Claims.** | **B.**  All Professionals or other Persons seeking Bankruptcy Court approval of Professional Compensation incurred through and including the Effective Date, other than Lender Professionals, must file, where applicable, their respective final applications for allowance of Professional Compensation within thirty (30) days following the Effective Date; and Allowed Professional Claims be paid on the date when the order relating to any such Administrative Expense Claim is a Final Order, or on such other terms as may be mutually agreed upon.  Professional Compensation Claims include Lender Professional Claims which are to be paid by the Purchaser on the Effective Date. |

US_ACTIVE-105108638.10

| | |
|---|---|
| | Total estimated Allowed Administrative Expense Claims not expected to exceed $1,000,000<br><br>Recovery: 100% |
| **Priority Tax Claims** | Except to the extent that a holder of an Allowed Priority Tax Claim has been paid by the Debtor prior to the Effective Date or agreed to other treatment, Allowed Priority Tax Claims will be paid in full in Cash, including statutory interest from the Purchaser in equal monthly installments commencing in the first full month following the Effective Date such that Allowed Priority Tax Claims will be paid in no more than sixty (60) months from the Effective Date. The Purchaser may, in its sole discretion, at any time, pre-pay Allowed Priority Tax Claims. In the event of an objection by a holder of a Priority Tax Claim to the treatment of its Allowed Priority Tax Claims, Purchaser and the applicable objecting holder of a Priority Tax Claim will reach agreement on acceptable treatment of such Priority Tax Claim prior to the Effective Date. Notwithstanding the foregoing, the ability of Purchaser to reach an agreement on payment terms with holders of Allowed Priority Tax Claims shall not be a condition precedent to the Effective Date. The deferred payment of Priority Tax Claims shall not serve as a basis for the prohibition of transfers of the Liquor License from Debtor to Purchaser.<br><br>Total Estimated Allowed Priority Tax Claims not expected to exceed $366,000.<br><br>Recovery: 100% |
| **U. S. Trustee Fees** | All fees payable in the Case under 28 U.S.C. § 1930, if and to the extent due, or as otherwise determined by the Bankruptcy Court, will, if not previously paid, be paid in full in Cash on the Effective Date and will continue to be paid pursuant to the Transition Agreement as required |

US_ACTIVE-105108638.10

| | under 28 U.S.C. § 1930 until such time as an order is entered by the Bankruptcy Court closing the Case.<br><br>Total Estimated Allowed Claims not expected to exceed $10,000<br><br>Recovery: 100% |
|---|---|
| **Class 1(A)** | **Unimpaired** |
| **Senior Secured Lender Claims – Post-petition DIP Advances** | Class 1(A) consists of Claims of the Senior Secured Lender arising out of and related to the Post-Petition DIP Advances. On the Effective Date, the Senior Secured Lender shall receive either title to the Collateral securing repayment of the Post-Petition DIP Advances in full or partial satisfaction of the Post-Petition DIP Advances, as applicable; or Cash payments in an amount equal to the outstanding amount of the Post-Petition DIP Advances, including payment of interest at the rate provided in the Post-Petition DIP Advances Order and reimbursement of all fees and costs, including attorney fees and costs incurred by the Senior Secured Lender on a prepetition and postpetition basis in connection with the Post-Petition DIP Advances. All contractual rights of subordination, guarantees and judgments granted to the Senior Secured Lender will remain in effect and not be altered or impaired in any manner by this Plan before or after the Effective Date. Further, nothing herein shall be deemed a waiver of any rights or remedies or a satisfaction of any claims that the Senior Secured Lender may have against Dr. Patel and/or Patel-Related Entities for damages arising out of, *inter alia*, intentional misrepresentation or concealment, misappropriation, the Post-Petition Equity Transfer, collusion, and/or tortious interference.<br><br><br>Total estimated Allowed Class 1(A) Claim in the approximate principal amount of $3,000,000, plus interest, fees, and costs.<br><br>Estimated Recovery: up to 100% (as determined by the Sale) |

US_ACTIVE-105108638.10

| Class 1(B) | Unimpaired |
|---|---|
| **Senior Secured Lender Claims – Pre-Petition Senior Secured Loan** | Class 1(B) consists of Claims of the holder of the Pre-Petition Senior Secured Loan.  On the Effective Date, the Senior Secured Lender shall receive either title to the Collateral securing repayment of the Pre-Petition Senior Secured Loan in full or partial satisfaction of the Pre-Petition Senior Secured Loan, as applicable after the Sale, or Cash payments in an amount equal to the outstanding amount of the Pre-Petition Senior Secured Loan, including payment of interest at the contract default rate of interest and reimbursement of all fees and costs, including attorney fees and costs incurred by the Senior Secured Lender on a prepetition and postpetition basis.    All contractual rights of subordination, guarantees, and judgments granted to the Senior Secured Lender will remain in effect and not be altered or impaired in any manner by this Plan before or after the Effective Date.  Further, nothing herein shall be deemed a waiver of any rights or remedies or a satisfaction of any claims that the Senior Secured Lender may have against Dr. Patel and/or Patel-Related Entities for damages arising out of, *inter alia*, intentional misrepresentation or concealment, misappropriation, the Post-Petition Equity Transfer, collusion, and/or tortious interference.<br><br>Total estimated Allowed Class 1(B) Claim in the approximate principal amount of $49,600,00, plus, among other things, interest accruing at the default rate from July 23, 2010, attorney fees, costs, and expenses.<br><br>Estimated Recovery:  up to 100% (as determined by the Sale). |

- 27 -

| Class 2 | Unimpaired |
| --- | --- |
| **Other Secured Claims** | Holders of Class 2 Claims consist of holders of Allowed Secured Claims other than the Secured Claims of the Senior Secured Lender.  In full and final satisfaction, settlement, release, and discharge of Allowed Class 2 Claims, and except to the extent holders of Class 2 Claims agree to different treatment, on the Effective Date, the holders of Allowed Class 2 Claims shall receive a distribution in Cash from the Cash Payment in full satisfaction of their Allowed Class 2 Secured Claim. <br><br> Total estimated Allowed Class 2 Claims not expected to exceed $1,326,845 <br><br> Estimated Recovery:  100% |

| Class 3 | Impaired |
| --- | --- |
| **Priority Claims** | Holders of Class 3 Claims consist of holders of Allowed Priority Claims, excluding Allowed Priority Tax Claims. In full and final satisfaction, settlement, release, and discharge of Allowed Class 3 Claims, on the Effective Date, and after satisfaction of Allowed Class 2 Secured Claims and Allowed Administrative Expense Claims, the holders of Allowed Class 3 Claims shall receive a distribution from the remaining proceeds of the Cash Payment, if any, until paid in full or in *a pro rata* share agreed to by the parties. <br><br> Total estimated Allowed Class 3 Claims not expected to exceed $960,845 <br><br> Estimated Recovery:  100% of principal |

US_ACTIVE-105108638.10

| Class 4 | Impaired |
|---|---|
| **General Unsecured Claims** | Holders of Class 4 Claims consist of holders of Allowed General Unsecured Claims.  In full and final satisfaction, settlement, release, and discharge of Allowed Class 4 Claims, holders of Allowed Class 4 Claims will receive from the Trustee a *Pro Rata* share of the Trust Assets until paid in full.  Distributions to the holders of Allowed Class 4 Claims will be made at the discretion of the Trustee in accordance with the Trust Agreement.<br><br>Total estimated Allowed Class 4 Claims expected to be between $2,900,000 and $5,200,000.<br><br>Estimated Recovery:  Approximately 19%-34% on the Effective Date with additional recoveries to be received from the proceeds of the Avoidance Actions. |

| Class 5 | Impaired |
|---|---|
| **Subordinated Unsecured Claims** | Class 5 consists of (i) Disputed Claims of Dr. Patel, the Patel-Related Entities and/or any Insider to the extent Allowed and not recharacterized as Interests, and (ii) any Subordinated Unsecured Claims.  The holders of Allowed Class 5 Claims are not expected to receive any distributions on account of such Claims.<br><br>Estimated Recovery:  0% |

| Class 6 | Impaired |
|---|---|
| **Equity Interests** | On the termination date of the Transition Agreement, Allowed Class 6 Interests will be deemed automatically cancelled without further action by the Debtor.  The holders of Class 6 Interests will receive no distribution under the Plan.  The Confirmation Order will enjoin the holders of Class 6 Interests from taking any action that may in any way interfere with or impede the Sale and/or the provisions of the Transition Agreement.<br><br>Recovery:  0% |

US_ACTIVE-105108638.10

**4.2**     **Classification and Treatment of Allowed Claims and Equity Interests**

    (a)     <u>Unclassified Allowed Claims</u>

       The Bankruptcy Code does not require administrative and certain priority claims to be classified under a chapter 11 plan.  Accordingly, Administrative Expense Claims, Priority Tax Claims, Professional Fee Claims, and statutory fees payable to the United States Trustee have not been classified in the Plan.  The Plan proposes to treat such Claims as follows:

          (i)     <u>Administrative Expense Claims</u>

       Unless otherwise agreed to by the holder of an Allowed Administrative Expense Claim and the Purchaser, or as otherwise expressly provided for in the Plan, each holder of an Allowed Administrative Expense Claim will receive in full and final satisfaction of its Administrative Expense Claim an amount of Cash equal to the amount of such Allowed Administrative Expense Claim either:  (a) in the ordinary course following the Effective Date, or (b) if the Administrative Expense Claim is not Allowed as of the Effective Date, within thirty (30) days after the date on which an order Allowing such Administrative Expense Claim becomes a Final Order, or as soon as reasonably practicable thereafter; <u>provided</u> <u>however</u>, that Allowed Administrative Expense Claims representing post-petition liabilities incurred by the Debtor in the ordinary course of business which are not materially past due (of which the Debtor submits there are none) shall be paid in accordance with the terms and conditions of the particular transactions relating to such liabilities and any related agreements.  Receipt of the amount of the Allowed Administrative Expense Claim by a holder of such Claim as provided for in the Plan shall constitute full satisfaction, settlement, release, extinguishment, and discharge of such Allowed Administrative Expense Claim as of the date paid.

          (A)     <u>Administrative Expense Claim Bar Date</u>.  All requests for allowance and payment of Administrative Expense Claims other than Cure Claims, but including Claims asserted pursuant to section 503(b)(9) of the Bankruptcy Code ("<u>Section 503(b)(9) Claims</u>"), must be filed with the Bankruptcy Court and served in accordance with the Bankruptcy Rules by the Administrative Expense Claims Bar Date.  The Debtor, the Purchaser, and the Trustee will have thirty (30) days after the Administrative Expense Claims Bar Date to review and object to such Administrative Expense Claims before a hearing for determination on the allowance of such Administrative Expense Claims is held by the Bankruptcy Court; provided that, such thirty (30) day period of review may be extended by the Bankruptcy Court upon request of the Purchaser or Trustee.  Administrative Expense Claims that are not timely filed will be disallowed automatically and deemed forever barred, estopped, and enjoined from assertion, and without the need for any objection by the Purchaser or the Trustee or any further notice to or action, order, or approval of the Bankruptcy Court, and are not enforceable against the Purchaser or the Trust, as the case may be.

          (B)     <u>Post-Petition Tax Claims</u>.  All requests for payment of Administrative Expense Claims by a governmental unit for taxes (and for interest and/or penalties related to such taxes) for any tax year or period, all or any portion of which occurs or falls within the period from and including the Petition Date through and including the Effective Date ("<u>Post-Petition Tax Claims</u>") and for which no bar date has otherwise been previously

- 30 -

established, must be filed on or before the later of (i) the Administrative Expense Claims Bar Date; or (ii) ninety (90) days following the filing with the applicable governmental unit of the tax return for such taxes for such tax year or period. Any holder of any Post-Petition Tax Claim that is required to file a request for payment of such taxes and does not file such a Claim by the applicable bar date shall be forever barred from asserting any such Post-Petition Tax Claim against the Debtor, the Purchaser, or their respective assets, whether any such Post-Petition Tax Claim is deemed to arise prior to, on, or subsequent to the Effective Date.

(ii)    <u>Compensation and Reimbursement Claims</u>

All Professionals or other Persons seeking Bankruptcy Court approval of Professional Compensation incurred through and including the Effective Date, other than Lender Professionals, must file, where applicable, their respective final applications for allowance of Professional Compensation within thirty (30) days following the Effective Date; and Allowed Professional Claims may be paid on the date when the order relating to any such Administrative Expense Claim is a Final Order, or on such other terms as may be mutually agreed upon. Professional Compensation Claims include Lender Professional Claims which are to be paid by the Purchaser on the Effective Date.

(iii)    <u>Priority Tax Claims</u>

Except to the extent that a holder of an Allowed Priority Tax Claim has been paid by the Debtor prior to the Effective Date or agreed to other treatment, Allowed Priority Tax Claims will be paid in full in Cash, including statutory interest from the Purchaser in equal monthly installments commencing in the first full month following the Effective Date such that Allowed Priority Tax Claims will be paid in no more than sixty (60) months from the Effective Date. The Purchaser may, in its sole discretion, at any time, pre-pay Allowed Priority Tax Claims. In the event of an objection by a holder of a Priority Tax Claim to the treatment of its Allowed Priority Tax Claims, Purchaser and the applicable objecting holder of a Priority Tax Claim will reach agreement on acceptable treatment of such Priority Tax Claim prior to the Effective Date. Notwithstanding the foregoing, the ability of Purchaser to reach an agreement on payment terms with holders of Allowed Priority Tax Claims shall not be a condition precedent to the Effective Date. The deferred payment of Priority Tax Claims shall not serve as a basis for the prohibition of transfers of the Liquor License from Debtor to Purchaser.

(iv)    <u>Statutory Fees Pursuant to 28 U.S.C. §1930</u>

All fees payable in the Case under 28 U.S.C. § 1930, if and to the extent due, or as otherwise determined by the Bankruptcy Court, will, if not previously paid, be paid in full in Cash on the Effective Date and will continue to be paid pursuant to the Transition Agreement as required under 28 U.S.C. § 1930 until such time as an order is entered by the Bankruptcy Court closing the Case.

(b)    <u>Classification and Treatment of Allowed Claims and Equity Interests</u>

A Claim or Equity Interest is placed in a particular Class only to the extent that the Claim or Equity Interest falls within the description of that Class, and is placed in other Classes to the extent that any portion of the Claim or Equity Interest falls within the description of such other

US_ACTIVE-105108638.10

Classes.  A Claim is also placed in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and such Claim has not been paid, released or otherwise settled prior to the Effective Date.  See above summary for discussion regarding classification and treatment of Allowed Claims and Equity Interests.

## ARTICLE V - MEANS OF IMPLEMENTATION OF THE PLAN

### 5.1    Source of Consideration for Plan Distributions.

(a)    Distribution Sources.  Distributions under the Plan will be funded from two sources: (i) the Purchaser with respect to Cash consideration under the Agreement and Assumed Liabilities, and (ii) the Trust with respect to Trust Assets.

(b)    The Sale.  The Plan will be funded through a sale of substantially all of the Debtor's assets (as defined in the Agreement, the "Purchased Assets").  The Purchaser shall make the initial bid for the Purchased Assets pursuant to the terms of the Agreement, but the Purchaser's bid is subject to higher and better offers.  Upon entry of the Confirmation Order approving the Plan, bid procedures will be established to solicit other qualified offers for the Purchased Assets, and if necessary, conduct an auction to determine the highest and best offer.  On the Effective Date, the Purchaser will acquire the Purchased Assets, which include all of the Debtor's assets other than the Excluded Assets.  The Senior Secured Lender's bid represents the initial offer for the Debtor's assets.  Provided that the Purchaser is the Senior Secured Lender or its designee, the Sale consideration will include, at a minimum, the following:

A.    Senior Secured Lender's credit bid (in an amount to be determined during the Sale) of up to the outstanding balance due under the Post-Petition DIP Advances and the Pre-Petition Senior Secured Loan.  The balances due under the Post-Petition DIP Advances and the Pre-Petition Senior Secured Loan consist of the principal balance of approximately $49,600,000 and $3,000,000 (assuming the Post-Petition DIP Advances are fully funded), respectively, plus additional advances, interest at the default rate, attorneys' fees, costs and other expenses.

B.    Senior Secured Lender's funding $2,140,718 for construction completion in addition to the funds in the Construction Reserve Account.

C.    Senior Secured Lender's Cash payment of $3,726,505 to be distributed as follows:

1.    First, in payment of Allowed Class 2 Secured Claims on the Effective Date until paid in full;

2.    Second, in payment of Allowed Administrative Expense Claims on the Effective Date until paid in full;

3.    Third, in payment of Allowed Class 3 Priority Claims on the Effective Date until paid in full;

US_ACTIVE-105108638.10

4.      Fourth, in payment of Allowed Priority Tax Claims until paid in full; and

5.      Fifth, the balance, if any, contributed to the Trust for the benefit of holders of Allowed Class 4 Claims and distributable in accordance with the terms of the Trust Agreement (until paid in full); and

D.      Senior Secured Lender's carve-out of $1,000,000 from distribution on account of its Pre-Petition Senior Secured Loan to be contributed to the Trust in Cash on the Effective Date for the benefit of holders of Allowed Class 4 Claims and distributable in accordance with the terms of the Trust Agreement.

## 5.2    The Trust

(a)     Creation of the Trust.  On the Effective Date, the Trust will be formed.  The Trust Agreement, in substantially the same form as included in an exhibit to the Plan Supplement, will be approved by the Bankruptcy Court pursuant to the Confirmation Order and executed by the Trustee, and all other necessary steps shall be authorized by the Bankruptcy Court and taken to establish the Trust.

(i)     Purpose of Trust.  The Trust will be established and maintained, in accordance with Treasury Regulation section 301.7701-4(d), for the purpose of collecting, holding, liquidating, monetizing and distributing the Trust Assets, resolving and administering Claims, and prosecuting Causes of Action that are transferred to the Trust pursuant to the Plan.  The Trust will not continue or engage in the conduct of a trade or business.

(ii)    Trust Assets.  On the Effective Date, all right, title and interest to the following assets of the Debtor and its Estate will be assigned, set over, transferred, and conveyed to the Trust, free and clear of Liens, Claims or encumbrances and without action required of the Trustee to effectuate the transfer of Trust Assets:

(A)     The Trust Unsecured Payment in the amount $1,000,000 (provided that the Purchaser is the Senior Secured Lender or its designee); and

(B)     (i) All Avoidance Actions; (ii) all Claims or Causes of Action relating to Excluded Assets; and (iii) the balance of the Cash Payment, if any, after payment in full of all, Allowed Class 2 Secured Claims, Allowed Administrative Expense Claims, Allowed Class 3 Claims, and Allowed Priority Tax Claims.

To the extent that certain Trust Assets, because of their nature or because they will accrue subsequent to the Effective Date, cannot be assigned, set over, transferred or conveyed to the Trust on the Effective Date, these

US_ACTIVE-105108638.10

assets will be deemed assigned, set over, transferred and conveyed to the Trust as soon as practical after the Effective Date.  Trust Assets shall not include any contractual rights of subordination, guarantees or judgments which are retained by the Senior Secured Lender.   On or after the Effective Date, with respect to all Claims constituting Excluded Assets, the Trustee will continue as a plaintiff in Causes of Action (on behalf of the Beneficiaries) of the Trust in which the Debtor was a plaintiff prior to the Effective Date and will be deemed the assignee of all Claims or Causes of Action that could have otherwise been asserted by the Debtor or a trustee of the Debtor if one were appointed.  All recoveries and proceeds arising from litigation and Causes of Action that are Excluded Assets will be deemed assigned, set over, transferred and conveyed to the Trust upon receipt thereof.

(iii)    Governance of the Trust.  The Trust will be controlled by the Trustee in accordance with the Trust Agreement, which will not be inconsistent with the Plan.  The Trustee will be subject to oversight by a three member oversight committee (the "Oversight Committee").  The Oversight Committee will be comprised of representatives selected by and agreed upon by the Committee and Lender.

(iv)    The Trustee.  The Trustee will be selected by the Lender.  The designation of the Trustee will be approved by the Bankruptcy Court and effective on the Effective Date without the need for a further order of the Bankruptcy Court.   The Trustee will exercise reasonable business judgment to administer the Trust Assets and make timely distributions from the Trust to the Beneficiaries of the Trust.

(v)    Costs and Expenses of the Trustee.  The costs and expenses of the Trust, including the fees and expenses of the Trustee and its retained professionals, will be paid from the proceeds of Trust Assets.  The Trustee may retain or reserve amounts estimated by the Trustee, based on his reasoned business judgment, to fund the fees and expenses of the Trustee and the professionals of the Trustee in a Liquidation Expense Reserve Account. The Trust may increase or decrease amounts held in a Liquidation Trust Reserve Account at the reasonable discretion of the Trustee.  The Trustee shall submit a three month budget for approval to the Oversight Committee on an ongoing basis.

(vi)    Compensation of the Trustee.  The Trustee intends to be paid certain contingency amounts which shall be set forth in the Trust Agreement and approved in the Confirmation Order.

(vii)    Distribution of Trust Assets.  The Trustee will make distributions of proceeds of Trust Assets to Beneficiaries at the discretion of the Trustee and in accordance with the Trust Agreement, and this Plan, except such amounts (i) that would otherwise be distributable to a holder of a Disputed

US_ACTIVE-105108638.10

Claim if such Disputed Claim had been Allowed prior to the time of such distribution (but only until such Claim is Allowed); (ii) that are reasonably necessary to meet future costs of administration and contingent liabilities and to maintain the value of the assets of the Trust during administration of the Trust and Trust Assets; (iii) to pay reasonable expenses (including, but not limited to, any taxes imposed on the assets of the Trust or in respect of the Trust); and (iv) to satisfy other liabilities incurred by the Trust as authorized by the Trustee in accordance with this Plan or the Trust Agreement.

(viii)   Retention of Professionals by the Trustee.   The Trustee will determine and retain primary counsel to the Trust and may retain and reasonably compensate such additional counsel and other professionals (subject to approval by the Oversight Committee) to assist in its duties as the Trustee.   The Trustee may retain any professional who represented parties in interest (including the Committee) in the Case.   The Trustee may retain legal counsel on a contingency fee basis to pursue certain Causes of Action that constitute Trust Assets.

(ix)   Authority to Settle and Grant Releases.   The Trustee, subject to prior notice to and approved by the Oversight Committee, and Bankruptcy Court approval for Claims or Causes of Action asserted in amounts in excess of $250,000, is authorized to compromise, settle, release and discharge Claims to the fullest extent permitted by law.

(x)   Attorney-Client Privilege.   On the Effective Date, any attorney-client privilege, work-product privilege or other privilege or immunity that the Debtor or the Estate are entitled to assert will vest in the Trust (and the attorneys and agents of the Trust) and the Trustee shall be entitled to assert or waive privileges and immunities to the same extent that the Debtor was entitled to do so prior to the Effective Date.

(xi)   Transfer of Claims of Debtor and the Estate to Trust.   A full investigation of potential Claims and Causes of Action has not been undertaken at this time.   Potential Claims and Causes of Action may exist as against, among others, (i) Persons (and/or subsidiaries and affiliates thereof) identified in items 3(a) and 3(b) of the Debtor's Statement of Financial Affairs (and other Persons subsequently discovered as having received payments that should have been listed and identified in item 3(a) or 3(b) of the Debtor's Statement of Financial Affairs, but were not); and (ii) other Claims and Causes of Action identified by the Trustee in the course of its post-Effective Date due diligence.   On the Effective Date, the Trustee will be substituted for the Debtor or Committee as party in any pending Cause of Action, adversary proceeding, contested matter, motion or action pending in the Bankruptcy Court or any other court arising from or relating to an Excluded Asset.

US_ACTIVE-105108638.10

(xii)    <u>Reservation of Causes of Action.</u>  All Claims and Causes of Action constituting an Excluded Asset are expressly reserved for the benefit of the Trust and its Beneficiaries, including, without limitation, potential Claims and Causes of Action against, among others:

(C)    Persons (and/or subsidiaries and affiliates thereof) identified in the Debtor's items 3(a) and 3(b) of the Debtor's Statement of Financial Affairs (and other Persons subsequently discovered as having received payments that should have been listed and identified in item 3(a) or 3(b) of the Debtor's Statement of Financial Affairs but were not);

(D)    Dr. Patel and/or Atul Bisaria, in their personal capacity and in the capacity as director and/or officer of the Debtor. Without limiting the scope of this reservation, all Claims and Causes of Action relating to actions/inactions committed, directed or authorized by Dr. Patel and/or Atul Bisaria, in any capacity with the Debtor are expressly reserved as well as all Causes of Action relating to Pre-Petition and Post-Petition transfers from the Debtor to Atul Bisaria, Dr. Patel, and/or the Patel-Related Entities, potential Causes of Action under applicable corporate/business/ fiduciary law, and other Claims and Causes of Action arising from or relating to ownership, management, control and other interactions and transactions among the Debtor, Atul Bisaria, Dr. Patel and/or the Patel-Related Entities;

(E)    the Patel-Related Entities and all Persons related thereto or associated therewith.    Without limiting the scope of this reservation, all Causes of Action relating to the aforementioned parties' involvement with the Debtor, including, without limitation Post-Petition and Pre-Petition transfers from the Debtor to or for the benefit of the Patel-Related Entities, are expressly reserved;

(F)    all Claims and Causes of Action against "insiders" as that term is defined in 11 U.S.C. § 101, including, but not limited to any and all Claims that may be covered under an Insurance Policy; and

(G)    all creditors that secured judgments or liens within ninety days prior to the Petition Date, or may otherwise be subject to an Avoidance Action.

(xiii)    <u>Federal Income Tax Treatment of Trust</u>.  For all federal income tax purposes, all parties (including, without limitation, the Debtor, the Trustee and the Beneficiaries) are required to treat the transfer of the Trust Assets to the Trust for the benefit of the Beneficiaries of the Trust, whether the Claims of such Beneficiaries are allowed prior to the Effective Date, as

US_ACTIVE-105108638.10

(A) a transfer of the Trust Assets directly to the Beneficiaries (other than to the extent allocable to Disputed General Unsecured Claims) followed by (B) the transfer by the Beneficiaries of Trust Assets to the Trust in consideration of beneficial interests in the Trust. Beneficiaries of the Trust will be treated for federal income tax purposes as the grantors and owners of their respective interests of the Trust Assets.

(xiv)    Tax Reporting. The Trustee will file any necessary tax returns for the Debtor for the period prior to the Effective Date and for the Trust as a grantor trust pursuant to Treasury Regulation section 1.671-1 through 4(a) and in accordance with this section 6.1(o).

(xv)    Subject to definitive guidance from the Internal Revenue Service or a court of competent jurisdiction to the contrary (including the receipt by the Trustee of a private letter ruling if the Trustee so requests one, or the receipt of an adverse determination by the Internal Revenue Service upon audit if not contested by the Trustee), the Trustee will (i) treat any Trust Assets allocable to, or retained on account of, Disputed Claims as held by one or more discrete trusts for federal income tax purposes (the "Disputed Claim Reserve") in accordance with the trust provisions of the Tax Code (section 641 *et seq.*); (ii) treat as taxable income or loss of the Disputed Claim Reserve, with respect to any given taxable year, the portion of the taxable income or loss of the Trust that would have been allocated to the holders of Disputed Claims had such Claims been Allowed on the Effective Date (but only for the portion of the taxable year with respect to which such Claims are unresolved); (iii) treat as a distribution from any reserve established under the Trust any increased amounts distributed by the Trust as a result of any Disputed Claims resolved earlier in the taxable year, to the extent such distributions relate to taxable income or loss of the Trust determined in accordance with the provisions hereof; and (iv) to the extent permitted by applicable law, report consistent with the foregoing for state and local income tax purposes. All holders of Allowed General Unsecured Claims shall report, for tax purposes, consistent with the foregoing.

(xvi)    The Trustee will be responsible for payments, out of, and only to the extent of, the Trust Assets, of any taxes imposed on the Debtor, the Estate, the Trust or the Trust Assets, including any Disputed Claim Reserve established under the Trust. In the event, and to the extent, any Cash retained on account of Disputed General Unsecured Claims in any Disputed Claim Reserve established under the Trust is insufficient to pay the portion of any such taxes attributable to the taxable income arising from the assets allocable to, or retained on account of, Disputed General Unsecured Claims, such taxes may be (i) reimbursed from any subsequent Cash amounts retained on account of Disputed General Unsecured Claims, or (ii) to the extent such Disputed General Unsecured Claims have subsequently been resolved, deducted from any amounts distributable by

- 37 -

the Trustee as a result of the resolutions of such Disputed General Unsecured Claims.

(xvii)  Reservation for the United States.  The United States Internal Revenue Service right to challenge the tax treatment of the Trust as stated in the Plan is reserved.

(xviii) Dissolution.  The Trust will be dissolved and the Trustee discharged at such time as (i) all Disputed Claims, whether classified or unclassified of potential Beneficiaries of the Trust have been resolved, (ii) all Trust Assets have been monetized, liquidated or abandoned and (iii) all distributions required to be made by the Trustee under the Plan and Trust Agreement have been made.  In no event will the Trust be dissolved after a period that would adversely affect the status of the Trust as a liquidating trust for federal income tax purposes.  The Trust will only exist as long as is necessary to facilitate or complete the recovery and liquidation of the Trust Assets and distribution of their proceeds to Beneficiaries of the Trust.  The Trustee will not unduly prolong the duration of the Trust and will at all times endeavor to resolve, settle or otherwise dispose of all Claims that constitute Trust Assets and effect the distribution of the Trust Assets in accordance with the terms of the Plan and the Trust Agreement. Trust Assets will be distributed to the Beneficiaries of the Trust pursuant to the provisions set forth in Section IV of the Trust and sections 4.5 and 6.2(a)(vii) of the Plan.

(xix)  Indemnification of Trustee.  The Trustee and the Trustee's agents and professionals will not be liable for actions taken or omitted in their capacity as, or on behalf of, the Trustee, except those acts or omissions arising out of willful misconduct or gross negligence, and each of the Trustee, the Trustee's agents and the Trustee's professionals will be entitled to indemnification and reimbursement for fees and expenses in defending any and all of its actions or inactions in its capacity as, or on behalf of, the Trustee, except for any actions or inactions involving willful misconduct or gross negligence. Any indemnification claim of the Trustee (and the other parties entitled to indemnification under this subsection) will be satisfied from Trust Assets prior to distributions to Beneficiaries of the Trust.  The Trustee will be entitled to rely, in good faith, on the advice of its retained professionals.

**5.3    Effectuating the Sale.**

(a)    Approval of the Sale and Authorization to Perform.  The filing of the Plan will be deemed to constitute a motion for an order of the Bankruptcy Court approving, pursuant to Bankruptcy Code sections 105, 363, 365, 1123 and 1129(b)(2)(A)(ii), the Agreement and actions contemplated thereunder, including without limitation, the sale of the Purchased Assets free and clear of all Liens, Claims, encumbrances, and any and all other interests, except as otherwise provided in the Plan and Agreement.  The Plan and the Confirmation Order shall be

US_ACTIVE-105108638.10

presumptively deemed to comply with all requirements of the Bankruptcy Code, and the Bankruptcy Rules. Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Agreement, establishment of the applicable bid procedures, and authorization for the Debtor, the Seller, the Purchaser, and the Trustee to effectuate all transactions contemplated therein.

On the Effective Date, the Debtor, Seller, Purchaser, and Trustee, as applicable, will each execute all documents and take other actions necessary or required to transfer, sell and convey, and where applicable, assume and assign, all of the Purchased Assets to the Purchaser and otherwise effectuate all transactions contemplated under the Agreement and the Plan.

(b)    Sale Consideration.  The Purchaser will pay the Total Consideration on the Effective Date.  Provided that the Purchaser is the Senior Secured Lender or its designee, the total consideration will consist of the Senior Secured Lender's credit bid, the Cash consideration, and Assumed Liabilities.

(c)    Transfer of Purchased Assets.  On the Effective Date, the Sale will be consummated and the Purchased Assets sold, transferred, conveyed, assumed and assigned from the Debtor to the Purchaser, free and clear of Liens, Claims and encumbrances except as otherwise provided in the Plan and the Agreement.  The Debtor will execute all documents necessary to sell, transfer, convey, assume and assign the Purchased Assets as contemplated under the Agreement.

In consideration of the sale, transfer, conveyance, assumption and assignment of the Purchased Assets by the Debtor to the Purchaser, the Purchaser will:

(i)    Pay the Cash consideration, subject to adjustment, as provided for under Plan;

(ii)    Accept assignment of the contracts to be assumed;

(iii)    Assume and pay amounts required to be paid by Purchaser on the Effective Date (or when otherwise due) in accordance with the Agreement with respect to Assumed Liabilities and Allowed Administrative Expense Claims.

## 5.4    **Transfer Taxes.**

Pursuant to section 1146(a) of the Bankruptcy Code, the consummation of the transactions contemplated by the Agreement and Plan, which may include, but is not limited to, the assignment or surrender of any lease or sublease, and the delivery of any deed or other instrument of transfer (including, without limitation, any deeds, bills of sale or assignments executed in connection with any disposition of assets contemplated by the Plan) will be deemed to be in furtherance of or in connection with the Plan and will not be subject to any stamp, real estate transfer, mortgage recording or other similar tax.

US_ACTIVE-105108638.10

5.5    **Corporate Action.**

On the Effective Date, all actions contemplated to be performed by the Debtor pursuant to the Sale Documents are authorized and approved in all respects.  Debtor is directed to take all actions required of the Debtor under the Plan, Sale Documents, and/or Plan Documents, including the Transition Agreement and the Trust Agreement.  In the event Debtor fails to consummate the Sale, the Transition Agreement, or any other transaction contained in or contemplated by the Plan and/or any applicable Plan Document, then upon request by the Senior Secured Lender, the Bankruptcy Court will appoint a Chief Restructuring Officer (or such other officer) for the Debtor with authority (i) to consummate the Sale and any other transactions contemplated in the Plan and/or Plan Documents and (ii) to execute the Agreement, the Transition Agreement, and any other document or instrument necessary or appropriate to effectuate the Plan and any transaction contemplated by or in the Plan and/or any Plan Document.

5.6    **Vesting of Assets in the Trust.**

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan, pursuant to sections 1123(a)(5), 1123(b)(3) and 1141(b) of the Bankruptcy Code, on the Effective Date, all property of the Estate constituting Excluded Assets will vest in the Trust free and clear of all Liens, Claims, charges, or other encumbrances. Notwithstanding the foregoing, the Post-Petition DIP Advances and Pre-Petition Senior Secured Loan and related loan documents shall remain in full force and effect except as expressly modified in the Plan.

5.7    **Distributions.**

Distributions will be made in accordance with the Plan.

5.8    **Subrogation Claims.**

All Subrogation Claims of the Debtor and the Estate will be assigned and transferred to the Trust on the Effective Date.

5.9    **Cancellation of Notes, Instruments, Certificates and Other Documents.**

On the Effective Date, except to the extent otherwise provided in the Plan, all notes, instruments, certificates, and other documents evidencing Claims or Interests will be cancelled and the obligations of the Debtor discharged in accordance with section 1141(d)(1) of the Bankruptcy Code.  Notwithstanding the foregoing, the Pre-Petition Senior Secured Loan and related loan documents shall remain in full force and effect, except as expressly modified in the Plan.

US_ACTIVE-105108638.10

### 5.10    Cancellation of Existing Securities and Agreements.

On the Effective Date, except as expressly provided in this Plan, the securities, promissory notes, trust indentures, share certificates, security agreements, deeds of trust, collateral agency agreements and other instruments evidencing or securing a Claim will be deemed cancelled without further act or action under any applicable agreement or law, and the obligations of the Debtor under the agreements, instruments, trust indentures and certificates governing and securing such Claims, as the case may be, will be discharged.  Subordination agreements in favor of the Senior Secured Lender shall survive the Effective Date.

### 5.11    Release of Liens.

Except as otherwise specifically provided in the Plan or in any contract, instrument or other agreement or document created in connection with the Plan, (i) each holder of:  (a) any purported Secured Claim and/or (b) any judgment, personal property or *ad valorem* tax, molder, warehouse or artisan or similar Lien Claim, in each case regardless of whether such Claim is an Allowed Claim, shall, on or immediately before the Effective Date and regardless of whether such Claim has been scheduled or proof of such Claim has been filed:  (y) turn over and release to the Estate any and all property of the Debtor or the Estate that secures or purportedly secures such Claim, or such Lien and/or Claim shall automatically, and without further action by the Plan Proponent, the Purchaser, the Debtor or the Trustee, as the case may be, be deemed released and (z) execute such documents and instruments as the Plan Proponent, the Purchaser, the Debtor or Trustee, as the case may be, requires to evidence the holder of a Claim's release of such property or Lien, and if such holder refuses to execute appropriate documents or instruments, the Plan Proponent, the Purchaser, the Debtor or the Trustee, as the case may be, in its discretion, file a copy of the Confirmation Order in the appropriate recording office, which shall serve to release any holder of a Claim's rights in such property; and (ii) immediately before the Effective Date, all right, title and interest in such property shall revert or be transferred to the Debtor, free and clear of all Claims, interests, and Liens of any kind, and thereafter be transferred to the Purchaser and the Trust, as applicable.

### 5.12    Books and Records.

As soon as reasonably practicable after the Effective Date, Debtor or its designee will transfer possession of all accounting, business, financial and tax records and information (i) relating to the Purchased Assets or the Assumed Liabilities that are in existence on the Effective Date to Purchaser and (ii) coming into existence after the Effective Date that relate to the Purchased Assets or the Assumed Liabilities before the Closing Date, to the management company or other designee identified by Purchaser.  In addition, from and after the Effective Date, Debtor or its designee shall provide access to Purchaser and its designees, (after reasonable notice and during normal business hours and without charge), to the books, records, documents and other information relating to the Purchased Assets or the Assumed Liabilities as Purchaser may reasonably deem necessary.  Such access shall include, without limitation, access to any computerized information retrieval systems relating to the Purchased Assets or the Assumed Liabilities.

US_ACTIVE-105108638.10

### 5.13    Closing of Case by Charitable Gift.

If at any time the Trustee determines that the expense of administering the Trust or distributing Trust Assets to Beneficiaries is likely to exceed the value of the Trust Assets remaining in the Trust, the Trustee may (i) reserve any amounts necessary to close the Case; (ii) donate any balance of Trust Assets or their proceeds to a charitable organization exempt from federal income tax under section 501(c)(3) of the Tax Code that is unrelated to the Debtor and any insider of the Debtor; and (iii) close the Case in accordance with the Bankruptcy Code and Bankruptcy Rules.

### 5.14    Labor Organizations and Labor Agreements.

Upon the Effective Date (and no earlier), the Purchaser will recognize and bargain with those labor organizations respectively, who are currently representing an appropriate unit of employees at the Hotel, where federal labor law requires the Purchaser to do so, including observing the terms of all labor agreements currently in effect, and where the labor agreement has expired, the applicable terms and conditions of employment now in effect for employees in each bargaining unit, except those which, by operation of law, do not survive the execution of the labor agreement covering the unit involved.  Where the labor agreement with a particular labor organization has expired, the Purchaser will enter into good faith negotiations for new labor agreements, where federal labor law requires the continuation of the bargaining relationship with said organization.  Pending the execution of new labor agreements in each applicable bargaining unit, the Purchaser will continue to staff the Hotel at those levels of employment that exist as of the Effective Date, but this commitment shall not be construed as a prohibition on the Purchaser, as the operator of the Hotel, to layoff employees or reduce their hours for economic reasons, or to discharge or discipline them for just cause.

## ARTICLE VI - PROCEDURES FOR DISPUTED CLAIM

### 6.1    Objections to Claims.

On and after the Effective Date, the Trust will be entitled to object to all Claims of potential beneficiaries of the Trust other than the Class 1(A) Claim and Class 1(B) Claim representing the Post-Petition DIP Advances and Pre-Petition Senior Secured Loan, respectively. The Plan Proponent and Purchaser may also object to Claims, including, but not limited to, Claims constituting Assumed Liabilities under the Sale Documents.

### 6.2    No Distribution Pending Allowance.

Notwithstanding any other provision of the Plan, if any portion of a Claim is a Disputed Claim, no payment or distribution to the holder of such Disputed Claim will be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim.

### 6.3    Reserve on Account of Disputed Claims.

(a)    **Establishment and Maintenance of Reserve for Disputed Claims.**  The applicable Responsible Distribution Agent will maintain a Disputed Claim Reserve at an amount equal to the aggregate of 100% of the distributable amounts to which holders of

- 42 -

such Disputed Claims would be entitled under the Plan if such Disputed Claims were Allowed Claims in their Disputed Claim Amounts or such lesser amount as required by a Final Order.  For purposes of effectuating the provisions of section 7.3(a) of the Plan and the distributions to holders of Allowed Claims, the Bankruptcy Court may set, fix or liquidate the amount of Disputed Claims pursuant to section 502(c) of the Bankruptcy Code, in which event the amounts so fixed or liquidated will be deemed the amounts of the Disputed Claim for purposes of distribution under this Plan.  In lieu of fixing or liquidating the amount of any Disputed Claim, the applicable Responsible Distribution Agent may request that the Bankruptcy Court determine the amount to be reserved for such Disputed Claim or such amount may be fixed by agreement in writing between the applicable Responsible Distribution Agent and the holder of a Disputed Claim.

(b)    **Distributions on Allowance of Disputed Claims**.  The holder of a Disputed Claim that becomes an Allowed Claim will receive distribution in Cash from the Disputed Claim Reserve of the applicable Responsible Distribution Agent as soon as practical following the date on which such Disputed Claim becomes an Allowed Claim pursuant to a Final Order.  These distributions will be made in accordance with the Plan based on the distribution(s) that would have been made to such holder under the Plan if the Disputed Claim had been an Allowed Claim on or prior to the Effective Date.  No holder of a Disputed Claim will have any Claim against the Disputed Claim Reserve or the applicable Responsible Distribution Agent with respect to such Claim until such Disputed Claim becomes an Allowed Claim pursuant to a Final Order, and no holder of a Disputed Claim will have any right to interest on such Disputed Claim except for any Reserve Income earned thereon (unless otherwise required pursuant to applicable non-bankruptcy law for Priority Tax Claims).

### 6.4    Resolution of Disputed Claims.

Unless otherwise provided in the Plan or ordered by the Bankruptcy Court after notice and a hearing, following the Effective Date, the Trustee will have the exclusive right to file objections to Claims.  Each objection must be served on the holder of the Claim to which the objection is made as soon as practicable, but in no event later than ninety (90) days after entry of the Post-Confirmation Order and Notice (subject, however, to the right of the Trustee to seek an order of the Bankruptcy Court granting an extension of time to file such objections with the Bankruptcy Court).  The Plan Proponent or Purchaser may file objections to Claims related to the Assumed Liabilities.

### 6.5    Estimation.

Irrespective of whether an objection is currently pending as to a particular Disputed Claim, if the amount of the Disputed Claim is listed as unknown, contingent, undetermined, or is otherwise unliquidated, the amount of such Disputed Claim shall be zero unless, within thirty (30) days after the Confirmation Date, the holder of the Disputed Claim requests an estimation of the amount of its Claim for this purpose from the Bankruptcy Court, and in such event, the amount of the estimated Claim shall be in the amount determined by a Final Order of the Bankruptcy Court.  Any amounts so assumed or determined shall not be binding on the Debtor, the Plan Proponent, or the Trustee for any other purposes.  The Plan Proponent and/or Trustee

US_ACTIVE-105108638.10

may pursue supplementary proceedings to object to the allowance of the Disputed Claim. All objection, estimation, and Claim resolution procedures are intended to be cumulative and not exclusive of one another.

**6.6    Distributions to Holders of Allowed Claims Upon Disallowance of Disputed Claims.**

On disallowance of any Disputed Claim, each holder of an Allowed Claim in the same Class as the disallowed Disputed Claim will be entitled to its *Pro Rata* share of Cash equal to the distribution that would have been made in accordance with the Plan to the holder of such Disputed Claim had such Disputed Claim been an Allowed Claim on or prior to the Effective Date (to the extent not already paid in full). Such distributions on account of disallowed Disputed Claims will be made as soon as practicable. On allowance or disallowance of all or a portion of such Disputed Claims, the applicable Responsible Distribution Agent will make appropriate distributions in accordance with the Plan.

## ARTICLE VII - TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### 7.1    Rejection of Executory Contracts and Unexpired Leases.

(a)    <u>General Treatment</u>. On the Effective Date, all executory contracts and unexpired leases to which the Debtor is a party shall be deemed automatically rejected in accordance with the provisions and requirements of sections 365 and 1123(b)(2) of the Bankruptcy Code, unless any such executory contract or unexpired lease: (i) has been previously subject to a Final Order of the Bankruptcy Court authorizing assumption/assignment or rejection, as the case may be, entered prior to the Effective Date; (ii) is the subject of a motion to assume, a motion to assume and assign, or a motion to reject pending as of the Effective Date; or (iii) is listed on the Schedule of Assumed Executory Contracts and Unexpired Leases which is an Exhibit to the Plan Supplement. A motion to assume executory contracts for Hotel bookings may be separately filed in connection with the Sale.

(b)    <u>Rejection Damages</u>. The Confirmation Order, as of the Effective Date, will constitute an order of the Bankruptcy Court authorizing and approving (i) the assumption and assignment of executory contracts and unexpired leases constituting contracts identified in an Exhibit to the Plan Supplement as to be acquired; and (ii) the rejection of all other Executory Contracts of the Debtor which are not otherwise identified in an Exhibit to the Plan Supplement or subject to a motion to assume/assume and assign executory contracts pending as of the Effective Date. The Plan Supplement Exhibit containing the list of Executory Contracts to be assumed may be amended from time to time up through and including the date of the Confirmation Hearing or such later date set by the Bankruptcy Court in connection with the Sale. Counterparties to executory contracts or unexpired leases that are deemed rejected as of the Effective Date will be permitted to assert any Claim on account of the rejection of such executory contracts or unexpired leases, including under section 502(g) of the Bankruptcy Code, subject to compliance with the requirements of the Plan. Unless otherwise provided by a Bankruptcy Court order, any proofs of claim asserting Claims arising from the rejection of the Debtor's executory contracts and unexpired leases pursuant to the Plan or otherwise must be

US_ACTIVE-105108638.10

filed with the Bankruptcy Court no later than thirty (30) days after the Effective Date.   Any proofs of claim arising from the rejection of the Debtor' executory contracts or unexpired leases that are not timely filed will be disallowed automatically, and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against the Trustee or the Estate, without the need for any objection by the Trustee or any further notice to or action, order, or approval of the Bankruptcy Court, and any Claim arising out of the rejection of the executory contract or unexpired lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules or a Proof of Claim to the contrary.   The Trustee may object to any Claim for rejection damages through the date which is seventy-five (75) days after the Effective Date or such other time as the Bankruptcy Court may subsequently set.   All Allowed Claims arising from the rejection of the Debtor's executory contracts and unexpired leases shall be classified as Class 4 General Unsecured Claims.

### 7.2    <u>Assumption of Executory Contracts and Unexpired Leases</u>.

(a)    <u>Assumption of Executory Contracts and Unexpired Leases</u>. On the Effective Date, the Debtor will assume and assign to the Purchaser all of the executory contracts and unexpired leases listed on the Schedule of Assumed Executory Contracts and Unexpired leases attached to the Plan Supplement as an Exhibit.  The Exhibit may be amended from time to time up through and including the date of the Confirmation Hearing (and such later date as may be extended by the Bankruptcy Court in connection with the Sale).  With respect to the executory contracts and unexpired leases listed on the Schedule of Assumed Executory Contracts and Unexpired Leases, the Debtor, in consultation with the Purchaser, will designate a proposed Allowed Cure Claim on the Schedule of Assumed Executory Contracts and Unexpired Leases which Schedule of Assumed Executory Contracts and Unexpired Leases will include Cure Costs identified in a schedule of the Agreement.   Counter-parties whose executory contracts and unexpired leases are listed on the Schedule of Assumed Executory Contracts and Unexpired Leases and whose Cure Claims, if any, are identified therein will have fourteen (14) days from the date of receipt of the Schedule of Assumed Executory Contracts and Unexpired Leases to file an objection to Cure Claims or otherwise object to assumption and assignment with the Bankruptcy Court; otherwise, such Cure Claims will be deemed to be Allowed Claims in the amount identified in the Schedule of Assumed Executory Contracts and Unexpired Leases.

(b)    <u>Modifications, Amendments, Supplements, Restatements, or Other Agreements</u>. Unless otherwise provided in the Plan, each executory contract or unexpired lease that is assumed pursuant to the Agreement and the Plan will include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such executory contract or unexpired lease, and all rights  related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated, or is rejected or repudiated pursuant to the Plan, the Agreement or separate motion and Final Order of the Bankruptcy Court.  Modifications, amendments, supplements, and restatements to prepetition executory contracts and unexpired leases that have been executed by the Debtor during the Case will not alter the prepetition nature of the executory contract or unexpired lease, or the validity, priority, or amount of any Claims in connection therewith.

US_ACTIVE-105108638.10

(c)     Modification of the Schedule of Assumed Executory Contracts and Unexpired Leases.  The Schedule of Assumed Executory Contracts and Unexpired Leases may be modified to add or delete contracts and leases up to two hours following the Confirmation Hearing, however, the applicable schedule identifying the Cure Claims may not be modified after the hearing on allowance of Cure Claims unless otherwise agreed by the applicable contract counter-party.

(d)     Proof of Claim Based on Executory Contracts or Unexpired Leases that Have Been Assumed.  Any and all Proofs of Claim relating to executory contracts or unexpired leases that have been assumed in the Case and assigned to the Purchaser will be deemed amended and superseded by the amount of the Allowed Cure Claim identified in the Schedule of Assumed Executory Contracts and Unexpired Leases, the Confirmation Order or other order of the Bankruptcy Court authorizing assumption of executory contracts to the Debtor and assignment of these contracts to Purchaser.

(e)     Cure of Defaults for Assumed Executory Contracts and Unexpired Leases. With respect to each of the executory contracts or unexpired leases listed on the Schedule of Assumed Executory Contracts and Unexpired Leases, a proposed Cure will be designated and the assumption and assignment of such executory contract or unexpired lease will be conditioned on the disposition of all issues with respect to Cure.  All Allowed Cure Claims shall constitute Allowed Administrative Expense Claims and will be satisfied by Purchaser by payment of the Allowed Cure Claim in Cash on the Effective Date or as soon as reasonably practicable thereafter, or on such other terms as may be either: (i) ordered by the Bankruptcy Court or (ii) agreed by the Purchaser, and applicable contract counter-party without any further notice to or action, order, or approval of the Bankruptcy Court.  Any provisions or terms of the Debtor's executory contracts or unexpired leases to be assumed and assigned pursuant to the Plan that are, or may be, alleged to be in default, shall be satisfied solely by the Cure, or by an agreed-upon waiver of the Cure.

(i)     **Cure Dispute Resolution Process (IMPORTANT BAR DATE).  The following process shall govern disputes relating to Cure:**

(A)     Counterparties to any executory contract and unexpired leases (I) designated for assumption on the Schedule of Assumed Executory Contracts and Unexpired Leases and (II) that dispute the proposed Cure Cost listed on Schedule of Assumed Executory Contracts and Unexpired Leases or who dispute assumption and assignment of an Acquired Contract for any other reason must serve counsel to the Plan Proponent, the Purchaser, the Debtor, and the Committee with a copy of any objection to the proposed Cure ("Cure Objection") so that it is received no later than fourteen (14) days prior to the Confirmation Hearing.

(B)     The Cure Objection should include: (1) the Cure Claim asserted by the objecting contract counter-party; (2) documentation that substantively and quantitatively supports the Cure Claim alleged by the objecting contract-counter party; (3) contact

US_ACTIVE-105108638.10

information of the counterparty (including but not limited to email, fax and telephone numbers at which the counterparty can be reached), and (4) the legal and factual basis for an objection to assumption and assignment of a proposed Acquired Contract.

(C)    The Plan Proponent, Purchaser and the objecting counterparty will promptly, following receipt of the Cure Objection, commence good faith negotiations of the Cure Objection.

(D)    If a Cure Objection dispute cannot be resolved by the Confirmation Hearing, the Debtor will file a notice of disputed Cure ("Cure Dispute Notice") with the Bankruptcy Court and Cure Objection disputes will be addressed by the Bankruptcy Court at a date and time set by the Bankruptcy Court.

(E)    Any time up to two hours following the Confirmation Hearing, the Plan Proponent, or the Purchaser may delete executory contracts and unexpired leases from the Schedule of Assumed Executory Contracts and Unexpired Leases.

(F)    Failure to comply with the Cure Objection dispute resolution process will result in the disallowance of the Cure Claim.  The contract counterparty will be forever barred, estopped, and enjoined from asserting a Cure Claim against the Purchaser, the Estate or the Trust in an amount that exceeds the amount listed in Schedule of Assumed Executory Contracts and Unexpired Leases.  In instances where an executory contract is to be assumed pursuant to the Agreement and the Plan and no Cure Objection has been timely filed with the Bankruptcy Court by the applicable contract counter-party, the Cure Cost listed on the Schedule of Assumed Executory Contracts and Unexpired Leases of the Agreement (notwithstanding anything included in the Schedules or in any Proof of Claim to the contrary); will be binding on all parties, including the Purchaser and contract counter-party.  The Plan Proponent, with approval of the Purchaser and notice to the Debtor and the Committee, may settle any Cure Objection without any further notice to or action, order, or approval of the Bankruptcy Court.

(f)    Entry of the Confirmation Order will constitute a finding of adequate assurance of future performance by the Purchaser within the meaning of section 365 of the Bankruptcy Code.  Objections relating to adequate assurance of future performance, or any other matters relating to the assumption and assignment of executory contracts and unexpired leases (other then Cure Claim disputes) must be asserted as an objection to confirmation of the Plan. Assumption of any executory contract or unexpired lease pursuant to the Confirmation Order or other order of the Bankruptcy Court will limit the Claims of any such contract counter-party to

- 47 -

the (i) Allowed Cure Claim and (ii) Claims for ongoing performance under the unexpired lease or executory contract by Purchaser pursuant to section 365(k) of the Bankruptcy Code.

## ARTICLE VIII - CONDITIONS PRECEDENT TO EFFECTIVENESS OF THE PLAN

8.1    **Conditions Precedent to Confirmation Date**.    The Plan shall not be confirmed by the Bankruptcy Court unless and until the following conditions shall have been satisfied or waived pursuant to Section 9.3 of the Plan:

(a)    All agreements, instruments or other documents necessary to implement the terms and provisions hereof shall be filed with the Bankruptcy Court prior to the Confirmation Hearing;

(b)    The Court shall have approved the Disclosure Statement to this Plan;

(c)    The Court shall have approved the bid procedures in substantially the form set forth in the Agreement; and

(d)    No material adverse effect on the business, assets, operations, property, condition (financial or otherwise) or prospects of the Debtor and/or Hotel, as determined by Plan Proponent, shall have occurred or be continuing.

8.2    **Conditions Precedent to Effective Date**.    Notwithstanding any other provision of the Plan or Confirmation Order, the Effective Date of the Plan shall not occur unless and until each of the following conditions has been satisfied or, if applicable, waived:

(a)    The Bankruptcy Court has entered the Confirmation Order in a form and substance acceptable to the Plan Proponent and no stay of the Confirmation Order is in effect;

(b)    Unpaid Allowed Administrative Expense Claims and UST Fees, exclusive of Lender Professional Claims, do not exceed $1,000,000 in the aggregate;

(c)    Purchaser is approved by the Bankruptcy Court as the successful bidder for the Purchased Assets and is deemed a good faith purchaser entitled to the protections of Section 363(m);

(d)    No other Order of the Bankruptcy Court necessary to effectuate the terms of the Plan is subject to a pending appeal, request for reconsideration, or otherwise is stayed;

(e)    Purchaser closes on the Sale and provides all consideration required under the Sale Documents;

(f)    All documents required to be executed by Purchaser and Seller to implement the Plan and close the Sale have been executed by Purchaser and Seller;

(g)    The Trust shall have become effective;

US_ACTIVE-105108638.10

(h)     The Claims asserted against the Plan Proponent by Dr. Patel in the Patel Adversary are dismissed with prejudice;

(i)     The Post-Petition DIP Advances have been paid in full;

(j)     The Claims asserted against the Plan Proponent and their affiliates by the Patel –Related Entities, including Atul Bisaria, are dismissed with prejudice

(k)     The statutory fees owing to the United States Trustee shall have been paid in full;

(l)     The Purchaser shall have received all authorizations, consents, and approvals necessary to implement the Plan; and

(m)     The Effective Date occurs no later than April 30, 2011.

**8.3     Waiver of Conditions Precedent**.  The Plan Proponent has the right to waive the conditions set forth in section 9.1 and 9.2 of the Plan.

**8.4     Effect of Nonoccurrence of Conditions to Effective Date**.  If the Plan Proponent determines that one of the conditions precedent set forth in sections 9.1 and 9.2 of the Plan cannot be satisfied and are not waived pursuant to section 9.3 of the Plan, then the Plan Proponent will file a notice with the Bankruptcy Court and the Confirmation Order may be vacated following notice and hearing.  If the Confirmation Order is vacated pursuant to section 9.4 of the Plan, the Plan will be null and void in all respects.

## ARTICLE IX - EFFECT OF CONFIRMATION

**9.1     Vesting of Assets.**

On the Effective Date, all property of the Estate that is an Excluded Asset will vest in the Trust free and clear of all Claims and Liens, except as provided in the Plan or the Confirmation Order.  On the Effective Date, all property of the Estate that is a Purchased Asset will vest in the Purchaser free and clear of all Claims and Liens.

**9.2     Binding Effect.**

Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code, on and after the Effective Date, the provisions of the Plan are binding on all holders of Claims against, or Equity Interests in, the Debtor and their respective successors and assigns, whether or not a Claim or Equity Interest of a holder is Impaired or Unimpaired under the Plan and whether or not such holder has accepted the Plan.

**9.3     Discharge of Claims and Termination of Equity Interests.**

Except as otherwise specifically provided in the Plan or in the Confirmation Order, the rights granted under the Plan and the payments and distributions to be made under the Plan discharge all existing debts and Claims, and terminate all Equity Interests of any kind, nature or

US_ACTIVE-105108638.10

description, whatsoever, in or against the Debtor, the Estate, their assets or properties to the fullest extent permitted by section 1141 of the Bankruptcy Code.  Except as otherwise provided under the Plan or in the Confirmation Order, on the Effective Date, all existing Claims against the Debtor and the Estate will be discharged and terminated, and all holders of Claims and Equity Interests will be precluded and enjoined from asserting against the Debtor, the Estate or any of its assets or properties, any other or further Claim or Equity Interest based upon any act or omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date, whether or not such holder has filed a Proof of Claim or is listed in the Schedules.

### 9.4    Discharge of the Debtor.

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in this Plan or in the Confirmation Order, the distributions and rights that are provided in this Plan will be in complete satisfaction, discharge, and release, effective as of the Confirmation Date (but subject to the occurrence of the Effective Date), of any and all Claims, whether known or unknown, against the Debtor or any of its assets or properties, regardless of whether the property has been distributed or retained pursuant to the Plan.  Without limiting the generality of the foregoing, the Debtor will be discharged from any and all Claims and debts of the kind specified in sections 502(g), 502(h) of 502(i) of the Bankruptcy Code, in each case whether or not (a) a Proof of Claim is filed or deemed filed under section 501 of the Bankruptcy Code, (b) a Claim is allowed under section 502 of the Bankruptcy Code, or (c) the holder of such a Claim accepted the Plan.

### 9.5    Full Release of Senior Secured Lender, BlackRock, and Midland.
Notwithstanding anything contained in the Plan to the contrary, on the Effective Date for the good and valuable consideration provided by Senior Secured Lender, BlackRock, and Midland under the Plan as Plan Proponent, the Debtor, the Committee, the Examiner, the Trust, and all Persons and Persons holding Claims or Interests in, by, through, or against the Debtor shall fully discharge and release the Lender Released Parties (and each such Lender Released Party so released shall be deemed released and discharged) from any and all Claims, Causes of Action and any other debts, obligations, rights, suits, damages, actions, causes of action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing as of the Effective Date or thereafter arising, in law, at equity, whether for tort, fraud, contract, violations of federal or state securities laws, or otherwise, based in whole or in part upon any act or omission, transaction or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way to the Debtor.

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Fed. R. Bankr. P. 9019, of the Full Release, which includes by reference each of the related provisions and definitions contained in this Plan, and _further_, shall constitute its finding that the Full Release is: (a) in exchange for the good and valuable consideration provided by the Lender Released Parties, a good faith settlement and compromise of such Claims; (b) in the best interests of the Debtor and all holders of Interests and Claims; (c) fair, equitable, and reasonable; (d) given and made after due notice and opportunity for hearing; and (e) a bar to any of the Debtor, the Committee, the Trustee, any holder of a Claim or Interest, or any other Person asserting any Released Lender Claim or any other**

US_ACTIVE-105108638.10

Claim, cause of action or liability related thereto of any kind whatsoever against any of Lender Released Parties.

### 9.6     Exculpation.

Notwithstanding anything contained in the Plan to the contrary, the Exculpated Parties shall neither have, nor incur any liability to any Person for any prepetition or postpetition act taken or omitted to be taken in connection with, or related to formulating, negotiating, preparing, disseminating, implementing, administering the Plan, any of the Sale Documents or any contract, instrument, release or other agreement or document created or entered into in connection with the Plan, or other pre- or post-petition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Company or confirming or consummating the Plan; *provided*, *however*, that the foregoing provisions of this Article shall have no effect on the liability of any Person that results from any such act or omission that is determined in a Final Order to have constituted gross negligence or willful misconduct, and, *provided*, *further*, that each Exculpated Party shall be entitled to rely upon the advice of counsel concerning his, her or its duties to, or in connection with, the Plan and the Sale Documents.

### 9.7     Preservation of Rights of Action.

(a)     Maintenance of Causes of Action

Except as otherwise provided in the Plan, after the Effective Date the Trust, as successor to the Debtor, shall retain all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, in any court or other tribunal including, without limitation, in an adversary proceeding filed.  Except as otherwise provided in the Plan, in accordance with section 1123(b)(3) of the Bankruptcy Code, any other Claims, rights, and Causes of Action in that the Debtor may hold against any Entity or Person shall vest upon the Effective Date in the Trust.  The Trust through the Trustee, will receive, be vested with and may exclusively enforce any and all such claims, rights, or Causes of Action.  After the Effective Date, the Trust shall have the exclusive right, authority, and discretion to institute, prosecute, abandon, settle or compromise any and all such claims, rights, and Causes of Action without the consent or approval of any third party and without further order of the Bankruptcy Court.

(b)     Preservation of All Causes of Action Not Expressly Settled or Released

Unless a Claim or Cause of Action against a Person or Entity is expressly waived, relinquished, released, compromised or settled in the Plan or any Final Order, all such Claims or Causes of Action are expressly reserved for the Trust and is Beneficiaries for later adjudication by the Trust (including, without limitation, Claims and Causes of Action not specifically identified or which the Debtor or Committee may presently be unaware or which may arise or exist by reason of additional facts or circumstances unknown to the Debtor or Committee at the time or facts or circumstances which may change or be different from those which the Debtor and Committee now believe to exist) and, therefore, no preclusion doctrine, including, without limitation, the doctrines or *res judicata*, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable, or otherwise) or laches shall apply to such Claims or Causes

US_ACTIVE-105108638.10

of Action upon or after the Confirmation or Consummation of the Plan based on the Sale Documents (including without limitation, the Disclosure Statement), except where such Claims or Causes of Action have been released in the Plan.  In addition, rights are expressly reserved for the Trustee as of the Effective Date and thereafter, to pursue or adopt any claims alleged in any lawsuit in which the Debtor is a defendant or an interested party, against any person or entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits.

**9.8    Injunction.**

(a)    From and after the Effective Date, all Person and Entities are permanently enjoined from commencing or continuing in any manner against the Debtor, the Trust, the Lender Released Parties, their successors and assigns, and their assets and properties, as the case may be, any suit, action or other proceeding, on account of or respecting any Claim, demand, liability, obligation, debt right, Cause of Action, interest or remedy released or to be released pursuant to the Plan or the Confirmation Order.

(b)    From and after the Effective Date, all Persons and Entities shall be precluded from asserting against the Debtor, its Estate, the Trust, the Lender Released Parties, their successors and assigns, and their assets and properties, any other Claims or Equity Interests based upon any documents, instruments, or any act or omission transaction or other activity of any kind or nature that occurred prior to the Effective Date.

(c)    The rights afforded in the Plan and treatment of Claims and Equity Interests in the Plan shall be in exchange for and in complete satisfaction and release of Claims and Equity Interests of any nature whatsoever, including any interest accrued on Claims from and after the Petition Date, against the Debtor and any of its assets or properties.  On the Effective Date, all such claims against, and Equity Interest in the Debtor shall be satisfied and released in full, unless as otherwise provided in the Plan.

(d)    Except as otherwise expressly provided in the Plan on in obligations issued pursuant to the Plan, all Parties and Entities are permanently enjoined from and after the Effective Date, on account of any Claim or Equity Interest satisfied and released hereby from:

(i)    Commencing or continuing in any manner, any action or other proceeding of any kind against the Debtor or Committee, after the Effective Date, against the Trust, their successors and assigns and their assets and properties;

(ii)    Enforcing, attaching, collecting or recovering by any manner or means any judgment, award, decree or order against the Debtor or, after the Effective Date, against the Trust, its successors and assigns, and their assets and properties;

(iii)    Creating, perfecting, or enforcing any encumbrance of any kind against the Debtor, or after the Effective Date, against the Trust or the property or Estate of the Debtor, or after the Effective Date, of the Trust;

(iv)    Asserting any right of setoff, subrogation or recoupment of any kind against any obligation due from the Debtor or after the Effective Date against the Trust, or

US_ACTIVE-105108638.10

against the property or Estate of the Debtor or after the Effective Date, of the Trust with respect to any such Claim or Equity Interest; or

(v)    Commencing or continuing in any manner any action or other proceeding of any kind in respect of any Claim or Cause of Action released or settled hereunder.

**9.9    Purchaser Not a Successor.**

Except for those liabilities and obligations specifically assumed pursuant to the Sale Documents, Purchaser shall not be deemed to be liable to any party, known or unknown, under any theory of successor liability including, without limitation, "Implied Assumption", "Defacto Merger", "Continuation of Enterprise", "Fraudulent Transfer" or "Product Line Exception".

## ARTICLE X - RETENTION OF JURISDICTION

**10.1    Jurisdiction by the Bankruptcy Court.**

The Bankruptcy Court will retain jurisdiction of all matters arising under, arising out of, or related to the Case and the Plan pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code and for, among other things, the following purposes:

(a)    To hear and determine motions for the assumption, assumption and assignment or rejection of executory contracts or unexpired leases and the allowance of Claims resulting therefrom;

(b)    To determine any motion, adversary proceeding, application, contested matter, and other litigated matter pending on or commenced after the Confirmation Date, or any other Cause of Action;

(c)    To ensure that distributions to holders of Allowed Claims are accomplished as provided herein;

(d)    To consider Claims or the allowance, classification, priority, compromise, estimation or payment of any Claim;

(e)    To enter, implement, or enforce such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified or vacated;

(f)    To issue injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any person with the consummation, implementation or enforcement of the Plan, the Confirmation Order or any other order of the Bankruptcy Court;

(g)    To hear and determine any application to modify the Sale Documents in accordance with section 1127 of the Bankruptcy Code, to remedy any defect or omission or reconcile any inconsistency in the Sale Documents, the Disclosure Statement or any order

US_ACTIVE-105108638.10

of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(h)     To hear and determine all applications under sections 328, 330, 331 and 503(b) of the Bankruptcy Code for awards of compensation for services rendered and reimbursement of expenses incurred by those Professionals appointed by Order of the Bankruptcy Court;

(i)     To hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, the Confirmation Order, any transactions or payments contemplated hereby, or any agreement, instrument, or other document governing or relating to any of the foregoing;

(j)     To hear and determine disputes arising in connection with the interpretation, implementation or enforcement of the Trust Agreement, and to hear and determine all matters involving or relating to the Trust or the Trustee;

(k)     To take any action and issue such orders as may be necessary to construe, enforce, implement, execute and consummate the Plan or to maintain the integrity of the Plan following consummation;

(l)     To recover all property of the Estate, wherever located, which jurisdiction shall not be limited as a result of the transfer of any such assets and property to the Trust pursuant to the Plan;

(m)     To determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(n)     To hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code (including, without limitation, matters with respect to any taxes payable by a trust or reserve established in furtherance of the Plan);

(o)     To hear and determine any other matters related hereto and not inconsistent with the Bankruptcy Code and title 28 of the United States Code; and

(p)     To enter a final decree closing the Case.

## ARTICLE XI - CRAMDOWN RESERVATION

### 11.1    Nonconsensual Confirmation.

The Plan Proponent reserves the right to undertake to have the Bankruptcy Court confirm the Plan under section 1129(b) of the Bankruptcy Code and/or amend the Plan, Plan Documents, and/or Sale Documents to the extent necessary to obtain entry of the Confirmation Order.

US_ACTIVE-105108638.10

## ARTICLE XII - MISCELLANEOUS PROVISIONS

### 12.1    Disposition of the Creditors Committee.

The Committee will disband and be released of its duties and obligations on the Effective Date.

### 12.2    Disposition of the Examiner.

The Examiner will be discharged and be released of her duties and obligations on the Effective Date.

### 12.3    Substantial Consummation.

On the Effective Date, the Plan will be deemed to be "substantially consummated" as contemplated under sections 1101 and 1127(b) of the Bankruptcy Code.

### 12.4    Payment of Statutory Fees.

On the Effective Date, (or as soon thereafter as is reasonably practicable) and thereafter as may be required, the Purchaser will pay all fees payable pursuant the Transition Agreement as required under section 1930 of chapter 123 of title 28 of the United States Code.

### 12.5    Modification of the Plan.

The Plan and any Plan Document may be amended, modified, or supplemented by the Plan Proponent in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law without additional disclosure pursuant to section 1125 of the Bankruptcy Code, except as the Bankruptcy Court may otherwise direct.  In addition, after the Confirmation Date, so long as such action does not materially adversely affect the treatment of holders of Claims or Equity Interests under the Plan, the Plan Proponent may institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan, any Plan Document, or the Confirmation Order, with respect to such matters as may be necessary to carry out the purposes and effects of the Plan.  Prior to the Effective Date, the Plan Proponent may make appropriate technical adjustments and modifications to the Plan or any Plan Document without further order or approval of the Bankruptcy Court, *provided* that such technical adjustments and modifications do not adversely affect in a material way the treatment of holders of Claims or Equity Interests.

### 12.6    Revocation or Withdrawal of Plan.

The Plan Proponent reserves the right to revoke or withdraw the Plan at any time prior to the Confirmation Date.  If the Plan Proponent takes such action, the Plan will be deemed null and void.  In such event, nothing in the Plan will be deemed to constitute a waiver or release of any Claim by or against the Debtor or any other person or to prejudice in any manner the rights of the Debtor or any other person in any further proceedings involving the Debtor.

US_ACTIVE-105108638.10

### 12.7   Courts of Competent Jurisdiction.

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising out of the Plan, such abstention, refusal, or failure of jurisdiction will have no effect upon and will not control, prohibit, or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

### 12.8   Severability.

If, prior to the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, at the request of the Debtor, will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision will then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, Impaired, or invalidated by such holding, alteration or interpretation. The Confirmation Order will constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

### 12.9   Governing Law.

Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent an exhibit hereto provides otherwise, the rights, duties and obligations arising under the Plan will be governed by, and construed and enforced in accordance with, the laws of the Commonwealth of Pennsylvania, without giving effect to the principles of conflicts of law thereof.

### 12.10   Successors and Assigns.

All the rights, benefits and obligations of any Person named or referred to in the Plan shall be binding on, and will inure to the benefit of, the heirs, executors, administrators, successors and/or assigns of such Person.

### 12.11   Time.

In computing any period of time prescribed or allowed by the Plan, unless otherwise set forth herein or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.

US_ACTIVE-105108638.10

## ARTICLE XIII - UNITED STATES FEDERAL INCOME TAX CONSIDERATIONS

### 13.1    Introduction

The following discussion summarizes certain material United States federal income tax ("Federal Income Tax") consequences of the Plan to certain holders of Allowed Claims (the "Creditors") and the Debtor.  This discussion does not address the Federal Income Tax consequences to:  (i) Creditors whose claims are entitled to payment in full in cash, or are otherwise unimpaired under the Plan; and (ii) holders of equity interests or claims that are extinguished without a distribution.  This discussion is based upon existing provisions of the Tax Code, Treasury regulations promulgated thereunder, judicial authorities and current administrative rulings and practices now in effect.  No assurance can be given that future legislation, regulations, administrative pronouncements and/or judicial decisions will not change applicable law and affect the analysis described herein.  Any such change could be applied retroactively in a manner that would adversely affect the creditors and the Debtor.

The Federal Income Tax consequences of certain aspects of the Plan are uncertain due to the lack of applicable legal authority and may be subject to administrative or judicial interpretations that differ from the discussion below.  The Plan Proponent has not sought and will not seek any rulings from the Internal Revenue Service ("IRS") with respect to the Federal Income Tax consequences discussed below.  Although the discussion below represents the best judgment as to the matters discussed herein, it does not in any way bind the IRS or the courts or in any way constitute an assurance that the Federal Income Tax consequences discussed herein will be accepted by the IRS or the courts.

The following discussion does not address state, local or foreign tax considerations that may be applicable to the Debtor or Creditors and the discussion does not address the tax consequences of the Plan to certain types of Creditors (including foreign persons, financial institutions, life insurance companies, tax-exempt organizations and taxpayers who may be subject to the alternative minimum tax) who may be subject to special rules not addressed herein.

THE FOLLOWING SUMMARY OF CERTAIN MATERIAL FEDERAL INCOME TAX CONSEQUENCES IS FOR GENERAL INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF AN ALLOWED CLAIM OR EQUITY INTEREST.  THE PLAN PROPONENT IS NOT MAKING ANY REPRESENTATIONS REGARDING THE PARTICULAR TAX CONSEQUENCES OF CONFIRMATION AND CONSUMMATION OF THE PLAN WITH RESPECT TO THE DEBTOR OR THE HOLDERS OF ANY CLAIMS OR EQUITY INTERESTS, NOR IS THE PLAN PROPONENT RENDERING ANY FORM OF LEGAL OPINION OR TAX ADVICE ON SUCH TAX CONSEQUENCES.  ALL HOLDERS OF CLAIMS OR EQUITY INTERESTS ARE ADVISED TO CONSULT THEIR OWN TAX ADVISORS WITH RESPECT TO THE FEDERAL, STATE, LOCAL, FOREIGN AND OTHER TAX CONSEQUENCES OF THE IMPLEMENTATION OF THE PLAN IN GENERAL AND IN PARTICULAR, THE TIMING, CHARACTER AND AMOUNTS OF INCOME, GAIN, LOSS, DEDUCTION, CREDIT OR CREDIT RECAPTURE TO BE RECOGNIZED, AND ANY PROCEDURAL REQUIREMENTS WITH WHICH THE HOLDER MUST COMPLY.

US_ACTIVE-105108638.10

**13.2    Certain Material United States Federal Income Tax Consequences to Holders of Claims**

      (a)     General

      The tax treatment of holders of Claims and the character and amount of income, gain or loss recognized as a consequence of the Plan and the distributions provided for by the Plan will depend upon, among other things, (i) whether the Claim (or any portion thereof) constitutes a Claim for principal or interest; (ii) the type and classification of consideration received by the holder in exchange for the Claim; (iii) whether the holder is a resident of the United States for tax purposes (or falls into any special class of taxpayers, such as those that are excluded from this discussion as noted above); (iv) the manner in which a holder acquired a Claim; (v) the length of time the Claim has been held; (vi) whether the claim was acquired at a discount; (vii) whether the holder has taken a bad debt deduction with respect to the Claim (or any portion thereof) in the current or prior years; (viii) whether the holder has previously included accrued but unpaid interest with respect to the Claim in its taxable income; (ix) the method of tax accounting of the holder; (x) whether the claim is an installment obligation for United States federal income tax purposes; and (xi) whether the "market discount" rules are applicable to the holder.  Therefore, holders of Claims should consult their tax advisors for information that may be relevant to their particular situation and circumstances and the particular tax consequences to them of the transactions contemplated by the Plan.

      A holder of a Claim should generally recognize a gain (or loss) to the extent that the amount realized under the Plan in respect of the Claim exceeds (or is exceeded by) the holder's tax basis in the Claim.  The holder's amount realized for this purpose will generally equal the amount of Cash the holder receives under the Plan in respect of its Claim.  The timing and amount of income, gain or loss recognized as a consequence provided for by the Plan will depend on, among other things, whether the holder of a Claim receives multiple distributions pursuant to the Plan and whether the Debtor's or Trustee's obligation to make such payments is treated as a new debt for United States federal income tax purposes.  Gain or loss may not currently be recognized if the property received does not have an ascertainable fair market value.

      (b)     Accrued But Untaxed Interest

      A portion of the consideration (whether cash, stock, debt or other consideration) received by Holders of Claims and Interest may be attributable to accrued but untaxed interest on such Claims.  Such amount should be taxable to that Holder as interest income if such accrued interest has not been previously included in the Holder's gross income for U.S. federal income tax purposes.  Conversely, a Holder generally recognizes a deductible loss to the extent any accrues interest claimed was previously included in income and is not paid in full.

      If the fair value of the consideration received by Holders of Claims and Interests is not sufficient to fully satisfy all principal and interest on Allowed Claims, the extent to which such consideration will be attributable to accrued but untaxed interest is unclear.  Holders of Claims and Interest should consult their tax advisors regarding the proper allocation of the consideration received by them under the Plan.

US_ACTIVE-105108638.10

(c)       Market Discount

The market discount provisions of the Internal Revenue Code of 1986 (the "Tax Code")
may apply to holders of certain Claims.  In general, a debt obligation other than a debt obligation
with a fixed maturity of one year or less that is acquired by a holder in the secondary market (or,
in certain circumstances, upon original issuance) is a "market discount bond" as to that holder if
its stated redemption price at maturity (or, in the case of a debt obligation having original issue
discount, its revised issue price) exceeds the tax basis of the debt obligation.  A debtor obligation
will not be a "market discount bond" if such excess is less than a statutory *de minimis* amount.
Gain recognized by the holder of a Claim with respect to a "market discount bond" will generally
be treated as ordinary interest income to the extent of the market discount accrued on such bond
during the holder's grace period of ownership, unless the holder elected to include accrued
market discount in taxable income currently.  A holder of a market discount bond that is required
under the market discount rules of the Tax Code to defer deduction of all or a portion of the
interest on indebtedness incurred or maintained to acquire or carry the bond may be allowed to
deduct such interest, in whole or in part, on disposition of such bond.

(d)       Information Reporting and Backup Withholding

Certain payments, including the payments with respect to Claims pursuant to the Plan,
are generally subject to information reporting by the payor (the Debtor or the Trustee, as
applicable) to the IRS.  Moreover, such reportable payments are subject to backup withholding
under certain circumstances.  Under the Tax Code's backup withholding rules, a holder of a
Claim may be subject to backup withholding with respect to distributions or payments made
pursuant to the Plan, unless the holder:  (1) comes within certain exempt categories (which
generally include corporations) and, when required, demonstrates this fact, or (2) provides a
correct United States taxpayer identification number and certifies under penalty of perjury that
the taxpayer identification number is correct and that the taxpayer is not subject to backup
withholding because of a failure to report all dividend and interest income.

Holders of Claims that are non-United States Persons and that receive payments or
distributions under the Plan will not be subject to backup withholding, provided that such holders
furnish certification of their status as non-United States Persons (and furnish any other required
certification), or are otherwise exempt from backup withholding.  Generally, such certification is
provided on IRS Form W-8BEN.

Backup withholding is not an additional tax.  Amounts withheld under the backup
withholding rules may be credited against a holder's United States federal income tax liability
and a holder may obtain a refund of any excess amounts withheld under the backup withholding
rules by filing an appropriate claim for refund with the IRS (generally, a United States federal
income tax return).

PERSONS CONCERNED WITH THE TAX CONSEQUENCES OF THE PLAN
SHOULD CONSULT THEIR OWN ACCOUNTANTS, ATTORNEYS AND/OR ADVISORS.
THE PLAN PROPONENT MAKES THE ABOVE-NOTED DISCLOSURE OF POSSIBLE
TAX CONSEQUENCES FOR THE SOLE PURPOSE OF ALERTING READERS TO TAX
ISSUES THEY MAY WISH TO CONSIDER.

US_ACTIVE-105108638.10

<u>**ARTICLE XIV - ALTERNATIVES TO THE PLAN**</u>

**14.1     <u>Other Chapter 11 Plans.</u>**

The Debtor filed its amended Debtor's Plan and amended Debtor's Disclosure Statement one day before the filing of this Plan.  Accordingly, the Senior Secured Lender has not had an adequate opportunity to review and comment on any proposed amendments to the Debtor's Plan.  The amended Debtor's Plan will be funded by revenues generated at the Hotel through the Debtor's continued ownership and management of the Hotel; will not be able to cure the defaults under the Senior Secured Lender's Loan; and will provide for junior classes of claims and interests to receive value on account of their junior claims and interests over a significant period of time dependent upon the Hotel's profitability.  The amended Debtor's Plan proposes certain undisclosed letters of credit to secure only a portion of the obligations under the Debtor's Plan.  Consequently, the Lender submits that the Debtor's amended Plan is rife with risk of nonpayment on account of claims, lacks the support of the Debtor's Senior Secured Lender, and violates the absolute priority rule with respect to the Senior Secured Lender and holders of Class 4 General Unsecured Claims.  As a result, the amended Debtor's Plan likely will not be confirmable.  Further, the amended Debtor's Plan, to the extent funded by Hotel operations, would necessarily delay creditors' receipt of distributions and is highly unlikely to formulate a methodology to create greater value (return) to impaired creditors than the Plan Proponent's Plan.  Accordingly, the Plan Proponent submits that its Plan will enable all creditors entitled to distributions to realize the greatest possible recovery on their respective Claims with the least possible delay.

**14.2     <u>Liquidation under Chapter 7 of the Bankruptcy Code.</u>**

If the Plan or any alternative chapter 11 plan cannot be confirmed under section 1129(a) of the Bankruptcy Code, the Case may be converted to a case under chapter 7 of the Bankruptcy Code, in which event a trustee would be appointed (or subsequently elected) to liquidate any remaining assets of the Debtor for distribution to creditors pursuant to chapter 7 of the Bankruptcy Code.  If a trustee is appointed and the assets of the Debtor are liquidated under chapter 7 of the Bankruptcy Code, creditors would likely receive distributions of a lesser value on account of their Allowed Claims.  A chapter 7 trustee would be required to invest substantial time and resources to investigate the facts underlying the multitude of Claims filed against the Estate and Causes of Action, thereby substantially increasing both costs and time necessary to fully administer the Estate.  Likewise, in addition to fees of professionals retained by a chapter 7 trustee, the chapter 7 trustee would also charge a fee tied to the value of all assets administered by the chapter 7 trustee in accordance with section 326(a) of the Bankruptcy Code.

**14.3     <u>Dismissal of the Chapter 11 Case.</u>**

If the Case was dismissed, the Senior Secured Lender could foreclose upon its Lien(s) on the Debtor's property with the same or similar result as liquidation under Chapter 7 of the Bankruptcy Code unless it agrees to provide other treatment to junior creditors.

US_ACTIVE-105108638.10

## ARTICLE XV - CONFIRMATION REQUIREMENTS

### 15.1    Acceptances Necessary to Confirm the Plan.

At the Confirmation Hearing, the Bankruptcy Court must determine, among other things, whether the Plan has been accepted by the requisite amount and number of Allowed Claims in each impaired class.  Under the Bankruptcy Code, a class of creditors or equity security holders is impaired if its legal, equitable or contractual rights are altered by a proposed plan of reorganization.  If a class is not impaired, each creditor or equity security holder in such unimpaired class is conclusively presumed to have accepted the plan pursuant to section 1126(f) of the Bankruptcy Code.  Classes 1(A), 1(B), and 2 are not impaired under the Plan and are, therefore, not entitled to vote on the Plan.  Classes 3 and 4 are impaired under the Plan and holders of Allowed Claims in such classes are entitled to vote for or against the Plan by completing and returning the Ballots mailed to them with this Disclosure Statement in the manner set forth in the Ballots.  Classes 5 and 6 are impaired under the Plan, but are deemed to reject the Plan, and are not entitled to vote on the Plan.

An impaired class of creditors and each holder of a claim in such class will be deemed to have accepted the Plan if the holders of at least two-thirds in amount and more than one-half of those in number of the Allowed Claims in such impaired class for which complete and timely Ballots have been received have voted for acceptance of the Plan.

Because the subordinated claims held by the members of Class 5 and the equity interests held by the members of Class 6 are eliminated entirely under the Plan, Classes 5 and 6 are deemed to have rejected the Plan, and the Debtor cannot satisfy the requirements of section 1129(a)(8) of the Bankruptcy Code.  Accordingly, the Plan Proponent intends to seek confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code.  Under section 1129(b), the Bankruptcy Court must determine, among other things, that the Plan does not discriminate unfairly and that it is fair and equitable with respect to each class of impaired Allowed Claims and Equity Interests that have not voted to accept the Plan.

### 15.2    Best Interests of Creditors.

The Bankruptcy Code requires that each holder of an impaired claim or equity interest either (i) accepts the Plan, or (ii) receives or retains under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive if the Debtor was liquidated under chapter 7 of the Bankruptcy Code.

The first step in determining whether this test has been satisfied is to determine the dollar amount that would be generated from the liquidation of the Debtor's assets and properties in the context of a chapter 7 liquidation case.  The gross amount of cash that would be available for satisfaction of claims and equity interests would be the sum consisting of the proceeds resulting from the disposition of the unencumbered assets and properties of the Debtor.

The next step is to reduce that gross amount by the costs and expenses of liquidation and by such additional administrative and priority claims that might result from the use of chapter 7 for the purposes of liquidation.  Any remaining net cash would be allocated to creditors and shareholders in strict priority in accordance with section 726 of the Bankruptcy Code.  Finally,

US_ACTIVE-105108638.10

the present value of such allocations (taking into account the time necessary to accomplish the liquidation) is compared to the value of the property that is proposed to be distributed under the Plan on the Effective Date.

The Debtor's costs of liquidation under chapter 7 would include the fees payable to a trustee in bankruptcy, as well as those fees that might be payable to attorneys and other professionals that such a trustee might engage.  Other liquidation costs include the expenses incurred during the Case and subsequently allowed in the chapter 7 cases, such as compensation for attorneys, financial advisors, appraisers, accountants and other professionals.

The foregoing types of claims, costs, expenses, fees and such other claims that may arise in a liquidation case would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to pay pre-petition priority and non-priority Claims in the Chapter 11 case.

As described in more detail in the Liquidation Analysis attached hereto as Exhibit B, the Plan Proponent submits that each Impaired Class will receive under the Plan a recovery at least equal in value to the recovery such Class would receive pursuant to a liquidation of the Debtor under chapter 7 of the Bankruptcy Code.  The Debtor also submits that the value of any distributions to each Secured Creditor in a Chapter 7 liquidation would be less than the value of distributions under the Plan and such distributions in a chapter 7 case would not occur for a substantial period of time.

### 15.3    Feasibility.

Section 1129(a)(11) of the Bankruptcy Code provides that a chapter 11 plan may be confirmed only if the Court finds that such plan is feasible.  A feasible plan is one which will not lead to a need for further reorganization or liquidation of the debtor.  The Plan Proponent submits that the Plan satisfies the financial feasibility requirement imposed by the Bankruptcy Code.

### 15.4    Confirmation of the Plan.

In the event the Bankruptcy Court determines that all of the requirements for the confirmation of the Plan are satisfied, the Bankruptcy Court will issue the Confirmation Order confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

US_ACTIVE-105108638.10

## ARTICLE XVI - CERTAIN RISK FACTORS TO BE CONSIDERED

HOLDERS OF IMPAIRED CLAIMS AGAINST OR INTERESTS IN THE DEBTOR ARE ENCOURAGED TO READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT, PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN. THOSE RISK FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.

### 16.1    Parties in Interest May Object to the Plan Proponent's Classification of Claims.

Section 1122 of the Bankruptcy Code provides that a plan of reorganization may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.  The Plan Proponent submits that the classification of claims and interests under the Plan complies with the requirements set forth in the Bankruptcy Code.  However, the Plan Proponent cannot give assurances that the Bankruptcy Court will reach the same conclusion.  For example, if the Claims of Dr. Patel are not subordinated pursuant to an Order issued in the Patel Adversary, such Claims may be included in Class 4 as General Unsecured Claims and share in such distributions to the extent such Claims are ultimately Allowed by the Bankruptcy Court.

### 16.2    The Plan Proponent May Not Be Able to Secure Confirmation of the Plan.

The Plan Proponent cannot assure you that the requisite acceptances to confirm the Plan will be received.  Even if the requisite acceptances are received, the Plan Proponent cannot assure you that the Bankruptcy Court will confirm the Plan.  A non-accepting creditor of the Debtor might challenge the balloting procedures and results as not being in compliance with the Bankruptcy Code or Bankruptcy Rules.  Even if the Bankruptcy Court determined that the Disclosure Statement and the balloting procedures and results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for confirmation had not been met.  Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation and requires, among other things, (a) a finding by the Bankruptcy Court that the confirmation of the Plan is not likely to be followed by a liquidation or a need for further financial reorganization; (b) that the value of distributions to non-accepting holders of claims and interests within a particular class under the Plan will not be less than the value of distributions such holders would receive if the Debtor was liquidated under chapter 7 of the Bankruptcy Code; and (c) that the Plan does not unfairly discriminate and is fair and equitable with respect to any non-accepting Classes.  While the Plan Proponent cannot give assurances that the Bankruptcy Court will conclude that these requirements have been met, the Plan Proponent submits that the Plan will not be followed by a need for further financial reorganization and that non-accepting holders within each class under the Plan will receive distributions at least as great as would be received following a liquidation under chapter 7 of the Bankruptcy Code.

US_ACTIVE-105108638.10

### 16.3    The Plan Proponent May Object to the Amount or Classification of Your Claim.

The Plan Proponent reserves the right to object to the amount or classification of any claim. The estimates set forth in this Disclosure Statement cannot be relied on by any creditor whose claim is subject to an objection. Any such creditor may not receive its expected share of the estimated distributions described in this Disclosure Statement.

### 16.4    The Sale to the Purchaser May Not Be Approved as Proposed.

It is possible that the sale of the Debtor's assets as proposed in the Plan may not be approved. To the extent the sale to the Purchaser does not close as proposed in the Plan or any of the conditions precedent to closing of the sale are not satisfied, the Plan may be at risk because the Plan is based on a compromise by various interested parties whose concessions are based on approval of the Plan as proposed.

## ARTICLE XVII - WHERE YOU CAN OBTAIN MORE INFORMATION

Pursuant to the requirements of the Office of the United States Trustee, the Debtor is required to and have filed monthly operating reports for the postpetition period with the Bankruptcy Court. These monthly operating reports may be obtained at prescribed per page copy rates by writing to the Office of the Clerk of the United States Bankruptcy Court for the Western District of Pennsylvania, 5414 U.S. Steel Tower, 600 Grant Street, Pittsburgh, PA 15219; telephone (412) 644-2700, or on-line at the Bankruptcy Court's website: http://www.pawb.uscourts.gov (PACER-CM/ECF account required for on-line viewing of documents).

*[Remainder of this page intentionally left blank]*

- 64 -

## ARTICLE XVIII - CONCLUSION AND RECOMMENDATION

The Plan Proponent believes that confirmation and implementation of the Plan is preferable to any of the alternatives described above because it will provide the greatest recoveries to holders of Claims.  The Plan Proponent urges holders of Claims entitled to vote on the Plan to vote to accept the Plan.

Dated:  December 29, 2010                     Respectfully submitted,

*/s/ Robert P. Simons, Esq.*
Robert P. Simons, Esq.
Pa. ID No. 48892
E-mail:  rsimons@reedsmith.com
Amy M. Tonti, Esq.
Pa. I.D. No. 33468
E-mail:  atonti@reedsmith.com
Gregory L. Taddonio, Esq.
Pa. I.D. No. 88564
E-mail: gtaddonio@reedsmith.com
Jeanne S. Lofgren, Esq.
Pa. I.D. No. 89078
E-mail: jlofgren@reedsmith.com
Reed Smith LLP
225 Fifth Avenue
Pittsburgh, PA 15222-2716
Phone:  (412) 288-3131
Fax:      (412) 288-3063

*Attorneys for Carbon Capital II Real Estate CDO 2005-1, Ltd. and BlackRock Financial Management, Inc., as sub-special servicer to Carbon Capital II Real Estate CDO 2005-1, Ltd.'s special servicer, Midland Loan Services, Inc.*

US_ACTIVE-105108638.10