N

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

IN RE:

SHUBH HOTELS PITTSBURGH, LLC,     :    Bankruptcy No. 10-26337JAD
                                  :
                                  :    Chapter 11
                                  :
    Debtor,                       :
                                  :
CARBON CAPITAL II REAL ESTATE     :    Doc. No. 312
CDO 2005-1 LTD., and BLACKROCK    :
FINANCIAL MANAGEMENT, INC., as    :
subspecial servicer to CARBON     :
CAPITAL II REAL ESTATE CDO        :
2005-1 LTD's special servicer,    :
MIDLAND LOAN SERVICES, INC.,      :
                                  :
    Movants,                      :
                                  :
vs.                               :
                                  :
SHUBH HOTELS PITTSBURGH, LLC,     :
                                  :
    Respondent.                   :

## ORDER DIRECTING THE APPOINTMENT OF A CHAPTER 11 TRUSTEE

AND NOW, this 1st day of February, 2011 and for the reasons set forth in the accompanying *Memorandum Opinion*, the Court hereby directs that a Chapter 11 Trustee be appointed for this bankruptcy estate.

SO ORDERED.

Dated: February 1, 2011

_____
JEFFERY A. DELLER
U.S. Bankruptcy Judge

00005473.WPD

FILED

FEB – 1 2011

CLERK, U.S. BANKRUPTCY COURT
WEST. DIST. OF PENNSYLVANIA

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

IN RE:

SHUBH HOTELS PITTSBURGH, LLC,   :   Bankruptcy No. 10-26337JAD

:   Chapter 11

Debtor,   :

CARBON CAPITAL II REAL ESTATE   :   Doc. No. 312
CDO 2005-1 LTD., and BLACKROCK
FINANCIAL MANAGEMENT, INC., as
subspecial servicer to CARBON
CAPITAL II REAL ESTATE CDO
2005-1 LTD's special servicer,
MIDLAND LOAN SERVICES, INC.,

Movants,   :

vs.   :

SHUBH HOTELS PITTSBURGH, LLC,   :

Respondent.   :

**MEMORANDUM OPINION**

On October 25, 2010, Carbon Capital II Real Estate CDO 2005-1 Ltd., and BlackRock Financial Management, Inc., as subspecial servicer to Carbon Capital II Real Estate CDO 2005-1 Ltd's special servicer, Midland Loan Services, Inc., ("Carbon Capital") filed an *Emergency Motion for an Order Appointing a Chapter 11 Trustee* and for related relief (the "Trustee Motion").

After due consideration of the evidence presented over many days of trial,

this Court exercised its discretion and (a) appointed an examiner, (b) held the request for the appointment of trustee in abeyance, and (c) stayed certain litigation that had been both consuming this Court's docket and draining the bankruptcy estate's financial resources (collectively, the "Examiner Appointment"). The findings and conclusions of the Court with respect to the Examiner Appointment are incorporated herein by reference (see Doc. ## 399, 419, 420 at pp. 138-145).

As this Court previously noted, the Debtor's transactions with Dr. Kiran Patel and his affiliates are cause for concern. The evidence introduced throughout these proceedings showed that hotel operations appeared to be controlled by Dr. Kiran Patel and his affiliates as "one team" well before the commencement of this bankruptcy case and thereafter. The evidence also showed that hotel revenues were diverted from time to time by Dr. Patel and his associates for their own benefit despite the fact that trade vendors of the hotel remained unpaid. The diversion of funds also took place while major hotel construction and renovation projects were incomplete. Hotel revenues were also diverted to other projects owned or managed by Dr. Patel and his associate, Mr. Jai Lalwani, elsewhere in the country.

Dr. Patel attempted to counter these transactions by alleging to be duped by Mr. Lalwani. Yet, the record reflected that Mr. Lalwani continued to be a part of the postpetition affairs of the Debtor as the hotel searched for a new "flag" (i.e.,

a national or international hotel franchiser for which the Debtor may partner). Indeed, Mr. Lalwani continued to be active in the Debtor's affairs even though the Debtor represented to the Court that Mr. Lalwani had no involvement with the hotel subsequent to the commencement of this bankruptcy case. Interestingly, despite this clear and convincing evidence with respect to Mr. Lalwani's involvement with the Debtor, the Debtor and Dr. Patel continue to this day maintain that Mr. Lalwani occupied no role in the hotel's management. (See Dkt. #674, p. 10). Such a statement is simply inaccurate and is refuted by e-mail communications in evidence, which reflect that Mr. Lalwani was intimately involved in both the Debtor's re-flagging of the hotel and in the litigation strategy employed by the Debtor and Dr. Patel with respect to motions filed by the Lender in this case.

When the Court appointed an Examiner, the Court did not take the step of appointing a Chapter 11 Trustee at that time because the Court was hopeful that an examiner would (a) operate as a monitor of the Debtor's finances given the blatant financial irregularities of the Debtor, and (b) reduce the continuous conflict that has consumed the estate.

The Examiner appointed in this case has performed her job admirably and competently with respect to monitoring the Debtor's finances. However, because the powers and duties of an examiner in bankruptcy are limited, it appears to the Court that a powerless examiner lacks sufficient Court (and/or Bankruptcy Code)

authority to rein-in or curb the litigation that continues to mount between the Debtor and the Lender. In this regard, and due to no fault of the Examiner, it is obvious that the Examiner Appointment has not had the salutary effect intended by the Court.

The distracting nature of the litigation that permeates this case can be illustrated by the matters heard on the Court's calender of January 31, 2011. One motion concerned a settlement of certain union claims in the case. The background of the union claim need not be addressed in length, except to note that the claim related to the diversion of funds from an account created by the Debtor in which employer withheld union dues were placed. The funds were previously diverted[1] and not remitted to the union. The settlement motion, filed by the union and not the Debtor, sought to authorize the Debtor to remit new funds to the union in satisfaction of certain sums due the union. The Lender had no opposition to the proposed payment to the union, but instead made the reasonable request that any claim or cause of action that the union or employees might have as a result of the diversion of the funds be assigned to the bankruptcy estate. In this regard, the Lender even drafted a proposed order to this effect, and the union agreed to it. Now, did the debtor-in-possession agree to it or request

---

[1] The Debtor remitted the funds to the Debtor's "special counsel" who was also described in e-mails as being Mr. Lalwani's "legal quarterback." Such funds which were paid post-petition to "special counsel" have purportedly been repaid to the Debtor after these matters came to light.

such relief? No it did not. The Court inquired the reason why, and the Debtor unconvincingly suggested that the proposed order somehow granted the Lender rights it did not have. The Court found the Debtor's argument to be unavailing as the proposed order made no final determination as to the rights of the Lender in any funds.

Now, why would the Debtor oppose the order proposed by the union and Lender when the estate clearly benefitted by it? Is it because the order assigned to the estate and reserved claims against the persons or entities which caused the diversion of funds in the first place? The Court appreciates that this is a delicate question to ask. However, there have been other instances in this case where the Court has inquired whether a Dr. Patel controlled Debtor is advocating the interests of the estate generally as opposed to advocating Dr. Patel's own special interests.

By way of example, there were many hearings in this case regarding debtor-in-possession financing. Dr. Patel desired to lend the estate funds, but was adamant on obtaining a lien that primed the Lender's equity. Given the Lender's willingness to provide alternative financing,[2] and the relatively small equity

---

[2] In order to obtain financing, secured by a priming lien pursuant to 11 U.S.C. § 364(d), the debtor must demonstrate that no suitable alternative financing is available from other sources, and that the proposed post-petition arrangement adequately protects the existing lienholders's interests. See e.g., Suntrust Bank v. Den-Mark Construction, Inc., 406 B.R. 683, 689 (E.D.N.C. 2009).

cushion in this case compared to the size of the Lender's claim,[3] the Court made it clear that it would not approve financing by Dr. Patel on a priming basis. Here, did the Debtor ask Dr. Patel to provide financing on a basis that did not prime the Lender? No it did not, much to the surprise of the Court. Instead, the Court held numerous hearings on this matter before an ultimate resolution could be had.

Similarly, the Court had some concerns with respect to the manner in which the debtor-in-possession adhered to its duties relating to the funding available from the Debtor's franchisor- Wyndham- under the franchise agreement approved by the Court. As reflected in this Court's prior *Memorandum Opinion and Order*, Wyndham had committed to fund $1 million toward the Debtor's property improvement plan. See In re Shubh Hotels Pittsburgh, LLC, 439 B.R. 637 (Bankr. W.D. Pa. 2010). Apparently such obligations are guaranteed by Dr. Patel. However, as reported by the Examiner, Dr. Patel failed to cause the Debtor to draw upon such funds even though the Debtor's property improvement plan remains incomplete. According to the Examiner, "When asked about this loan, Dr. Patel's attorney . . . explained that since Dr. Patel is guaranteeing the Franchise Agreement, the Debtor has chosen not to use these funds at this time." See *First*

---

[3] Courts have held that an equity cushion alone does not per se result in a finding of adequate protection. Suntrust Bank, 406 B.R. at fn. 24. In the matter *sub judice*, the Court would note that while a small equity cushion exists using a going concern value for the Debtor's hotel, statements by counsel in this case suggest that if the case were to be converted to a liquidation, there would be no equity in the Lender's collateral. Cf. In re Phoenix Steel Corp., 39 B.R. 218, 226-27 (D. Del. 1984)(adopting an intermediate value when there is some probability that the debtor will avoid a forced liquidation).

00005473.WPD                                -6-

*Status Report of Examiner Margaret M. Good* at p. 10 (Dkt. #487).[4]

The Court's calender of January 31, 2011 also included the competing objections to disclosure statements filed by the Lender and the Debtor. The objections filed by each party reflect that these two parties cannot even agree as to the basic background facts behind the Debtor's bankruptcy case.[5] Instead, each party desires to use the disclosure statement dissemination process to wage a public relations campaign to advocate the litigation interests of Dr. Patel and the Lender, respectively.

Indicative of this course of action, the disclosure statement proposed by Dr. Patel and the Debtor declined to identify material information to creditors in the form of the identity of which financial institutions would issue letters of credit securing, in part, payment obligations of the plan proposed by the Debtor and Dr. Patel. This material information was withheld purportedly out of a fear of prospective interference by the Lender with such letters of credit. When pressed as to why such a non-disclosure (and averment of an expectation of interference) was appropriate in a disclosure statement, the Debtor/Dr. Patel team could offer no explanation that was convincing. Instead, when pressed on the issue, they agreed that the footnote should be deleted in its entirety. Of course, this little

---

[4] The Court still does not know whether the $1 million property improvement loan was drawn upon.

[5] The record also reflects that the parties could not even agree as to whether disputes in this case should be mediated. It was only after the Court overruled the Lender's objection to mediation that mediation became a possibility. Nothing contained herein should be deemed or construed to preclude the parties from mediating their disputes. In fact, the Court encourages the parties to try and work out an economic solution to their differences.

tussle over a footnote in a proposed disclosure statement is indicia of the level of animosity that exists between these parties.[6]

The Court is not confident that the animosity and acrimony between the Lender and a Dr. Patel controlled Debtor will cease anytime soon. The Court reaches this conclusion because there is no level of trust between a Dr. Patel controlled Debtor and the Lender.

As this *Memorandum Opinion* is being written, the Court has received the latest status report filed by the Examiner, which outlines a few of the instances which illuminate the level of distrust between the parties. In her report dated February 1, 2011, the Examiner notes that the Lender has strong opposition to the management of the Debtor's construction projects being handled by Mr. Frank Amedia,[7] an alleged insider of the Debtor, and his company MAC Construction.[8] Based on the record made in the hearings on the Trustee Motion, the Court understands that the Lender's heartburn in this regard stems not only from the fact that Mr. Amedia is an insider, but also from other factors. The Examiner reports that the Debtor's construction project has since been stalled because each side is firmly entrenched in their positions.[9]

---

[6] The Court, of course, recognizes that it takes "two to tango." As such, it does not place the blame of the state of affairs entirely on the Debtor or Dr. Patel. Rather, the Lender bears some responsibility too.

[7] The record reflects that Mr. Lalwani introduced Mr. Amedia to Dr. Patel.

[8] The Examiner also noted that the Lender has strong opposition to the hotel employing Mr. Amedia's two daughters.

[9] The Examiner recommends that bids for construction manager be sought from qualified firms.

The level of animosity and acrimony in this case must stop.[10] Otherwise, the costs of the estate will continue to skyrocket and the chances of reorganization will go down. This reorganization has already taken its toll on the morale of the Debtor's employees. In fact, almost twenty employees appeared in court at the hearings held on January 31, 2011, with representatives expressing their concern over the direction of this case (including the direction of present management and ownership).[11]

In light of all of the circumstances of this case, the record is clear and convincing that a Chapter 11 Trustee should be appointed pursuant to 11 U.S.C.§ 1104(a)(1) and (2). See also In re Marvel Entertainment Group, Inc., 140 F.3d 463 (3d Cir. 1998)(appointment of trustee appropriate given high level of acrimony in complicated case). In rendering its decision to direct the appointment of a Chapter 11 Trustee, the Court is nonetheless mindful of the costs associated with the appointment of a trustee. However, without the interjection of a neutral third party, it is clear to the Court that litigation costs will bury this case in the absence of a change of direction.

---

[10] The Examiner's latest report states that the competing plan process appears to be working. The Court agrees that a competing plan process works in that it gives competing plan proponents the incentive to increase consideration to be paid to creditors. However, that process has not diminished the level of acrimony between the respective parties, and that acrimony and animosity does come with a cost to the detriment of unsecured creditors and the employees of the Debtor.

[11] The employees addressed the Court with no objection by the Debtor or any other parties in interest in attendance. At least one of the employees raised concerns regarding the Debtor's franchisor- Wyndham. The Court would note that it previously approved the Debtor's entry into the Wyndham franchise agreement, and nothing contained in this *Memorandum Opinion* should be deemed or construed to be a finding or conclusion that Wyndham is not performing its end of the bargain approved by the Court.

For all of the reasons stated above, the Court shall direct that the Office of the U.S. Trustee appoint a Chapter 11 Trustee in this case. An appropriate order shall be issued.

Dated: February 1, 2011

_____
JEFFERY A. DELLER
U.S. Bankruptcy Judge

**FILED**

FEB - 1 2011

CLERK, U.S. BANKRUPTCY COURT
WEST. DIST. OF PENNSYLVANIA