**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

IN RE:

SHUBH HOTELS PITTSBURGH, LLC,

        Debtor.

Bankruptcy Case No. 10-26337-JAD

Chapter 11

Honorable Jeffery A. Deller

**MODIFIED SECOND AMENDED DISCLOSURE STATEMENT IN CONNECTION
WITH MODIFIED SECOND AMENDED PLAN OF REORGANIZATION DATED
APRIL 6, 2011**

Dated: April 6, 2011

BERGER SINGERMAN, P.A.
Counsel for Pittsburgh Grand LLC
and Dr. Kiran C. Patel
James G. Gassenheimer, Esq.
Daniel Lampert, Esq.
Brian G. Rich, Esq.
200 South Biscayne Blvd. Suite 1000
Miami, FL 33131
Tel: 305-714-4383

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ................................................................................................. 1

II.     OVERVIEW OF CHAPTER 11 ......................................................................... 3

III.    BACKGROUND OF THE DEBTOR AND EVENTS LEADING TO THE
        FILING OF THE BANKRUPTCY CASE ......................................................... 7

        A.      THE DEBTOR ......................................................................................... 7

        B.      PRE-PETITION OPERATIONS ........................................................... 9

        C.      EVENTS LEADING TO THE FILING ............................................. 10

        D.      POST-PETITION EVENTS ................................................................. 12

        E.      ASSETS AND LIABILITIES .............................................................. 24

IV.     SUMMARY OF AMENDED PLAN'S TREATMENT OF CLAIMS AND
        INTERESTS ...................................................................................................... 25

        1.      GENERAL DISCUSSION REGARDING TREATMENT OF
                CLAIMS AND CERTAIN RISK FACTORS ..................................... 33

        2.      UNCLASSIFIED CLAIMS ................................................................. 34

        3.      THE DIP LOAN .................................................................................. 37

        4.      ADMINISTRATIVE EXPENSE CLAIMS ......................................... 37

        5.      CLASSES ............................................................................................. 38

        6.      DISPUTED CLAIMS .......................................................................... 47

        7.      RELEASES ........................................................................................... 49

V.      MEANS OF IMPLEMENTING AMENDED PLAN ....................................... 59

        1.      POST-CONFIRMATION OPERATIONS OF THE DEBTOR ......... 61

        2.      CONFIRMATION STANDARDS ...................................................... 62

        3.      BEST INTERESTS TEST .................................................................... 62

VI.     ALTERNATIVES TO THE AMENDED PLAN ............................................. 64

VII.    OTHER MATTERS ........................................................................................... 65

        1.      THE TRUST ......................................................................................... 65

        2.      EXECUTORY CONTRACTS ............................................................. 68

        3.      OBJECTIONS TO CLAIMS ............................................................... 69

        4.      PRESERVATION OF ACTIONS AND AVOIDANCE CLAIMS ..... 70

        5.      CONDITIONS PRECEDENT TO EFFECTIVENESS OF THE
                AMENDED PLAN ............................................................................... 72

VIII.   U.S. FEDERAL INCOME TAX CONSIDERATIONS ................................................. 73

IX.   ANALYSIS OF THE AMENDED PLAN VS. LIQUIDATION .................................. 78

X.   RISK FACTORS ........................................................................................................ 79

    1.   FAILURE TO SATISFY VOTE REQUIREMENT ......................................... 79

    2.   THE AMENDED PLAN MAY NOT BE ACCEPTED OR CONFIRMED....... 79

    3.   ALLOWED CLAIMS MAY EXCEED ESTIMATES .................................... 80

    4.   THE REORGANIZED DEBTOR MAY NOT BE ABLE TO
       PERFORM PER ITS FINANCIAL PROJECTIONS ...................................... 81

    5.   THE SETTLEMENT MIGHT NOT BE CONSUMMATED ........................... 82

XI.   CONFIRMATION BY CRAM DOWN ..................................................................... 82

**EACH OF THE PLAN PROPONENTS RESERVES THE RIGHT TO AMEND OR SUPPLEMENT THIS AMENDED DISCLOSURE STATEMENT AND THE AMENDED PLAN AT OR BEFORE THE CONFIRMATION HEARING.**

## I.  INTRODUCTION

Pittsburgh Grand, LLC (an equity holder of Shubh Hotel Pittsburgh, LLC; the "Debtor") and Dr. Kiran Patel, the principal of Pittsburgh Grand, LLC (collectively, the "Plan Proponents") have prepared this *Modified Second Amended Disclosure Statement In Connection with Modified Second Amended Plan of Reorganization Dated April 6, 2011* (the "Disclosure Statement" or "Amended Disclosure Statement") in connection with the solicitation of acceptances or rejections of the *Modified Second Amended Chapter 11 Plan Proposed by Dr. Kiran Patel and Pittsburgh Grand, LLC Dated April 6, 2011,* (the "Amended Plan" or "Second Amended Plan"), a copy of which accompanies this Disclosure Statement as **Exhibit A**.  Capitalized terms used herein have the meanings assigned to them in the Definitions section in the Amended Plan. Whenever the words "include," "includes" or "including" are used in this Disclosure Statement, they are deemed to be followed by the words "without limitation."

This Disclosure Statement is presented to certain holders of Claims against and Interests in the Debtor in accordance with the requirements of section 1125 of the United States Bankruptcy Code, 11 U.S.C. §§101-1330 (the "Code").  Section 1125 of the Code requires that a disclosure statement provide information sufficient to enable a hypothetical and reasonable investor, typical of the debtor's creditors and interest holders, to make an informed judgment whether to accept or reject a plan.  This Disclosure Statement may not be relied upon for any purpose other than that described above.

This Disclosure Statement and the Amended Plan are an integral package, and they must be considered together for the reader to be adequately informed. This introduction is qualified in its entirety by the remaining portions of this Disclosure Statement (including its Exhibits or Schedules), and this Disclosure Statement in turn is qualified in its entirety by the Amended Plan. This Disclosure Statement contains only a summary of the Amended Plan. You are strongly urged to review the Amended Plan, a copy of which is provided herewith, before casting a Ballot.

No representations concerning the Plan Proponents or information regarding the Hotel or Debtor (particularly as to the values or cash flow of the Hotel) are authorized other than as set forth in this Disclosure Statement. You should not rely upon any representations or inducements made to secure your acceptance or rejection of the Amended Plan other than as contained in this Disclosure Statement, and such additional representations and inducements should be reported to the Plan Proponent's counsel, who will in turn deliver such information to the proper authorities for such action as may be appropriate.

The information contained in this Disclosure Statement, including any exhibits concerning the financial condition of the Debtor, has not been subjected to an audit or independent review except as expressly set forth herein. The Plan Proponents have endeavored in good faith to be accurate in this Disclosure Statement. Statements of the assets and liabilities of the Debtor as of the date of the commencement of the Chapter 11 Case are on file with the clerk of the Bankruptcy Court and may be inspected by interested parties during regular business hours.

The statements contained in this Disclosure Statement are made as of the date of

2

this Disclosure Statement unless another time is specified. There is no guaranty that facts will not change after this Disclosure Statement was filed; and it must be assumed that some facts will indeed change from that time until the hearing on the approval of the Disclosure Statement (discussed below), and thereafter during the periods in which the Debtor makes payments under the Amended Plan.

This Disclosure Statement was prepared in accordance with section 1125 of the Bankruptcy Code and not in accordance with federal or state securities laws or other applicable non-bankruptcy law. Entities holding or trading in or otherwise purchasing, selling or transferring claims against, interests in or securities of, the debtor should evaluate this disclosure statement only in light of the purpose for which it was prepared. This Disclosure Statement has not been approved or disapproved by the Securities and Exchange Commission and the Securities and Exchange Commission has not passed upon the accuracy or adequacy of the statements contained herein. Nor may this Disclosure Statement be construed to be advice on the tax, securities or other legal effects of the Amended Plan. You should, therefore, consult with your own legal, business, financial and tax advisors as to any such matters concerning the solicitation, the Amended Plan or the transactions contemplated thereby.

## II.     OVERVIEW OF CHAPTER 11

Chapter 11 comprises the chapter of the Code primarily used for business reorganization. Formulating a plan to restructure a debtor's finances forms a fundamental purpose of a case under chapter 11 of the Code. Businesses also sometimes use chapter 11 as a means to conduct asset sales and other forms of liquidation. Whether the Debtor seeks to reorganize or liquidate, a chapter 11 plan sets forth and governs the treatment and rights creditors and interest holders will

3

receive with respect to their claims against and equity interests in a debtor's bankruptcy estate. The Code entitles only holders of impaired claims or equity interests who receive some distribution under a proposed plan to vote to accept or reject the plan. The Code conclusively presumes that holders of unimpaired claims or equity interests under a proposed plan have accepted the plan and need not vote on it. The Claims in Classes in 1, 3, 4 and 5 of the Amended Plan are Impaired and thus may vote either to accept or reject the Amended Plan. The Term Sheet referred to herein (as modified by the Settlement Order) anticipates and provides that Lender will agree to support the Amended Plan that is consistent with the Term Sheet pursuant to a Plan Support Agreement. No such Plan Support Agreement had been executed on March 28, 2011, when the Amended Plan was first filed.[1] A copy of the Plan Support Agreement is or will be attached as **Exhibit I** to this Disclosure Statement. The Debtor has enclosed a Ballot with this Disclosure Statement to solicit the votes of the Creditors in Classes 1, 3, 4 and 5. Those Creditors may vote on the Plan by completing the enclosed Ballot and mailing it to the following address:

> BERGER SINGERMAN, P.A.
> 200 South Biscayne Blvd., Suite 1000
> Miami, FL 33131
> Telephone: (305) 714-4383
> Facsimile: (305) 714-4340
> Attn: James D. Gassenheimer, Esquire

You should use the Ballot sent to you with this Disclosure Statement to cast your vote for or against the Plan. You may not cast Ballots or vote orally or by facsimile. **For your Ballot to be considered by the Bankruptcy Court, it must be received at the above address by 5:00**

---

[1] Once executed, the Plan Proponents will file a Notice on the Court's CM/ECF system regarding a web site where the Plan Support Agreement and related documentation will be posted. In addition, any interested party may request a copy of such documentation by contacting Berger Singerman, P.A., at the address and telephone number noted herein.

p.m. (**prevailing Eastern time**) **by the date fixed by the Bankruptcy Court on the accompanying scheduling order (the "Voting Deadline").** If you are a Creditor in Class 1, 3, 4 or 5 and you did not receive a Ballot with this Disclosure Statement, please contact:

> BERGER SINGERMAN, P.A.
> 200 South Biscayne Blvd., Suite 1000
> Miami, FL 33131
> Telephone: (305) 714-4383
> Facsimile: (305) 714-4340
> Attn: James D. Gassenheimer, Esquire

A ballot that does not indicate acceptance or rejection of a plan will not be considered. An impaired class of claims accepts a plan if at least 2/3 in amount and more than 1/2 in number of the allowed claims in the class that actually vote are cast in favor of the plan. A class of interests accepts a plan if at least 2/3 in amount of the allowed interests of such class that actually vote are cast in favor of the plan. Whether or not you vote, you will be bound by the terms and treatment set forth in the Amended Plan if the Bankruptcy Court confirms the Amended Plan. The Bankruptcy Court may disallow any vote accepting or rejecting the Amended Plan if the vote is not cast in good faith.

Once it is determined which impaired classes have accepted a plan, the bankruptcy court will determine whether the plan may be confirmed. For a plan to be confirmed, the Code requires, among other things, that the plan be proposed in **good faith** and comply with the other applicable provisions of chapter 11 of the Code, including a requirement that at least one class of impaired claims accept the plan, and that confirmation of the plan is not likely to be followed by the need for further financial reorganization. The bankruptcy court will confirm a plan only if it finds that all of the requirements enumerated in section 1129 of the Code have been met. The Debtor believes that the Amended Plan satisfies all of the requirements for confirmation.

5

One requirement for confirmation of a plan is called the "best interests test." Notwithstanding acceptance of the plan by each impaired class of claims, in order to confirm a plan, if even one member of an impaired class votes to reject the plan, the bankruptcy court must determine that the plan is in the best interests of each holder of a claim or interest in such class. The best interests test requires that the bankruptcy court find that the plan provides to each member of such impaired class a recovery on account of the class member's claim or interest that has a value, as of the Effective Date of the plan (generally, at least 14 days after confirmation), at least equal to the value of the distribution that each such class member would have received if the debtor's assets were liquidated under chapter 7 of the Code on such date. Under the Chapter 7 liquidation analysis provided in this Disclosure Statement, all holders of claims within Classes 1, 3, 4 and 5 (the impaired classes) will receive more under the Amended Plan than they would if the Debtor was liquidated and its most valuable asset, the Hotel at 600 Commonwealth Place, Pittsburgh, PA was sold.

The Bankruptcy Code also requires that, in order to confirm a plan, the Court must find that confirmation of a plan is not likely to be followed by liquidation or the need for further financial reorganization of the Debtor ("financial feasibility test"). For a plan to meet this test, the Court must find that the Debtor's estate and the Reorganized Debtor possess the capital and should generate the other resources to meet their respective obligations under the Amended Plan. The Plan Proponents believe that following confirmation of the Amended Plan, the Reorganized Debtor will be able to fully perform all obligations under the Amended Plan without any need for liquidation or further financial reorganization. As shown by the financial projections attached as **Exhibit B** to this Disclosure Statement, the Hotel's projected cash flows, along with the

Emergence Financing (as more fully described herein) more than adequately cover the Reorganized Debtor's payment obligations to the various classes under the Amended Plan.

The bankruptcy court may confirm a plan notwithstanding the plan's rejection by some impaired classes, if the bankruptcy court finds that at least one impaired class of claims (not including any acceptances by "insiders" as defined in section 101(31) of the Code) has accepted the plan and that the plan satisfies certain additional conditions. This provision, found in section 1129(b) of the Code, is generally referred to as the "cram-down" provision. Pursuant thereto, the bankruptcy court may confirm a plan over the rejection by a class of secured claims if the plan is fair and equitable and satisfies one of the alternative requirements of section 1129(b)(2)(A) of the Code (otherwise known as "cram-down"). Likewise, the bankruptcy court may confirm a plan over the rejection by a class of unsecured claims if the plan is fair and equitable and if the non-accepting claimants will receive the full value of their claims, or (even if the non-accepting claimants receive less than full value), if no class of junior priority will receive or retain anything on account of its pre-petition claims or interests.

**THESE ARE COMPLEX STATUTORY PROVISIONS, AND THE PRECEDING PARAGRAPHS ARE NOT INTENDED TO BE A COMPLETE SUMMARY OF THE LAW. IF YOU DO NOT UNDERSTAND THESE PROVISIONS, PLEASE CONSULT WITH YOUR ATTORNEY. THE PLAN PROPONENTS EXPECT THAT THEY MAY HAVE TO RELY UPON THE "CRAM-DOWN" PROVISION OF SECTION 1129(b) OF THE CODE IN ORDER TO CONFIRM THE AMENDED PLAN.**

### III.    BACKGROUND OF THE DEBTOR AND EVENTS LEADING TO THE FILING OF THE BANKRUPTCY CASE

#### A.    THE DEBTOR

The Debtor is a Florida Limited Liability Company. The original members of the Debtor were affiliates of Atul Bisaria ("Bisaria"). After the Petition Date, and without Lender approval, on September 21, 2010, the members of the Debtor transferred one hundred percent (100%) of

their membership interests so that Pittsburgh Grand LLC, a Florida limited liability company ("PG"), owns 99% of the Debtor's equity and Pittsburgh Grand Manager, LLC, a Delaware limited liability company ("PGM"), owns the remaining 1% and serves as the Debtor's Manager. Dr. Kiran Patel owns PG and PGM. Because of Bisaria's equity transfer, Dr. Patel presently holds one hundred percent (100%) of the membership interests in the Debtor.[1] Bisaria has no role going forward with the Debtor's operations or the Amended Plan.

The Debtor owns and operates the largest hotel in the City of Pittsburgh (the "Hotel"), with more than 700 guest rooms and approximately 40,000 square feet of meeting space. Conrad Hilton built the Hotel as his first such property, and Hilton Hotels International ("Hilton") owned and operated the Hotel for more than 50 years. Hilton sold the Hotel to the Debtor on or about May 22, 2006 for approximately twenty-eight million dollars ($28,000,000). After the sale, the new owners still maintained the Hilton flag through a franchise arrangement. Toward the end of their ownership of the Hotel, the Plan Proponents allege Hilton stopped investing in the property, and allowed the Hotel to deteriorate substantially below their franchise standards. By the time of the sale, the Hotel required a substantially expensive and elaborate renovation (including structural improvements to all of the Hotel rooms) to bring the Hotel up to Hilton brand standards. The Debtor financed the acquisition of the Hotel, in part, from the predecessor in interest to the Debtor's present lender, Column Financial, Inc. ("CFI"), through an acquisition and construction loan of $49.6 million (the "Loan").

---

[1] The Commonwealth of Pennsylvania does provide that certain equity transfers of non-operating real estate entities can trigger a documentary stamp tax. The Debtor verified that the sale of the membership interests in the Hotel does not trigger the Realty Transfer Tax with the Office of Chief Counsel for the PA Department of Revenue. The Debtor will report its tax attributes for the short year ending with the equity transfer to Bisaria, and its tax attributes for the balance of 2010 to Dr. Patel.

8

Carbon Capital II Real Estate CDO 2005-1 Ltd., a Cayman Islands exempted company ("Lender" or "Carbon Capital") acquired a first lien on, and security interest in, substantially all of the Debtor's real and personal assets to secure repayment of the Loan. On September 15, 2010, Carbon Capital filed a Proof of Claim (Claim No. 3-1), as amended on February 1, 2011 (Claim No. 3-3). Lender asserts its Class 1 Claim, as of March 2011, has an aggregate value of between approximately $56.4 million and $60 million, consisting of at least $49.6 million in principal, more than $4.6 million in accrued and unpaid interest at the default rate provided under the Loan Documents, plus more than $2.2 million in fees and costs incurred by Lender in enforcing its rights and remedies under the Loan Documents as a result of the Debtor's defaults thereunder, with interest at the default rate, fees, and costs continuing to accrue thereafter (subject to the Settlement Order). In connection with and subject to the Settlement and the Settlement Order, and upon the Bankruptcy Court's approval of this Disclosure Statement, Lender will hold an Allowed Class 1 Claim in the amount equal to the aggregate of: (a) the $49.6 million principal balance, (b) at least $2.3 million of accrued and accruing default interest (subject to the Settlement Order), and (c) subject to the Settlement Order, reasonable fees, costs and charges incurred by the Lender or provided under the Loan Documents and allowable under 11 U.S.C. §506(b).

**B.    PRE-PETITION OPERATIONS**

Dr. Kiran Patel has alleged that he began lending money on an unsecured basis to the Debtor starting in 2009, when the Debtor's prior owners were struggling to comply with Hilton's requirements and the terms of the Debtor's loan documents with Lender. Jai Lalwani ("Lalwani") first entered into dealings with the Hotel in July 2009. Through various discovery, it appears that Lalwani misappropriated revenues at the Hotel and improperly diverted those

9

revenues from payment owed to Hotel creditors and vendors for personal use. As information was brought to light about Lalwani's pre-petition conduct, his participation in the Debtor's affairs was ended and for some time he has had no role at the Hotel and he will also have no ongoing role with the Reorganized Debtor after the Effective Date of the Amended Plan. After the Effective Date, the Hotel will be managed by Wyndham Hotels and Resorts ("<u>Wyndham</u>"), the largest hotel company in the world.[2]

## C.  EVENTS LEADING TO THE FILING

Various circumstances led to the Debtor's decision to file a Chapter 11 bankruptcy proceeding. The principal factors relate to Bisaria's inability to continue the construction and remodeling of the Hotel, events involving Hilton's termination of the Hotel franchise and Carbon Capital's efforts to foreclose on the Hotel after multiple attempts to work with the Debtor's prior owners to reach a resolution on outstanding defaults under the Loan.

In August 2008, Hilton sent the Debtor a notice of default and termination letter due to an "Unacceptable" score for the Hotel's condition and alleged failure to comply with brand standards (the "<u>First Hilton Default Notice</u>"). The First Hilton Default Notice constituted a non-monetary default under the Loan with Carbon Capital. The Debtor and Carbon Capital negotiated a forbearance agreement in response to the First Hilton Default Notice, which required, *inter alia,* the Debtor to adhere to the construction completion schedule, satisfy all outstanding Mechanics Liens filed against the Hotel; and reduce certain outstanding accounts payable to no more than $1MM. Hilton agreed to extend the construction deadline to April 1,

---

[2]  On November 23, 2010, the Bankruptcy Court also approved the execution of a franchise with Wyndham to brand the Hotel, formerly a Hilton, as an exclusive and valuable Wyndham Grand. *See Memorandum Opinion*, Doc. No. 463.

3474450-33

2009. The Debtor's previous owners failed to satisfy many of the Lender's requirements, including the completion of the construction.

On April 7, 2009, an inspection of the Hotel revealed the renovations of the guest rooms, corridors and restaurant spaces were successfully completed and the Debtor was advancing construction on the meeting spaces and lobby. However, the Hotel's financial condition continued to deteriorate and by October of 2009 outstanding franchise fees had increased to $724,245 and the judgments and liens against the property exceeded three million five hundred dollars ($3,500,000).

In early January, 2010, Hilton failed the Hotel in its quality inspection. The Debtor and Carbon Capital then entered into a transaction resulting in that certain First Amendment to Loan Agreement (the "Amendment") dated as of January 14, 2010. Pursuant to the Amendment, Carbon Capital accommodated the Debtor by extending the maturity date of the Loan from September 2009 to January 14, 2015 and agreeing to accept interest only payments at a reduced non-default interest rate. In exchange, the Debtor agreed to: (1) to pay a loan exit fee equal to $100,000 for each month and partial month after the Amendment closing date to the transfer closing date for any transfer of the property; (2) pay the greater of 20% of the net proceeds of any prepayment or $2,750,000 for any closing that occurred on or after the first anniversary of the Amendment; (3) pay the greater of 20% of the prepayment net proceeds, or $2,750,000, in conjunction with any refinancing of the Loan at any time after the Amendment; (4) pay $2,750,000 in connection with repayment of the Loan in full at any time after the Amendment, including the initial maturity date, or the extended maturity date; and (5) pay $2 million into escrow to settle outstanding mechanics' and other liens at closing of the Amendment. The Amendment also required the Debtor to (a) complete the addition (expansion exterior) by

11

December 1, 2010, as required by Hilton's PIP and Additional Build Out (expansion interior) by July 15, 2011, and (b) enter into a management agreement with Crescent Hotels & Resorts ("Crescent").

In July 2010, Hilton conducted a surprise PIP inspection which the Debtor failed. Hilton notified the Debtor of this second "strike" within the 12 month period, and gave the Debtor notice of potential termination of the franchise if the Hotel failed an inspection on August 31, 2010. The Debtor, made efforts to meet the inspection requirements, including making substantial additional expenditures to accelerate the construction schedules. However, Hilton failed the Hotel from the August 31, 2010 inspection. After the Hilton inspector announced the Hotel's failure at 5 p.m. on August 31, 2010, Hilton terminated the franchise agreement and shut down the Hotel's reservation system at 12:01 am on September 1, 2010. The Debtor disputes the validity of Hilton's termination of the franchise agreement. On September 3, 2010, Carbon Capital filed a *Complaint in Mortgage Foreclosure* in the Court of Common Pleas of Allegheny County to foreclose on its interests in the Hotel and filed an *Emergency Motion to Appoint a Receiver for the Hotel*. On September 7, 2010, the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the Bankruptcy Court.

D. **POST-PETITION EVENTS**

The Bankruptcy Case began very contentiously, but diligent work on all sides has produced a resolution of the majority the disputes as more fully described in this Disclosure Statement and the Amended Plan. Significantly, after much litigation and many disputes, the Plan Proponents reached a settlement with BlackRock and Carbon Capital, (the "Settlement") which is set forth in the Term Sheet dated February 25, 2011 (the "Term Sheet") as modified by the Settlement Order. The Term Sheet is attached hereto as **Exhibit C**. The Settlement, *inter*

12

*alia,* proposes a consensual resolution of the claims asserted by Carbon Capital, the Debtor and the Plan Proponents against one another and provides for releases of all claims and litigation relating thereto, assuming all parties are in full compliance with the terms of the Settlement and the Plan Support Agreement contemplated by the Term Sheet. Pursuant to a motion brought by the Plan Proponents and the Lender, the Bankruptcy Court approved the Settlement on March 29, 2011, and a copy of the Bankruptcy Court Order approving the Settlement (the "Settlement Order") is attached as **Exhibit C-1** hereto. In addition, on March 28, 2011, the Plan Proponents concluded certain negotiations and reached certain agreements with the General Unsecured Creditors Committee and Chapter 11 Trustee relating to the treatment of Classes 4 and 5 under the Amended Plan and related matters, and a summary of those terms is contained in a term sheet attached as **Exhibit C-2** hereto (the "Committee Term Sheet"). The following summarizes the significant events that have occurred since the filing of the Bankruptcy Case:

**Carbon Capital's Motion for Relief From the Automatic Stay, Motion to Appoint a Chapter 11 Trustee and Lender Plan.**

On September 8, 2010, Carbon Capital filed Carbon Capital's and BlackRock's Emergency Motion for Relief from the Automatic Stay (the "Stay Relief Motion") (Doc. Nos. 7, 109 and 186), the day after this Case commenced. The Debtor, Dr. Patel and the Committee each vigorously opposed the Stay Relief Motion. The Debtor filed its Response on September 14, 2010 (Doc. No. 41). Substantial discovery and multiple weeks of evidentiary hearings ensued thereafter.

Carbon Capital then filed its Emergency Motion to Appoint a Chapter 11 Trustee and to Terminate Exclusivity on October 25, 2010 (Doc. No. 312). Again, the Debtor and Dr. Patel opposed these Carbon Capital motions in their November 3, 2010 Response (Doc. No. 373).

3474450-33

On November 8, 2010, the Court entered its Order staying litigation on the Stay Relief Motion, appointing an Examiner to monitor and report on the Debtor's operations, and terminating the Debtor's exclusive right to file a plan of reorganization. As a result the following actions occurred: (1) litigation on the Stay Relief Motion ceased; (2) on November 12, 2010, the Court appointed Margaret M. Good to serve as an examiner of the Debtor, pursuant to section 1104 of the Bankruptcy Code. (Docket No. 419); and (3) on December 29, 2010, Carbon Capital filed its Disclosure Statement and Plan (the "Lender Plan") and related Disclosure Statement and Plan Summary.

On January 31, 2011, the Bankruptcy Court heard arguments on the Disclosure Statement accompanying the competing Lender's Plan as well as arguments on certain other motions filed by the Hotel's labor unions. At this hearing, the Bankruptcy Court decided to appoint a Chapter 11 Trustee for the Debtor, for the reasons stated on the record. On February 1, 2011, the Bankruptcy Court entered its order appointing the Chapter 11 Trustee and set forth its reasons for the appointment in that certain Memorandum Opinion accompanying the Order. (Doc. No. 312). On February 7, 2011, the Bankruptcy Court approved the application filed by the Office of the United States Trustee and appointed James R. Walsh, Esquire, as the Chapter 11 Trustee for the Debtor's estate. Following the appointment of the Chapter 11 Trustee, the Chapter 11 Trustee now manages the operations of the Hotel and all other property of the Debtor's estate.

**The Creditors' Committee**.

On September 24, 2010, the Official Committee of Unsecured Creditors was formed (the "Committee"). On September 24, 2010 the Committee selected Leech Tishman Fuscaldo & Lampl, LLC as counsel. Since its formation, the Committee has actively engaged in all aspects

of the Case.  The Committee has now sought Court approval to retain the former Examiner as financial advisor to the Committee.  (Doc. No. 779).

**DIP Financing and Use of Cash Collateral**.

The Debtor filed its Expedited Motion for an Order Authorizing it to Use Cash Collateral or in the Alternative to Obtain Alternative Debtor in Possession Senior Lending Facility on September 8, 2010 (Doc. No. 13).  The Lender filed its Response on September 14, 2010 objecting to the Debtor's Motion (Doc. No. 40).

On September 10, 2010, the Court continued the hearing on the Debtor's Expedited Motion for an Order Authorizing it to Use Cash Collateral or in the Alternative to Obtain Alternative Debtor in Possession Senior Lending Facility ("DIP Financing Motion") (Doc. No. 13) to September 15, 2010.  The Court again continued the hearing on the DIP Financing Motion to September 29, 2010.

On November 9, 2010, the Debtor filed its *Amended and Expedited Motion for an Order Authorizing it to Enter into Alternative Debtor In Possession Senior Lending Facility* ("Amended DIP Financing Motion") (Doc. No. 402).   On November 12, 2010, the Debtor filed a Supplement/Addendum to the DIP Financing Motion seeking to borrow up to $3 million from Dr. Kiran Patel (Doc. No. 418).  After the hearing held on November 12, 2010, the Debtor and the Lender agreed, and the Court granted interim approval for the Debtor to enter into a Debtor In Possession senior lending facility with Carbon Capital in an amount up to $1.35 million (the "DIP Loan") by entry of an Interim Financing Order dated November 12, 2010 (Do. No. 425).

On November 15, 2010, as a result of the hearing on November 12, the Court continued the final hearing on the Amended DIP Financing Motion until December 3, 2010 (Doc. No. 430).  On December 3, 2010, the Court again continued the hearing on the Amended DIP Financing

15

Motion to December 9, 2010 (Doc. No. 493). The Court entered a Final Order Approving Debtor in Possession Financing and Use of Cash Collateral on December 21, 2010 (Doc. No. 549), approving DIP Financing of up to $3 million. As of the date of this Disclosure Statement, the amount drawn under the DIP Loan totaled approximately $1.8 Million, approximately the same amount outstanding at the end of 2010. The Plan Proponents are uncertain as to whether or not the amount drawn on the DIP Loan will be greater than $1.8 Million on the Effective Date.

Pursuant to the terms of the Final DIP Order, as modified by the Settlement, the DIP Loan is to mature on or before May 30, 2011.

**The Examiner and Chapter 11 Trustee**.

As set forth above, the Bankruptcy Court had appointed an examiner in this Case, Margaret M. Good. The Court authorized the Examiner to monitor the Hotel's cash receipts and disbursements, and not to provide management services or otherwise displace the Debtor's business judgment. The Examiner's Initial Report was dated December 2, 2010 (Doc. No. 487), and Second Report was dated February 1, 2011 (Do. No. 720). The Examiner's appointment was automatically terminated when the Chapter 11 Trustee was appointed. The Chapter 11 Trustee is now charged with the management of the Debtor's post-petition operations.

**The Equitable Subordination Complaint**.

On November 3, 2010, Dr. Patel filed a complaint (the "Equitable Subordination Complaint") (A.P. Doc. No. 1) pursuant to section 510 of the Bankruptcy Code against Carbon Capital and BlackRock to equitably subordinate their entire claim to all other classes and assert damage claims. Carbon Capital counterclaimed against the Equitable Subordination Complaint to assert that Dr. Patel's claims should be equitably subordinated. The Settlement resolves all claims and issues in the Equitable Subordination Complaint, and upon the Bankruptcy Court's

16

approval of this Disclosure Statement, the Equitable Subordination Complaint will be dismissed with prejudice consistent with the terms of the Settlement and Settlement Order. The counterclaim will only be dismissed if the Amended Plan is confirmed in accordance with the Term Sheet.

**The Debtor's Application to Enter into the Wyndham Franchise**

On or about September 20, 2010, the Debtor filed a motion for authority, among other matters, to execute a franchise agreement with Wyndham. (Doc. No. 70). Debtor filed this motion on an expedited basis because the Hotel flag contributes substantially to its reservations and cash flow, and Hilton's termination of its franchise (which the Debtor disputes) substantially damaged the Hotel's operations. On November 23, 2010, the Bankruptcy Court issued a Memorandum Opinion approving the execution of the Wyndham franchise agreement. (Doc. No. 463). As noted above, on and after the Effective Date, Wyndham will manage the Hotel and its cash flow in connection with the post-confirmation operations of the Reorganized Debtors. Additionally, Wyndham is providing part of the funding to the Reorganized Debtor as part of the emergence financing (consisting of the Plan Loan of up to $11 million and the Mezzanine Loan of up to $6 million) to pay claims and other amounts due on the Amended Plan's Effective Date (the "Emergence Financing") in addition to the $1 million development loan which will fund certain construction costs (including the signage on the Hotel). Management of the Hotel by Wyndham and its commitment to fund part of the Emergence Financing for the Amended Plan should put to rest any concerns on the part of any party regarding the ongoing management and sound operation of the Hotel after oversight of the Bankruptcy Court and the Chapter 11 Trustee have terminated. The Plan Proponents contemplate that Dr. Patel will procure at least 30% of the Emergence Financing (which amount will be subject to his agreement to subordinate his interest

17

during a Class 5 Event of Default), and the exact allocation of the funding between Wyndham and Dr. Patel will be determined and documented prior to confirmation of the Amended Plan, and that the allocation shall be disclosed at least fifteen (15) days before the confirmation hearing on the Amended Plan and seven (7) days prior to the deadline for filing objections to confirmation.

**The Filing of the Debtor's Disclosure Statement and Plan, and The Plan Proponents' Subsequent Disclosure Statement and Plan**.

On October 6, 2010, the Debtor and Pittsburgh Grand, LLC filed their Disclosure Statement (the "Original Disclosure Statement")[3] and Plan of Reorganization (the "Debtor's Plan").  The Court held a hearing on approval of the Original Disclosure Statement on November 23, 2010.  Objections were filed by Carbon Capital (Doc. No. 445) on November 16, 2010.  The Committee filed its Response (Doc. No. 444) and its requests for clarifications and/or other objections have been addressed in this Disclosure Statement.  Allegheny County and Hertz Gateway also filed objections to the Original Disclosure Statement which were resolved.  As a result of the foregoing proceedings, and other considerations and concerns raised in this matter, including concerns regarding the management of the Hotel and its cash flow, and because of the Court's appointment of a Trustee for the Debtor, the Plan Proponents filed the Plan and the related Disclosure Statement on February 7, 2011.  That Plan differed from the Debtor's Plan principally by (a) removing the Debtor as a sponsor because a Trustee has been ordered but had not yet been appointed at that time, (b) providing that Wyndham will be appointed manager of the Hotel and control its operations and cash flow, after the Effective Date of the Plan, and (c) removing concerns about the financial ability of Dr. Patel to fund Plan distributions after the

---

[3] This Original Disclosure Statement has been withdrawn.

3474450-33

Effective Date by provisions for Dr. Patel's obligations to be fulfilled on the Effective Date. This Amended Plan additionally differs from the Debtor's Plan by also providing for settlement of the Lender's Claims and providing for the treatment of the Lender's Claims and interests in accordance with the Term Sheet.

**Mediation Process and Settlement.**

The Court ordered mediation to commence on February 8, 2011, which followed by one day the Plan Proponent's filing of the Plan and Disclosure Statement, including the Wyndham term sheet filed therewith. The mediation process proved successful, and led to the execution of the Term Sheet on February 25, 2011, a copy of which is attached hereto and incorporated herein as **Exhibit C**. For the convenience of the holders of Claims and Interests, a summary of the Term Sheet is provided below. Holders of Claims and Interests must read the Term Sheet and the Settlement Order for a detailed explanation of the Settlement. Further, to the extent there is any inconsistency between the summary below and the Term Sheet or the Second Amended Loan Documents, the Second Amended Loan Documents shall govern. While the Reorganized Debtor may make payments to holders of Allowed Claims after the Effective Date from Hotel Cash Flow, it may also make such payments pursuant to draws on the Emergence Financing, by payments on guarantees, or by equity infusion.

**Settlement Term Sheet Summary**.[4]

(a) Lender agrees to support the Amended Plan provided that the Amended Plan is consistent with the terms and conditions of the Term Sheet and the Plan Support

---

[4] The Plan Proponents will file a Notice on the Court's CM/ECF system regarding a web site where various documents as between the Plan Proponents and the Lender shall be available for review, at least 15 days prior to the confirmation hearing for the Amended Plan and 7 days before the deadline for confirmation objections. In addition, any interested party may request a copy of such documentation by contacting Berger Singerman, P.A., at the address and telephone number noted herein.
.

Agreement to be executed pursuant to the Term Sheet.

(b)     Wyndham will manage the Hotel and its cash flows after the Effective Date.

(c)     The parties will negotiate and execute a Plan Support Agreement (which will be filed upon such execution as an additional Exhibit hereto) which provides, among other things:

(i)     The Equitable Subordination Complaint shall automatically be dismissed with prejudice (the Counterclaims asserted therein are preserved, subject to further provisions calling for Lender's standstill and release of the Counterclaims upon the Effective Date occurring in accordance with the Term Sheet and Plan Support Agreement) upon Court approval of the Term Sheet and the Disclosure Statement for the Amended Plan;

(ii)    The Lender's Prepetition Senior Secured Claim, including accrued fees and accrued and accruing default interest (subject to the reservations and limitations in the Settlement Order), shall be allowed upon Court approval of the Term Sheet and this Disclosure Statement for the Amended Plan in accordance with the negotiated terms, and shall not be subject to Avoidance Actions;

(iii)   There shall be a tolling of the statute of limitations for the Lender's claims against the Patel Parties, the Plan Proponents, and other third parties;

(iv)    Upon failure of the Effective Date to occur under the Term Sheet, Plan Support Agreement, or Amended Plan, in certain circumstances, then (x) the Plan Proponents and Patel Parties' (as defined in the Term Sheet) claims and interests are disallowed and (y) the Plan Proponents and Patel Parties fully release the Lender Parties, and (z) the Plan Proponents and Patel Parties agree to cooperate with Lender supporting the Lender's resolution of the Bankruptcy Case, and the Amended Plan shall be withdrawn.

(d)     The Plan Proponents shall pay a Settlement Payment to the Lender on the Amended Plan's Effective Date of $10 million plus 50% of any increase in the DIP Loan above $1,773,000 ("Settlement Payment"), for application (a) first to pay the DIP Loan in full, (b) then to pay $1.2 million in satisfaction of any Lender's claims for accrued and accruing default interest (subject to the Settlement Order) and professional fees through the Effective Date (the "$1.2 million allocation"), and (c) with the balance being applied to reduce the principal amount outstanding under the Prepetition Credit Agreement.

•     Any amounts the Debtor pays on account of Lender's professional fees (pursuant to the amended DIP Loan Budget, $25,000 per week will be paid to Lender on such account), will be applied on a dollar for dollar

20

basis to reduce the amount of Settlement Payment and reduce the $1.2 million allocation.

- If the DIP Loan is paid in full on or before its expected extended Maturity Date of May 30, 2011 (from excess cash flow or external funds), the amount so paid will be credited in reduction of the Settlement Payment.

(e)     The Loan will be amended, which amendments will include (but shall not be limited to) the following provisions:

(i)     Lender consents to a junior secured loan made by affiliates of Wyndham and Dr. Patel encumbering the Hotel, up to the extent required to consummate the Plan, but only up to $11 million (the "Plan Loan"). The Plan Loan shall be subordinated to the Loan pursuant to the Subordination Agreement, but allow interest payments as described in the Term Sheet so long as no Event of Default exists under the Loan. The Plan Loan will mature at the same time as the Loan, as amended by the Second Amended Loan Documents, matures.

(ii)    The Exit Fee under the Loan will be the greater of $2.75 million or 20% of (a) the excess proceeds above $55 million from a transfer of the Hotel or (b) the amount by which the Hotel's appraised value exceeds $55 million upon a refinance of the Hotel.

(iii)   The Hotel's revenues will be applied to pay tax/insurance, interest, other sums due Lender, and the FF&E reserve, before being released to Wyndham for use under the Hotel Management Agreement. Lender and the Debtor will collaborate to agree upon using the existing FF&E Reserve to pay costs to repair the Hotel roof and HVAC systems.

(iv)    The Plan Proponents and Dr. Pallavi Patel will guaranty to Lender: (a) $3 million of the Loan for the first 12 months after the Effective Date, (b) $2 million for the next 12 months, (c) $1 million for the next 12 months, and (d) the completion of the construction of the pending improvements to the Hotel, on a lien-free basis.

(v)     The Reorganized Debtor may also obtain the Mezzanine Loan as part of the Emergence Financing, which Mezzanine Loan shall provide for repayment so long as there are no Events of Default under the Loan and may be made on a revolving basis with payments permitted so long as Reorganized Debtor certifies that no default exists; and the Mezzanine Loan may be made by an affiliate of Patel so long as the Reorganized Debtor remains solvent after giving effect thereto. The Mezzanine Loan will mature at the same time as the Loan, as amended by the Second Amended Loan Documents, matures.

21

(vi)    The Loan will be payable interest only at LIBOR plus 1.75% for the first 12 months after the Effective Date and LIBOR plus 3.50% thereafter until the final maturity.

(vii)    The Replacement Reserve Monthly Deposit under the Loan will be 2% of Gross Income from Operations for the first 24 months after the Effective Date, 3% for the next 12 months, and 4% thereafter.

(viii)    The Interest Reserve will be released to Lender on the Effective Date and applied to pay all monthly interest accruing under the Loan until it is exhausted. The Construction Reserve will be disbursed to pay construction costs for the Hotel (subject to the Loan Document provisions), after the Plan Proponents first expend $1 million of their funding or the Wyndham development loan, after February 8, 2011.

(f)    On the confirmation of the Amended Plan, the Plan Proponents, the Debtor, and all of the Debtor's creditors, including, e.g., Atul Bisaria, Jai Lalwani, present and former counsel to the Debtor and the Plan Proponents, will release Lender Parties and its affiliates and related parties from all claims relating to the Debtor or the Loan, and the Plan Proponents shall use their commercially reasonable efforts to obtain executed third party releases from such parties prior to voting on the Plan. The Plan will provide for such releases, effective upon the consummation of the Plan, whether or not such third party releases are executed. If such third party releases are not signed and delivered, the Guarantors and the Plan Proponents will indemnify and defend Lender Parties against any claims from such parties that are not effectively precluded by the confirmation order of the Amended Plan, and pledge their equity interests in the Debtor as security for that indemnity.

(g)    The Plan Proponents undertake to seek confirmation of the Amended Plan by May 30, 2011 (subject to extension of this time parameter to June 30, 2011 in certain circumstances).

(h)    Lender will release the Plan Proponents and certain related parties upon the Effective Date of the Amended Plan (and the Amended Plan provides for releases of the Plan Parties on the Effective Date from all creditors of the Debtors). Lender will also release the Plan Proponents upon the consummation of their resolution of these proceedings, with the cooperation of the Plan Proponents.

(i)    The DIP Loan maturity shall be extended until May 30, 2011.

(j)    The Term Sheet also provides for remedies for enumerated Events of Default under the Term Sheet, the Plan Support Agreement or Amended Plan, including but not limited to provisions for the termination of the Plan Proponent's claims and interests with respect to the Debtor, the immediate release of all claims of the Plan Proponents against the Lender, the Plan Proponents' cooperation with the Lender in the Lender's subsequent resolution of these reorganization proceedings,

and upon such resolution with such cooperation, the Lender's release of the Plan Proponents.

**March 8 Amended Plan and the Committee Term Sheet**.

On March 8, 2011, the Plan Proponents filed the First Amended Plan (and related Disclosure Statement and Plan Summary), which provided for, among other things, different treatment for Class 4 (A) and 4 (B) Claims.  Under the First Amended Plan, Class 4 (A) consisted of General Unsecured Claims Necessary to the Continued Operations of the Debtor, and were treated by (a) permitting Class 4 (A) Claims that are Allowed on the Effective Date of the Plan to elect to receive a Distribution of 35% of their Allowed Claim on the Effective Date in full satisfaction of such Allowed Class 4 (A) Claim, or (b) otherwise, to receive 100% of their Allowed Class 4 (A) Claim, with interest at the Prime Rate, in eight semi-annual installments after the Effective Date. Under the First Amended Plan, Class 4 (B) consisted of General Unsecured Claims Not Necessary to the Continued Operations of the Debtor, and were treated by assigning $650,000 (plus $100,000 for administrative expenses) to the Creditor Trust, plus Avoidance Actions not released pursuant to the First Amended Plan, which were to be assigned to the Creditor Trust for prosecution and distribution to Allowed Class 5 Claims.

The Plan Proponents, the Committee and the Chapter 11 Trustee have negotiated the terms of the First Amended Plan since it was filed with respect to the treatment of Class 4(A) and 4(B) Claims under the First Amended Plan, leading to the recent agreement set forth in the Committee Term Sheet, which the Committee and Plan Proponents believe enhance the treatment of these Allowed Claims. Parties in interest should refer to the Committee Term Sheet attached hereto as Exhibit C-2 and made a part hereof for disclosure of the terms of the Committee Term Sheet.

3474450-33

### E.    ASSETS AND LIABILITIES

The First Meeting of Creditors Notice issued on September 30, 2010, set a Bar Date for all creditors to file their Proofs of Claim documents by February 1, 2011, for all Creditors and March 7, 2011, for all Governmental Units.

The Hotel forms the Debtor's principal asset.  As stated by the Bankruptcy Court in its *Memorandum Opinion* issued on November 23, 2010, the "record reflects that the [Hotel] is worth approximately $54 million" and the "Lender's own internal documents suggest that the hotel is worth $56 million."  Cushman & Wakefield, Inc. performed an appraisal of the Hotel and their September 27, 2010 report values the Hotel as $54 million as of September 7, 2010. The report also calculated the Hotel's prospective value as of December 31, 2010 and upon assumption of the Wyndham Brand as $58 million and the Hotel's prospective market value upon the completion of all expansion and renovations as $66 million.

Dr. Patel has asserted a substantial (almost $4 million) unsecured creditor claim against the bankruptcy estate for loans that he asserts he made to the Debtor.  His asserted claim is disputed by Carbon Capital, and may be disputed by others, including the Committee, the Creditor Trust and the Chapter 11 Trustee.  Concededly, Debtor's original schedules omitted Dr. Patel's asserted claim, the loans he asserts he made were undocumented, and the balance sheet filed with the Debtor's September 2010 monthly operating report did not reflect the loans he asserts he made.  However, Dr. Patel asserts that the loans he asserts he made were reflected in the Debtor's books of account, and the amended schedules do include Dr. Patel's asserted claim in the amount of $3,917,729.  Under the Amended Plan, Dr. Patel consents to the extinguishment of his asserted unsecured claims, and will receive 100% of the Reorganized Debtor's equity.

3474450-33

### IV. SUMMARY OF AMENDED PLAN'S TREATMENT OF CLAIMS AND INTERESTS

The Amended Plan provides for the satisfaction or other treatment of Allowed Claims against, and Interests in the Debtor, as summarized below. Please note that the following summarizes only certain provisions of the Amended Plan, and the complete version of the Amended Plan is attached as **Exhibit A** hereto and enclosed with this Disclosure Statement, among other documents. You are urged to review the entire Amended Plan. To the extent that the Amended Plan varies from this Disclosure Statement, the Amended Plan shall control.

The following table provides a summary of the classification and treatment of Claims and Equity Interests under the Amended Plan. The summary is qualified in its entirety by the more detailed information in the Amended Plan. The total amount of the Claims reflects the Plan Proponents' current estimate, based upon the Debtor's Schedules, books and records; the Proofs of Claim filed on the Claims Register; and the informed estimate of the Plan Proponents' professionals of the likely Allowed amount of certain objectionable claims after resolution by settlement or litigation. Reference should be made to the entire Disclosure Statement and to the Amended Plan for a complete description of the classification and treatment of Claims and Equity Interests. At the Confirmation hearing the Plan Proponents will provide evidence to demonstrate proof of available and sufficient funds necessary to confirm the Amended Plan and make the payments required under the Amended Plan.

| UNCLASSIFIED CLAIMS | Unimpaired |
|---|---|
| **Administrative Expense Claims**<br><br>**Administrative Expense Claims, including Allowed Cure Claims** | Unless otherwise agreed to by the holder of an Allowed Administrative Expense Claim or as otherwise expressly provided for in the Amended Plan, each holder of an Allowed Administrative Expense Claim (including Professional Compensation Claims addressed below) |

| | |
|---|---|
| | will receive in full and final satisfaction of its Administrative Expense Claim an amount of Cash equal to the amount of such Allowed Administrative Expense Claim either: (a) in Cash on the Effective Date, (b) in the ordinary course following the Effective Date for claims arising in the ordinary course, or (c) if the Administrative Expense Claim is not Allowed as of the Effective Date, within thirty (30) days after the date on which an order Allowing such Administrative Expense Claim becomes a Final Order, or as soon as reasonably practicable thereafter; provided however, that Allowed Administrative Expense Claims representing post-petition liabilities incurred by the Debtor in the ordinary course of business which are not materially past due shall be paid in accordance with the terms and conditions of the particular transactions relating to such liabilities and any related agreements. Receipt of the amount of the Allowed Administrative Expense Claim by a holder of such Claim as provided for in the Amended Plan shall constitute full satisfaction, settlement, release, extinguishment, and discharge of such Allowed Administrative Expense Claim as of the date paid.<br><br>Estimated Amount:   less than $1,100,000<br><br>Estimated Recovery:   100% |
| **DIP Loan** | Must be paid in full on or prior to the Effective Date. The DIP Loan shall be repaid pursuant to the terms of the DIP Order, and if outstanding on the Effective Date, pursuant to the Amended Plan, Settlement, Settlement Order, and the Term Sheet attached as Exhibit C. |
| **Professional Compensation Claims, Exclusive of Lender Professional Claims.** | All Professionals that have been retained pursuant to Court orders seeking Bankruptcy Court approval of Professional Compensation (including fees and expenses) incurred through and including the Effective Date, must file, where applicable, their respective final applications for allowance of Professional Compensation within thirty (30) days following the Effective Date; and Allowed Professional Compensation Claims shall be paid when the Order allowing and approving the same becomes a Final Order.   All rights to object to any Final |

26

| | |
|---|---|
| | Fee Applications are hereby reserved by the Plan Proponents and the Lender. |
| | Total estimated Allowed Administrative Expense Claims (including Professional Compensation Claims) are not expected to exceed $1,100,000. The Plan Proponents will produce at the confirmation hearing on the Amended Plan, evidence of adequate availability under the Emergence Financing, or other sources, sufficient to pay Allowed Administrative Expense Claims (including Professional Compensation Claims) in full when due. |
| | Recovery: 100% |
| **Priority Tax Claims** | Except to the extent that a holder of an Allowed Priority Tax Claim has been paid by the Debtor prior to the Effective Date or agreed to other treatment, Allowed Priority Tax Claims will be paid in full in Cash, including statutory interest by the Reorganized Debtor in equal monthly installments commencing in the first full month following the Effective Date such that Allowed Priority Tax Claims will be paid in no more than sixty (60) months from the Effective Date. The Reorganized Debtor may, in its sole discretion, at any time, pre-pay Allowed Priority Tax Claims. Any tax claims which are presently secured by the Hotel or Collateral shall be treated as Class 2 Secured Claims and shall be paid in full on the Effective Date or, if they are Disputed, the full amount of the asserted Class 2 Secured Claim shall be deposited in the Disputed Claim Reserve on the Effective Date and held until such time as the claim is Allowed and thereafter paid from the Disputed Claim Reserve by the Reorganized Debtor. No liens shall remain attached to the Hotel or the Lender's Collateral with respect to these claims and any such liens on the Hotel or Collateral shall be extinguished, with such liens attaching solely to the amounts deposited in the Disputed Claim Reserve. |
| | Total Estimated Allowed Priority Tax Claims are not expected to exceed $366,000. |
| | Recovery: 100% |

3474450-33

| U. S. Trustee Fees | All fees payable in the Case under 28 U.S.C. § 1930, if and to the extent due, or as otherwise determined by the Bankruptcy Court, will, if not previously paid, be paid in full in Cash on the Effective Date and will continue to be paid by the Reorganized Debtor as required under 28 U.S.C. § 1930 until such time as an order is entered by the Bankruptcy Court closing the Case; provided that if, after the second anniversary of the Effective Date, the holder of the Class 1 Claim desires to keep the Case open, Lender agrees to reimburse the Reorganized Debtor for such fees thereafter incurred until such time as the Lender requests that the Case be closed.<br><br>Total Estimated Allowed Claims for US Trustee Fees are not expected to exceed $20,000<br><br>Recovery: 100% |
|---|---|
| **CLASSIFIED CLAIMS** | |
| **Class 1** | **Impaired** |
| **Senior Secured Claims- Pre-Petition Credit Agreement** | The Class 1 Claim shall be an Allowed and fully Secured Claim in its entirety, including all professional fees and accrued and accruing default interest (subject to the Settlement Order). The Class 1 Claim shall be reinstated as amended under the terms of the Settlement, the Term Sheet, and the Second Amended Loan Documents, including the payment on account of the Class 1 Claim by a portion of the Settlement Payment required to be made on the Effective Date. Class 1 Claim shall retain its first priority mortgage on the Hotel and first liens on other Collateral after the Effective Date. |
| **Class 2** | **Unimpaired** |
| **Other Secured Claims** | Holders of Class 2 Claims consist of holders of Allowed Secured Claims other than the Secured Claims of the Lender. In full and final satisfaction, settlement, release, extinguishment of liens and discharge of Allowed Class 2 Claims, and except to the extent holders of Allowed Class 2 Claims agree to different treatment, on the Effective Date, the holders of Allowed Class 2 Claims shall be paid the full amount of their Allowed Class 2 Secured Claim. If a Class 2 Claim is Disputed, then the full amount of the asserted Class 2 Claim shall be |

3474450-33

| | |
|---|---|
| | deposited in the Disputed Claim Reserve on the Effective Date and held until such time as the claim is Allowed and thereafter paid from the Disputed Claim Reserve by the Reorganized Debtor. No liens shall remain attached to the Hotel or the Lender's Collateral with respect to these claims and any such liens on the Hotel or Collateral shall be extinguished, with such liens attaching solely to the proceeds deposited in the Disputed Claim Reserve. <br><br> Total estimated Allowed Class 2 Claims are not expected to exceed $750,000 <br><br> Estimated Recovery: 100% |
| **Class 3** | **Impaired** |
| **Priority Claims** | Holders of Class 3 Claims consist of holders of Allowed Priority Claims, excluding Allowed Priority Tax Claims, and shall be paid ninety percent (90%) of the amount of their Allowed Claim on the Effective Date (or such later date on which their claims become Allowed) and the balance, with interest at Prime Rate, on the first Semi-Annual Payment Date for Allowed claims in Class 4 thereafter. If a Class 3 Claim is Disputed, then on the Effective Date, ninety percent (90%) of the amount of such Disputed Class 3 Claim shall be deposited in the Disputed Claim Reserve and held until such time as the claim is Allowed and thereafter paid by the Reorganized Debtor from the Disputed Claim Reserve. If any Class 3 Claim is still disputed on the first Semi-Annual Payment Date for Allowed claims in Class 4, then the remaining ten percent (10%) shall also be deposited in the Disputed Claim Reserve and held until such time as the claim is Allowed and thereafter paid by the Reorganized Debtor from the Disputed Claim Reserve Total estimated Allowed Class 3 Claims are not expected to exceed $1 Million <br><br> Estimated Recovery: 100% of principal |
| **Class 4** | **Impaired** |
| **General Unsecured Claims For** | Class 4 Claims consist of holders of Allowed Claims of |

| Creditors Necessary to the Continued Operations of the Reorganized Debtor | Creditors Necessary to the Continued Operations of the Reorganized Debtor, are identified on Exhibit D, and shall be paid as follows: |
|---|---|
| | (1) Holders of Allowed Claims in this Class may elect to receive a lump sum payment on the Effective Date representing 35% of their Allowed Claim in full and final satisfaction of their Allowed Claim. Holders of Claims in this Class that become Allowed after the Effective Date also may elect to receive a 35% lump sum payment on the next Class 4 Payment Date in full and final satisfaction of their Allowed Claim; or |
| | (2) 100% of Allowed Claim, with interest from the Effective Date until paid, at Prime Rate. Payable in eight semi-annual installments (on the Class 4 Payment Dates) until paid in full from the Hotel Cash Flow, draws on the Emergence Financing or otherwise by the Reorganized Debtor and personally guaranteed by Dr. Patel and his wife, Dr. Palllavi Patel, which Class 4 Guaranty shall be subordinate to each Class 1 Guaranty in favor of Lender upon the occurrence of an Event of Default under the Second Amended Loan Documents, in which event no payments under or in connection with the Class 4 Guaranty shall be made unless and until each Class 1 Guaranty has been honored, paid, released or terminated. |
| | If a Class 4 Claim is Disputed, then on any date (after the Effective Date) on which Distributions shall be made to the Allowed Class 4 Claims, the amount of Distributions to which such claim would be entitled if it were Allowed at such time shall be deposited in the Disputed Claim Reserve and held until such time as the claim is Allowed and thereafter paid by the Reorganized Debtor from the Disputed Claim Reserve. If any Class 4 Claim is still disputed on the succeeding Class 4 Payment Dates, then the additional payments due on such Class 4 Payment Date shall also be deposited in the Disputed Claim Reserve and held until such time as the claim is Allowed and thereafter paid by the Reorganized Debtor. |
| | Class 4 Claims shall not receive any proceeds of |

| | |
|---|---|
| | Avoidance Actions, and shall not be liable for any Avoidance Actions.<br><br>Total estimated Allowed Class 4 Claims not expected to exceed $2.9 Million[5].<br><br>Estimated Recovery: 100% for those not electing the 35% Effective Date payment option.<br><br>**This is a summary of the Class 4 treatment only. Please refer to Article IV, Section 5(d) for a more detailed description of the treatment of Class 4 Claims.** |
| <u>**Class 5**</u> | <u>**Impaired**</u> |
| **General Unsecured Claims For Creditors That Are Not Necessary to the Continued Operations of the Reorganized Debtor** | Class 5 Claims consist of the holders of Allowed Claims of Creditors Not Necessary for the Continued Operations of the Reorganized Debtor, and include all general unsecured claimants not set forth in Exhibit D, including those identified on Exhibit E. These claims shall be paid as follows:<br><br>(1)  Holders of Allowed Claims in this Class as of the Effective Date shall receive a lump sum payment on the Effective Date representing 35% of their Allowed Claim in full and final satisfaction of their Allowed Claim; or<br><br>(2)  Holders of Disputed Class 5 Claims that become Allowed after the Effective Date shall receive 35% of Allowed Claim, Payable in Two Equal Annual Installments, the first of which shall be paid on the Annual Payment Date that first occurs at least 60 days after the Claim becomes Allowed, and the second of which shall be paid at the next succeeding Annual Payment Date. Payments to Allowed Class 5 Claimants shall be made subject to the provisions of the Bankruptcy Code relating to distributions to creditors that have received avoidable transfers from the Debtor.<br><br>In addition, on the Effective Date, the Plan Proponents |

---

[5]     This includes the payment with respect to the unsecured (and non-priority) portion of presently asserted priority wage and benefit claims.  These claims will be treated as Class 4 claims.

3474450-33

| | |
|---|---|
| | will fund $100,000 to the Creditor Trust, for administrative expenses, and assign to the Creditor Trust rights to recover Avoidance Actions (other than transfers to creditors in Class 4, and other avoidance claims which are otherwise released pursuant to the Amended Plan). Allowed Claims in Class 5 will also be entitled to the Net Avoidance Actions Recoveries, distributable by the Creditor Trust to Allowed Class 5 Claims, pro rata, after all objections to Class 5 Claims have been resolved.<br><br>Total estimated Allowed Class 5 Claims, after giving effect to objections and counterclaims, are not expected to exceed $5 Million.<br><br>Estimated Recovery: 35% plus a Pro Rata share of the aggregate net proceeds of Avoidance Actions.<br><br>**This is a summary of the Class 5 treatment only. Please refer to Article IV, Section 5(e) for a more detailed description of the treatment of Class 5 Claims.** |
| **Creditor Trust to Pay Proceeds of Avoidance Actions to Class 5 Claims** | A Creditor Trust will be created as set forth in the Amended Plan. On the Effective Date, the Creditor Trust will be funded with $100,000 from the Plan Proponents to fund legal and other administrative expenses of the Creditor Trust. Additionally, and as more fully described herein, the Creditor Trust will be assigned, receive and administer Avoidance Actions, which proceeds shall be utilized to make further payments by the Creditor Trust to the holders of Allowed Class 5 Claims, pro rata. |
| **Class 6** | **Impaired** |

| Subordinated Unsecured Claims | Class 6 consists of any Subordinated Unsecured Claims asserted by Dr. Patel, which Dr. Patel has asserted in the amount of $3.9 million and which the Lender, Creditor Trust, Committee or other parties can challenge. Dr. Patel and the Plan Proponents or their designees shall receive nothing for this asserted Claim, but shall receive 100% of the Reorganized Debtor's equity, in consideration of, among other things, their agreement to extinguish the asserted Class 6 Claim, and their provision of funding and Guarantees on the Effective Date in accordance with the Committee Term Sheet and the Settlement and the Term Sheet with respect to BlackRock. |
|---|---|

| **Class 7** | **Impaired** |
|---|---|
| **Equity** | All parties that hold or assert an equity interest in the Debtor, including but not limited to the Plan Proponents or their designees, shall receive nothing for their Interests, but Dr. Patel's designee shall receive 100% of the Reorganized Debtor's equity, in consideration of the Plan Proponents' provision of funding and Guarantees on the Effective Date in accordance with the Committee Term Sheet and the Settlement and the Term Sheet with respect to BlackRock. The funding and consideration that Dr. Patel provides in connection with consummation of the Amended Plan includes (a) guaranty of up to $2.9MM of Class 4 Claims, (b) guaranty of Lender of up to $3MM, (c) guaranty/indemnity of Lender against Third Party Releasor Claims, and for certain costs of completing the pending improvements in the Hotel, (d) guaranty of certain obligations to Wyndham, and (e) agreement to void his release regarding Avoidance Actions and subordinate his participation interest in the Emergence Financing upon a Class 5 Event of Default. |

1.     **General Discussion Regarding Treatment of Claims and Certain Risk Factors**.

There are risks associated with the Amended Plan and the payment to creditors it

provides.  With the addition of the Wyndham flag, the Reorganized Debtor projects that

operations will stabilize and grow over the next four years. The payment schedules, however, presume the accuracy of the Debtor's forecasts of income, expenses and cash flow (copies of forecasts of which are attached as Exhibit B hereto), and even minor variances in the assumptions contained in the Debtor's Financial Projections could substantially change the cash flow. **Payments to be made on and after the Effective Date, including payments to be made into the Disputed Claim Reserve shall be made by the Plan Proponents or the Reorganized Debtor. The Disputed Claim Reserve shall be funded on and after the Effective Date for those Claims in Classes 2, 3 and 4 eligible for Distributions and subject to dispute. The Plan Proponents are continuing to review and negotiate with certain creditors. It is possible that settlements may be reached or other events may occur which could result in a presently identified Class 5 Claim being reclassified as a Class 4 Claim. However, no presently identified Class 5 Claim may be reclassified as a Class 4 Claim after the Confirmation hearing commences. Additionally, no presently identified Class 5 Claim may be reclassified as a Class 4 Claim prior to the Confirmation hearing without the consent of the Lender.**

2.    <u>Unclassified Claims.</u>

Subject to the allowance procedures and deadlines provided herein or as approved by the Court, on the Effective Date or as soon thereafter as is practicable, the holder of each Allowed Administrative Expense Claim shall receive on account of such Allowed Administrative Expense Claim and in full satisfaction, settlement, release and discharge of and in exchange for such Allowed Administrative Expense Claim, (a) on the Effective Date, Cash equal to the unpaid portion of such Allowed Administrative Expense Claim or (b) such other treatment as to which the Debtor and the holder of such Allowed Administrative Expense Claim have agreed upon in

34

writing.  However, Allowed Administrative Expense Claims with respect to liabilities incurred by the Debtor in the ordinary course of business during the Chapter 11 Case shall be paid in the ordinary course of business in accordance with the terms and conditions of any agreement or course of dealing relating thereto.  Other than Cure Claims and Professional Compensation Claims, the Plan Proponents are not aware of what Administrative Expense Claims may be asserted, except that Hilton has indicated that it expects to file an Administrative Expense Claim in the approximate amount of $40,000.

The Reorganized Debtor will pay the United States Trustee the appropriate sum required pursuant to 28 U.S.C. § 1930(a)(6) within ten days from the entry of an order confirming the Amended Plan for pre-confirmation periods and simultaneously provide to the United States Trustee an appropriate affidavit indicating the cash disbursements for the relevant period.  In addition, the Reorganized Debtor will pay the United States Trustee the appropriate sum required pursuant to 28 U.S.C. § 1930(a)(6) for post-confirmation periods within the time period set forth in 28 U.S.C. § 1930(a)(6), based upon post-confirmation disbursements made by the Reorganized Debtor, until the earlier of the closing of this Case by the issuance of a final decree by the Bankruptcy Court, or upon the entry of an order by the Bankruptcy Court dismissing the Chapter 11 Case or converting the Case to another chapter under the Bankruptcy Code, and the Reorganized Debtor will provide to the United States Trustee upon the payment of each post-confirmation payment an appropriate affidavit indicating all the cash disbursements for the relevant period.

Each Professional in the Chapter 11 Case will file with the Bankruptcy Court its final fee application seeking final approval of its Professional Compensation Claim for all fees and expenses from the Petition Date through the Effective Date.  Lender's professional fees and costs

are not subject to these requirements and are treated pursuant to the terms of the Term Sheet, the Settlement, and the Settlement Order. As of the Effective Date, any requirement that Professionals comply with sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date will terminate. The right to object to any Final Fee Applications is hereby reserved by the Plan Proponents, any other party in interest and the Lender.

With respect to each Allowed Priority Tax Claim, except to the extent that a holder of an Allowed Priority Tax Claim has been paid by the Debtor prior to the Effective Date or agreed to other treatment, Allowed Priority Tax Claims will be paid in full in Cash, including statutory interest by the Reorganized Debtor in equal monthly installments commencing in the first full month following the Effective Date such that Allowed Priority Tax Claims will be paid in no more than sixty (60) months from the Effective Date. The Reorganized Debtor may, in its sole discretion, at any time, pre-pay Allowed Priority Tax Claims. Any tax claims which are presently secured by the Hotel or Collateral shall be treated as Class 2 Secured Claims and shall be paid in full on the Effective Date or, if they are Disputed, the full amount of the asserted Secured Claim shall be deposited in the Disputed Claim Reserve on the Effective Date and held until such time as the claim is Allowed and thereafter paid from the Disputed Claim Reserve by the Reorganized Debtor. No liens shall remain attached to the Hotel or the Lender's Collateral with respect to these claims and any such liens on the Hotel or Collateral shall be extinguished, with such liens attaching solely to the amounts deposited in the Disputed Claim Reserve. Priority Tax Claims may include the following:

| | |
|---|---|
| Allegheny County Liquor Tax | $2,898 |
| Allegheny County Occupancy Tax | $118,893 |
| Internal Revenue Service | $1,483 |
| Pa Department of Revenue | $150,290 |
| City of Pittsburgh, Dept of Finance | $3,439 |
| Commonwealth of PA- Dept. of Labor | $59,555 |
| Pittsburgh Water & Sewer Authority | $57,476 |

3.      **The DIP Loan.**

Provided that the DIP Loan is not paid in full prior to the Effective Date, then on the Effective Date, a portion of the Settlement Payment (as defined in the Term Sheet) will be used to repay the DIP Loan in full.

4.      **Administrative Expense Claims.**

All claims entitled to administrative priority status under 11 U.S.C. Section 503(a)(2) shall be paid in full on the Effective Date of the Amended Plan, from the proceeds of the Plan Loan and Mezzanine Loan advanced by Wyndham and/or the Plan Proponents. These Administrative Expense Claims primarily include, but may not be limited to, Professional Compensation Claims incurred by the Debtor during the course of the Chapter 11 Case. It is estimated that these Administrative Expense Claims, including Professional Compensation Claims, will not exceed $1,100,000 and include the following:

| | |
|---|---|
| Debtor's Counsel | $280,000 |
| Committee Counsel | $400,000 |
| Chapter 11 Trustee and Counsel | $210,000 |

| | | |
|---|---|---|
| Examiner | $35,000 | |
| Committee Financial Advisor, if appointed | 100,000 | |
| Total | $1,025,000[6] | |

The foregoing are estimates only and should not and do not act as, nor are they intended to be, a cap on the amount of Allowed Professional Compensation Claims.

5.    **Classes**.

(a)    **Class 1**.

**Class 1** consists solely of Carbon Capital II Real Estate CDO 2005-1, Ltd., by BlackRock Financial Management, Inc., as sub-special servicer to Carbon Capital II Real Estate CDO 2005-1, Ltd.'s special servicer, Midland Loan Services, a division of PNC Bank, National Association. The Class consists of the pre-petition loan in the principal amount of $49.6 million, plus accrued and accruing default interest (subject to the Settlement Order), fees and expenses as provided for under the Settlement Order, and excludes the DIP Loan. The Settlement provides that the Class 1 Claim will be an Allowed Secured Claim in its entirety (subject to modifications in the Settlement Order) and reinstated in accordance with the terms and conditions set forth in the Term Sheet, Settlement, Settlement Order and Second Amended Loan Documents with all of its liens retained as first priority perfected liens on the collateral.

(b)    **Class 2**.

---

[6]    These are estimates based upon the updated DIP Loan budget prepared with input from the Trustee and the Committee. Substantial amounts of professional fee claims have already been paid or provided for from the Lender's $500,000 carve out and weekly ongoing payments from the DIP Loan Budget. But in any event the total amount of Allowed Administrative Expense Claims, after approval of Final Fee Applications, will be paid on later of the Effective Date or the entry of a Final Order approving any Final Fee Application.

**Class 2** consists of holders of Allowed Secured Claims, other than the Secured Claims of the Lender and generally consists of the Secured Claims listed below:

***SECURED CLAIMS***

| Creditor | Total Amount Owed | Type of Collateral Priority of Lien (1, 2, 3) | Disputed (D) Liquidated (L) Unliquidated (U) |
|---|---|---|---|
| | | | |
| Comm Steel | $196,333 | Mechanics Lien | D |
| Commonwealth of PA – Department of Labor | $35,233 | Judgment lien on real estate | D |
| Commonwealth of Pennsylvania – Department of Revenue | $14,716 | Statutory Lien for Sales Tax (POC #48) | D |
| HEREIU | $437,946 | Judgment | D |
| PWSA | $57,546.49 | Statutory water lien | |
| Main Street Bank | $86,100 | Lien | D |
| PJ Dick Incorporated | $382,606 | Mechanics Lien | D |

These claims aggregate $1,210,480. However, certain of these claims are subject of dispute, review and objection and it is anticipated that this total figure will be reduced through the claims objection process or negotiation. In full and final satisfaction, settlement, release, extinguishment of liens and discharge of Allowed Class 2 Claims, and except to the extent holders of Allowed Class 2 Claims agree to different treatment, on the Effective Date, the holders of Allowed Class 2 Claims shall receive a distribution in Cash for the full amount of their Allowed Class 2 Claim. If a Class 2 Claim is Disputed, then the full amount of the asserted Class 2 Claim shall be deposited in the Disputed Claim Reserve on the Effective Date and held

39

until such time that the claim is Allowed and thereafter paid from the Disputed Claim Reserve by the Reorganized Debtor. No liens shall remain attached to the Hotel or the Lender's Collateral with respect to these claims and any such liens on the Hotel or Collateral shall be extinguished, with such liens attaching solely to the proceeds deposited in the Disputed Claim Reserve.

(c)     **Class 3** consists of creditors holding Allowed Unsecured Priority Claims[7] and generally consists of the claims listed below:

---

[7]     Certain of these asserted claims include sums that represent unsecured amounts. The Allowed unsecured portions will be treated as Class 4 Claims.

## PRIORITY CLAIMS

| Creditor | Total Amount Alleged Owed |
|---|---|
| Carpenters Contribution Trust Account | $8,369 |
| Joseph Belan | $1,150 |
| Central Pension Fund of Intl UOE | $143,782 |
| Sysco | $50,423 |
| HEREIU | $590,875 |
| International Union of Painters and Allied Trades | $4,190 |
| Opg Eng Local 95 Training Fund | $327 |
| Highmark | $33,204 |
| Painters Dist 57 Local Union 6 | $102,360 |
| Painters Dist 57 Local Union 6 | $6,226 |
| Pittsburgh Building Owners Welfare | $51,281 |
| Paragon | $15,909 |
| Plumbers Local 27 Combined Funds | $3,541 |
| United-HERE National Retirement | $184,046 |
| ACHD Air Pollution Control Fund | $375.00 |
| Pitts Building Owners Fund | $24,224 |
| USW Local 12-591 | $451 |
| United Consulting Group | $3,500 |
| Hasick Construction | $6,811 |
| Constellation | $22,465 |

3474450-33

These claims aggregate $1,199,963. However, certain of these claims are subject to dispute and it is anticipated that this total figure will be reduced through the claims objection process or negotiation. Holders of Class 3 Claims shall be paid ninety percent (90%) of the amount of their Allowed Claim on the Effective Date (or such later date on which their claims become Allowed) and the balance, with interest at Prime Rate, on the first Semi-Annual Payment Date for Allowed claims in Class 4 thereafter. If a Class 3 Claim is Disputed, then on the Effective Date, ninety percent (90%) of the amount of such Disputed Class 3 Claim shall be deposited in the Disputed Claim Reserve and held until such time as the claim is Allowed and thereafter paid by the Reorganized Debtor from the Disputed Claim Reserve. If any Class 3 Claim is still disputed on the first Semi-Annual Payment Date for Allowed Claims in Class 4, then the remaining ten percent (10%) shall also be deposited in the Disputed Claim Reserve and held until such time as the claim is Allowed and thereafter paid by the Reorganized Debtor.

(d) **Class 4**.

**Class 4** consists of holders of Allowed Claims of Creditors Necessary to the Continued Operations of the Reorganized Debtor and are identified on **Exhibit D**[8] and shall be paid as follows:

(i) Holders of Allowed Claims in this Class may elect to receive a lump sum payment on the Effective Date representing 35% of their Allowed Claim in full and final satisfaction of their Allowed Claim. and Holders of Claims in this Class that become Allowed after the Effective Date may elect to receive a 35% distribution in satisfaction of their Allowed Claim, payable on the next Class 4 Payment Date; or

---

[8] This list is subject to amendment and further revisions.

(ii)     Holders of Allowed Claims in this Class that do not elect to receive 35% of their Allowed Claim on the Effective Date (or the next Class 4 Payment Date after their Claim becomes Allowed) shall receive 100% of their Allowed Claim, with interest from the Effective Date until paid, at Prime Rate.  The Reorganized Debtor will pay these Allowed Claims in eight semi-annual installments paid on the Class 4 Payment Dates until paid in full from the Hotel Cash Flow, draws under the Emergence Financing, or otherwise by the Reorganized Debtor.  The payments of Class 4 Allowed Claims shall be personally guaranteed by Dr. Patel and his wife, Dr. Pallavi Patel, pursuant to the Class 4 Guaranty.  The Class 4 Guaranty shall be subordinate to each Class 1 Guaranty in favor of Lender upon the occurrence of an Event of Default under the Second Amended Loan Documents, in which event no payments under or in connection with the Class 4 Guaranty shall be made unless and until each Class 1 Guaranty has been paid, satisfied, released or terminated.   In the event of a default in payment of a Class 4 Allowed Claim that is not cured within twenty (20) days of notice to the Guarantors by the Creditor Trust or the defaulted Allowed Class 4 Claimant, the Creditor Trust (on behalf of the defaulted Allowed Class 4 Claimants) shall have the right, among other remedies, to prosecute or otherwise enforce the Class 4 Guaranty against Dr. Patel and his wife (subject to the subordination of the Class 4 Guaranty to each Class 1 Guaranty as described in the preceding sentence).  Nothing herein shall affect or impair any other rights or remedies available to the Class 4 Claimants or the Creditor Trust on their behalf.

The aggregate amount of Class 4 Claims is not expected to exceed $2.9 Million.

If a Class 4 Claim is Disputed, then on any date (after the Effective Date) on which Distributions shall be made to the Allowed Class 4 Claims, the amount of Distributions to which

43

the holder of the Disputed Class 4 Claim would be entitled if it were Allowed shall be deposited in the Disputed Claim Reserve and held until such time as the Disputed Class 4 Claim is Allowed and thereafter paid by the Reorganized Debtor from the Disputed Claim Reserve. If any Class 4 Claim is still disputed on any successive Class 4 Payment Date, then the additional payments due on such Class 4 Payment Date shall also be deposited in the Disputed Claim Reserve and held until such time as the claim is Allowed and thereafter paid by the Reorganized Debtor from the Disputed Claim Reserve.

The holders of Class 4 Claims shall be released from liability in respect of Avoidance Claims on the Effective Date and shall not be entitled to receive Distributions in respect of the proceeds of Avoidance Actions.

The Second Amended Loan Documents will provide that the Reorganized Debtor's failure to make payments when due in respect of Allowed Class 4 Claims, which is not cured within the given notice and grace period, will constitute an Event of Default under the Second Amended Loan Documents (which may be waived or enforced by the holder of the Class 1 Claim).

(e)     **Class 5**.

**Class 5** consists of the holders of Allowed Claims of Creditors Not Necessary for the Continued Operations of the Reorganized Debtor, which consists of all claims not listed on Exhibit D, including without limitation, those listed on **Exhibit E**[9]. These claims shall be paid as follows:

(i)     On the Effective Date, the Reorganized Debtor or Plan Proponents will (i) Distribute to Allowed Class 5 Claims 35% of the amount Allowed in full satisfaction of

---

[9] This list is subject to amendment and further revisions.

such Allowed Class 5 Claim, and (ii) transfer to the Creditor Trust $100,000 for the payment of all Creditor Trust administrative and legal expenses (for which the Reorganized Debtor shall have no further liability).

(ii)     Class 5 Claims that become Allowed after the Effective Date shall be paid in 2 equal annual installments. The first such installment shall be paid on the next Annual Payment Date that is at least 60 days after the date such Class 5 Claim becomes Allowed, and the second installment shall be paid on the next succeeding Annual Payment Date. Additionally, and as more fully described herein, the Creditor Trust will receive the Avoidance Actions, with the Net Avoidance Actions Proceeds being available to make an additional payment to the Holders of Allowed Class 5 Claims, pro rata, after all objections to Class 5 Claims are resolved.

(iii)     The aggregate asserted amount of Class 5 Claims exceeds $29 Million. However, after valid objections and negotiation, the final amount of Allowed Class 5 Claims is not expected to exceed $5 Million.

(iv)     The Reorganized Debtor will fund to the Class 5 Claims Reserve (from the proceeds of draws under the Mezzanine Loan) $20,000 per month, commencing June 2011 until $200,000 is so funded, to serve as collateral for the Reorganized Debtor's obligation to make payment of Allowed Class 5 Claims. These amounts drawn under the Mezzanine Loan shall not be encumbered by the lien securing the Class 1 Claim. If the Class 5 Claim Reserve is depleted, the Reorganized Debtor will resume making $20,000 monthly payments to restore the Class 5 Claim Reserve to $200,000 and if funded from the Lender's Collateral or proceeds thereof, such funds shall be subject to the perfected first priority liens securing the Class 1 Claim. Upon full payment of all Allowed Class 5

45

Claims to the extent required by the Amended Plan, the remaining Class 5 Claim Reserve shall be returned to the Reorganized Debtor. Allowed Class 5 Claimants whose payments are in default (and/or the Creditor Trust on their behalf) may seek, among other remedies, payment from the Class 5 Claims Reserve. The Class 5 Claim Reserve shall serve as collateral and not as an initial funding source for payment to Allowed Class 5 Claims.

(v)     Upon the occurrence of a Class 5 Event of Default, any right of Dr. Patel or his agents, representatives, affiliates or designees to payment from the Reorganized Debtor including but not limited to his participating interest in the Plan Loan and/or Mezzanine Loan shall be subordinated to the rights of Allowed Class 5 Claimants (and the Creditor Trust on their behalf) until the defaulted payments are made in full.

(vi)    The release given to Dr. Patel and his agents, representatives and affiliates under the Second Amended Plan with respect to Claims and Causes of Action against him (the "Patel Claims") shall be void and ineffective as against the Allowed Class 5 Claimants and the Creditor Trust on their behalf upon the occurrence of a Class 5 Event of Default.  Dr. Patel (for himself and on behalf of his agents, representatives and affiliates) shall enter into a tolling agreement, tolling any and all statute of limitations for any such Claims or Causes of Action that may be brought until such time as all Allowed Class 5 Claims are paid in full to the extent provided for in the Amended Plan.  Claims and Causes of Action that may be asserted against Dr. Patel and his agents, representatives and affiliates shall upon the occurrence of a Class 5 Event of Default automatically be assigned to and vest with the Creditor Trust to be prosecuted to recover up to 100% of the Allowed Class 5 Claims and the fees and costs of prevailing in the pursuit of the Patel Claims and/or collecting any recovery under the Patel Claims, if any.

46

Upon the occurrence of a Class 5 Event of Default and in the discretion of the Trustee of the Creditor Trust, any net recovery from other avoidance actions may be used to fund litigation costs and expenses to pursue the Patel Claims.

(vii)    The Second Amended Loan Documents will provide that the occurrence of a Class 5 Event of Default will constitute an Event of Default under the Second Amended Loan Documents (which may be waived or enforced by the holder of the Class 1 Claim).

(f)    **Class 6**.

**Class 6** consists of the Subordinated Unsecured Claims asserted by Dr. Patel, which may be disputed by, among others, the Creditor Trust, the Chapter 11 Trustee or the Committee.  Dr. Patel, the Plan Proponents or their designees shall receive nothing for this asserted unsecured Claim, but shall receive 100% of the Reorganized Debtor's equity on the Effective Date.

(g)    **Class 7**.

**Class 7** consists of Equity Interests, which will be extinguished on the Effective Date. All equity interests in the Reorganized Debtor will be issued to the Plan Proponents or their designee in consideration of their agreeing to extinguishment of their asserted Class 6 Claim and providing funding for the Amended Plan and guarantees on the Effective Date as contemplated by the Committee Term Sheet and the Settlement and the Term Sheet with Lender, including without limitation (i) a guaranty of up to $2.9 million Class 4 Claims, (ii) guarantees to Wyndham, (iii) guarantees, indemnities and pledges to the holder of the Class 1 Claim, and (iv) the agreement to void his release and subordinate his interest in the Emergence Financing upon a Class 5 Event of Default.

**6**.    <u>Disputed Claims</u>.

Based upon the Debtor's Amended Schedules and claims filed to date, the total amount of claims aggregate approximately $33 Million.   However, this includes Dr. Patel's asserted claim at $3.9 million and several significant claims which are subject to dispute.   The primary claims subject to dispute are as follows:

The Debtor lists Disputed Unsecured Claims that aggregate approximately $27 million. The largest of these Disputed Unsecured Claims are asserted by Black Diamond Hospitality and Atul Bisaria in the aggregate amount of $17 Million and Hilton in the amount of $4,315,524.12 (the "<u>Hilton Franchise Termination Fee</u>").   Other significant Disputed Unsecured Claims include those asserted by Hilton in the amount of $422,144.85 (the "<u>Hilton Unpaid Royalty Claim</u>"; together with the Hilton Franchise Termination Fee, Hilton asserts a total claim of $4,737,668.97), P.J. Dick Corporation in the amount of $1,264,466 (the "<u>P.J. Dick Claim</u>"), Rush Air in the amount of $267,931, and Crescent Management in the amount of $172,836. Proof of Claim Numbers 25 and 26 for C & M Installations ($216,000), Contract Purchasing and Design ($316,000) are also disputed since all or part of these claims may be for goods and services provided to other Atul Bisaria owned hotels.   The Debtor and Plan Proponents dispute the Hilton Franchise Termination Fee and the Hilton Unpaid Royalty Claim for several reasons, including certain of the allegations of the Equitable Subordination Complaint and the actions of Hilton and Crescent set forth in Section III.A, discussed above, which relate to Hilton.   The Debtor and Plan Proponents dispute the P.J. Dick claim, which arose from performance of the construction at the Hotel, because of manifold and manifest defects, overcharges and failures of performance by P.J. Dick in connection with the construction.   Additionally, the Debtor will assert claims against P.J. Dick for, among other things, gross negligence, willful misconduct,

48

deficient work. The damages include, inter alia, increased costs of construction, materials, and professional fees to correct deficiencies, increased costs due to carry.

The Debtor and Plan Proponents dispute the Rush Air claim and continues to investigate this claim and quality of the climate control equipment and services provided by Rush Air. The Debtor and Plan Proponents dispute the Crescent claim because of their many breaches and failures to perform in connection with their management of the Hotel, as well as their improper activities regarding the "surprise" Hilton inspection and communications with Carbon Capital.

The Debtor and Plan Proponents dispute the Claims asserted by Lalwani, Bisaria, Black Diamond Hospitality and their affiliates for reasons too numerous to specify here, including without limitation, their substantial liability in respect of Avoidance Actions.

Upon confirmation of the Amended Plan, Dr. Patel's asserted unsecured claim of almost $4 million shall be subordinated to all other creditors and extinguished under the Amended Plan. The Amended Plan will, as required by the Bankruptcy Code, provide for the disputed claims in Classes 2, 3, 4, and 5 and the mechanisms of the Disputed Claims Reserve for Disputed Claims in Classes 2, 3 and 4 and the Class 5 Claim Reserve for Disputed Class 5 Claims. The Reorganized Debtor will fund the Class 5 Claim Reserve consistent with the provisions of the Amended Plan. The Reorganized Debtor will fully fund the Disputed Claims Reserve on the Effective Date for Disputed Claims in Classes 2 and 3 with the amount of all Distributions to which Disputed Claims in Classes 2 and 3 and 4 would be entitled if they were Allowed on such dates. The Reorganized Debtor will fully fund the Disputed Claims Reserve on the first Class 4 Payment Date for the balance owing under Disputed Class 3 Claims, if they were Allowed on such date. The Reorganized Debtor will fully fund the Disputed Claims Reserve for Class 4 on

49

each Class 4 Payment Date with the amount of all Distributions to which Disputed Class 4

Claims would be entitled, if they were Allowed on such date.

7.    **Releases**.

The Amended Plan provides for the following releases and the Plan Proponents intend to

seek approval — on a nonconsensual basis, if necessary — of the releases set forth below in the

Confirmation Order.     Nothing in this Amended Disclosure Statement shall be deemed an

approval by the Bankruptcy Court of the proposed releases.   That issue will be determined at the

Confirmation Hearing.

(a)     **Amended Plan Release of the Lender Parties**.  **The Amended Plan and the**

**Confirmation Order shall seek to provide for releases of the Lender, BlackRock, Carbon**

**Cayman, Key Bank, N.A. ("Key"), Midland Loan Services, a division of PNC Bank,**

**National Association ("Midland"), PNC Bank, National Association ("PNC"), Reed Smith,**

**LLP, and their respective employees, officers, directors, attorneys, advisors, agents,**

**affiliates, successors, and assigns (collectively, the "Lender Parties"), by (i) Dr. Patel**

**(individually and together with Dr. Pallavi Patel, as husband and wife), Pittsburgh Grand**

**LLC, the Plan Proponents, Frank Amedia, MAC Construction, LLC, Tropical Luxury**

**Rentals, LLC, Berger Singerman, P.A., and the Guarantors and their respective employees,**

**officers, directors, attorneys, advisors, agents, affiliates, personal representatives, heirs,**

**successors, and assigns (collectively, the "Patel Parties"); (ii) Third Party Releasors and**

**their respective employees, officers, directors, attorneys, advisors, agents, affiliates,**

**personal representatives, heirs, successors, and assigns (collectively, "Third Party**

**Releasors Parties"); Third Party Releasors include (a) Atul Bisaria, Mihu Bisaria, Shubh**

**Hotels Pittsburgh Investment, LLC; Shubh Hotels Pittsburgh Acquisitions, LLC, and**

50

Shubh Hotels LLC; (b) Jai Lalwani, Vani Lalwani, Black Diamond Hospitality LLC, Black Diamond Hotel Super Group LLC, and Black Diamond Hotel Supergroup LLC; (c) David K. Rudov and Rudov & Stein and (d) Scott Hare and Scott Hare P.C.; and (iv) the Debtor, the Committee and its members, the Chapter 11 Trustee, the Debtor's Bankruptcy Estate and its creditors ("<u>Plan Releasors</u>", and with the Patel Releasors, and the Third Party Releasors, collectively, "<u>Releasors of Lender Parties</u>"), for all claims related in any way to the Debtor, the Hotel, the Lender, the Bankruptcy Case, the Adversary Proceeding, or the Loan Documents, and from all claims, debts, obligations, demands, liabilities, suits, judgments, damages, rights, and causes of action, whatsoever, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, secured or unsecured, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise, that are based in whole or in part upon any act or omission, transaction or event with respect to any of the foregoing that occurred on or prior to the Effective Date; *but such release shall not include* any breach of the Amended Plan or the order confirming the Amended Plan, or any claims, debts, obligations, demands, liabilities, suits, judgments, damages, rights, and causes of action, whatsoever, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, secured or unsecured, foreseen or unforeseen, arising, in law, equity or otherwise, that are based in whole upon any act or omission, transaction or event that occurred on or after the Effective Date.  This release shall not affect the rights or obligations of any party in interest, including the Committee and the Chapter 11 Trustee, to enforce the Settlement Order through the Effective Date.

3474450-33

**(b)** <u>Mutual Release between the Patel Parties and the Lender Parties Effective as</u> <u>of the Effective Date</u>. The Patel Parties and the Lender Parties shall exchange authenticated and enforceable releases mutual releases in form and substance accepted by the Lender in its sole discretion, effective on the Effective Date, releasing all claims related in any way to the Debtor, the Hotel, the Lender, the Bankruptcy Case, the Adversary Proceeding or the Loan Documents, and from all claims, debts, obligations, demands, liabilities, suits, judgments, damages, rights, and causes of action, whatsoever, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, secured or unsecured, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise, that are based in whole or in part upon any act or omission, transaction or event relating to any of the foregoing that occurred on or prior to the Effective Date; *but such release shall not include* any breach of the Amended Plan or the order confirming the Amended Plan, the Amended Senior Credit Agreement, or any claims, debts, obligations, demands, liabilities, suits, judgments, damages, rights, and causes of action, whatsoever, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, secured or unsecured, foreseen or unforeseen, arising, in law, equity or otherwise, that are based in whole upon any act or omission, transaction or event that occurred on or after the Effective Date (the "<u>Patel/Lender</u> <u>Releases</u>"). The Patel/Lender Releases shall be executed and delivered to a mutually agreeable independent party, with copy to the Lender and Patel, not less than two business days prior to the voting deadline under the Amended Plan. Upon the Effective Date, the originals of the Patel/Lender Releases shall be delivered by the independent party to the respective counter-parties.

(c)     <u>Mutual Release with Third Party Releasors</u>.  The Plan Proponents shall also use reasonable efforts to obtain authenticated and enforceable releases mutual releases between the Third Party Releasors and the Lender Parties in form and substance accepted by the Lender in its sole discretion, effective on the Effective Date, releasing all claims related in any way to the Debtor, the Hotel, the Lender, the Bankruptcy Case, or the Loan Documents, and from all claims, debts, obligations, demands, liabilities, suits, judgments, damages, rights, and causes of action, whatsoever, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, secured or unsecured, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise, that are based in whole or in part upon any act or omission, transaction or event relating to any of the foregoing that occurred on or prior to the Effective Date ("<u>Third Party Releases</u>"); *but such release shall not include* any breach of the Amended Plan or the order confirming the Amended Plan, or any claims, debts, obligations, demands, liabilities, suits, judgments, damages, rights, and causes of action, whatsoever, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, secured or unsecured, foreseen or unforeseen, arising, in law, equity or otherwise, that are based in whole upon any act or omission, transaction or event that occurred on or after the Effective Date.  All obtained Third Party Releases shall be executed and delivered to a mutually agreeable independent party, with a copy to the Lender and Patel, not less than two business days prior to the voting deadline under the Amended Plan.  Upon the Effective Date, the originals of the Third Party Releases shall be delivered by the independent party holding them to the respective counter-parties.  For the avoidance of doubt, any Third Party Releases provided under the Amended Plan shall not affect, or be deemed a release of,

53

Claims or Causes of Action that may be asserted by the Debtor or the Debtor's bankruptcy estate and/or the Creditor Trust, the Committee, or the Chapter 11 Trustee against the Third Party Releasors.

(d) **Indemnification and Pledge by Guarantors and Plan Proponents in favor of Lender Parties**. The Guarantors and the Plan Proponents shall defend and indemnify the Lender Parties against any and all claims brought by any of the Patel Parties or any of the Third Party Releasors, against any of the Lender Parties related in any way to the Debtor, the Hotel, the Lender, the Bankruptcy Case, or the Loan Documents, and from all claims, debts, obligations, demands, liabilities, suits, judgments, damages, rights, and causes of action, whatsoever, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, secured or unsecured, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise, that are based in whole or in part upon any act or omission, transaction or event relating to any of the foregoing that occurred on or prior to the Effective Date, pursuant to an indemnity agreement ("**Indemnity Agreement**") which Indemnification Agreement shall be (i) in form and substance acceptable to the Lender; (ii) executed as part of the Plan Support Agreement, and (iii) effective as of the Effective Date.

Furthermore, the Plan Proponents, Equity Owner, and Guarantors shall execute a pledge (as a first lien) of 100% of the equity in the Reorganized Debtor as security for any Event of Default (as defined in the revised loan documents) with respect to such Indemnity Agreement ("**Pledge**") which Pledge shall be (i) in form and substance acceptable to the Lender, (ii) executed as part of the Plan Support Agreement, and (iii) effective as of the Effective Date.

54

(e)  __Amended Plan Release of the Patel Parties__.  The Amended Plan and Confirmation Order shall provide that on the Effective Date occurring in accordance with the Plan Support Agreement, Lender (except for all claims arising out of the Amended Senior Credit Agreement and related documents) and all other creditors and parties-in-interest shall conclusively be deemed to have released the Patel Parties (which definition for purposes herein specifically excludes (i) Atul Bisaria, Mihu Bisaria, Shubh Hotels Pittsburgh Investment, LLC; Shubh Hotels Pittsburgh Acquisitions, LLC, and Shubh Hotels LLC, and/or any of their respective relatives, attorneys, advisors, agents and affiliates, and their respective, present and former employees, officers, directors and agents; (ii) Jai Lalwani, Vani Lalwani, Black Diamond Hospitality LLC, Black Diamond Hotel Super Group LLC, and Black Diamond Hotel Supergroup LLC, or any of their respective relatives, attorneys, advisors, agents and affiliates, and their respective, present and former employees, officers, directors and agents; and (iii) Jonathan Kamin, or any of his respective relatives, attorneys, advisors, agents and affiliates, and their respective, present and former employees, officers, directors and agents (none of such parties listed in (i)-(iii) above, among others, shall be benefitted by this release))), from all claims, debts, obligations, demands, liabilities, suits, judgments, damages, rights, and causes of action, whatsoever, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, secured or unsecured, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise, that are based in whole or in part upon any act or omission, transaction or event that occurred on or prior to the Effective Date in any way relating to the Debtor and its Chapter 11 Case, the Amended Plan, the Disclosure Statement, including without limitation actions and claims arising under

55

Chapter 5 of the Bankruptcy Code, *but such release shall not include* (A) any breach of the Amended Plan or the order confirming the Amended Plan, or any claims, debts, obligations, demands, liabilities, suits, judgments, damages, rights, and causes of action, whatsoever (other than, to the extent that it has standing under applicable law, the right to enforce any and all obligations under the Amended Plan), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, secured or unsecured, foreseen or unforeseen, arising, in law, equity or otherwise, that are based in whole or in part upon any act or omission, transaction or event that occurred on or after the Effective Date or under the Amended Senior Credit Agreement, and (B) any release specifically excludes (x) Atul Bisaria, Mihu Bisaria, Shubh Hotels Pittsburgh Investment, LLC, Shubh Hotels Pittsburgh Acquisitions, LLC, and Shubh Hotels, LLC, and/or any of their respective relatives, attorneys, advisors, agents and affiliates, and their respective, present and former employees, officers, directors and agents; (y) Jai Lalwani, Yani Lalwani, Black Diamond Hospitality LLC, Black Diamond Hotel Super Group LLC, and Black Diamond Hotel Supergroup LLC, or any of their respective relatives, attorneys, advisors, agents and affiliates, and their respective, present and former employees, officers, directors and agents; and (z) Jonathan Kamin, or any of his respective relatives, attorneys, advisors, agents and affiliates, and their respective, present and former employees, officers, directors and agents (none of such parties listed in (x)-(z) above, among others, shall be benefitted by this release).

The release given to Dr. Patel and his agents, representatives and affiliates under the Amended Plan for Claims and Causes of Action that may be brought against them (the "Patel Claims") shall be void and ineffective as against the Class 5 Claimants and the

Creditor Trust on their behalf upon the occurrence of a Class 5 Event of Default. Dr. Patel (for himself and on behalf of his agents, representatives and affiliates) shall enter into a tolling agreement, tolling any and all statute of limitations for any Claims and Causes of Action that may be brought until such time as all Allowed Class 5 Claims are paid in full to the extent required by the Amended Plan. Claims and Causes of Action that may be asserted against Dr. Patel and his agents, representatives and affiliates shall automatically upon the occurrence of a Class 5 Event of Default be assigned to and vest with the Creditor Trust to be prosecuted to recover up to 100% of the Allowed Class 5 Claims and the fees and costs of prevailing in pursuit of the Patel Claims and/or collecting any recovery under the Patel Claims, if any.

(f)     **Release by Patel Parties in favor of the Lender Parties Effective on Event of Default under Term Sheet, Plan Support Agreement, or Plan Confirmation Order.** The Patel Parties shall execute authenticated and enforceable releases in form and substance accepted by the Lender in its sole discretion, releasing all claims against any of the Lender Parties related in any way to the  Debtor, the Hotel, the Lender, the Bankruptcy Case, the Adversary Proceeding, or the Loan Documents, and from all claims, debts, obligations, demands, liabilities, suits, judgments, damages, rights, and causes of action, whatsoever, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, secured or unsecured, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise, that are based in whole or in part upon any act or omission, transaction or event relating to any of the foregoing that occurred on or prior to the Event of Default (under the Term Sheet, or Plan Support Agreement or Plan confirmation order) (the "**Patel Party Release of Lender Parties**"). The Patel Party Release of Lender Parties

57

shall be executed and delivered to a mutually agreeable independent party, with a copy to the Lender and Patel, with the execution of the Plan Support Agreement, and will be effective upon such an Event of Default. The originals of the Patel Release of the Lender Parties shall be delivered by the independent party to Lender Parties upon the occurrence of an Event of Default under the Term Sheet, or Plan Support Agreement or Plan confirmation order.

To the extent approved by the Bankruptcy Court, notwithstanding anything contained in the Amended Plan to the contrary, on the Effective Date for the good and valuable consideration provided by Lender, Carbon Capital, BlackRock, and Midland, the Debtor, the Committee, the Examiner, the Trust, and all Persons and Persons holding Claims or Interests in, by, through, or against the Debtor shall fully discharge and release the Lender Released Parties (and each such Lender Released Party so released shall be deemed released and discharged) from any and all Claims, Causes of Action and any other debts, obligations, rights, suits, damages, actions, causes of action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing as of the Effective Date or thereafter arising, in law, at equity, whether for tort, fraud, contract, violations of federal or state securities laws, or otherwise, based in whole or in part upon any act or omission, transaction or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way to the Debtor. This release shall not affect the rights or obligations of any party in interest, including the Committee and the Chapter 11 Trustee, to enforce the Settlement Order through the Effective Date.

3474450-33

Upon Entry of the Confirmation Order by the Bankruptcy Court, the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Fed. R. Bankr. P. 9019, of the Full Release, which includes by reference each of the related provisions and definitions contained in this Plan, and *further*, shall constitute its finding that the Full Release is: (a) in exchange for the good and valuable consideration provided by the Lender Released Parties, a good faith settlement and compromise of such Claims; (b) in the best interests of the Debtor and all holders of Interests and Claims; (c) fair, equitable, and reasonable; (d) given and made after due notice and opportunity for hearing; and (e) a bar to any of the Debtor, the Committee, the Chapter 11 Trustee, any holder of a Claim or Interest, or any other Person asserting any Released Lender Claim or any other Claim, cause of action or liability related thereto of any kind whatsoever against any of Lender Released Parties.

(g) **Consideration for Releases**. The consideration for the releases in favor of the Lender Parties under the Amended Plan includes, but is not limited to, (i) substantial compromise of the amounts due and owing to the Lender under the Loan Documents, (ii) agreement by the Lender to modify the terms of the Loan Documents post-Effective Date that reinstate the modified Loan in good standing, waive default, and permit the use of reserve funds consistent with the terms of the Second Amended Loan Documents, and (iii) deferral of the exercise of Lender's rights and remedies and prosecution of a competing chapter 11 plan of reorganization, all of which provide substantial and necessary consideration to the Debtor's estate that make the reorganization and payments contemplated under the Amended Plan possible.

3474450-33

The consideration for the releases in favor of the Patel Parties under the Amended Plan includes, but is not limited to, (i) extinguishment of Dr. Patel's asserted Class 6 Claim, (ii) the provision of Emergence Financing for the Amended Plan, (iii) provision of the Guarantees (including Guarantees in respect of the Class 4 Claims, and Guarantees, indemnity and pledge agreements in favor of the Lender), (iv) guarantees in favor of Wyndham, and (v) Dr. Patel's agreement to void his release and subordinate his interest in the Emergence Financing upon a Class 5 Event of Default.

## V.  MEANS OF IMPLEMENTING AMENDED PLAN

Dr. Patel will receive 100% of the Reorganized Debtor's equity. The Amended Plan contemplates substantial payments on or before the Effective Date, including without limitation the $10+ million Settlement Payment to Lender, payment of Allowed Administrative Expenses, and payments due on the Effective Date to Classes 2, 3, 4 and 5. The Plan Proponents (and Wyndham) will finance these payments by a combination of the Plan Loan (as provided in the Term Sheet, up to the amount required to consummate the Amended Plan but not exceeding $11 million, to be secured by a junior lien on the Hotel, and payable (subject to the Subordination Agreement) interest only until the Amended Loan is paid in full or the Lender otherwise consents) and the Mezzanine Loan (as provided in the Term Sheet and the Pre-Petition Credit Agreement, up to $6 million, funded and repaid on a revolving basis). The Plan Loan and the Mezzanine Loan will each bear interest at 10% per annum, payable annually after every Annual Payment Date to Allowed Claims in Class 4 (i.e., after the second, fourth, sixth and last such distribution) and thereafter on the anniversaries of the Effective Date until the Plan Loan and the Mezzanine Loan are paid in full (a "Loan Payment Date"). The Emergence Financing shall mature when the Class 1 Claim matures. Hotel Cash Flow (remaining after the Distribution to

60

Allowed Claims) on such Loan Payment Dates will be applied first to pay accrued interest on the Plan Loan and then to pay accrued interest on the Mezzanine Loan (with any remaining Cash Flow after such application being available to pay customary tax distributions and principal on the Mezzanine Loan). Any accrued interest on the Plan Loan and/or Mezzanine Loan that exceeds the Cash Flow available to pay same will remain accrued and become payable at the next succeeding Loan Payment Date (or upon the maturity or acceleration of the Plan Loan and/or Mezzanine Loan). The Plan Proponents, Dr. Patel and his wife will also provide Guarantees to Lender for $3 million (declining by $1 million a year over 3 years) and for the lien-free completion of the pending construction of the pending Hotel improvements. Drs. Patel will also personally guaranty the eight (8) semi-annual payments in respect of the Class 4 Claims, which Class 4 Guaranty shall be subordinate to each Class 1 Guaranty in favor of Lender upon the occurrence of an Event of Default under the Second Amended Loan Documents, in which event no payments under or in connection with the Class 4 Guaranty shall be made unless and until each Class 1 Guaranty has been honored, paid, released or terminated. Upon the occurrence of a Class 5 Event of Default, any participation interest and right to payment that Dr. Patel or his affiliates, representatives or agents holds in the Emergence Financing shall be subordinated to the Allowed Claims of Class 5 and the Creditor Trust (on behalf of the Allowed Claims of Class 5) until the defaulted payments are made in full. These substantial capital commitments and their performance by the Plan Proponents, provide and will provide tangible assurance to all creditors regarding the viability and feasibility of the Amended Plan, and support the releases granted to these parties in connection with the Plan.

With respect to the deferred Plan payments, now that the Bankruptcy Court has approved the execution of a franchise agreement with Wyndham to flag the Hotel as a Wyndham Grand,

Wyndham has committed substantial capital to the Hotel and agreed to serve as its Manager after the Effective Date, the Debtor's ability to fund the claims payments from the Hotel's cash flow is further assured. The flag of a hotel, especially a hotel that caters to conferences and other organized events, has a direct and significant effect on its cash stream. Moreover, the Debtor obtained post-petition financing in the form of a DIP loan from Carbon Capital to support the Hotel's operational needs until confirmation of the Amended Plan under the terms and conditions set forth in the DIP Order as modified by the Settlement. The financial projections for the Hotel's cash flow during the next four years, attached as **Exhibit B**, provide more than reasonable assurances that the Hotel will generate sufficient profits to pay all the Classes according to the Plan terms.

Payments to be made on and after the Effective Date, including any payments to be made into the Disputed Claim Reserve for all Classes and the Class 5 Reserve Fund shall be made by the Plan Proponents or the Reorganized Debtor.

1. **Post-Confirmation Operations of the Debtor**.

The Reorganized Debtor plans to operate the Hotel immediately after the Effective Date of the Plan under the management and operational control of Wyndham. Dr. Patel will not receive any salary from the Reorganized Debtor, or any dividends or distributions from the Reorganized Debtor (other than in respect of his participating interest in the Emergence Financing and customary tax distributions) until all Class 2, 3, 4 and 5 Allowed Claims are paid in full to the extent provided in the Amended Plan, and Disputed Claims in those Classes are resolved. Other than in respect of his/her/its participating interest in the Emergence Financing and customary tax distributions, Dr. Patel and his affiliates, including his relatives, will not receive any salary or other payments from the Reorganized Debtor except on arm's length

competitive terms consistent with the Second Amended Loan Documents until all Class 2, 3, 4 and 5 Allowed Claims are paid in full, to the extent provided in the Amended Plan, and Disputed Claims in those Classes are resolved.

2.      **Confirmation Standards**.

For a plan to be confirmed, the Bankruptcy Code requires, among other things, that the plan be proposed in good faith and comply with the other applicable provisions of chapter 11 of the Bankruptcy Code, including a requirement that at least one class of impaired claims accept the Plan, and that confirmation of the plan is not likely to be followed by the need for further financial reorganization. The Bankruptcy Court will confirm a plan only if it finds that all of the requirements enumerated in section 1129 of the Bankruptcy Code have been met. The Plan Proponents believe that the Plan satisfies all of the requirements for Confirmation.

3.      **Best Interests Test**

A requirement for confirmation of a plan is called the "best interests test". Notwithstanding acceptance of the plan by each impaired class, in order to confirm a plan, the bankruptcy court must determine that the plan is in the best interests of each holder of a claim or interest in any such impaired class. Accordingly, if an impaired class does not unanimously accept the plan, the best interests test requires the bankruptcy court to find that the plan provides to each member of such impaired class a recovery on account of the class member's claim or interest that has a value, as of the effective date, at least equal to the value of the distribution that each such class member would have received if the debtor's assets were liquidated under Chapter 7 of the Bankruptcy Code on such date.

To estimate what members of each impaired class of unsecured creditors and equity interest holders would receive if a debtor were liquidated under Chapter 7, the bankruptcy court

63

first determines the aggregate dollar amount that would be generated from the assets if the Chapter 11 case was converted to a Chapter 7 case under the Bankruptcy Code and the Confirmation Date and the assets were liquidated by a trustee in bankruptcy (the "Liquidation Value" of such Assets). The Liquidation Value would consist of the net proceeds from the disposition of the assets and would be augmented by any cash held by the debtor.

The Liquidation Value of the debtor's assets available to general creditors would be reduced by the costs and expenses of the liquidation, as well as other administrative expenses of the Chapter 7 case. The costs of liquidation under Chapter 7 would include the compensation of a trustee or trustees, as well as counsel and other professionals retained by the trustee, disposition expenses, all unpaid expenses incurred by the debtor during its chapter 11 proceeding (such as compensation for attorneys and accountants) that are allowed in a Chapter 7 proceeding, and litigation costs and claims against the debtor arising from its business operations during the pendency of the Chapter 11 case and Chapter 7 liquidation proceedings. These costs, expenses and claims would be paid in full out of the debtor's liquidation proceeds before the balance would be made available to pay general unsecured claims or to make any distribution in respect of equity interests.

Once the percentage recoveries in liquidation of secured claimants, priority claimants, general unsecured creditors and equity security holders are ascertained, the value of the distribution available out of the Liquidation Value is compared with the value of the property offered to each of the classes of claims and interests under the plan to determine whether the plan is in the best interests of each class. The Plan Proponents believe that the Amended Plan satisfies this best interests test because the Debtor's operations will continue as a going concern under the terms of the Amended Plan and the distributions under the Amended Plan will provide

64

at least the same recovery to holders of Allowed Claims against and Allowed Interests in the Debtor on account of such Allowed Claims and Allowed Interests as would distributions by a chapter 7 trustee.

## VI. ALTERNATIVES TO THE AMENDED PLAN

Although this Disclosure Statement is intended to provide information to assist a Claim or Interest holder in determining whether to vote for or against the Amended Plan, a summary of the alternatives to confirmation of the Amended Plan may be helpful.

If the Amended Plan is not confirmed, the following alternatives are available: (a) confirmation of another Chapter 11 plan or a competing plan; (b) conversion of the Chapter 11 Case to one under Chapter 7 of the Bankruptcy Code; (c) dismissal of the Chapter 11 Case leaving Creditors and Interest holders to pursue available non-bankruptcy remedies; or (d) granting Lender stay relief which would likely result in foreclosure of the Debtor's property. Based upon the Settlement, the Settlement Order, the Committee Term Sheet, and the benefits contained therein, including the resolution of much of the contested litigation, the alternatives to the Amended Plan are very limited and not likely to benefit creditors. The Term Sheet provides that if this Disclosure Statement is approved, but the Second Amended Plan is not confirmed under certain circumstances, the Plan Proponents could not file a new plan. While the Lender could be released from its standstill and prosecute the competing Lender's Plan or an amendment thereof, the most likely results if the Amended Plan is not confirmed (and the Lender does not prosecute the Lender's Plan) is that the Lender will seek relief from the automatic stay or the Chapter 11 Case will be converted to Chapter 7 of the Bankruptcy Code. The Plan Proponents believe that conversion of this Chapter 11 Case to Chapter 7 case would result in (i) significant delay in distributions to all creditors who would have received a distribution under the Amended

65

Plan and (ii) diminished or no recoveries for certain classes of creditors. If the Lender receives relief from stay or the Chapter 11 Case is dismissed, creditors would be free to pursue non-bankruptcy remedies in their attempts to satisfy claims against the Debtor and Lender would likely foreclose and eliminate any recovery to other creditors. Additionally, the recoveries from Avoidance Actions would not be available for distribution solely to Class 5 Creditors, although such proceeds could be available for distribution to allowed claims in the order provided for pursuant to Section 726 of the Bankruptcy Code in the event of a conversion to Chapter 7. The Committee asserts that if the Amended Plan is not confirmed, the Chapter 11 Trustee could seek to sell the Hotel, or the Committee could seek to negotiate to preserve Avoidance Actions for the benefit of creditors. However, if the Amended Plan is not confirmed, and the Lender validly declares an Event of Default under the Settlement, the Plan Proponents are required to support the Lender's Plan and/or the Lender's request for Relief from Stay and subsequent foreclosure (or deed in lieu thereof) and intend to honor that agreement.

## VII.    OTHER MATTERS

1.    **The Trust.**

The Plan Proponents gave the option to evaluate, designate and pursue all Avoidance Actions to the for the benefit of holders of Allowed Class 5 Claims, provided however that no Avoidance Actions may be asserted against the holders of Class 4 Claims or any party entitled to the benefit of a release as referred to in the Amended Plan. After consultation with the Committee, the parties have agreed that a Creditor Trust will be established and the Avoidance Actions (as defined in the Amended Plan) will be transferred/assigned to the Creditor Trust. The Creditor Trust will be formed and administered, and any professionals it engages will be compensated, by utilizing $100,000 from the Emergence Financing and the proceeds of

66

Avoidance Actions, and the Plan Proponents, Debtor (and Reorganized Debtor) shall not be responsible therefor in excess of such $100,000 payment on the Effective Date. The proceeds from the Avoidance Actions will be Distributed for the benefit of Class 5 creditors' Allowed Claims to augment their 35% Distribution. The Trust Agreement will be prepared and filed with the Plan Supplement prior to the Confirmation hearing. The Creditor Trust, at the direction of the Committee, shall disclose the name of the Trustee and the mechanics for the pursuit of these claims. If any Avoidance Actions (or funds) remain after the full payment of all Allowed Class 5 Claims and all expenses of the Creditor Trust, including professional fees and expenses (including resolution of Disputed Claims), the Creditor Trust will re-assign the remaining Avoidance Claims (or funds) to the Reorganized Debtor.

(a)     Creation of the Trust. On the Effective Date, the Trust will be formed. The Trust Agreement, in substantially the same form as will be included in an exhibit to the Plan Supplement, will be approved by the Bankruptcy Court pursuant to the Confirmation Order and executed by the Trustee, and all other necessary steps shall be authorized by the Bankruptcy Court and taken to establish the Trust.

(b)     Purpose of Trust. The Trust will be established and maintained, in accordance with Treasury Regulation section 301.7701-4(d), for the purpose of collecting, holding, liquidating, monetizing and distributing the Trust Assets, resolving and administering Claims, and prosecuting Causes of Action that are transferred to the Trust pursuant to the Amended Plan. The Trust will not continue or engage in the conduct of a trade or business.

(c)     Trust Assets.  On the Effective Date, all right, title and interest to the following assets of the Debtor and its Estate shall be assigned, set over, transferred, and conveyed to the

Creditor Trust, free and clear of Liens, Claims or encumbrances and without action required of the Trustee to effectuate the transfer of Trust Assets:

    (i)    Payment of $100,000 which shall be reserved and used to pay legal and other administrative claims of the Trust; and

    (ii)    All Avoidance Actions (excluding any Avoidance Actions against the Lender Parties, BlackRock, the holders of Class 4 Claims the Plan Proponents or Dr. Patel, as such claims are released pursuant to the Committee Term Sheet, the Settlement with Lender and in connection with this Second Amended Plan);

To the extent that certain Trust Assets, because of their nature or because they will accrue subsequent to the Effective Date, cannot be assigned, set over, transferred or conveyed to the Trust on the Effective Date, these assets will be deemed assigned, set over, transferred and conveyed to the Trust as soon as practical after the Effective Date. Trust Assets shall not include any contractual rights of subordination, guarantees or judgments which are retained by the Lender. On or after the Effective Date, the Trustee will continue as a plaintiff in all Avoidance Actions (on behalf of the Beneficiaries of the Trust) in which the Debtor's estate or Chapter 11 Trustee was a plaintiff prior to the Effective Date and will be deemed the assignee of all Avoidance Claims that could have otherwise been asserted by the Debtor or the Chapter 11 Trustee of the Debtor, other than Avoidance Actions released pursuant to the Second Amended Plan. All recoveries and proceeds arising from litigation in respect of the Avoidance Claims will be deemed assigned, set over, transferred and conveyed to the Trust upon receipt thereof.

    (d)    <u>Governance of the Trust</u>. The Trust will be controlled by the Trustee in accordance with the Trust Agreement, which will not be inconsistent with the Second Amended Plan. The Trustee will be subject to oversight by a three member oversight committee (the

"Oversight Committee").  The Oversight Committee will be comprised of representatives selected by and agreed upon by the Committee and the Plan Proponents.

(e)      The Trustee.  The Trustee will be selected by the Committee. The designation of the Trustee will be approved by the Bankruptcy Court and effective on the Effective Date without the need for a further order of the Bankruptcy Court. The Trustee will exercise reasonable business judgment to administer the Trust Assets and make timely distributions from the Trust to the Beneficiaries of the Trust.

(f)      Costs and Expenses of the Trustee.  The costs and expenses of the Trust, including the fees and expenses of the Trustee and its retained professionals, will be paid from the proceeds of Trust Assets and funded initially by the $100,000. The Trustee may retain or reserve amounts estimated by the Trustee, based on his reasoned business judgment, to fund the fees and expenses of the Trustee and the professionals of the Trustee in a Liquidation Expense Reserve Account. The Trust may increase or decrease amounts held in a Liquidation Trust Reserve Account at the reasonable discretion of the Trustee.

2.      **Executory Contracts.**

All Executory Contracts and unexpired leases of the Debtor not expressly assumed prior to the confirmation date, or at the confirmation date, shall be deemed rejected.  The Plan Proponents do not expect rejection damages to exceed an aggregate amount of $100,000 (excluding any potential rejection damages under section 1113 of the Bankruptcy Code, which, if assessed, would significantly increase this amount).  Rejection damage claims shall be treated as Class 5 Claims.   Within 7  days prior to the objection to Confirmation deadline, the Plan Proponent will file a Plan Supplement clearly listing the contracts to be assumed and the proposed cure amounts and provide counter-parties the opportunity to object to the proposed

69

cure amounts.  The Plan Proponents intend to seek assumption of all of the contracts listed in

**Exhibit F**.  The total cure amounts set forth on the schedule aggregate $885,658.  The Plan

Proponents may dispute some of the alleged cure amounts.  The name of the contract party and

the amount of the proposed cure and notice of the opportunity to object to the proposed cure

amount will be set forth to allow the contract counter-parties the requisite notice.  The cure

amounts for assumed executory contracts and unexpired leases will be negotiated or be paid on

the Effective Date of the Amended Plan.  Schedule G from the Debtor's Amended Schedules

indentifies the Debtor's list of Executory Contracts and Unexpired Leases.

The most important of these Executory Contracts are the five Collective Bargaining

Agreements ("CBA") for the vast majority of the hotel employees.  The CBA's can only be

rejected pursuant to section 1113 of the Bankruptcy Code.  Local 57 UNITE HERE has asserted

that the CBA between it and the Debtor has renewed automatically and expires on September 30,

2011.  The Plan Proponents asserted that it has already expired.  In any event, the Plan

Proponents intend to negotiate with all of the unions, including Local 57 UNITE HERE

regarding the CBA's.  The Debtor has been, and the Plan Proponents remain committed to (i)

honoring all existing and unexpired CBA's, and (ii) negotiating in good faith new CBA's for

those agreements that have expired or will expire in the near future.

3.      **Objections to Claims.**

Pursuant to the Amended Plan, Debtor, the Reorganized Debtor, the Creditor Trust and/or

the Chapter 11 Trustee may object to any scheduled claim or Proof of Claim filed against the

Debtor, excluding any of the Lender's Claims, subject to the Settlement Order.  Such an

objection shall preclude the consideration of any claims as "allowed" for the purposes of timely

distribution in accordance with the Amended Plan.  However, payments due on account of the

Disputed Claims (if such Claims were Allowed) in Classes 2, 3 and 4 shall be set aside on and after the Effective Date in the Disputed Claim Reserve, until such Claim is allowed or disallowed. The Plan Proponents anticipate that objections to claims of various creditors will occur pursuant to the procedures and time-frame established by the Bankruptcy Court.

4.     **Preservation of Actions and Avoidance Actions.**

From and after the Effective Date, to the extent not otherwise adjudicated or settled prior to or as a part of the Amended Plan, all rights pursuant to Chapter 5 of the Bankruptcy Code; including but not limited to all preference claims pursuant to section 547 of the Bankruptcy Code; all fraudulent transfer claims pursuant to section 544 or 548 of the Bankruptcy Code; all unauthorized post-petition transfers under Bankruptcy Code Section 549; and all claims recoverable under section 550 of the Bankruptcy Code (excluding any such claims, actions and Avoidance Actions against the Lender Parties, BlackRock, Class 4 Claims, Dr. Patel or the Plan Proponents, which are proposed to be extinguished and released under the Amended Plan) are hereby preserved, and will be assigned to a Creditor Trust for the benefit of the Class 5 creditors. A Trustee shall be appointed under the Creditor Trust (selected by the Committee), pursuant to directions from the Committee, to oversee the pursuit and recovery of these claims. A non-exhaustive schedule of potential claims known to Plan Proponents is attached as **Exhibit G**. The failure to include a potential claim on this schedule is not a waiver of the right to pursue such claim. Prior to the Confirmation Hearing, the Trust document shall be prepared and approved by the Committee and filed with the Court. There shall not be any Avoidance Actions or Causes of Action filed against any Lender Party, and holder of a Class 4 Claim and Dr. Patel and to the extent that such Avoidance Actions or Causes of Action exist against the Lender Parties, holders of Class 4 Claims or Dr. Patel they are fully released under the Amended Plan (subject to the

provisions of the Committee Term Sheet voiding the release for Dr. Patel upon the occurrence of a Class 5 Event of Default).

Additionally, there are alleged Avoidance Actions against current and former insiders of the Debtor (collectively, the "Insider Avoidance Actions"). The Insider Avoidance Actions may represent a significant source of recovery for the Debtor's estate. These claims may include the following:

(i)      Jai Lalwani and/or Black Diamond allegedly received payments of more than $727,000 from the Debtor's bank accounts since November 2009.

(ii)      Approximately $800,000 in cash withdrawals that were made from the Debtor's bank accounts during the 14-month period preceding the bankruptcy. The recipient of these funds has yet to be determined, but the magnitude of the payments warrants further investigation.

(iii)      Amounts paid at the direction of Jai Lalwani to American Express for certain personal charges of insiders. The bank records show that in excess of $527,000 was paid to American Express between July 1, 2009 through the Petition Date, but there is no evidence that the Debtor received reasonably equivalent value.

(iv)      Atul Bisaria, the former equity holder of the Debtor and his wife, Mihu Bisaria, allegedly received payments in excess of $186,000 from the Debtor since July 2009. These payments were made when the Debtor was unable to satisfy other operating expenses, including but not limited to, a payment of $50,000 just days before the Petition Date.

(v)      Vani Lalwani, the sister of Jai Lalwani, allegedly received more than $197,000 in payments from the Debtor.

(vi)     The Debtor's bank records also indicate that Harris Mathis ($45,000), Geebin Flores ($28,500), and Ademola Shittu ($14,200) each received payments from the Hotel in 2010. Although Mr. Mathis previously served as chief operating officer for the Debtor, there is no evidence to suggest these individuals provided any goods or services to the Debtor in exchange for the payments they received.

(vii)    Dr. Patel allegedly received payments of more than $2,600,000 from the Debtor's bank accounts within the one-year period preceding the Petition Date. The Plan Proponents assert that these amounts are not subject to recovery because, among other things, Dr. Patel was not an "insider" with respect to the Debtor when the payments were made (within the meaning of the preference provisions of the Bankruptcy Code), and Dr. Patel asserts that he made even more substantial loans to the Debtor after these transfers, and so did not improve his debt position thereby. Under the terms of the Amended Plan, Dr. Patel will be released from these alleged claims, subject to the provisions of the Amended Plan voiding and rendering that release ineffective upon the occurrence of a Class 5 Event of Default.

5.    **Conditions Precedent to Effectiveness of the Amended Plan.**

The Amended Plan shall not become effective and the Effective Date shall not occur unless and until:

(a)     A final order approving the Settlement and the Term Sheet is entered;

(b)     Fourteen days shall have passed from the Confirmation Date;

(c)     The Bankruptcy Court shall have entered the Confirmation Order in form and substance satisfactory to each of the Plan Proponents and the Lender authorizing and directing the Debtor to take all actions necessary or appropriate to enter into, implement, and consummate the contracts, instruments, releases, indentures and other agreements or documents

73

created, amended, supplemented, modified, or adopted in connection with the Amended Plan;

(d)  The Bankruptcy Court shall have approved the information contained in the Disclosure Statement as adequate pursuant to section 1125 of the Bankruptcy Code; and

(e)  No stay of the Confirmation Order shall be in effect at the time the other conditions set forth in this Section are satisfied, or, if permitted, waived;

(f)  All documents, instruments and agreements, in form and substance satisfactory to each of the Plan Proponents, provided for under this Amended Plan or necessary to implement this Amended Plan shall have been executed and delivered by the parties thereto, unless such execution or delivery has been waived by the parties benefited thereby; and

(g)  There is no Event of Default under the Term Sheet or the Plan Support Agreement or the Plan Support Termination Date has not occurred.

## VIII.  U.S. FEDERAL INCOME TAX CONSIDERATIONS

A summary description of certain U.S. federal income tax consequences of the Amended Plan is provided below. This description is for informational purposes only and is subject to significant uncertainties. Only the principal consequences of the Amended Plan for the Debtor and for the holders of Claims and Interests who are entitled to vote to confirm or reject the Amended Plan are described below. No opinion of counsel has been sought or obtained with respect to any tax consequences of the Amended Plan, and no tax opinion is being given in this Disclosure Statement. No rulings or determinations of the Internal Revenue Service ("IRS") or any other tax authorities have been obtained or sought with respect to the Amended Plan, and the description below is not binding upon the IRS or such other authorities.

The following discussion of U.S. federal income tax consequences is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), regulations promulgated and proposed thereunder and judicial decisions and administrative rulings and pronouncements of the IRS as in effect on the date hereof. Legislative, judicial or administrative changes or

74

interpretations enacted or promulgated in the future could alter or modify the analyses and conclusions set forth below. It cannot be predicted at this time whether any tax legislation will be enacted or, if enacted, whether any tax law changes contained therein would affect the tax consequences to holders. Any such changes or interpretations may be retroactive and could significantly affect the U.S. federal income tax consequences discussed below.

**THIS DISCUSSION DOES NOT ADDRESS FOREIGN, STATE OR LOCAL TAX CONSEQUENCES OF THE AMENDED PLAN, NOR DOES IT PURPORT TO ADDRESS THE U.S. FEDERAL TAX CONSEQUENCES OF THE AMENDED PLAN TO SPECIAL CLASSES OF TAXPAYERS. FURTHERMORE, ESTATE AND GIFT TAX ISSUES ARE NOT ADDRESSED AND TAX CONSEQUENCES RELATING TO THE ALTERNATIVE MINIMUM TAX ARE GENERALLY NOT DISCUSSED HEREIN.**

**NO REPRESENTATIONS ARE MADE REGARDING THE PARTICULAR TAX CONSEQUENCES OF THE AMENDED PLAN TO ANY HOLDER OF A CLAIM OR INTEREST. EACH HOLDER OF A CLAIM OR INTEREST IS STRONGLY URGED TO CONSULT ITS OWN TAX ADVISOR REGARDING THE U.S. FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE TRANSACTIONS DESCRIBED HEREIN AND IN THE AMENDED PLAN.**

Holders of Claims should generally recognize gain (or loss) to the extent the amount realized under the Amended Plan (generally the amount of Cash received) in respect of their Claims exceeds (or is exceeded by) their respective tax bases in their Claims. The tax treatment of holders of Claims and the character and amount of income, gain or loss recognized as a consequence of the Amended Plan and the distributions provided for by the Amended Plan will

depend upon, among other things, (a) the nature and origin of the Claim, (b) the manner in which a holder acquired a Claim, (c) the length of time a Claim has been held, (d) whether the Claim was acquired at a discount, (e) whether the holder has taken a bad debt deduction in the current or prior years, (f) whether the holder has previously included in income accrued but unpaid interest with respect to a Claim, (g) the method of tax accounting of a holder; and (h) whether a Claim is an installment obligation for U.S. federal income tax purposes. **Therefore, holders of Claims should consult their own tax advisors for information that may be relevant to their particular situations and circumstances and the particular tax consequence to such holders as a result thereof.**

The tax treatment of a holder of a Claim that receives distributions in different taxable years is uncertain. If such a holder treats the transaction as closed in the taxable year it first receives (or is deemed to have received) a distribution of Cash and/or other property, it should recognize gain or loss for such tax year in an amount equal to the cash and the value of other property actually (and deemed) received in such tax year (other than that received in respect of accrued interest) with respect to its Claim (other than any portion of the Claim that is attributable to accrued interest) plus the estimated value of future distributions (if any) less its tax basis in its Claim (except to the extent its Claim is for accrued interest). A holder should then subsequently recognize additional income or loss when additional property distributions are actually received in an amount equal to the Cash and/or value of such other property (other than that received in respect of accrued interest) less the holder's allocable tax basis in its Claim with respect to such subsequent distribution. A holder may have to treat a portion of any such subsequent distribution as imputed interest recognizable as ordinary income in accordance with the holder's method of tax accounting. If instead the open transaction doctrine applies as a result of the value of the

76

Subsequent Distributions that a holder may receive not being ascertainable on the Effective Date, such holder should not recognize gain (except to the extent the value of the Cash and/or other property already received exceeds such holder's adjusted tax basis in its Claim (other than any Claim for accrued interest)) or loss with respect to its Claim until it receives the final distribution thereon (which may not be until the Final Distribution Date). It is the position of the IRS that the open transaction doctrine applies only in rare and extraordinary cases. The Debtor believes that the open transaction doctrine should not apply and that holders may be entitled to take the position that on the Effective Date no value should be assigned to the right to receive any Subsequent Distributions. **Creditors are urged to consult their own tax advisors regarding the application of the open transaction doctrine and how it may apply to their particular situations, whether any gain recognition may be deferred under the installment method, whether any loss may be disallowed or deferred under the related party rules and the tax treatment of amounts that certain Creditors may be treated as paying to other Creditors.**

Holders of Allowed Claims will be treated as receiving a payment of interest (in addition to any imputed interest as discussed in the preceding paragraph) includible in income in accordance with the holder's method of accounting for tax purposes, to the extent that any Cash and/or other property received pursuant to the Amended Plan is attributable to accrued but unpaid interest, if any, on such Allowed Claims. The extent to which the receipt of Cash and/or other property should be attributable to accrued but unpaid interest is unclear. The Amended Plan provides, and the Debtor intends to take the position, that such Cash and/or other property distributed pursuant to the Amended Plan will first be allocable to the principal amount of an Allowed Claim and then, to the extent necessary, to any accrued but unpaid interest thereon. Each holder should consult its own tax advisor regarding the determination of the amount of

consideration received under the Amended Plan that is attributable to interest (if any) and whether any such interest may be considered to be foreign source income. A holder generally will be entitled to recognize a loss to the extent any accrued interest was previously included in its gross income and is not paid in full.

**Holders of Disputed Claims are urged to consult their own tax advisors regarding the taxation of their Disputed Claims.**

Certain payments, including the payments of Claims and Interests pursuant to the Amended Plan, are generally subject to information reporting by the payor to the IRS. Moreover, such reportable payments are subject to backup withholding under certain circumstances. Under the backup withholding rules, a holder of a Claim may be subject to backup withholding at the applicable tax rate with respect to distributions or payments made pursuant to the Amended Plan, unless the holder: (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates this fact or (b) provides a correct taxpayer identification number and certifies under penalty of perjury as to the correctness of its taxpayer identification number and certain other tax matters. Backup withholding is not an additional tax. Rather, the U.S. federal income tax liability of those subject to backup withholding will be reduced by the amount of tax withheld. If withholding results in an overpayment of U.S. federal income taxes, a holder may obtain a refund of any excess amounts withheld under the backup withholding rules by timely filing the appropriate claim for refund with the IRS.

**THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE AMENDED PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX**

PROFESSIONAL.  THE ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE.  THE TAX CONSEQUENCES OF THE AMENDED PLAN ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S INDIVIDUAL CIRCUMSTANCES.  ACCORDINGLY, HOLDERS ARE URGED TO CONSULT WITH THEIR OWN TAX ADVISORS ABOUT THE U.S. FEDERAL, STATE, LOCAL AND FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE AMENDED PLAN.

<u>CIRCULAR 230 DISCLAIMER</u>: The IRS now requires written advice (including electronic communications) regarding one or more Federal (i.e., United States) tax issues to meet certain standards. Those standards involve a detailed and careful analysis of the facts and applicable law which we expect would be time consuming and costly. We have not made and have not been asked to make that type of analysis in connection with any advice given in this e-mail. As a result, we are required to advise you that any Federal tax advice rendered in this e-mail is not intended or written to be used and cannot be used for the purpose of avoiding penalties that may be imposed by the IRS.

IX.    <u>ANALYSIS OF THE AMENDED PLAN VS. LIQUIDATION</u>

All payments as provided for the in the Amended Plan shall be financed by the Reorganized Debtor's Hotel Cash Flow, cash on hand, Emergence Financing to be advanced by Wyndham and the Plan Proponents, and/or other funding sources.  As with any plan, an alternative would be a conversion of the Chapter 11 Case to a Chapter 7 case and subsequent liquidation of the Debtor by a duly appointed or elected Chapter 7 trustee.  In the event of a liquidation under Chapter 7, the following is likely to occur:

79

(i)    An additional tier of administrative expenses entitled to priority over general unsecured claims under § 507(a)(1) of the Bankruptcy Code would be incurred. Such administrative expenses would include the Chapter 11 Trustee's commissions and fees to the trustee's accountants, attorneys and other professionals likely to be retained by said trustee for the purposes of liquidating the assets of the Debtor.

(ii)    Further claims would be asserted against the Debtor with respect to such matters as income and other taxes associated with the sale of the assets, and the inability of the Debtor to fulfill outstanding, contractual commitments and other related claims.

(iii)    A liquidation analysis is attached as **Exhibit H.**

In this case, the Settlement provides that if the Amended Plan is not confirmed and the Lender validly declares an Event of Default under the Settlement, the Plan Proponent will support the Lender in seeking confirmation of the Lender's Plan or relief from stay and a deed in lieu of foreclosure. Predicated upon the foregoing, it is the Plan Proponents' opinion that the liquidation value of the Debtor would be insufficient to pay all classes of creditors holding Allowed Claims other than secured creditors.

## X.    RISK FACTORS

1.    **Failure to Satisfy Vote Requirement**.

The Plan Proponents are seeking to receive votes in number and representing Claims in amount sufficient to enable the Bankruptcy Court to confirm the Amended Plan. If the Amended Plan does not receive sufficient votes for Confirmation pursuant to section 1129(a) of the Bankruptcy Code, then the Plan Proponents may and specifically reserve the right to seek to employ the "cram down" procedures set forth in section 1129(b) of the Bankruptcy Code, except the Plan Proponents shall not seek to utilize these provisions to "cram-down" Class 1.

80

2.    **The Amended Plan may not be Accepted or Confirmed**.

While the Plan Proponents believe the Amended Plan is confirmable under the standards set forth in section 1129 of the Bankruptcy Code, there can be no guarantee that the Bankruptcy Court will find the Amended Plan to be confirmable. Additionally, the Amended Plan as drafted requires acceptance by at least one of the impaired Classes. Subject to the Amended Plan being in conformity with the Term Sheet and the Plan Support Agreement, and otherwise acceptable to the Lender, the Class 1 Claims (which are impaired) have agreed to support the Amended Plan, which would satisfy this requirement. There can be no cram-down or cram up of this Amended Plan on the Class 1 Claim, as such would be an Event of Default under the Term Sheet and Plan Support Agreement.

If the conditions precedent to the Effective Date, as discussed in detail in this Disclosure Statement, the Term Sheet, the Plan Support Agreement, and in the Amended Plan, have not been satisfied or waived, the Confirmation Order may not be entered, and/or the Bankruptcy Court may vacate the Confirmation Order. **THERE CAN BE NO ASSURANCE THAT ALL OF THE VARIOUS CONDITIONS TO EFFECTIVENESS OF THE AMENDED PLAN WILL BE TIMELY SATISFIED OR WAIVED.** In the event that the conditions to effectiveness have not been timely satisfied or waived, the Amended Plan would be deemed null and void and the Lender may propose or solicit votes on the Lender's Plan, or an alternative plan, or may seek relief from stay to foreclose, with results that may not be as favorable to parties in interest as the Amended Plan.

3.    **Allowed Claims May Exceed Estimates**.

The timing and amount of projected distributions set forth in the Amended Plan and described in this Disclosure Statement are based upon the Plan Proponents' good faith estimates

81

and the Projections attached hereto, including projections of the amount of Amended Plan expenses that will be incurred and total amount of Claims in each Class that will ultimately be allowed. The actual amount of Amended Plan expenses could be greater than expected for a variety of reasons, including greater than anticipated administrative and litigation costs associated with resolving disputed Claims. Additionally, the actual amount of Allowed Claims in any Class could be materially greater than anticipated (based on, among other things, success in disputing Claims). However, as the minimum percentage of recovery has been established through the Committee Term Sheet, this may only impact any additional pro rata distributions from the recovery of Avoidance Actions to Allowed Class 5 Claims.

4.  **The Reorganized Debtor May Not Be Able To Perform Per Its Financial Projections**.

The portion of the distributions payable over time to Class 3 creditors and the distribution over time for the Class 4 creditors not electing the 35% Effective Date payment option, and for Class 4 and 5 Claims that are disputed as of the Effective Date and become Allowed thereafter under the Second Amended Plan may, in addition to other funding sources, be paid in whole or in part upon the Reorganized Debtor's Hotel Cash Flow. The Debtor's Projections regarding such cash flow are attached an Exhibit B to this Disclosure Statement. Those projections reflect assumptions and estimates that the Plan Proponents believe to be reasonable, but the Reorganized Debtor's actual results will vary from those projected and the differences may be material or substantial. For instance, the projected results assume certain levels of revenues based on occupancy and room rates, and certain levels of expenses. The revenue projections could be affected by positive or negative general economic conditions (or those affecting the Wyndham Grand franchise network or the hospitality industry in the Hotel's region). The

82

expense projections could be affected by unexpected liabilities. If there is a default under the payments due to Classes 4 and 5 that is not timely cured, the Holders of Allowed Class 4 and 5 Claims will have the remedies under applicable law and as set forth in this Disclosure Statement and the Amended Plan.

5.      **The Settlement Might Not Be Consummated.**

The Settlement might fail to be consummated. If the Settlement fails to be consummated because of an Event of Default, as provided for in the Term Sheet, the Debtor will most likely liquidate with little or no proceeds to creditors other than Lender.

## XI.      CONFIRMATION BY CRAM DOWN

The Plan Proponents reserve the right, in the event that impaired classes, other than Class 1, reject the Amended Plan, to seek confirmation of the Amended Plan if the Court finds that the Amended Plan does not discriminate unfairly and is fair and equitable with respect to each dissenting class.

The Plan Proponents believe that confirmation of the Amended Plan is preferable to all other alternatives, and therefore urges all voting Creditors to **ACCEPT** the Amended Plan by completing and returning their Ballots so that they will be actually **RECEIVED** on or before the Voting Deadline.

3474450-33

Dated: April 6, 2011

Respectfully submitted,

Pittsburgh Grand LLC

By: _/s/ Kiran C. Patel_
Name: Dr. Kiran C. Patel
Its:     Authorized Signatory

AND

_/s/ Kiran C. Patel_
Dr. Kiran C. Patel

AND

Counsel to Dr. Kiran Patel and
Pittsburgh Grand LLC:

Fox Rothschild LLP
625 Liberty Avenue, 29th Floor
Pittsburgh, PA 15222-3115
Telephone:  (412) 391-1334
Facsimile:  (412) 391-6984

By:     _/s/ John R. Gotaskie, Jr._
John R. Gotaskie, Jr., Esquire
jgotaskie@foxrothschild.com
Pa. ID No. 81143

and

BERGER SINGERMAN, P.A.
200 South Biscayne Blvd., Suite 1000
Miami, FL 33131
Telephone:  (305) 714-4383
Facsimile:  (305) 714-4340
James D. Gassenheimer, Esquire
(admitted _pro hac vice_)

Daniel Lampert, Esquire
(not admitted in PA)
Brian G. Rich, Esquire
(admitted _pro hac vice_)